UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

**************************************************

JOSEPH TRANCHINA,                                    *

                              Plaintiff,        *

                   -v-   17-cv-1256              *

C.O. JUSTIN McGRATH, et al.,                         *

                              Defendants.       *

**************************************************


                TRANSCRIPT OF TRIAL TESTIMONY
          BEFORE THE HONORABLE MAE A. D'AGOSTINO
                     August 19, 2020
            445 Broadway, Albany, New York


FOR THE PLAINTIFF:

SIVIN, MILLER & ROCHE, LLP.
20 Vesey Street, Suite 1400
New York, New York 10007
By:  David Roche, Esq.
     Andrew Weiss, Esq.


FOR DEFENDANT McGRATH:

LIPPES MATHIAS WEXLER FRIEDMAN, LLP.
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
By:  Vincent M. Miranda, Esq.
     James P. Blenk, Esq.


FOR DEFENDANT BARNABY

NEW YORK STATE ATTORNEY GENERAL
The Capitol
Albany, New York 12224
By:  Matthew P. Reed, AAG.
     Ryan Abel, AAG.

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - DIRECT - WEISS

```
 1              MR. WEISS:  Plaintiff calls Mr. Tranchina to
 2     the stand.
 3              THE COURT:  All right.  Just come right up to
 4     the witness starred.
 5              COURT CLERK:  Would you please raise your
 6     right hand and state your full name for the record.
 7              THE WITNESS:  Joseph Tranchina.
 8     J O S E P H   T R A N C H I N A ,  having been duly
 9     sworn, was examined and testified as follows:
10              THE COURT:  Mr. Tranchina, make sure that
11     you're speaking right into that microphone and keeping
12     your voice up.  You may move that microphone closer.
13     Whenever you're ready.
14              MR. WEISS:  Thank you, your Honor.
15     DIRECT EXAMINATION
16     BY MR. WEISS:
17     Q    Good morning, Mr. Tranchina.
18     A    Good morning.
19     Q    Mr. Tranchina, where do you currently reside?
20     A    In Manhattan.  New York City.
21     Q    For how long have you lived there?
22     A    Basically my entire life.
23     Q    With whom do you currently live?
24     A    Girlfriend.
25     Q    And what is your marital status?
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1   A    Three years involved with someone.

2   Q    What -- is that your girlfriend?

3   A    Yes.

4   Q    What does she do for a living?

5        MR. BLENK:  Objection, your Honor.

6        THE COURT:  Sustained.

7   Q    Do you have any children?

8   A    No, sir.

9   Q    How old are you?

10  A    37.

11  Q    Can you tell us how far you got in school?

12  A    High school.

13  Q    And can you tell us your employment history.

14  A    Since I left high school, I've basically been in

15  the same field, construction, working my way up to

16  project manager.

17  Q    Where do you currently work?

18  A    Project manager for an electrical contractor.

19  Q    How long have you been doing that?

20  A    For three and a half years.

21       THE COURT:  If there's ever any time when you

22  cannot hear, just get my attention because it's very

23  important that you hear.  This is a large courtroom and

24  obviously masks are being worn.  So if you can't hear,

25  just wave your arms and get my attention.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1   BY MR. WEISS:

2   Q    At some point in your life, were you ever

3   incarcerated in the New York State prison system?

4   A    Yes.

5   Q    And what was the crime with which you were

6   incarcerated?

7   A    Attempted burglary and criminal contempt.

8   Q    What were you sentenced to?

9   A    Three years, five years' parole.

10  Q    Do you remember when you entered and left the

11  prison system?

12  A    Around April 2014.

13  Q    Was that when you entered or left?

14  A    Entered.

15  Q    And when did you leave?

16  A    Around April of 2017.

17  Q    Prior to that incarceration, had you previously

18  been convicted of criminal mischief?

19  A    Yes.

20  Q    Do you remember when that was?

21  A    2013, 2014.

22  Q    What were you sentenced to?

23  A    It is just released.  Conditional release, pay

24  restitution.

25  Q    Now, on January 28th of 2016, where were you

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1   located?

2   A     Living-wise?

3   Q     Yes.

4   A     F-2 dorm in Bare Hill Correctional Facility.

5   Q     Briefly describe Bare Hill Correctional Facility.

6   A     It's a medium, fenced-in facility with multiple

7   dorms and school buildings.

8   Q     What was your dorm setting like?

9   A     It was a -- two giant rooms, one for sleeping,

10   sleeping area and the other for your common areas.

11   Bathrooms, T.V., phone, et cetera.

12   Q     And what was the designation of your dorm?

13   A     F, as in Frank, 2.

14   Q     How many guards were regularly assigned to your

15   dorm?

16   A     Just one.

17   Q     Did there ever come a time that you met a

18   corrections officer named Maura Mayer?

19   A     Yes.

20   Q     Did she have a regular assignment, to your

21   knowledge?

22   A     To my knowledge, yes.

23   Q     What was that?

24   A     A regular assignment was F-2 as the guard.

25   Q     Can you tell us the date that you last had contact

TRANCHINA - DIRECT - WEISS

1   with Officer Mayer?

2   A    January 24th.

3   Q    Was that 2016?

4   A    Yes.

5   Q    Mr. Tranchina, can you describe how your

6   relationship began with Officer Mayer.

7   A    Just casual conversation in passing.  Questions and

8   stuff.

9   Q    Can you tell us more about it.

10  A    We had casual conversation about daily nonsense or

11  something that was brought up or something maybe --

12  maybe that happened in a dorm.

13  Q    Can you give us an example.

14  A    Just, like I said, daily stuff.  Nothing -- nothing

15  that I can remember specifically.

16  Q    Okay.  Tell us more about your relationship with

17  Officer Mayer after it progressed.

18  A    Same thing.  We were -- just talk.  Once in a while

19  she would have a snack or some sort of food maybe she

20  brought from home.  Just standing there at the desk and

21  talk.  I had given her nonsense that I had pens and

22  such.

23  Q    Why did you give her pens?

24  A    She hadn't had a pen and I had, like, extra colors

25  that I had received in a package that I wasn't going to

TRANCHINA - DIRECT - WEISS

1   use so I would give them to her.

2   Q    Did there ever come a time that your relationship

3   became physical?

4   A    Briefly.

5   Q    Can you please describe to the jury that series of

6   events.

7   A    There was a time in the -- leaving the dorm that it

8   had gotten briefly physical.  She had made a comment

9   about my rear end and slapped me as I walked out.  There

10  was another incident where she attempted or we had both

11  attempted, I guess, to kiss each other.  That was brief

12  in itself.  That was it for contact.

13  Q    What happened between you and Officer Mayer on that

14  last day that you had contact with her January 24th,

15  2016?

16  A    There was conversation about her leaving, there was

17  a conversation about what contact after I was going to

18  leave, after I had been released.  She had asked me for

19  contact info.  We talked a little bit more.  We had

20  conversation in between my dorm's double doors and there

21  was brief contact and then that was it.  I didn't see

22  her after that day.

23  Q    When you say in between your dorm's double doors,

24  was that similar to the vestibule where this incident

25  later occurred?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1  A    It's the exact same.

2  Q    Did they have one of those on each building?

3  A    For the most part for the dorms and school

4  buildings, yeah.

5  Q    Can you describe to us what exactly occurred when

6  you and Officer Mayer were in the vestibule of your

7  dormitory?

8  A    She had -- she had asked me prior to that incident

9  to give her contact information and when I wrote her a

10  note and mentioned that it's probably not a good idea.

11  So we had talked about that in between the double doors.

12  She had put her hand in my private area, and we had a

13  short, brief kiss and then talked for maybe a couple

14  more seconds and that was back in the dorm.

15  Q    Can you describe to the jury the contents of the

16  note that you gave her, to the best of your

17  recollection?

18  A    It was just telling her I enjoyed -- that I enjoyed

19  our conversation, that giving contact probably wasn't a

20  great idea right now, we could use social media to find

21  each other when I would be released, and to my

22  recollection, that was it.

23  Q    Do you remember ever mentioning a nickname?

24  A    Calling her M and M because of her initials.

25  Q    Why did you call her M and M?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1    A    Her initials.

2    Q    Which were what?

3    A    M.M.

4    Q    What if any other interactions did you have with

5    Officer Mayer in the time of this incident?

6    A    That would be it.

7    Q    Now, at the time that you wrote this note, did you

8    have any sense that you were committing some sort of

9    infraction?

10   A    To a degree.

11   Q    And what was that?

12   A    Contact was supposed to be limited, especially with

13   the female guards.  Guess I just got ahead of myself.

14   Q    Now, at the time of exchanging that note, what did

15   you believe Officer Mayer's relationship status would

16   be?

17   A    I wouldn't know something like that.

18   Q    Did you know whether she was in a relationship with

19   another officer at Bare Hill?

20   A    I did not.

21   Q    Had you ever met Officer McGrath at that point?

22   A    I did not.

23   Q    Had you ever seen Sergeant Barnaby before?

24   A    No, sir.

25   Q    Have you ever heard either of their names?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - DIRECT - WEISS

1   A    No.

2   Q    When was the first time that you learned the name

3   Officer McGrath?

4   A    From the -- in my -- excuse me.  In my disciplinary

5   hearing.

6   Q    What was the first time that you recall seeing

7   Officer McGrath?

8   A    I don't believe I actually saw his face physically

9   until an arbitration hearing that had taken place after

10  I had been -- everything had been reversed and I had

11  been sent back to a medium.  About a week after that,

12  they had called me to participate in this -- this

13  hearing.

14  Q    Did you see his face briefly when you were at the

15  annex school that day?

16  A    I did see his face that day at the annex school,

17  unfortunately.

18  Q    Now, before we get to that incident, I just want to

19  ask you a few questions about the classes that you

20  attended at Bare Hill.

21       How often did you attend classes or courses or

22  vocational?

23  A    Monday through Friday.

24  Q    And what was the class that you were attending in

25  the time of this incident?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

━━━━━━━━━TRANCHINA - DIRECT - WEISS━━━━━━━━━

1   A    Just that -- that class in that building on my

2   program.  That was a G.E.D. program.

3   Q    And how often would you -- what were the hours that

4   you went to that program?

5   A    I believe it was Monday through Friday, 8:45 to

6   about 12, which was our lunch break.

7   Q    How long had you been going to that program on

8   January 28th, 2016?

9   A    I had been at least a few months.

10  Q    And now, when you went to that program, what was

11  the normal frisking procedure for when you entered the

12  building?

13  A    There wasn't.

14  Q    Had you ever been frisked before when entering the

15  annex school?

16  A    No, sir.

17  Q    What was the normal procedure for frisking when you

18  left the annex?

19  A    There wasn't.

20  Q    Had you ever seen anybody else be frisked on the

21  way into the annex school?

22  A    Not once.

23  Q    Had you ever seen anybody be frisked on the way out

24  of the annex school?

25  A    No.


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1  Q    Did you ever attend any other class or vocational
2  training where there was a frisk?
3  A    I had a afternoon program in horticulture which
4  there was a metal detector on your way out of class, not
5  going in.
6  Q    Did anybody pat frisk you?
7  A    A few -- I believe a few made the detector -- made
8  it go off a few times and they weren't too sure where it
9  was coming from.  Then the next step I think was either
10 to be wanded with a metal detector wand or you would be
11 physically searched.
12 Q    Just to be clear, was anybody ever physically
13 searched on the way into the horticulture class?
14 A    No.  No, sir.
15 Q    Where, if anywhere, did you see people being
16 frisked on the way into the building?
17 A    In, not so much.  It was mainly you would see it
18 maybe coming out of someplace but never in.
19 Q    What were the kinds of places that you would come
20 out of where there would be a frisk?
21 A    It could be anywhere.  You could be in -- come out
22 of the cafeteria, coming out of the gym.  It could be at
23 any point in time.
24 Q    How many guards were regularly assigned to the
25 annex school?

                Lisa L. Tennyson, CSR, RMR, FCRR
              UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1   A    One.  You mean, like, just posted?  Yeah, just one

2   officer.

3   Q    Where was that guard stationed?

4   A    His desk was on the inside of the building in your

5   common area.

6   Q    Can you describe briefly if you were coming into

7   the building how you would get to that officer's desk.

8   A    We would have to pass his -- depending on which

9   class we were going to.  My classroom I would have to

10  pass it making my way into the double doors and turning

11  into where my -- you know, the area where the -- my

12  classroom was, his desk was right there.

13  Q    How far would you say his desk was from the double

14  door/vestibule area?

15  A    15 feet, give or take a few feet.

16  Q    Was his desk or where he was sitting, would that be

17  facing toward the double door/vestibule area or away

18  from it?

19  A    You're asking me a time.  Sound travels, he was --

20  excuse me.  He was -- he was faced kind of both

21  towards -- towards the direction of the doors and just

22  kind of at a wall.

23  Q    Can you describe the entranceway to the annex

24  school.

25  A    It's concrete path leading from the street, and you

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - DIRECT - WEISS

1    walk up the path through -- around a little railing and

2    into your -- your first door, and there's your -- I want

3    to say five, six feet to the vestibule and there's a

4    second metal door and then you're in the building.

5    Q    Can you describe what those doors looked like?

6    A    Big beige metal doors with a slit -- tiny slit

7    window on the top right-hand side of it.

8    Q    Can you describe that six-foot vestibule area that

9    you mentioned.

10   A    It's a small square, rectangular-ish area, top

11   floor cinderblock walls, radiator on one side of the

12   room or one side of the vestibule, and that's it.

13   Q    Was there anything else in there?

14   A    No.

15            MR. WEISS:  Your Honor, I ask that what's

16   already been admitted into evidence as Plaintiff's 32 be

17   displayed.

18            THE COURT:  Of course.

19   Q    Mr. Tranchina, do you know what's in this photo?

20   A    This is your view from the first door on the

21   outside of the annex building looking into the vestibule

22   and beyond is the beginning of the school building.

23   Q    Can you point out where that radiator would be that

24   you mentioned?

25   A    It would be on your left-hand side of the picture,

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1    the lower left-hand side of the picture, midway, I
2    should say.
3    Q    Okay.  And does this picture fairly and accurately
4    depict the vestibule as you remember it on January 28th,
5    2016?
6    A    Unfortunately, yes.
7    Q    Now, I'd like to ask you, prior to January 28th,
8    2016, did you know what a tier hearing was?
9    A    Yes, I knew of them.
10   Q    Did you have a tier hearing later on in relation to
11   this incident?
12   A    I did.
13   Q    We will get to that later, actually.
14        Mr. Tranchina, I'd like you to focus on the events
15   of January 28th, 2016.  Do you remember that day?
16   A    Yes.
17   Q    Can you tell us what you remember from when you
18   first woke up that day, what happened.
19   A    I had a -- I put in a previous -- the previous day
20   I put in for a sick call.  I was having pain in my
21   shoulder, and I needed a pumice stone.  So that morning
22   I woke up, I was told that I had the appointment for
23   sick call, to be ready to go around, I believe 7, 7:15.
24        I had made my way to the medical building, was seen
25   by a medical staff about pain in my shoulder, and was

1   given to what -- I was given what the equivalent is, I

2   want to say maybe Advil or Tylenol, ibuprofen, something

3   of the sort.  I was given that, I was given a pumice

4   stone and then told to return to my dorm, upon which I

5   let my dorm officer know that I was back from sick call

6   and that I would be attempting to head to school because

7   I was essentially late.

8   Q    Around what time was it?

9   A    8:30, 8:40.

10  Q    What time do you normally go to school?

11  A    I was usually up and at 'em by 8:15 at the latest.

12  Q    Do you remember who your officer -- dorm officer

13  was that day?

14  A    I don't want to say for sure but I would like to

15  say Officer Malley.  He would be my rec officer.

16  Q    Had you spoken to Officer Mayer at all that day?

17  A    No.

18  Q    Was Officer Mayer still stationed at Bare Hill, to

19  your knowledge?

20  A    To my knowledge, no.

21  Q    I want to ask you -- you mentioned having pain in

22  your shoulder.  What shoulder was that?

23  A    My right shoulder.

24  Q    And how did that -- was that pain?  How was that

25  pain affecting you?

─TRANCHINA - DIRECT - WEISS─

1   A    Mobility, uncomfortable.  Just a little bit of

2   hindrance to the area of operation.  I had stopped from

3   going to the gym to play basketball because of it.

4   Q    Can you describe briefly how that affected your

5   mobility.

6   A    With lifting my arm so much is -- couldn't lift it

7   up and fully extend it.

8   Q    Now, when you came back to the dorm from the

9   infirmary, did you change your clothes at all?

10  A    I did not.

11  Q    What were you wearing that day?

12  A    My state-issued greens.

13  Q    Can you describe for the jury what state-issue --

14  what that's composed of?

15  A    It's your uniform.  It's a green pants, green

16  shirt.  State-issued boots, state-issued jacket.

17  Q    Were you wearing boxers that day?

18  A    I was.

19  Q    Do you own long underwear or thermal underwear?

20  A    I did.

21  Q    Were you wearing that on January 28th, 2016?

22  A    I was not.

23  Q    How do you know?

24  A    For -- it was somewhat of a warmer day.

25  Q    Now, did you eventually leave the dorm to go to the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1   annex school after you returned?

2   A    I did.

3   Q    And did you have anything else on your person other

4   than your clothing?

5   A    Cigarettes, watch, my prison I.D.  That's about it.

6   Q    Okay.  So can you tell us what happened when you

7   left the dorm to go to the school and explain some of

8   the path that you walked to get there as well.

9   A    I took the -- there's only -- when you are going to

10  go, there's only certain paths that you take.  So I took

11  the normal path that would lead me to the back school,

12  and I just proceeded to go straight there from my dorm.

13  Q    How long is that walk?

14  A    Maybe five minutes.

15  Q    Were you alone or with anybody else?

16  A    I was alone to a certain point.

17  Q    Okay.  When you were making that walk to the annex

18  school, are you escorted by an officer?

19  A    No.

20  Q    Are you shackled?

21  A    No.

22  Q    Handcuffed?

23  A    No.

24  Q    Are there any sort of security measures at Bare

25  Hill for when inmates are walking between buildings?

TRANCHINA - DIRECT - WEISS

```
 1   A    There's guards on the paths that's, you know,
 2   monitoring, I guess, but -- to my knowledge, no.
 3   Q    Okay.  So you mentioned that you were going up
 4   until a certain point.  What happened at that point?
 5   A    Another gentleman from any class I believe had been
 6   late as well and was making his way to the same
 7   classroom, his dorm, but that was along the way.
 8   Q    Do you remember his name?
 9   A    Mr. Cordero.
10   Q    How far were you from the annex school when you met
11   up with Mr. Cordero?
12   A    Two buildings away, so maybe, you know, entering
13   the building within -- within sight of the doorway.
14   Q    Did you two discuss anything?
15   A    No.
16   Q    Did you pass by any guards on the way?
17   A    On the way, no.
18   Q    Are there any guards normally stationed outside of
19   the annex school?
20   A    Stationed, no.
21   Q    Where would the nearest guard be outside of the
22   annex school, to the best of your recollection?
23   A    Outside of the school?  To the best of my
24   recollection, maybe by a yard, which was on the complete
25   back end of that building.  Opposite side of it.  Maybe
```

1   between the fences that separate two different sides of

2   the prison but nowhere -- nowhere directly outside.

3   Q    Now, when you approached the annex school building,

4   what happened?

5   A    There was an officer standing in the doorway.

6   Q    Did you know who that officer was at the time?

7   A    I did not.

8   Q    Sitting here today, do you know who that officer

9   is?

10  A    I do.

11  Q    Do you see him sitting in the room?

12  A    Yes.

13  Q    Can you please point to him and --

14  A    He is the gentleman on the left.  Officer McGrath.

15  Q    What happened when you and Mr. Cordero approached

16  Officer McGrath that morning?

17  A    Mr. Cordero had moved in ahead of me and just

18  walked into the school building, and I was stopped and

19  told that I had to undergo a pat frisk.

20  Q    Did you know why you were being stopped?

21  A    I did not.

22  Q    Do you know if -- did you know why Mr. Cordero was

23  let into the building?

24  A    I didn't even think about it.

25  Q    Did Officer McGrath explain why Mr. Cordero was

1    allowed to go in while you were stopped?

2    A    He did not.

3    Q    Can you describe what happened next.

4    A    I was told to just, you know, stand to the side for

5    a pat frisk and I put myself into the normal standing

6    position for a search and -- and put my hands on the

7    wall, and Mr. McGrath proceeded to start his pat frisk.

8            MR. WEISS:  Your Honor, under code of

9    regulation, this might not be possible but would

10   Mr. Tranchina be allowed to stand up and show the jury

11   what the pat frisk position looks like?

12           THE COURT:  Yes.  You may stand up and

13   demonstrate that.

14   A    Where am I going here?

15           THE COURT:  No.  No further than right there.

16   A    I guess my hands would be -- this would be the

17   wall.

18   BY MR. WEISS:

19   Q    Okay.  Can you use the wall behind you.  I have

20   no --

21           THE COURT:  I don't think the jurors are going

22   to --

23   A    Imagine my right hand in the same place as my left.

24   Q    What are the -- what are the rules for normally

25   when you're being pat frisked.

TRANCHINA - DIRECT - WEISS

```
 1              THE COURT:  Take your seat, sir.
 2   A    Stay like that and look up, to keep your head up at
 3   all times, could lead to a situation you wouldn't want
 4   if you did anything other than what was told.
 5   Q    Had you ever experienced anything like that?
 6   A    No, I had not.
 7   Q    So how did you know that that could be a problem?
 8   A    I had heard, I had seen.  Everybody knows.
 9   Q    While you were being pat frisked by Officer
10   McGrath, what happened?
11   A    He started the search in my wrists, my hands and my
12   wrists, ripping off my watch.  Making his way down my
13   arms, pulling my jacket off backwards.  Asking me --
14   bringing me -- asking me what was going on in F-2, if I
15   thought I was a hotshot, still yanking at my clothes,
16   pulling off -- making his way down my body as he does
17   so.
18   Q    If you can, describe what happened following that.
19   A    He had told me that -- continuing to ask the same
20   thing.  You know, if I thought I was a hotshot and
21   making his way down to around my ankles, and I proceeded
22   to say I didn't know what he was talking about and then
23   he asked me if that was the case, why was I carrying a
24   weapon, to which I responded again that I didn't have
25   one and I do not -- you know, I don't know what he's
```

─────TRANCHINA - DIRECT - WEISS─────

```
 1   talking about.
 2   Q    I want to focus for a second on Officer McGrath's
 3   words.  Can you recall exactly what he said to you
 4   during this frisk?  You just mentioned some of the
 5   statements but if you can just explain what it was that
 6   you were hearing.
 7   A    He asked me if -- what was going on in my dorm,
 8   which was F-2, what was going on in F-2.  You guys think
 9   you're hotshots.  There may have been some other things
10   in there that I can't give, you know, word for word.
11   There was -- two statements were pretty clear.
12   Q    Did you know why he was saying those things to you?
13              MR. MIRANDA:  Objection, your Honor.
14   Speculation.
15              THE COURT:  Rephrase that question.
16   Sustained.
17   BY MR. WEISS:
18   Q    What was your belief as to why he was saying those
19   things to you?
20   A    At the moment, I didn't really understand.
21   Q    And you mentioned that he said something else when
22   he reached your ankle?
23   A    Yes, if -- if I didn't know anything, why was I
24   carrying a weapon.
25   Q    Were you carrying a weapon on you that day?
```

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - DIRECT - WEISS

| | |
|---|---|
| 1 | A    I was not. |
| 2 | Q    Did you ever carry a weapon on you while you were |
| 3 | at Bare Hill Correctional Facility? |
| 4 | A    Not one day of three years did I carry a weapon on |
| 5 | me. |
| 6 | Q    Have you ever been written up for carrying a weapon |
| 7 | or getting into a fight? |
| 8 | A    No. |
| 9 | Q    What happened next after Officer McGrath was |
| 10 | frisking your ankle? |
| 11 | A    Continued to tell him I didn't know what he was |
| 12 | talking about, at which point the next thing I know, I |
| 13 | am trying to get my hands out to stop myself from |
| 14 | smashing my face on the floor.  He had pulled my ankles |
| 15 | out from behind me and proceeded to get on my back and |
| 16 | start physically assaulting me. |
| 17 | Q    Can you describe the assault? |
| 18 | A    He repeatedly punched me in the side of my head and |
| 19 | my ribs, to the point of almost losing consciousness. |
| 20 | Q    When you were on the ground, did you make any |
| 21 | attempt to protect yourself? |
| 22 | A    I tried to pull my hands up.  I tried to pull the |
| 23 | top of my head and it didn't work out too well. |
| 24 | Q    When you say you tried to pull your hands up, what |
| 25 | do you mean? |

TRANCHINA - DIRECT - WEISS

1    A    Tried to get something over my face.  Try to

2    continuously tuck my head because I was being punched in

3    the side and so I would try to tuck my head into my ear,

4    my ears into my shoulders.  It wasn't working.

5    Q    Approximately how many times were you punched?

6    A    A good amount that I almost thought I was going to

7    pass out.

8    Q    Can you tell us the degree of force generally,

9    whether it was light, medium, heavy, the punches?

10   A    Heavy.

11   Q    How did you feel during this attack?

12   A    Fearful for my life.  I cannot deny the fact

13   that in physical altercations before, that this made me

14   seem like I was close to the end.  I felt myself losing

15   consciousness.  I begged to just try to stay awake until

16   help arrived until it stopped.  I -- I couldn't tell you

17   what the feelings.

18   Q    Were you physically in pain at all?

19   A    I -- I don't know if I could have -- I would have

20   even known.  I was just trying to get through this

21   situation.

22   Q    Do you know approximately how long the assault

23   lasted?

24   A    I want to say anywhere from a minute and a half to

25   three minutes.


Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

─────TRANCHINA - DIRECT - WEISS─────

```
 1    Q    Now, you mentioned before that Officer McGrath said
 2   something about a weapon.  Did you ever see any kind of
 3   weapon?
 4    A    I did not.
 5    Q    At any point that day did you ever see a weapon
 6   that he allegedly recovered off of you?
 7    A    I did not.
 8    Q    At any point later did you ever see that weapon?
 9    A    Later, later that day or --
10    Q    Later in general.
11    A    I have seen a picture of it.
12    Q    When was it that you saw the picture?
13    A    When I received, I believe -- I believe it's when I
14   received all the paperwork pertaining to the tier
15   hearing and -- and getting that paperwork to put my
16   appeal in.  That could have been the first time.
17    Q    Okay.  Did you ever see the physical weapon itself?
18    A    Besides in a picture, no.
19    Q    Now, taking you back to the vestibule, at some
20   point did other guards appear?
21    A    Yes.
22    Q    And at that time where were your hands?
23    A    Behind my back.
24    Q    Were they handcuffed?
25    A    I believe so.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1   Q    Who handcuffed you?

2   A    Mr. McGrath.

3   Q    Can you describe what happened when the other

4   guards appeared?

5   A    The outside door to the vestibule opened, and to

6   which I had seen a white shirt and believed that it was

7   over -- that it was over.

8   Q    Just for clarification for the members of the jury,

9   what does a white shirt mean to you as an inmate in

10  Bare Hill?

11  A    Supervising officer of some sort.  Lieutenant,

12  captain.  Anybody above a regular blue shirt.

13  Q    Can you describe the person that you saw entering

14  who had a white shirt?

15  A    It was Mr. Barnaby.

16  Q    Can you describe him physically?

17  A    Heavyset, white, heavyset male wearing a standard

18  New York State Department of Corrections uniform.  The

19  only thing to differentiate him and McGrath was the

20  white shirt and that's about it.

21  Q    What happened when Sergeant Barnaby entered the

22  vestibule?

23  A    He kicked me directly in the face.

24  Q    Can you describe the time from when you first saw

25  him to when he kicked you?

1    A    Maybe a matter of seconds from me looking up,

2    seeing him coming into the doorway, covering the two and

3    a half feet it took from the door to my face, and then

4    seeing him again when they pulled me up off the floor

5    standing in front of him.

6    Q    What part of your face did he kick you?

7    A    He kicked me on the left cheekbone.

8    Q    Have you been hit in the left side of your face at

9    all when Mr. McGrath was assaulting you?

10   A    Not one time.

11   Q    Why was it that -- how did that happen?

12   A    I can only speculate and assume that it's --

13            MR. BLENK:   Objection, your Honor.

14            THE COURT:   No speculation.   Sustained.   I

15   sustained the question.   Next question.

16   BY MR. WEISS:

17   Q    Mr. Tranchina, did you feel any punches to the left

18   side of your face when Mr. McGrath was assaulting you?

19   A    I did not.

20   Q    Which way was your head facing when you were lying

21   down while Mr. McGrath was assaulting you?

22   A    Pretty much straight, for the most part.

23   Q    Which way was your head facing when Sergeant

24   Barnaby entered the vestibule?

25   A    I looked left to see the door open, so I was facing

TRANCHINA - DIRECT - WEISS

1    left.

2    Q    Can you describe sort of how you were lying on the

3    floor.  Like what position you were in the vestibule?

4    A    Flat.  Flat, chest down.

5    Q    Diagonally?  Straight?  Something else?

6    A    Sort of from -- I have the pictures now, from the

7    radiator to the opposite wall, not door to door.  From

8    wall to wall.  So flat.  Horizontal to -- yeah.  Flat,

9    yeah, left.  Left and right.

10              MR. WEISS:  Could I ask the Court that

11   Plaintiff's 32 be displayed again.

12   A    It's going to be from left -- left to right in the

13   picture.  My head is on the left in front of the

14   radiator.  My body stretched out flat across the floor

15   to the right side of the picture.

16   Q    Okay.  And when Sergeant Barnaby entered, where was

17   Officer McGrath?

18   A    Standing over and behind me.

19   Q    Approximately how long before Sergeant Barnaby

20   entered did Officer McGrath get off your back?

21   A    I'm not sure.

22   Q    When Sergeant Barnaby entered the vestibule, did he

23   enter alone or was anybody else with him?

24   A    I believe he had a -- some other officers that were

25   behind him.

TRANCHINA v McGRATH - 17-cv-1256

─────────TRANCHINA - DIRECT - WEISS─────────

1   Q    And how many officers entered the vestibule in
2   total?
3   A    In the vestibule there could have only been maybe
4   two to three of us, but in total around the area, that
5   would be anywhere from six to eight maybe.
6   Q    Where were these other officers that you mentioned?
7   A    Standing right outside the doorway.
8   Q    And how did you see them?
9   A    Out -- the door was open.
10  Q    Were you lying on the ground at that point?
11  A    Yes.  I had -- all in the motion of -- door
12  opening, being kicked, being pulled up is -- is when
13  everything starts to come into focus, and I saw -- you
14  know, you could see a bunch of officers and tell what
15  was going on.
16  Q    At any point did you hear Officer McGrath say
17  anything to Sergeant Barnaby?
18  A    Not entirely sure.
19  Q    Did you hear Sergeant Barnaby say anything when he
20  entered the vestibule?
21  A    No, sir.
22  Q    After Sergeant Barnaby kicked you, did McGrath ever
23  come into physical contact with you again?
24  A    No.
25  Q    Did he kick you afterward?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1   A    I believe he kicked me in the testicles before --

2   before I had gotten up off the floor.

3   Q    Can you just describe what -- when Sergeant

4   Barnaby's kick was as opposed to when Officer McGrath's

5   kick occurred?

6   A    They both kicked me relatively around the same

7   time.  McGrath kicked me when he first gotten up, and

8   then Barnaby kicked me I know before I was pulled up off

9   the floor.

10  Q    Okay.  Was Sergeant Barnaby in the vestibule when

11  Officer McGrath kicked you?

12  A    I do not believe so.

13  Q    Okay.  What happened after you were stood up in the

14  vestibule?

15  A    I was placed into a transport van to be taken I

16  guess to the SHU.

17  Q    And can you describe exactly how that happens?

18  A    I was just literally thrown into the back of the

19  van.  Told if I moved around or if I did anything when

20  the door opens, that I would be a lot worse than I

21  already was and then was driven to the SHU building.

22  Q    Who was it that put you in the back of the van?

23  A    Somebody that was driving, another regular officer.

24  Q    Just describe from when you were stood up in the

25  vestibule, who took you to the van and how you were

1    taken there.

2    A    I was just taken by -- you know, by my arm and

3    dragged to the van by smaller -- smaller-than-me

4    officer.  When I say "smaller," I mean shorter.  Again,

5    I -- I could only tell you that he was wearing, you

6    know, a blue corrections uniform.  I wasn't really, at

7    this point, fully aware.

8    Q    Was Officer McGrath part of the group of people who

9    you were escorting you to the van?

10   A    No, I don't believe so.

11   Q    Did you see him again that day?

12   A    I did not.

13   Q    What about Sergeant Barnaby?

14   A    I did not.

15   Q    Now, after you were put into the van, where were

16   you taken?

17   A    To the SHU building.

18   Q    Were you aware of what injuries you had at this

19   point?

20   A    I was not.

21   Q    When you say "the SHU building," what do you mean?

22   A    That's the solitary housing unit.

23   Q    Can you describe what happened after you arrived at

24   the solitary housing unit?

25   A    I was put into the search room to where I was told

1   to strip and stand against the wall.  I was grabbed,

2   slapped around a little bit, and grabbed and told to

3   dress, go with the motion, the nurse was going to come,

4   to just sign the paper and not say anything and to -- I

5   proceeded to strip to my boxers.

6   Q    I want to be clear.  Were any officers in the van

7   with you?

8   A    I only could tell you that it was being driven.  I

9   couldn't tell you who else was in there.

10  Q    When you got out of the van, you were being

11  escorted into the solitary housing unit, did you

12  recognize any of the officers that were with you?

13  A    Just the -- the driver who placed me in the vehicle

14  was now pulling me out of it.

15  Q    Can you describe the officers that slapped you

16  around in the solitary housing unit?

17  A    I could not.  Just uniforms.

18  Q    Were any of them wearing white shirts?

19  A    There were white shirts there.  More than one.

20  Q    Did you see -- were you able to identify Sergeant

21  Barnaby there?

22  A    He was not there, not to my knowledge.

23  Q    Can you describe exactly how you were physically

24  assaulted in the solitary housing unit?

25  A    Like I say, when I say "slapped around," I mean

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    slapped and pushed and grabbed by my throat and --

2    Q    Now you mentioned that a nurse arrived.

3    A    A nurse did come, yes, to the infirmary.

4    Q    What, if anything, did you mention that you were

5    told before she got there?

6    A    She told -- I was told to not say anything to her

7    about what had happened, she was going to look over my

8    injuries, have me sign a form, just sign and -- and let

9    her leave.

10   Q    Who told you not to say anything?

11   A    One of the officers that was there.

12   Q    Are you able to identify as you sit here today?

13   A    I am not.

14   Q    Now, when the nurse examined you, can you take us

15   through that process.

16   A    Just a quick -- she touched a few parts of me, you

17   know, checked the bruising, checked some of the cuts.

18   That was it.

19   Q    Were any photographs taken?

20   A    Photographs were taken.

21        MR. WEISS:  I ask that what's been admitted

22   into evidence as Plaintiff's 10 be displayed.

23   Q    Mr. Tranchina, before I ask the Court to scroll

24   down so you can view the photos, do you remember if you

25   were bleeding when you were initially taken out of the

TRANCHINA - DIRECT - WEISS

1   vestibule in the annex school?

2   A    I could have been.  I couldn't tell you for sure.

3           MR. WEISS:  I ask that the document be

4   scrolled down so that we can view the photos.

5           COURT CLERK:  Do you know what page it's on?

6           MR. WEISS:  If you can go up a little bit

7   more.

8           (Discussion held off the record)

9   BY MR. WEISS:

10  Q    If you go to the first colored photo.  I understand

11  these aren't the best photographs that they take but do

12  you recognize these photos?

13  A    Yes.

14  Q    What are they?

15  A    Photos of me in the SHU.

16          MR. WEISS:  Can you please scroll to the next

17  set of photos.  Can you scroll down again?

18  Q    Mr. Tranchina, can you tell us about these photos.

19  A    Looking at the back of my head and -- on the left,

20  and then the front left side of my face on the right.

21  Q    Can you explain your injuries as you see in these

22  photographs.

23  A    The photo on the right shows the three striations

24  on my cheekbone that matched -- that could be -- that

25  could match Mr. Barnaby's boot.

                Lisa L. Tennyson, CSR, RMR, FCRR
             UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1          MR. WEISS:  Can the Court scroll to the next
2   set of photos.
3   Q    Mr. Tranchina, what's in these photographs?  This
4   photograph?
5   A    I can't even tell.  I know it's my hand.  I think
6   that is -- I am bleeding from -- I think on my left --
7   right hand that is.
8          MR. WEISS:  Can the Court please scroll to the
9   next photo.  Can the Court please scroll to the next
10  photo.
11  Q    Mr. Tranchina, can you describe this photo.
12  A    That's the same photo of my left side of my face,
13  my cheekbone.  You can see where he -- Mr. Barnaby
14  kicked me on the cheek.
15  Q    Is there a --
16  A    Go ahead.  I'm sorry.
17  Q    Can you describe if there was any injuries to your
18  nose?
19  A    There's -- there's an injury to my nose; it seems
20  like a scratch.  Could not tell you for sure what it
21  was, though.
22  Q    What about your ear?
23  A    My ear's red, I had blood -- I had blood on the
24  back of my ear.  I think something in my ear.  Not
25  entirely sure.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1    Q    Okay.
2              MR. WEISS:  Can you please scroll to the next
3    photo.
4    Q    Can you describe this photo of the right side of
5    your face?
6    A    Yeah.  This is my right ear, was pretty badly cut,
7    swollen and bruised.  Same with my face and my head.
8              MR. WEISS:  Can you please scroll to the next
9    photo.
10   A    This is a -- shows the bruising and blood on the
11   back of my ears.
12   Q    Okay.
13             MR. WEISS:  That you scroll to the next photo
14   please.  Thank you.
15   Q    Any injuries on your hands to your memory,
16   Mr. Tranchina?
17   A    My right hand I think I had some cuts.
18   Q    Okay.
19             MR. WEISS:  If you please scroll to the next
20   photo.
21   Q    Can you describe any injuries that are depicted in
22   this photo.
23   A    This is the mark on my cheekbone again, my ears.
24   You can't really tell what's going on in my ribs.  I
25   don't know if there's a picture that shows that.

                   Lisa L. Tennyson, CSR, RMR, FCRR
                   UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

38

TRANCHINA - DIRECT - WEISS

1   Q    Okay.

2           MR. WEISS:  Can you please scroll through the

3   next photo.  Keep scrolling.

4   Q    Mr. Tranchina, can you describe this photo at all?

5   Zoom in a little bit please.  That's good.

6   A    I think it shows scratch marks on my back.  That is

7   my back.  That's the back of my right bicep or right

8   tricep and then my right side of my back.

9   Q    Okay.

10          MR. WEISS:  Can you please scroll to the --

11  Q    Mr. Tranchina, were photos taken of you the next

12  day?

13  A    Yes, this was when the department's investigators

14  had taken photos.

15  Q    Now, had you been to -- had you received any

16  medical treatment before these photos were taken?

17  A    Yes.

18  Q    Where did you receive medical treatment?

19  A    Alice Hyde Medical Center.

20  Q    Anywhere else?

21  A    No.

22  Q    Okay.

23          MR. WEISS:  And can you please scroll to the

24  next photo.

25  Q    Is this another photo from the next day?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

 1   A     Yes.

 2   Q     Who exactly was it that was taking these photos?

 3   A     The investigator.

 4   Q     And why were there investigators taking photos of

 5   you?

 6   A     I had gotten in contact with -- I guess commanding

 7   officer of the prison they transported me to and asked

 8   to speak with someone.

 9   Q     And what happened?

10   A     The next morning, they sent these investigators

11   to talk to me about the incident.

12   Q     Okay.

13            MR. WEISS:  Please scroll to the next photo.

14   Can you please scroll to the next photo.  That's it.

15   Thank you.

16   Q     Now, I know you were just mentioning receiving

17   treatment at a hospital.  Can you describe what happened

18   following being examined by the nurse at the solitary

19   housing unit.

20   A     Yeah.  The -- I had been given a new set of state

21   greens, pants and a shirt, was escorted to a cell and

22   given a tray of food, to which case I sat down and

23   started eating it, and it was in a matter of minutes

24   was -- there was a knock on my cell door to get dressed,

25   stand in the corner, and the two officers were going to

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - DIRECT - WEISS

1   escort me to the hospital.

2   Q    Which hospital was that again?

3   A    Alice Hyde Medical Center.

4   Q    What if anything do you remember happening at

5   Alice Hyde?

6   A    Nothing.  They examined me, I believe they gave me

7   a Percocet or a pain killer of some sort and then that

8   was it.

9   Q    Where were you taken after Alice Hyde?

10  A    I was taken to Franklin Correctional Facility.

11  Q    Do you know why you were taken to a different

12  correctional facility?

13  A    I do not.

14  Q    Now, at any point did you -- were you x-rayed?

15  A    At Alice Hyde.

16  Q    At any point did you find out what the results of

17  those x-rays were?

18  A    I had suffered a fractured rib.

19  Q    Do you know which rib it was that was fractured?

20  A    The lower one, the -- one of the lower ones on my

21  right side.

22  Q    Can you take us through how your head was feeling

23  now at Franklin Correctional Facility.

24  A    I was still in a daze.  I still really was trying

25  to absorb everything that had gone on.  My head was

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

```
 1    pounding.  I was -- pain was starting to set in.  Just
 2    tired, overwhelmed.
 3    Q    What about your rib?
 4    A    I could barely breathe at that point.
 5    Q    Could you --
 6    A    Deep inhale, just painful to -- to twist or cough
 7    or to do anything of the sort.
 8    Q    What happened at Franklin Correctional Facility
 9    after you arrived?
10    A    I was brought in, spoke with the captain or whoever
11    the commanding officer is that brought me in, given me a
12    quick once over, made sure I didn't have any new
13    injuries, and then brought to a observation cell, like a
14    medical, which was just like a clear room.
15    Q    Did you give a statement about the incident to
16    anyone while at Franklin Correctional Facility?
17    A    I did.  After being there and after asking them to
18    speak to someone, I wrote up a statement and gave it to
19    someone.
20    Q    Do you remember what you wrote about in this
21    statement?
22    A    I wrote being -- that I had been afraid for my
23    safety, what had happened, why it had happened.  Giving
24    them a brief description of everything and -- and again,
25    asking that I need to speak to somebody because I was
```

TRANCHINA - DIRECT - WEISS

```
 1   afraid.
 2   Q    When you say you wrote why it happened, what did
 3   you write about?
 4   A    I wrote that I had kind of put two and two
 5   together.
 6            MR. BLENK:  Objection, your Honor.  This is
 7   all hearsay.
 8            THE COURT:  Overruled.  Go ahead.
 9   A    I wrote as to I'm -- ask the question again.
10   BY MR. WEISS:
11   Q    I was asking that -- you mentioned that you wrote
12   what had happened and why it happened and I was asking
13   what you meant by that.
14   A    I had given -- I had told them why and why I had
15   said that and why I thought that was the reason was
16   because of -- you know, Mr. McGrath asked me about being
17   a hotshot and what was going on in my dorm, and I could
18   only, at this point, assume that it had to be that
19   and --
20   Q    When you say "it had to be that," what are you
21   talking about?
22   A    It had to be the -- the back and forth with Officer
23   Mayer and then whatever transpired from that because I
24   had -- I had no other issues while I was in prison, so --
25   Q    Why didn't you write the complaint to the
```

TRANCHINA - DIRECT - WEISS

1    supervisor earlier?

2    A    The supervisor at Bare?

3    Q    So you -- you were saying that you wrote a letter.

4    Who was that to?

5    A    It was a supervising officer at Franklin.

6    Q    Okay.  Why didn't you make a complaint about this

7    incident while you were still at Bare Hill?

8    A    I was -- I never went back.  Right?  Between the

9    incidents that -- that happened between McGrath and

10   Franklin, I -- I mean, I didn't have an opportunity to.

11   Q    What did you explain about your relationship with

12   Officer Mayer?

13   A    I -- just like I had stated here, that we had had

14   brief, you know, conversational things, brief contact.

15   That I had assumed or I stated that I assumed that it --

16   it had to be from that and that I was afraid for my

17   life.

18   Q    At the point when you wrote that letter, were you

19   aware that Officer McGrath was accusing you of having a

20   weapon during the incident?

21   A    No.

22   Q    When -- when did you become aware of that?

23   A    I became aware when the investigators came, I

24   believe.

25   Q    Okay.  And what was your reaction when you were --

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1  when you found out about that?

2  A    I was shocked.  I was shocked.  I told them

3  immediately within seconds of hearing it that I would

4  like them to do a -- if it was possible something like

5  this to happen, to do a DNA test on the weapon.

6  Q    Did they ever follow up with you that day?

7  A    Months down the line, yes.

8  Q    Did they collect a DNA sample from you?

9  A    They did.

10 Q    Did you ever find out the results of that DNA test?

11 A    I did.

12 Q    What was that?

13 A    They were negative.

14 Q    When was it that you found out about those results?

15 A    The -- when I returned to Washington.  After

16 getting that letter from Albany while I was in Attica, I

17 returned to Washington, I received a visit shortly after

18 returning to Washington from OSI investigators

19 explaining to me --

20         MR. BLENK:  Hearsay, your Honor.

21         THE COURT:  Yes, you can't state what others

22 said to you.  That's hearsay.  So the answer will stand:

23 When I returned to Washington.  After getting that

24 letter from Albany while I was in Attica, I received a

25 visit shortly returning to Washington.  That answer will

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1   stand but anything that an OSI investigator said is
2   hearsay.  Sustained.  After that, it's sustained.
3   BY MR. WEISS:
4   Q    I want to briefly describe sort of the time
5   between, you know, when you arrived at Franklin and how
6   you ended up at Attica Correctional Facility.
7        At some point did you receive a misbehavior report
8   about this incident?
9   A    I did.
10  Q    What is a misbehavior report?
11  A    It's pretty straightforward.  You get a report when
12  you do something you're not supposed to detailing what
13  you did wrong, what the number of the infraction is,
14  basic -- basic inmate info, my name, DIN number, so on
15  and so forth.
16            MR. WEISS:  Can I ask the Court to display
17  Defendants' F on plaintiff's monitor, I mean on the
18  witness's monitor.
19            COURT CLERK:  Exhibit D-F?
20            MR. WEISS:  Yes.
21  BY MR. WEISS:
22  Q    Mr. Tranchina, have you seen this document before?
23  A    I have.
24  Q    What is it?
25  A    That's my misbehavior report.

TRANCHINA - DIRECT - WEISS

1    Q    Can you describe what's contained in this report?

2    A    It outlines what I had done, the -- what

3    the alleged misbehavior was, what I had done while he

4    was pat frisking me, Officer McGrath, and that's it.

5              MR. WEISS:  And can I ask the Court to scroll

6    down.

7    Q    Who is this report signed by?

8    A    J. McGrath.

9    Q    Did anything result from you being issued this

10   misbehavior report?

11   A    Yes.

12   Q    Can you describe what happened.

13   A    I was forced to do 210 days in solitary

14   confinement.

15   Q    Can you describe how that 210 days was decided

16   upon?

17   A    You went to -- you go to a hearing, a tier hearing

18   they call it, and this misbehavior report is the, I

19   guess, main piece of evidence and they -- they go over

20   what you did wrong, if you have any other prior

21   misbehavior reports, any witnesses that may come

22   forward, anything you'd like to say, and then you go

23   back outside the office for about five minutes I guess

24   while the tier hearing officer decides your fate and

25   then you go back in and get told what you're going to

TRANCHINA - DIRECT - WEISS

1  do.

2  Q    I just want to ask you a few more details.

3       So you went to this tier hearing; is that correct?

4  A    Correct.

5  Q    And did Officer McGrath testify against you at that

6  hearing?

7  A    He did, via telephone.

8  Q    Did he -- he didn't appear in person?

9  A    He did not.

10 Q    Were you represented by a lawyer at that hearing?

11 A    I was not.

12 Q    Who was the judge in that hearing?

13 A    A corrections officer who was assigned to -- I

14 guess to take care of tier hearings, if it's a captain

15 or whatever his rank is.

16 Q    You mentioned that Officer McGrath testified by

17 telephone.

18      Were you given an opportunity to ask Officer

19 McGrath questions, like cross-examine him?

20 A    I believe possibly.  I believe I was.

21 Q    Now, what was the sentence that resulted from the

22 tier hearing?

23 A    210 days in solitary confinement, loss of

24 privileges, which means loss of packages, packages,

25 commissary and so forth, which didn't matter because I

1  was in solitary.

2  Q    Can you describe solitary confinement for the jury.

3  A    Imagine being in a closet for seven months with no

4  contact to the outside world in a room where you have

5  nothing but your mind to keep you from losing it.

6  Shower's in there, your toilet, your bed.  Everything is

7  in one tiny room.  Even our ability to have recreation

8  was, in that instant, the cage where you would go out is

9  attached to your cell so you never really left.

10 Q    Were you ever given updates while you were in

11 solitary confinement on the status of the investigation

12 that was occurring?

13 A    No.  Well, to a degree.  My family, I was at the

14 time was trying to get in touch with them.  I believe --

15 I wrote a letter but I wasn't given any update as to how

16 it was proceeding.  I was basically told it was

17 proceeding.

18 Q    What facility were you at to where you were

19 spending the time in solitary confinement?

20 A    Upstate Correctional.

21 Q    By the time you were released from solitary

22 confinement, were you still suffering from any of the

23 physical injuries that you described?

24 A    No.

25 Q    When you first started your time in solitary

─────TRANCHINA - DIRECT - WEISS─────

1   confinement, were you still suffering from any of the

2   physical injuries you described?

3   A    Yes, I was.

4   Q    And as you first started in solitary confinement,

5   can you describe sort of what the pain was like in your

6   head at that time.

7   A    I was still suffering from headaches constantly,

8   sore spots, sensitive to light.  My ribs were still bad,

9   I could barely breathe, I could barely move.  Getting up

10   out of bed was something that did not happen quickly and

11   I was kept by myself for a few weeks because of my

12   physical condition.

13   Q    As best you could estimate, how long were you

14   experiencing pain in your head following your start in

15   solitary confinement?

16   A    At least definitely the first week.

17   Q    And is there a time afterward where you felt that

18   that pain had completely subsided?

19   A    I would think weeks, you know, weeks to the first

20   month my head subsided somewhat back to normal.

21   Q    And what about the pain in your ribs?

22   A    That took a little longer.  It took a few weeks for

23   me to be able to cough without wincing to fully be gone,

24   it had to be at least a few months.

25   Q    And, sorry, just to clarify.  How long after the

TRANCHINA v McGRATH - 17-cv-1256

────────TRANCHINA - DIRECT - WEISS────────

1    incident did you start solitary confinement?

2    A    Directly.

3    Q    Was it, like, what day?  Do you remember how many

4    days afterward your tier hearing took place?

5    A    Within -- within seven days.  I think it's the --

6    first of all, it's department policy that we get them

7    within seven to ten days, but it was within a week, I

8    want to say.  It was postponed the first time and then

9    we took care -- we took care of within a week.

10   Q    When you were released from solitary confinement,

11   what facility were you in?

12   A    I was released to Attica Correctional Facility.

13   Q    And can you briefly describe Attica Correctional

14   Facility sort of as opposed to Bare Hill Correctional

15   Facility?

16   A    It's like going from a day camp to hell.  You have

17   all these -- prison doesn't allow a lot of privileges

18   but you're given, you know, some slack when it comes to

19   being an adult and being a grown-up when you're in a

20   medium, and that all goes out the window when you go to

21   a max, from inmate life to officers themselves, come --

22   it's just a completely different environment.

23   Q    Can you describe how the inmates are different, in

24   your opinion, at a maximum security prison?

25   A    You could die over something as stupid as a snack

TRANCHINA - DIRECT - WEISS

1    from commissary in Attica.  These men had no -- there

2    was nothing at the end of the tunnel and you don't

3    even -- for me, you don't let that out because I could

4    be going home rather soon and that would be a reason for

5    one man to take my life just because I'm going to see

6    light again.

7        In a medium, you know, guys kind of applaud each

8    other on getting to their time without any problem,

9    going to your family.  In a max, it's all about

10   survival.  It's about making it to the next morning.

11   Q   How long were you in a maximum security facility?

12   A   Thankfully only about four months.

13   Q   And what happened at the end of that four months?

14   A   About a week before Thanksgiving, a week or so I

15   received a letter from Albany telling me that --

16           MR. BLENK:  Objection, hearsay, your Honor.

17           THE COURT:  What year?  What year?

18           THE WITNESS:  I'm sorry, 2016.

19           THE COURT:  Thank you.  Go ahead.

20   A   I received a letter from Albany telling me that --

21           MR. MIRANDA:  Objection, your Honor.  Hearsay.

22   A   I received a --

23           THE COURT:  Sustained.  That is hearsay.

24   Rephrase.  Ask another question.

25           MR. WEISS:  Without telling us any of the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1  contents of the letter that you received, what is your
2  understanding as to why you were transferred out of a
3  maximum security prison.
4        MR. BLENK:  Same objection, your Honor.
5        THE COURT:  Overruled.  If he knows why he was
6  moved, he may answer, but just don't reference the
7  letter.
8  A    Everything that had happened did happen and it was
9  found out that that was true.
10 BY MR. WEISS:
11 Q    Now, did you have any other incidents between the
12 time that you were transferred back to medium facility
13 and the time you were released from prison?
14 A    No, sir.
15 Q    And when you were released from prison, were any of
16 the physical injuries that you sustained in this
17 incident still affecting you?
18 A    No, sir.
19 Q    What about the emotional or psychological injuries?
20 Did you sustain any of those?
21 A    From time to time.
22 Q    What do you mean by that?
23        MR. BLENK:  Objection, your Honor.  This is
24 incompetent evidence.
25        THE COURT:  Overruled.  You can answer.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - DIRECT - WEISS

1    A    From time to time I have thoughts and about what

2    had happened.  Occasional sleeping issues.  It's just

3    things that bring up that day.

4    Q    Well, this might be difficult to talk about but can

5    you describe the -- what you were feeling emotionally

6    when you were in the vestibule that day?

7    A    I thought it was over.  I thought I didn't make it

8    to the three years, the end, my end of the three.  I was

9    just scared, confused.  Not really sure.  A whole bunch

10   of emotions.  I drowned.  I really had -- I had no clue

11   as to what was happening.

12   Q    Can you describe how you were emotionally feeling

13   when you were told to, as you stated, not say anything

14   to the nurse when you were in the solitary housing unit

15   following the vestibule?

16   A    This -- the same, and I thought it was just all

17   going downhill and getting worse, so mentally I was --

18   just kind of shut down.

19   Q    Can you tell us how you felt when you were

20   sentenced to the 210 days in solitary confinement?

21   A    I cried.  I cried until I probably cried myself to

22   sleep.  I was scared to death.  I didn't think I was

23   going to make 210 years -- 210 days trapped in a room.

24   Still confused.  Still not sure as to what was going to

25   happen.  A whole bunch of motions.  You start to learn

─────TRANCHINA - DIRECT - WEISS─────

1   about being charged with a weapon that I didn't have

2   that could have potentially added more time to a place

3   that I didn't want to be.

4        Same with I assaulted him, Mr. McGrath, so that was

5   going to probably add more time.  It was just a whole

6   bunch of emotions.

7   Q    Can you describe your mental state while you were

8   in solitary confinement?

9   A    Hell wreck.  I was pretty -- all over the place.  I

10  tried to -- I tried to keep myself busy by reading as

11  much as humanly possible, which worked out pretty well.

12  I did 20,000 steps every day back and forth in that

13  room.

14  Q    Can you describe any emotional or psychological

15  injuries that you were -- trauma that you still

16  experience today?

17  A    I try to hide it, honestly.  I try to just keep it

18  to myself.  I don't trust many people.  Just trying to

19  not to think about it.

20  Q    Does it affect you and your everyday life ever?

21  A    There have been times where it stops me in my

22  tracks.  There have been times I think about the sound

23  of the shower and -- in solitary or having to hear

24  another man go to the bathroom while -- it's just -- the

25  sounds of a man screaming and bang their heads against

TRANCHINA - DIRECT - WEISS

```
 1    the wall that are losing their minds because they're
 2    trapped in solitary.  Just a whole bunch of things.
 3            MR. WEISS:  At this time I ask permission to
 4    have Defendants' 8 displayed and if I could read a
 5    section from the report that's already admitted into
 6    evidence.
 7            THE COURT:  Okay.
 8    Q    Let me just ask first.  Mr. Tranchina, have you
 9    ever seen this report before?
10    A    I have.
11    Q    What is it?
12    A    It's an injury report detailing the places on my
13    body that were either marked or injured.
14    Q    And do you know -- do you know when this report was
15    generated?
16    A    I want to say the day of the incident.
17    Q    Okay.  Can I ask that you scroll down?  Reading
18    from the report, I believe it says on 8/28/2016 at
19    approximately 9:30, I, RN Mulverhill, viewed Inmate
20    Tranchina in shorts for injuries.  The following is
21    noted.  Injuries, right facial cheek extending up to
22    here, red bruising -- red and bruised, swelling.  Purple
23    discoloration to right ear and swelling.  Red mark to
24    mid-forehand.  Left facial cheek bruising and swelling.
25    Back of left ear red marks and superficial scratch.  Red
```

TRANCHINA - DIRECT - WEISS

1    marks noted to left -- to left neck, chest and left

2    upper arm.  Right knee smaller abrasion, back of right

3    hand quarter-inch, two superficial cuts, right chest

4    wall red mark.  Open skin areas cleansed with Betadine

5    and left open to air.

6          Verbal orders obtained from M.D. as follows:  X-ray

7    facial bones and ribs.  Arrangement made for x-rays be

8    done at Franklin Correctional Facility.  Ibuprofen given

9    for discomfort.

10               MR. WEISS:  One moment, your Honor.

11               THE COURT:  Yes.

12   BY MR. WEISS:

13   Q    Mr. Tranchina, one final question.  Has Mr. McGrath

14   or Sergeant Barnaby ever expressed any remorse or

15   apologized to you?

16   A    They have not.

17               MR. WEISS:  Nothing further, your Honor.

18               THE COURT:  Cross-examination?

19               MR. BLENK:  Yes, your Honor.  Your Honor, may

20   I go to the podium so that I could see the witness?

21               THE COURT:  No.  You have to stay at your

22   seat.  I think we discussed this.

23               MR. BLENK:  Mr. Tranchina has been nice enough

24   to move slightly so I have a better view of him.

25               THE COURT:  You can stand up, if that would

TRANCHINA - CROSS - BLENK

1   help.

2   CROSS EXAMINATION

3   BY MR. BLENK:

4   Q    Mr. Tranchina, I want to go back to the exact

5   timeline around the point after the fact that you had

6   gone out to Alice Hyde and what facility did you go to?

7   A    From Alice Hyde?

8   Q    Yes.

9   A    Franklin.

10  Q    And on that night, you -- that's when you wrote a

11  letter to the superintendent?

12  A    That's correct.

13  Q    I think your testimony was that at that point you

14  didn't know that there was a weapon allegation involved

15  with the interaction with Mr. McGrath; is that correct?

16  A    Yes.

17          MR. BLENK:  I'd like to show just

18  Mr. Tranchina 29-D.

19          THE COURT:  What exhibit was that?

20          MR. BLENK:  Plaintiff's 29-D.  29-D.

21          THE COURT:  Okay.  Go ahead.

22  BY MR. BLENK:

23  Q    To the third page.

24          THE COURT:  Mr. Tranchina, are you able to see

25  that?

                Lisa L. Tennyson, CSR, RMR, FCRR
             UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

**58**

TRANCHINA - CROSS - BLENK

```
 1              THE WITNESS:  It's not coming --
 2              COURT CLERK:  I'm a little hesitate, Judge.
 3              THE COURT:  Does someone have a hard copy of
 4    that exhibit?
 5    BY MR. BLENK:
 6    Q    Do you recognize this as the statement that you
 7    made to the superintendent of the Bare Hill facility?
 8    A    I believe so, yes.
 9    Q    Okay.  And do you see in -- beginning in the
10    sentence -- beginning on the third -- the third line
11    down -- well, and you --
12              MR. BLENK:  Could we go to the fourth page
13    just for a moment, demonstrate to Mr. Tranchina that
14    he did indeed sign that document?
15    Q    That's your name there and your signature?
16    A    Yes.
17    Q    And your DIN number?
18    A    Uh-huh.
19    Q    Go back to the third page.  Do you see the sentence
20    beginning on the third sentence down?  Those are your
21    words that you wrote; is that correct?
22    A    Correct.
23    Q    Can you read them?
24    A    Then said to me that I --
25              COURT CLERK:  That's not in evidence yet.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1          THE COURT:  I think it is.  What exhibit
2     again?
3          COURT CLERK:  29-D, Plaintiff's 29-D.
4          THE COURT:  Is there any objection to 29-D?
5     Plaintiff's 29-D?
6          MR. WEISS:  Just objection to having him read
7     from 2, your Honor.
8          THE COURT:  No.  Is there any objection to the
9     exhibit being received in evidence?
10         MR. WEISS:  No, your Honor.
11         THE COURT:  All right.  29-D is received.
12         (Plaintiff's Exhibit 29-D received)
13         THE COURT:  And you may answer the question.
14    BY MR. BLENK:
15    Q    The third line down, if you could just start --
16    A    Then --
17         MR. WEISS:  Objection.  Objection, your Honor.
18    I ask that he be able to read the surrounding sentences.
19         THE COURT:  This is cross-examination, so he
20    can ask whatever he wants to ask.
21         COURT CLERK:  Should it be showed to the jury
22    now as well?
23         THE COURT:  Yes, you may show it to the jury.
24    Don't stray from your desk, please.  Could you read back
25    the last question to the witness, please.

TRANCHINA - CROSS - BLENK

```
 1              (Question read by court reporter)
 2   A    Where am I starting?  It says to me that I found a
 3   weapon in the sock and it's not going to be good for
 4   you.
 5   Q    Does this refresh your recollection that when you
 6   wrote this letter, you did in fact have knowledge that
 7   there was a weapon allegation against you?
 8   A    That's possible.  I believe so.
 9   Q    That is the case?
10   A    That is the case.
11   Q    And this is a letter that you sent the night that
12   this incident happened, the day of the -- the evening
13   after the incident had occurred.  Correct?
14   A    Yes.
15   Q    Okay.  So when you are sitting there at Franklin,
16   what kind of cell are you in?
17   A    It was not a regular cell.  It was a medical
18   observation, so it had, I want to say, on one side a
19   big, clear window.
20   Q    Okay.  It was far from SHU, right?
21   A    Yes, it was a hospital room.
22   Q    You had already seen SHU?
23   A    Yes.
24   Q    You had already been to SHU and you knew what the
25   SHU cells are like?
```

TRANCHINA - CROSS - BLENK

1    A    Yes.

2    Q    You had known what a SHU cell would be like if you

3    stayed there for a longer duration.  Right?

4    A    I did not, no.

5    Q    Did you know that you were going to be confined for

6    23 hours per day if you were put into SHU?

7    A    That I did know, yes.

8    Q    Yes.  Did you know that you would be denied

9    packages and other privileges?

10   A    Yes.

11   Q    So you're sitting in there, that cell, and you must

12   realize that there is a significant SHU sentence waiting

13   for you if you can't avoid this contraband charge; is

14   that correct?

15   A    I wasn't entirely sure.

16   Q    What do you mean you weren't sure?

17   A    I don't know what the sentence is going to be.

18   It's my first real offense, so --

19   Q    Had you ever been -- were you aware of any other

20   inmates who were caught with contraband at Bare Hill?

21   A    I had heard stories.

22   Q    How did -- did the stories involve time in the SHU?

23   A    Circumstantial, depending on that person's history.

24   Q    Anybody who had been caught with a weapon?

25   A    I can't recall.  Probably.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1   Q    So compared to the SHU, you had said that the F-2
2   dorm, which would be the alternative at that point, that
3   the F-2 dorm was like a day camp; is that correct?
4   A    I said that about a medium facility in general.
5   Q    Medium facility in general?
6   A    Yes.
7   Q    So how many medium facilities have you been to?
8   A    Just the -- just that one.
9          THE COURT:  Folks, I don't know why instant
10  messages are showing up on our court screen but at lunch
11  break, we will endeavor to take care of that.  Every
12  once in a while, I am communicating electronically with
13  Britney and with my law clerk but that should not be
14  popping up and that pop-up sound I'm sure is
15  distracting, and when we take a break, we will have
16  someone come down here and try to put an end to that.
17  Go ahead.
18  BY MR. BLENK:
19  Q    So Bare Hill was your first facility, correct?
20  A    Yes.
21  Q    How many months had you been there?
22  A    At that point, I would say six to seven.
23  Q    Okay.  So your only jail experience had -- I'm
24  sorry.  Your only prison experience at that point is the
25  day camp relative to maximum security facilities or --

TRANCHINA - CROSS - BLENK

1   and even worse being SHU; is that correct?

2   A    Correct.

3   Q    Okay.  And what made -- did you have more

4   interaction at -- in the F-2 dorms with other inmates

5   than you did at Attica?

6   A    Yes.

7   Q    Okay.  And did you make friends in the F-2 dorm?

8   A    No.

9   Q    Were you friendly with any inmates in the F-2 dorm?

10  A    Yes, friendly.

11  Q    What was that?

12  A    Friendly with maybe the guy who is next to you or

13  if you have maybe somebody in your dorm that has a same

14  program as you, but otherwise, you don't make friends in

15  prison.

16          THE COURT:  Why don't you come over this way a

17  little more.  I think now that -- you can see him now

18  that you are standing, right?

19          MR. BLENK:  Yes.

20  BY MR. BLENK:

21  Q    And, Mr. Tranchina, you gave a deposition to -- and

22  given various statements on this, but you gave a

23  deposition to my colleague, Mr. Miranda, and you

24  mentioned a relationship that you had with Mr. Goode?

25  A    Goode.

TRANCHINA - CROSS - BLENK

1    Q    Do you remember that testimony?

2    A    Yes.

3    Q    And was Mr. Goode one of the inmates that you were

4    friendly with?

5    A    Yes.

6    Q    And I think you testified at the deposition that

7    you and Mr. Goode had a similar outlook on prison life;

8    is that correct?

9    A    Correct.

10   Q    What was that outlook?

11   A    It just -- in general, that it wasn't a life that

12   we wanted for either one of us.  Also just the, you

13   know, the dangerousness of it and the everyday living.

14   Q    Tell me about those dangers.

15   A    Of living in prison?

16   Q    Yes.

17   A    Everything.  I mean, you -- you are with some men

18   that had nothing to lose, you are with some men that

19   have very little respect to other people's physical

20   well-being.  Your daily nuances of -- you know, prison

21   life.

22   Q    So you do what you have to do to get out in one

23   piece?

24   A    You survive.  Yes.

25   Q    You also mentioned that if you had been caught with

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1    contraband, that could lengthen your stay in prison; is

2    that correct?

3    A    Correct.

4    Q    And you contemplated that at the time?

5    A    At the time of --

6    Q    That you gave this statement?

7    A    Which statement?  The one that --

8    Q    To the superintendent.

9    A    I had contemplated that many times from the

10   incident until my hearing was set.

11   Q    Beginning with the incident.

12   A    Correct.

13   Q    So we had some -- we had a little bit of testimony

14   about the -- what had happened on January 28th and then

15   compared to what had happened on a normal day.

16        You said that you put in a sick call; is that

17   correct?

18   A    Correct.

19   Q    And what time did you do that?

20   A    I could not tell you for sure.  I know -- you write

21   out a slip and you put in a box.  What time that was the

22   day prior to, I -- I couldn't say for sure.

23   Q    Okay.  It was on your dorm that you put in the

24   slip?

25   A    Yes.


Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - CROSS - BLENK

1   Q    Okay.  And does it go into a locked box?

2   A    Yes.

3   Q    So it's not common knowledge that you would have a

4   sick call out that day?

5   A    Not -- not -- I don't think so.

6   Q    We talked a little bit about the actual dorm and

7   especially for the jurors, could you explain this --

8   so -- there's sleeping areas and there's the common

9   areas.  Correct?

10   A    Correct.

11   Q    And there are -- they are open?

12   A    Correct.

13   Q    And inmates go back and forth at their leisure

14   through the course of the day?

15   A    Correct.

16   Q    So at any given point in time, there are inmates in

17   the dorm areas and inmates in the common areas?

18   A    Correct.

19   Q    Is that the case overnight as well?

20   A    Overnight?  Not supposed to be but, yes, there

21   could be inmates that are using the bathroom so they

22   are, you know, you're not -- very few.

23   Q    So how many inmates would be in that area or would

24   be in either area at any -- how many inmates were on the

25   F-2 dorm?

TRANCHINA - CROSS - BLENK

1  A    I believe it should be 60 in each dorm.

2  Q    So there's a lot of eyes on you at any given time?

3  A    Yeah.

4  Q    There could be?

5  A    Could be.

6  Q    And these inmates have nothing to do than to talk

7  to each other about what's going on in the dorm, right?

8         MR. WEISS:  Objection.

9  A    I don't know.

10        THE COURT:  Overruled.

11 Q    Inmates are looking at what's going on around the

12 dorm and often talking about it.  Isn't that right?

13 A    I stay away from gossip so I couldn't tell you.

14 Q    Never gossip with Mr. Goode?

15 A    It's not gossip.  Talking about daily -- our daily

16 activities.

17 Q    Isn't that what I just asked you about?

18        THE COURT:  Don't comment like that.  The

19 question is stricken.  Ask another question.

20 Q    You said that -- you had testified that you were

21 going to a school program and that you had a

22 horticulture program; is that correct?

23 A    Correct.

24 Q    And if you had been sentenced to SHU or when you

25 were sentenced to SHU, did you have access to the same

1   programming?

2   A     No.

3   Q     Okay.  You were under a situation in the hospital

4   where you understand that there's a weapon charge

5   against you or coming against you and then you

6   start telling your story; is that correct?

7   A     To a degree.

8   Q     Yeah.  What do you mean "to a degree"?

9   A     Well, because also I don't fully -- you know, I

10  can't fully give you every detail of -- of what had

11  happened after the incident leading up to when

12  everything became clear again about a week later.  I had

13  still -- was suffering from headaches, I -- I was

14  confused, scared.  So, I couldn't give you an -- exact

15  details as to what my mind state was.

16  Q     So are you saying that your statements after the

17  fact were inaccurate?

18  A     No, just saying that some may be more accurate than

19  others.  Some may be -- give you more of detail to what

20  I had going on in my head, some may give you less.

21  Q     Some may have more details and those are more

22  trustworthy than the ones that have less detail?

23  A     That's not what I'm saying.

24  Q     What are you saying?

25  A     I'm saying precisely what I said.  That some may

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

```
 1    have more detail.  Unfortunately, it also is during
 2    three and a half years to the day or to the time that it
 3    happened.  So --
 4    Q    Right.  So we should trust the statements that you
 5    gave immediately after this event occurred; is that
 6    correct?
 7    A    What you trust is what you trust.  I can't -- I
 8    can't make you trust something or want you to trust
 9    something, I should say.  It's a matter of did.  All
10    that matters is putting everything together.
11    Q    Are you aware of any inaccuracies in the statement
12    that you made to the -- to the superintendent of the
13    Bare Hill facility?
14    A    Can you repeat that?  I'm sorry.
15    Q    The statement that you made to the Bare Hill
16    superintendent on January 28th, are you aware of any
17    inaccuracies in that?
18    A    I don't believe so, no.
19    Q    Something -- something that you said that after --
20    after recollection or after you had some days to
21    recover, it turned out not to be the case?
22    A    Not that I recall.
23    Q    Have you been diagnosed with a concussion?
24    A    I had been, yes, from -- from what outside medical
25    told me.
```

TRANCHINA - CROSS - BLENK

1   Q    Alice Hyde diagnosed you with a concussion?

2   A    I believe so.  I believe on that report it says

3   concussion and fractured rib.

4   Q    Okay.  Do you remember the testing that they did to

5   diagnose with a concussion?

6   A    I do not.

7   Q    And you -- we agree that there's difference between

8   a loss of memory that might result in fewer details in a

9   story compared to a -- refined details that you put into

10  a story, right?

11  A    I -- not in medical experience, but, yes.

12  Q    A concussion doesn't add details to a story; is

13  that correct?

14  A    Didn't add, you said?

15  Q    Right.

16  A    I would assume that.

17  Q    Okay.

18          MR. BLENK:  Can the Court show Exhibit D-E to

19  the -- one more question.

20  Q    So, who did you tell your story to, beginning with

21  the superintendent?

22  A    Who did I tell -- who -- who did I start telling

23  everything to?  Like, after the incident happened?

24  Q    Each time.

25  A    I believe the first person was the commanding

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1   officer in Franklin.

2   Q    The superintendent or -- is it commanding officer?

3   A    I don't know if -- if the commanding officer is the

4   superintendent.  That could be the same person.  I'm not

5   sure.

6   Q    We're talking about the letter, though --

7   A    That --

8   Q    -- that I just --

9   A    Again, I'm not sure if it went to -- I don't know

10  if the superintendent is the commander.  I don't know,

11  you know, that chain of command.  I don't know who that

12  highest person is that it went to.  I just only assumed

13  it was a commanding officer, that's why I say.

14  Q    Understood.  Did you tell anybody the story before

15  the next day, then?

16  A    Before the OSI investigators showed up the next

17  morning, no.

18  Q    And what time did he show up?

19  A    Anywhere between 9 and 11:00 A.M. possibly.  I'm

20  not entirely sure.

21  Q    What did you talk about?

22  A    The incident.

23  Q    Did he ask you questions?

24  A    He did.

25  Q    Okay.  And he had shown up there, so you write the

TRANCHINA - CROSS - BLENK

1  letter to the superintendent the evening of the 28th.

2  Right?

3  A    Yes, sir.

4  Q    And he shows up there.  Was it in the morning?

5  A    The morning of the 29th.

6  Q    So pretty quick turnaround?

7  A    Yeah.

8  Q    He immediately got up there and got your statement?

9  A    Yes.

10  Q    And did you tell him the truth?

11  A    A hundred percent.

12          MR. BLENK:  Can you put up what's been marked

13  as Exhibit D-P.

14          THE COURT:  What exhibit is that?

15          COURT CLERK:  This is D-P.  It's not presented

16  to the jury, it's just for you to see, Judge.  D-P is in

17  evidence.

18  BY MR. BLENK:

19  Q    Do you recognize this statement?

20  A    I do.

21  Q    Is this the statement that you gave to what you

22  understood to be an OSI investigator?

23  A    Can we scroll down?  My only question is why is

24  someone --

25          THE COURT:  Don't ask any questions.  Is that

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1    the -- the question is:  Is that the statement that you

2    gave to what you understood to be an OSI investigator?

3    A    Yes, that's my handwriting.  I just don't know.

4              THE COURT:  You have answered the question.

5    A    Okay.

6    BY MR. BLENK:

7    Q    This is your handwriting?

8    A    Correct.

9    Q    And at the bottom right corner, are those your

10   initials?

11   A    Correct.

12   Q    And at the bottom, that's your signature?

13   A    Yes.

14   Q    That's dated January 29th?

15   A    That it is.

16   Q    That's the date following the incident and you

17   gave -- and going back up to the -- scrolling up

18   slightly, you gave a statement at about 10:30 A.M.

19   Correct?

20   A    Correct.

21   Q    You signed the evidence, the remaining four pages

22   of the document; is that correct?

23   A    Yeah.

24   Q    And you initial each of those pages?

25             THE COURT:  Give a verbal answer.


                 Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1    A    I'm waiting.  Yes, I did, 04 is initialed by me.

2    Q    And you signed at the end?

3    A    Correct.

4    Q    And you see on the first statement there's a notice

5    that says notice for Penal Law 210.45.  Can you read

6    that?

7    A    I don't see that.

8    Q    Scrolling down slightly.

9    A    Yeah, there they are.  Yes, I see it.

10   Q    Can you read that for us.

11   A    In a written instrument, any person who knowingly

12   makes a false statement which such person does not

13   believe to be true has committed a crime under the laws

14   of the State of New York, punishable as a class A

15   misdemeanor.

16   Q    Thank you.  The same way that you testified, I want

17   to start going back and starting to talk about the

18   interactions with Miss Mayer.  So that's going to begin

19   on the third page of the -- of the document.  In the --

20   in your interactions with Miss Mayer, you came to have

21   an affection for her; is that correct?

22   A    No.

23   Q    You didn't -- you didn't take a liking?

24   A    I think that's assuming something.

25   Q    Were you attracted to her?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1  A    Yes.

2  Q    Did you enjoy conversations with her?

3  A    Yes.

4  Q    Did you tell other inmates about your interactions

5  with Miss Mayer?

6  A    No, not in the beginning.

7  Q    When did you tell them about her?

8  A    I was -- the last night that she was there, I told

9  the -- the man, the gentleman you had mentioned,

10 Mr. Goode.

11 Q    Going to the -- the center of page 3, it says

12 reading your -- this immediately scared me and I told my

13 friend, 28 Inmate Goode, that she was crazy, and then

14 only then did you -- were you notified that Officer

15 Mayer was leaving; is that correct?

16 A    Only then?  It says she notified me on 1/24, yes.

17 Q    So you had told Mr. Goode about your interaction

18 with her before the -- before you found out she was

19 going, right?

20 A    I'm not sure.  I don't believe so.  I believe it's

21 that same day.

22 Q    Okay.  And so getting into the interactions on the

23 24th, you said that you -- she said something to the

24 effect of she wanted you to come into her office?

25 A    Quote-unquote, yes.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1    Q    And what was that?  What was her office?

2    A    It's the vestibule between the double doors.

3    Q    So would you -- and you had gone up there several

4    times with her before; is that correct?

5    A    No, not several times, no.

6    Q    More than once?

7    A    No.  I had gone out one time, walking through the

8    double doors when she had physically -- or became

9    physical and then the time on the 24th.  That was it.

10   Q    You would go out there and you would go outside and

11   smoke with her; is that correct?

12   A    I would, yes.  I would.  I would go out with her

13   and smoke and go out with and no, I wouldn't always be

14   out there smoking.  Maybe coming back from rec or meal

15   or potentially go out once in a while but, no, it wasn't

16   like an everyday thing.

17   Q    The interaction in the -- strike that.

18        When the two of you are out there, the inside doors

19   is visible to all the inmates that are in which area?

20   A    The inside doors go to the common area, maybe --

21   the sleeping area if you look through the window but

22   mainly the common area.

23   Q    So there's inmates around watching you, watching --

24   that can see anybody coming in and out of the building

25   through the vestibule.  Correct?

TRANCHINA - CROSS - BLENK

1   A     If they -- they can see somebody open the doors,
2   yeah.
3   Q     There's windows to that vestibule?
4   A     There's 2-inch-by-12-inch slit.
5   Q     Okay.  So tell me what happened when you were out
6   in the vestibule.
7   A     We had -- she had asked me why I didn't write
8   anything about contact information on the letter,
9   she attempted to grab my crotch area.
10  Q     Tell me about that.
11  A     Attempted to grab my crotch area.  There's nothing
12  more to it, really.
13  Q     Did she touch your penis?
14  A     Kind of.  Not really.
15  Q     Was your penis erect at the time?
16  A     No.
17  Q     How did it make you feel when she touched your
18  penis?
19  A     It was enjoyable.
20  Q     Is there a reason why you didn't proceed?
21  A     We were in between two double doors.  I had no --
22  couldn't tell you if -- for sure why we didn't proceed
23  or not proceed or --
24  Q     You don't remember what you thought at the time?
25  A     No.


Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - CROSS - BLENK

```
 1    Q    And did the two of you kiss?
 2    A    We did.  Not in you're -- the way you're thinking
 3    we sat and made out.  It was just like your peck on your
 4    lips.
 5    Q    Why didn't that proceed?
 6    A    I couldn't tell you for sure.
 7    Q    And have you been consistent about the idea that
 8    you had kissed in the vestibule several times that you
 9    told this story?
10              MR. WEISS:  Objection.
11              THE COURT:  What's your objection?
12              MR. WEISS:  Speculation.  It's improper
13    impeachment as well, your Honor.
14              THE COURT:  Overruled.  You may answer.
15    A    What was the question again?
16    BY MR. BLENK:
17    Q    And have you been consistent about the idea that
18    you had kissed in the vestibule several times that you
19    told this story?
20    A    Yes.
21    Q    So you have always kissed in your accounts?
22    A    Yes.
23    Q    Exhibit D-P, page 3, six lines up.  It says -- can
24    you read that?
25    A    I don't have it in front of me.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1  Q    Six lines up from the bottom of page 3.

2         THE COURT:  Direct him what word you want him

3  to start.

4  Q    Beginning with "she."

5  A    She asked me?  Is that what you are referring to?

6  Q    She attempted.

7  A    She attempted to kiss me but I said why would I do

8  this?  She attempted to kiss me but I said why do this?

9  You are leaving.

10 Q    So, did she kiss you?

11 A    She did.

12 Q    Why did you say that she attempted to kiss you?

13 A    Because I didn't know if she wanted to stay there

14 and make out or -- or what her intentions were but our

15 lips touched.  In my book, that's a kiss.

16 Q    Going to page 4 of the same document.  Now we are

17 looking at nine lines up.  We never.

18 A    We never -- hold on one second.  We never kissed or

19 had any type of sexual relationship.  Keep reading?

20 Q    No, that's okay.  Why did you say that if you had

21 kissed?

22 A    I don't -- I couldn't tell you why I said that.

23 Q    This is -- you made a statement the morning after

24 it happened, right?

25 A    Excuse me?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

────────────TRANCHINA - CROSS - BLENK────────────

1   Q     This statement that -- you gave this statement the
2   morning after the events occurred?
3   A     Correct.
4   Q     And you intended for law enforcement to rely on
5   that statement; is that correct?
6   A     Correct.
7   Q     And -- but it didn't accurately reflect what
8   happened?
9   A     It accurately reflects everything that happened.
10  Q     Can you explain to me how it could accurately
11  reflect what happened when you say now that you kissed
12  and in that statement you said you did not kiss her?
13  A     No, I can't say that.  I can tell you it reflects
14  everything that happened.
15  Q     Which version do you want the jury to believe?
16  A     The version that they -- they feel they need to
17  believe.
18  Q     So neither is objectively right or wrong.
19  A     It -- that's --
20             MR. WEISS:  Objection.
21             THE COURT:  Excuse me.  In that form,
22  sustained.  I think you should move on now.
23  BY MR. BLENK:
24  Q     In that same -- in Exhibit D-P, this also said you
25  never had any sexual relationship with Miss Mayer.  Now,

TRANCHINA - CROSS - BLENK

1    does that mean that she did touch your penis or that she
2    didn't touch your penis?
3              THE COURT:  We covered this.  He testified
4    that she touched his penis.  We covered this.  You asked
5    it and got that answer.
6    Q    But that's not a sexual relationship?
7    A    I don't know if I'm supposed to answer she --
8              THE COURT:  Answer the pending question.  But
9    that's not a sexual relationship?
10   A    That's not a sexual relationship.
11   Q    How far would it have to go for it to be sexual
12   relationship, as you used the term in this document?
13   A    I would like to say further than just touching me,
14   but, yes.  Further probably than just being touched
15   or --
16   Q    So after that point, Miss Mayer left the prison,
17   right?  After the -- after -- the 24th was the last day
18   that you saw Miss Mayer?
19   A    Yes, that's -- not sure the actual, but, yes.
20   Q    But then you moved to -- adding to the story when
21   you have -- the 28th, when you have this interaction
22   with Mr. McGrath, right?  Is that correct?
23   A    Correct.
24   Q    So that day, you weren't -- you weren't -- you
25   weren't following your normal routine; is that correct?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - CROSS - BLENK

```
1   A    I'm sorry.  After -- after the 28th I wasn't?
2   Q    On the 28th, you weren't following your normal
3   routine?
4   A    Yes, I was.
5   Q    You go to a sick call every day?
6   A    Okay.  Specifically, no.
7   Q    Okay.  So your timeline was different that day that
8   it had been for any standard day in prison, is that
9   correct?
10  A    I was off by about ten minutes.
11  Q    So what time do you normally arrive at the school
12  annex?
13  A    Anywhere between 8:15, 8:30, something like that, I
14  want to say.
15  Q    And what time did you in fact arrive that day?
16  A    I would say anywhere between 8:30 and 8:45.
17  Q    So 15 to half -- 15 minutes to a half hour?
18  A    I would say, give or take maybe.  Yeah.  Not much,
19  not off more than my normal schedule.
20  Q    You see Mr. Cordero on the way in.  Is that
21  correct?
22  A    Correct.
23  Q    Mr. Cordero goes through, and then you're pat
24  frisked by Mr. McGrath?
25  A    Correct.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1    Q    Now, you said that you hadn't seen a pat frisk at

2    that -- at the school annex before but you had -- you

3    said that it's normal for a pat frisk to occur almost

4    anywhere, right?

5    A    Correct.

6    Q    Okay.  So, you didn't notice anything out of the

7    ordinary about the fact that there was an officer there

8    waiting for you to come in, it was just that you didn't

9    expect him to be there.

10   A    I didn't expect him to be standing there waiting to

11   search me.

12   Q    Okay.  But you weren't surprised when someone told

13   you that you were going to be pat frisked?

14   A    No, sir.

15   Q    Okay.  Pat frisks -- Mr. McGrath has you on the

16   wall and you say that Mr. McGrath pulls your feet out.

17   Is that correct?

18   A    To a degree, yeah.

19   Q    And then he ends up on top of you and when that's

20   occurring --

21            MR. BLENK:  Can we see Exhibit 32.

22   Plaintiff's 32.

23   Q    So we saw -- this is the room where it occurs and

24   then to help orient us, looking at this picture,

25   Sergeant Barnaby would be coming in from -- Sergeant

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1    Barnaby and whoever else responded to the scene, they

2    all came from the doorway that's closest to the text at

3    the bottom of that photograph?

4    A    Correct.

5    Q    Okay.  You end up on the ground face down?

6    A    Correct.

7    Q    And then Mr. McGrath is straddling you and punching

8    you?

9    A    Correct.

10   Q    And he's straddling and punching you for -- I think

11   you said today one and a half to three minutes, right?

12   A    Something like that, yes.

13   Q    But in the statement that you gave the following

14   day, you said two to three minutes.  Do you

15   remember putting that in your statement?

16   A    What was the time I said today?  One and a half to

17   three?

18   Q    That's what you testified to today.

19   A    So two -- two to three could be potentially be the

20   exact same.

21   Q    Closer in time to the incident, you thought it was

22   two to three minutes.  Right?

23   A    Possibly.

24   Q    Fair to say that it's on the higher end of the

25   one-and-a-half-to-three-minute estimate?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

 1  A    No, I think it's around two.
 2  Q    Okay.  So he's -- and he's punching you I
 3  think repetitively?  Is that the term you used?
 4  A    Repeatedly.
 5  Q    Repeatedly.  So is he punching you -- is he
 6  stopping it, catch his breath or is it pretty
 7  consistent?
 8  A    I don't know if he's breathing.  It seemed pretty
 9  consistent.
10  Q    Boom, boom, boom, or that that would be, you know,
11  once every half second?  Are we talking boom, boom.
12  A    It seemed like it was volley punches.
13  Q    So a volley of quick punches?
14  A    Yeah, and just repeatedly over and over.
15  Q    Did he punch you like a hundred times?
16  A    That's -- it sure felt like it.
17  Q    Okay.  And he must have punched you a hundred times
18  if that's the kind of pace we're going at, and we are
19  continuing for a minute and a half at least and probably
20  at least two minutes.  Right?
21  A    Yeah.
22  Q    So he -- so we agree he punched you probably about
23  a hundred times?
24  A    I don't agree to the number.  It felt like a
25  hundred times.

TRANCHINA - CROSS - BLENK

```
 1    Q    Well, if he's on you for a minute and a half to two
 2    minutes, he must be punching you every --
 3              MR. WEISS:  Objection.
 4              THE COURT:  Sustained.  You can't testify.
 5    You can't testify to that -- how many times he was
 6    punching.  You can ask your witness that if -- sometime
 7    if you want or any witness, but you can ask this witness
 8    but he's already answered that.  He said he can't say it
 9    was a hundred times but he felt like it was a hundred
10    times.
11    BY MR. BLENK:
12    Q    And the punches are going to the side of your face,
13    correct?  And to the side of your face and your ribs,
14    right?
15    A    Correct.
16    Q    And he's -- your face is face down so your nose is
17    to the ground, right?
18    A    To some degree, yeah.
19    Q    Now, did you suffer any injuries to your nose?
20    A    Some scratches on it.
21    Q    You had a scratch on your nose after a correction
22    officer was sitting on your back volleying punches
23    against you for a minute and a half.
24    A    I did fall on my face.
25    Q    So the -- so it could be that you had injured your
```

TRANCHINA - CROSS - BLENK

1    nose from falling on your face but then your face is --
2    he's striking the back and side of your head, right?
3    A    Correct.
4    Q    And but nothing's happening to your face?
5    A    After falling on it, no.
6    Q    No, you don't have a -- you weren't diagnosed with
7    a broken nose?
8    A    No.
9    Q    You didn't even have a bleeding nose?
10   A    No, sir.
11           MR. BLENK:  I'd like to show Mr. Tranchina
12   what's been marked Exhibit D-AA.
13           THE COURT:  Before you do that, I want to give
14   the jurors a stretch break.  Mr. Tranchina, would you
15   put your mask back on, please, and then walk back to
16   your table.
17           THE WITNESS:  Sure.
18           THE COURT:  Folks, just so you know, I'm going
19   to try to complete this witness before the lunch break.
20   So, let's take a ten-minute break.  We need some water.
21   If you brought any snacks, have a snack, and I'll call
22   you back in ten minutes.
23           During this break, do not discuss this case
24   amongst yourselves or with anyone else and remember all
25   of the instructions I gave you.  No research about the

TRANCHINA - CROSS - BLENK

```
 1    case, and I will remind you of these every time we take
 2    a break.  So we stand in recess for ten minutes.
 3              (Jurors excused, 11:31 A.M.)
 4              THE COURT:  How much longer do you think that
 5    you have on this cross?
 6              MR. BLENK:  Probably about 20 minutes to a
 7    half hour.
 8              THE COURT:  Okay.  Don't go beyond a half
 9    hour.  How much time do you believe you have on cross
10    for Mr. Barnaby?
11              MR. REED:  Probably 20 minutes to a half hour.
12              THE COURT:  If you want redirect, it's going
13    to be very, very limited.  A lot of this was already
14    getting repetitious.  We stand in recess for ten
15    minutes.
16              MR. BLENK:  May I raise a point?  There's --
17    we have -- we submitted pretrial briefing on the fact
18    that Mr. Tranchina had previously sued police officers.
19              THE COURT:  It's not coming in; I ruled on
20    that.
21              MR. BLENK:  My concern is that in the opening,
22    they did raise the fact that he's in a relationship with
23    a police officer, which I think is just character
24    evidence that invites that --
25              THE COURT:  And when they tried to elicit
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

```
 1   that, you objected and I sustained it as irrelevant.  So
 2   it's not in.  As I say, jurors can consider opening
 3   statements but they are not evidence.
 4           MR. BLENK:  Thank you very much.
 5           THE COURT:  We're in recess for ten minutes.
 6           (Recess taken)
 7           THE COURT:  Mr. Tranchina, please come up and
 8   take the witness stand.  Be seated.  Mr. Tranchina, if
 9   you have to cough, try coughing in your elbow, okay?
10   Everybody try to always keep your masks up on your nose,
11   your mouth as well.  Sometimes if you just pinch them on
12   your nose, they're likely to stay there a little better.
13   They're annoying, I know.  Let's jet the jury, please.
14           (Jurors enter courtroom)
15           THE COURT:  I hope you got a chance to
16   stretch, maybe some water, maybe a snack.  As I said, we
17   are going to try to finish this witness and then break
18   for lunch but I will give you a full hour for lunch
19   because by then I'm sure you're going to be hungry and
20   wanting to just decompress a little bit.  Go ahead.
21   BY MR. BLENK:
22   Q   Okay, Mr. Tranchina, we were talking about what's
23   been marked for identification as Exhibit D-AA.
24           Do you see the testimony there concerning --
25   beginning at page 4 -- I'm sorry -- line 4 on page 96.
```

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - CROSS - BLENK

```
 1              THE COURT:  Are you -- Britney, is that --
 2              COURT CLERK:  That's just to the witness.
 3              THE COURT:  Are you trying to impeach the
 4   witness?
 5              MR. BLENK:  That's correct.
 6              THE COURT:  Lay some foundation.
 7   BY MR. BLENK:
 8   Q    So you testified earlier that you were not punched
 9   a hundred times?
10   A    Earlier today?
11   Q    Yes.
12   A    I didn't.  I said it felt like a hundred.
13   Q    Okay.  But you're not sure.  You're not sure how
14   many times you were punched?
15   A    The exact number, no.
16   Q    Were you punched more than 20 times?
17   A    Yes.
18   Q    Were you punched more than 40 times?
19   A    Yes.
20   Q    Were you punched more than 60 times?
21   A    I didn't go -- after 40 or 50, I can't tell you for
22   sure.
23   Q    So you were punched at least 40 or 50 times by
24   Mr. McGrath?
25   A    At least, yes.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1           MR. BLENK:  And could we look back at
2    pictures -- going to Exhibit P-10.  Scrolling down to a
3    picture straight on of Mr. Tranchina's face.  Further
4    down please, with the color.
5    Q    So that's the side of your face that Mr. McGrath
6    was punching.  Right?
7    A    Correct.
8    Q    So he's -- you're face down, he's punching you on
9    the right side of your face.  So that's where he's
10   connecting with, right?
11   A    Correct.
12   Q    And then the other side of your face is on the
13   ground and it would be hitting the ground every time you
14   were being punched.  Correct?
15   A    I can't say for sure.
16   Q    Well, was your face striking the ground when you
17   were being punched from the side of your head?
18   A    I can't say for sure.
19   Q    40 or 50 times for your face and those are the
20   injuries that you suffered?
21           MR. WEISS:  Objection.
22           THE COURT:  Overruled.  The answer will stand.
23   BY MR. BLENK:
24   Q    The answer is yes.
25   A    I didn't answer.  Did you ask me if these were the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1   injuries I sustained?

2   Q    On your face.

3   A    Correct, and the back of my head.

4   Q    That's where you were -- it was depicted on your

5   face, right?

6   A    Correct.

7   Q    And then you said that Mr. Barnaby came and kicked

8   you on the other side of your face?

9   A    Correct.

10  Q    But all of the facial -- that was just -- that was

11  the punches, there was nothing else coming behind that.

12  Right?

13           MR. WEISS:  Objection.

14  Q    Is that correct?

15  A    Correct.

16           MR. BLENK:  And we see -- I think we can

17  scroll down a little bit and we will see a scratch on

18  Mr. Tranchina's nose.

19           COURT CLERK:  Tell me when to stop.

20  BY MR. BLENK:

21  Q    There we go.  And that's the scratch on your nose

22  and I think when we look at the use of force that we

23  looked at earlier, which has been marked as Plaintiff's

24  Exhibit DD, you said that you weren't sure that you were

25  bleeding I think at one point but then you had confirmed

TRANCHINA v McGRATH - 17-cv-1256

———————TRANCHINA - CROSS - BLENK———————

1    that you had been scratched on your ear?

2    A    Correct.

3    Q    And there was blood coming down from your ear and I

4    think you saw a nurse's report that said there was a

5    superficial -- superficial cuts.  Do you remember

6    superficial cuts?

7    A    Correct.

8    Q    Okay.  And you received treatment and you went all

9    the way to the hospital, right?  And you said -- your

10   testimony was that you were diagnosed with a broken rib

11   and with a concussion?

12   A    I believe so, yes.

13   Q    And that would be reflected in the medical records

14   from Alice Hyde?

15   A    Yes.

16        MR. BLENK:  If we can go to P-30, please.

17   Page 24, please.

18   Q    Do you recognize this as the discharge instructions

19   you received when you left the Alice Hyde?

20   A    I didn't receive discharge instructions.

21        MR. BLENK:  Can we scroll down?

22   Q    Mr. Tranchina, I looked through.  Your signature

23   appears on that page?

24   A    Okay.

25   Q    Can we scroll up?  Is that your signature?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

 1   A    That is.

 2   Q    So you did receive discharge instructions?

 3   A    I signed papers.  I didn't receive papers to leave

 4   with.

 5   Q    Okay.  You signed this noting -- and what does it

 6   list under the discharge instructions?

 7   A    I can't see.  Reads bruised ribs, facial and scalp,

 8   contusions, head injuries.  Adult.

 9   Q    Okay.  Nothing about broken ribs in this discharge

10   instruction?

11   A    Not that I'm reading.

12   Q    Nothing about a concussion?

13   A    No, sir.

14   Q    Thank you.  Your testimony, Mr. Tranchina, is that

15   other officers came into that vestibule area and -- but

16   Mr. McGrath didn't say anything to them.  Is that

17   correct?

18   A    Not to my knowledge, no.

19   Q    Okay.  He didn't say what the basis for the

20   interaction was?

21   A    Not that -- not that I recall today.

22   Q    He didn't explain why they were on the ground?  I'm

23   sorry.  He didn't explain why you were on the ground?

24   A    Like I said, not that I recall.

25   Q    You had handcuffs on at that point?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1   A    I believe so, yes.

2   Q    And he didn't explain to anybody why you have had

3   handcuffs on?

4   A    He possibly told them I had a weapon but I can't

5   say for sure.

6   Q    Well, I thought you said that you didn't know about

7   the weapons unless --

8   A    I said it's possible.  I can't say for sure what he

9   told them why I was.

10  Q    But he was in your presence the entire time that he

11  could have communicated to them.  Correct?

12  A    Correct.

13  Q    And you don't remember him saying anything about a

14  weapon?

15           THE COURT:  He said he doesn't remember three

16  times now.

17  Q    And your testimony is that without any background

18  for Mr. McGrath, these guys kicked you and punched you.

19  That's correct?

20  A    Correct.

21           MR. WEISS:  Objection.  That wasn't his

22  testimony.

23           THE COURT:  Overruled.  The answer will stand.

24  BY MR. BLENK:

25  Q    They kicked you twice in your groin?

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - CROSS - BLENK

1    A    They?  Clarify.

2    Q    Well, who -- did an officer kick you in the groin?

3    A    An officer did kick me in the groin, yes.

4    Q    Which officer was that?

5    A    Mr. McGrath and Mr. Barnaby.

6    Q    One from each?

7    A    Correct.

8    Q    Okay.  Do you remember an officer with

9    salt-and-pepper hair?

10   A    Define the question.

11   Q    Do you recall an officer with salt-and-pepper hair?

12   A    I believe so, yes.

13   Q    What did he do?

14   A    I believe one -- one salt-and-pepper hair officer

15   was my driver, and I think one of them was also somebody

16   who grabbed me kind of by the throat in SHU.

17   Q    This is an officer you encountered in the SHU.  Do

18   you recall in your supporting deposition you said that

19   the officer with salt-and-pepper hair kicked you in the

20   back of the knee, causing you to fall?

21   A    Yes.

22              MR. WEISS:  Objection.

23              THE COURT:  What's your objection?

24              MR. WEISS:  Improper, leading.

25              THE COURT:  I don't know what he's referring

TRANCHINA - CROSS - BLENK

1   to but to save time, at this point, Lisa, would you read

2   back the question.

3              (Question read by court reporter)

4              THE COURT:  Next question.

5   BY MR. BLENK:

6   Q    And then he -- did he -- did the same officer apply

7   a martial arts technique to you?

8   A    There is an officer who grabbed me by the throat.

9   If it's a martial arts move, I couldn't tell you for

10  sure, but it felt like in the way he applied his hand.

11  Q    Did you get the officer's name?

12  A    I did not.

13  Q    Is there a reason why you could not get his name?

14  A    Specifically, no.

15  Q    He had a badge on.  He had a name on his shirt

16  right as an officer?

17  A    Could.  Don't recall.

18  Q    Did you ever see an officer at Bare Hill

19  Correctional Facility without a name tag on?

20  A    I don't recall.

21  Q    Did anybody except for -- did anybody in the

22  vestibule, aside from Mr. McGrath and Mr. Barnaby, punch

23  you or kick you?

24  A    Did anybody beside them in the vestibule?  No.

25  Q    Yes.  And how many officers punched and kicked you

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - CROSS - BLENK

```
 1   in the SHU?
 2   A    I want to say maybe just a couple.  One, two
 3   possibly, just to give me -- no more than that.
 4   Q    And you don't know any of their names?
 5   A    I do not.
 6   Q    You testified earlier that you had -- well, you
 7   testified that you had lingering symptoms even after the
 8   immediate event; is that correct?
 9   A    Correct.
10   Q    I'm going to show you what's been marked as Exhibit
11   P-31, and I think that there was some testimony about
12   how much you were in physical pain at that point, right?
13   A    Yes.
14   Q    Serious pain because of the -- the punches and
15   kicks?
16   A    Correct.
17   Q    And then under 29, you returned to or you left
18   Alice Hyde on the 28th, correct?  You didn't stay the
19   night at Alice Hyde on the evening of the incident?
20   A    Yes.
21   Q    Correct?  And you went -- you returned to the
22   facility to -- was it Franklin?
23   A    Correct.
24   Q    That's where you spent the night?
25   A    Correct.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1    Q    And do you recall being in pain at that point?

2    A    Yes.

3    Q    A lot of pain?

4    A    Yes.

5              MR. BLENK:  Can you scroll down to

6    Defendants' -- Barnaby Defendants' 00063 Bates stamp.

7    Q    Do you see the date on that record?

8    A    1/28.

9    Q    That's the date of the incident?

10   A    Correct.

11   Q    And you recognize that military time to be 4:50 in

12   the afternoon?

13   A    Correct.

14   Q    Do you see the third line from the -- from the

15   bottom of that first entry?  Do you see what it says in

16   the -- in the middle there, pain six out of ten?

17   A    Correct.

18   Q    Does that reflect the pain that you were feeling at

19   that time?

20   A    Possibly.

21   Q    Six out of ten on the pain scale?

22   A    Possibly.

23   Q    Thank you.  So after this process, we spoke

24   briefly -- after the incident we spoke briefly about the

25   tier hearing that you were afforded on the misbehavior

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1    report, right?

2    A    Correct.

3    Q    And you had an opportunity to cross-examine

4    Mr. McGrath at that -- at that proceeding?

5    A    Correct.

6    Q    And you didn't?

7    A    I don't believe so, no.  I don't recall.

8    Q    And you had the opportunity to call witnesses?

9    A    I did.

10   Q    Did you call any witnesses?

11   A    I attempted to.

12   Q    Who did you attempt to call?

13   A    Mr. Cordero.

14   Q    Okay.  And did Mr. Cordero show up?

15   A    He did not.

16   Q    And in the tier hearing you -- did you make any

17   reference to your interaction with Miss Mayer?

18   A    Not entirely sure, no.

19   Q    You're not sure if you brought that up in your

20   defense?

21   A    No.

22   Q    But you had been telling that story from the 28th

23   immediately -- you had been telling the story that --

24   the Miss Mayer situation was explaining everything that

25   was happening to you?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - CROSS - BLENK

```
 1   A    To a degree, yes.
 2   Q    Were there any witnesses to your interaction with
 3   Miss Mayer?
 4   A    No.
 5   Q    There weren't?  So that's -- is that why you didn't
 6   call anybody in your defense at the tier hearing?
 7   A    No.
 8   Q    Well, if you had a witness to your interaction with
 9   Miss Mayer, you would have called her.  Right?
10   A    Not necessarily.
11           MR. WEISS:  Objection.
12           THE COURT:  Overruled.  You may answer.
13   A    Not necessarily.
14   Q    But there weren't any witnesses anyway so it didn't
15   make any difference?
16   A    Yeah, no.  Not really.
17   Q    Going to Exhibit D-P.  Page 3.  Can you read to us
18   starting with everyone?
19   A    Everyone on the dorm was looking when I came back
20   in the dorm.
21   Q    Keep going.
22   A    Everyone wanted to know what happened.  The guy in
23   20 cube next to the handicapped cube said he saw us
24   touching.  I told him my -- I told -- I told my friend
25   Goode what happened, and we had a few more conversations
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - CROSS - BLENK

1   throughout the night.

2   Q    That's good.  So, in fact, there was a witness to

3   your physical interaction with Mrs. Mare -- with

4   Miss Mayer?

5   A    Okay.

6   Q    Okay.  And you never -- well, you told that to the

7   state police, didn't you?

8   A    The statement?

9   Q    Yes.

10  A    Yeah.

11  Q    And you told them that there were witnesses?

12  A    I -- what I wrote in the statement, correct.

13  Q    Was it true that there were witnesses?

14  A    There was this man that had seen something but that

15  doesn't mean I have to call them in a disciplinary

16  hearing.

17  Q    And did you ever -- well, did you ever have a

18  conversation with this inmate again?

19  A    I did not.  I didn't have one to begin with with

20  him.

21  Q    Well, how did you find out that he saw you

22  touching?

23  A    He informed me that he saw us.

24  Q    That's not a conversation?

25  A    No.  No, a conversation is two people talking about

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - BLENK

1    something back and forth.  He informed me he saw

2    something and I didn't respond to it.

3    Q    Okay.  So it wasn't a conversation, he was

4    just giving you that information?

5    A    Correct.

6    Q    And even though he would provide all of the -- the

7    story you needed and he would be the person who saw all

8    this back with Miss Mayer, you had no interest in

9    bringing him to your tier hearing?

10   A    No.

11   Q    And Mr. Goode -- you trusted Mr. Goode, right?

12   A    To a degree.

13   Q    Mr. Goode -- you didn't ask Mr. Goode to come to

14   the tier hearing either?

15   A    No.

16   Q    And then we have the salt-and-pepper officer.  He's

17   not in this room today, right?

18   A    No, sir.

19   Q    You haven't taken his statement from him, right?

20   A    No, sir.

21   Q    Miss Mayer, she's not in this room, right?

22   A    No, sir.

23   Q    Okay.  So all of the witnesses that could have

24   corroborated your testimony, none of them are here?

25   A    Except for the one that it happened with.


                 Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - REED

```
 1            MR. BLENK:  No further questions.
 2            THE COURT:  Cross-examination on behalf of the
 3    other defendants.
 4            MR. REED:  Sorry, your Honor.
 5            THE COURT:  Go ahead.
 6            MR. REED:  Thank you.
 7            THE COURT:  You can stand, if you wish.
 8            MR. REED:  I actually can see him better
 9    sitting, your Honor, with the mic and with visibility.
10    CROSS EXAMINATION
11    BY MR. REED:
12    Q    So, Mr. Tranchina, I'm going to rewind way back to
13    the beginning of your direct testimony.  You told us all
14    that you were in F-2 dorm, right?
15    A    Correct.
16    Q    And that's where you had these alleged interactions
17    with Miss Mayer?
18    A    Correct.
19    Q    Sergeant Barnaby was not assigned to that dorm, was
20    he?
21    A    He was not.
22    Q    You testified that you had never seen Sergeant
23    Barnaby before January 28th; is that correct?
24    A    Correct.
25    Q    You never talked to Miss Meyer about Sergeant
```

TRANCHINA - CROSS - REED

1    Barnaby, did you?

2    A    No, sir.

3    Q    Did she ever bring his name up?

4    A    No, sir.

5    Q    Did you ever see the two of them interacting?

6    A    I did not.

7    Q    She left the facility on the 24th and you went to

8    class on the 28th; is that correct?

9    A    Correct.

10   Q    And you were running a little behind because of

11   your early morning sick call?

12   A    Correct.

13   Q    So it's fair to say I think from your testimony

14   that you arrived at that vestibule, as we're calling it,

15   at around 8:45?

16   A    Around.

17   Q    Okay.  You described that as a small, six-foot

18   area?

19   A    Yeah.  I would say six foot by -- yeah, small area.

20   Q    Rectangular?

21   A    Yes.

22   Q    And you described the walls were cinderblock?

23   A    Correct.

24   Q    The floor was tile?

25   A    Correct.

TRANCHINA - CROSS - REED

1    Q    And there's that radiator on that one side?

2    A    Yes.

3    Q    So no -- no -- no soft surfaces?

4    A    No.

5    Q    And you saw this Mr. Cordero on his way as well?

6    A    Yes.

7    Q    He was also running late, I take it?

8    A    I believe so.

9    Q    Did you talk about that?

10   A    No.

11   Q    He would have passed directly by Defendant McGrath

12   just before you, is that fair?

13   A    Yes.

14   Q    Along the path where you were walking with

15   Mr. Cordero, you testified that there were no officers?

16   A    Not to my knowledge, no.

17   Q    Are there not rec officer shacks that line that

18   walkway between the buildings on the annex?

19   A    There are, not in the position of where we were.

20   Q    Now, we're in the vestibule now.  No one else was

21   present when you interacted with Mr. McGrath?

22   A    No, sir.

23   Q    Sergeant Barnaby was not there?

24   A    No, sir.

25   Q    You were not initially surprised to be frisked, you

TRANCHINA - CROSS - REED

```
 1    told Mr. Blenk, I believe?
 2    A    Correct.
 3    Q    When that frisk began, it was routine?
 4    A    Yes.
 5    Q    And you testified that at some point after
 6    Mr. McGrath spoke to you, allegedly, he pulled your
 7    ankles out from under you?  Is that correct?
 8    A    Yes.
 9    Q    So you fell on your face.
10    A    I did.
11    Q    Onto the tile floor?
12    A    Yes, clipped that radiator coming down.
13    Q    You hit the radiator and the tile floor, both hard
14    suffers I take it?
15    A    Yes.
16    Q    Radiator is metal?
17    A    Yes.
18    Q    Is it like a modern aluminum radiator or are we
19    talking like old steel, bent pipes?
20    A    Best of my knowledge, I would say aluminum.
21    Q    You described being on the ground on your stomach
22    with your face down while he was on top of you; is that
23    accurate?
24    A    Yes.
25    Q    Now, at one point you -- while you testified he was
```

TRANCHINA - CROSS - REED

1    punching you in the side of your head and ribs but you

2    tried to tuck your head.  Where would your head have

3    gone if you are tucking it?  What do you mean by that?

4    A    Shielding it, trying to get it within my shoulders.

5    Q    Okay.  So sliding it back and forth across the

6    floor?

7    A    No, just -- just leaning it to the side.

8    Q    You were face down on the floor, though, right?

9    A    Yes.

10   Q    So how would you tuck your face into your shoulder

11   without sliding it across the floor?

12   A    Not meaning -- just leaning it left to right.

13   Q    Okay.  Now, you didn't -- you testified initially,

14   I think, that this went on for one and a half to three

15   minutes but then I think we narrowed it down to around

16   two maybe.  Is that -- is that accurate or --

17   A    I do not --

18   Q    -- or do you disagree?

19   A    That's -- I'm still going go with anywhere from one

20   and a half to three.  I believe you came up to two to

21   three but I'm still --

22   Q    Okay.  So one and a half to three minutes this went

23   on.  You claim that you felt yourself losing

24   consciousness and thought this might be the end, I think

25   is the word you used.  Is that accurate?

TRANCHINA - CROSS - REED

1   A    Yes.  Very accurate.

2   Q    But you claim with particular detail but you

3   were -- you're sure you were never hit on the left side

4   of your face during Mr. McGrath's alleged assault?

5   A    Correct.

6   Q    You're sure of this despite the fact that you were

7   potentially losing consciousness?

8   A    Correct.

9   Q    I think your testimony actually in quotes as you

10   had no clue real as to what was happening.  Is that

11   true?

12   A    I mean, I had a clue that I was being severely

13   beaten, yes.

14   Q    But I will repeat the question.  On direct did you

15   not say I had no clue really as to what was happening?

16   A    I don't recall saying that.

17   Q    Now, after -- well, let's clarify.  Had Mr.

18   McGrath's punching ended when Sergeant Barnaby entered

19   the room?

20   A    Yes.

21   Q    Were you still on the ground?

22   A    Yes.

23   Q    Still on your face?

24   A    Correct.

25   Q    And you say you looked left to see the door open?

TRANCHINA - CROSS - REED

```
 1   A     Yes.
 2   Q     Now, you said Mr. Barnaby entered and kicked you in
 3   the face with his boot I think.  Did you say boot?
 4   A     He kicked me.  He was using his foot.
 5   Q     Okay.  You also said that he was accompanied by six
 6   to eight officers, didn't you?
 7   A     That's possible, yeah.
 8   Q     Did they see this happen?
 9   A     I couldn't tell you what they saw.
10   Q     Did they punch, hit, kick you?
11   A     They did not.
12   Q     Did they try to stop Barnaby from doing so?
13   A     They did not.
14   Q     And you didn't hear Mr. Barnaby say anything to
15   Mr. McGrath?
16   A     Not that I recall, no.
17   Q     Do you recall him saying anything to you?
18   A     No.
19   Q     Now, the order events here I want to make sure I
20   have clear.
21         You claim that Officer McGrath kicked you in the
22   groin area before you were lifted off the floor,
23   correct?
24   A     Correct.
25   Q     And I believe you said on direct that Mr. Barnaby
```

TRANCHINA - CROSS - REED

1    was not there for that?

2    A    He kicked me.  I believe he was -- I believe he had

3    already entered when he kicked me.

4    Q    So did Mr. McGrath kick you before or after Mr.

5    Barnaby allegedly kicked you in the face?

6    A    He kicked me -- this was after Mr. Barnaby kicked

7    me in the face.

8    Q    Okay.  On direct you told us it was either the same

9    time or McGrath kicked first.  So I'm kind of confused.

10   A    The same time as Barnaby kicked me in the face?

11   Q    Yes.  Your testimony was that you -- it either

12   happened as you recall at the same time, they both

13   kicked you at once or it happened -- McGrath kicking you

14   first and then Barnaby kicking you?

15             MR. WEISS:  Objection.

16             THE COURT:  Sustained as to form.  Rephrase.

17             MR. REED:  Yes, your Honor.

18   BY MR. REED:

19   Q    So did McGrath kick you before Barnaby or after

20   Barnaby?

21   A    Before.

22   Q    Okay.

23   A    I'm sorry.  Are you asking me if he kicked me

24   before Barnaby kicked me in the face?  Kicked me in the

25   balls?  Or --

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - CROSS - REED

1  Q    I was unaware of Mr. Barnaby kicked you in the

2  balls.  You're now testifying that Barnaby kicked you in

3  the balls.  Are you now testifying that Mr. Barnaby also

4  kicked you in the groin?

5  A    I'm saying that he kicked me as well, he attempted

6  to kick me between my legs as well.  I did say that

7  before.

8  Q    When did you say that before?

9  A    At some point being questioned, I believe.

10  Q    Have you ever said that before in previous

11  statements to OSI?

12  A    Yes, to OSI I believe I did.  I did tell OSI this.

13         THE COURT:  Mr. Tranchina, make sure you let

14  the attorney get the whole question out before you start

15  to answer.

16         THE WITNESS:  Yes, ma'am.  Go ahead.

17  BY MR. REED:

18  Q    Do you recall being deposed in this case?  Going to

19  a formal deposition?

20  A    I do.

21  Q    And that was with my colleague Mr. Hickey?

22  A    I believe so.

23  Q    And Mr. Miranda was also present?

24  A    Correct.

25  Q    And that's similar to here, there was a court

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - CROSS - REED

```
 1   reporter?
 2   A    I believe so, yes.
 3   Q    And you took an oath, the same oath you took when
 4   you took the stand today?
 5   A    Yes, sir.
 6   Q    In that deposition, you didn't tell anyone that
 7   Mr. Barnaby kicked you in the groin, did you?
 8            MR. WEISS:  Objection.
 9            THE COURT:  Overruled.  You may answer.
10   A    I'm not sure.
11   BY MR. REED:
12   Q    So you did at the deposition claim that Mr. Barnaby
13   kicked you in the groin?
14   A    I just -- I -- I'm not sure.
15   Q    Not sure or not true?
16   A    Not sure.  I'm sorry.
17   Q    Okay.  That deposition you were being -- you were
18   giving sworn testimony about all of your claims in this
19   action, correct?
20   A    Correct.
21   Q    You agree it would have been important to make sure
22   that all of those claims were discussed?
23   A    I do agree and --
24   Q    And that you would have --
25            MR. WEISS:  Objection.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - REED

1              THE COURT:  Overruled.

2      A    I do agree.

3      BY MR. REED:

4      Q    And you would have answered all questions fully and

5      truthfully?

6      A    Yes.

7      Q    But in that deposition, you're not sure whether or

8      not you said that Barnaby kicked you in the groin or

9      not?

10     A    Correct.

11     Q    The exhibit electronically -- it's a little bit

12     more cumbersome.

13             MR. REED:  I'll move on.

14     Q    Now, you claim that Sergeant Barnaby kicked you in

15     the face within two seconds of entering, he had to clear

16     two and a half feet of space, I believe you testified?

17     A    Correct.

18     Q    You -- it's been clear that you sought medical

19     attention immediately after this.  Correct?

20     A    Yes.

21     Q    And you had an x-ray?

22     A    Yes.

23     Q    Both of your ribs, also your face.  Correct?

24     A    Correct.

25     Q    And there were no orbital fractures noted?

               Lisa L. Tennyson, CSR, RMR, FCRR
               UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - REED

1   A     No, sir.

2   Q     No broken nose?

3   A     No, sir.

4   Q     No bleeding nose, even?

5   A     No.

6   Q     Your cheekbone was not broken?

7   A     No, it was not.

8   Q     Your teeth weren't broken, missing, or loose?

9   A     No.

10   Q     Your mouth wasn't bloody at all, was it?

11   A     I don't believe so.

12             MR. REED:  If the Court could please pull up

13   P-10.  Page 12 I believe would be the quickest.  Page 14

14   I need to get a little bit better.

15   Q     This imagine, on direct you testified that was

16   taken right after the incident?

17   A     Yes, sir.

18   Q     And you described those marks on your cheek as

19   striations?

20   A     Yes, sir.

21   Q     And the striations on your nose as -- I think you

22   called it a scratch?

23   A     Yes.

24   Q     And that's the injury you're claiming was caused by

25   Mr. -- or Sergeant McGrath's black boot kicking you in

---TRANCHINA - CROSS - REED---

1   the face?

2   A    Sergeant Barnaby's.

3   Q    I apologize if I misspoke.  Yes, Sergeant Barnaby.

4   That's the injury you're claiming Sergeant Barnaby

5   caused?

6   A    Correct.

7   Q    Could you go to page 20, please, of the same

8   exhibit.

9        This image is admittedly sideways but I think on

10  direct that we established this was taken the next day

11  when you were -- when they are initiating an

12  investigation into your claim?

13  A    Yes.

14  Q    That left cheek, that's the same scratch that's

15  shown in the last picture?

16  A    Correct.

17  Q    This is a day later?

18  A    Correct.

19  Q    There's no swelling or black-and-blue marks or

20  contusions other than those scratches that you can see,

21  are there?

22  A    That I can see?  That I know there's swelling to

23  that.  You can't see it in the picture.

24  Q    So that picture does not portray --

25  A    It does not.

TRANCHINA - CROSS - REED

1    Q    -- any swelling?  And your eye was blackened?

2    A    No, it's just swollen cheekbone.

3    Q    You can remove the exhibit.  Thank you.  In the

4    vestibule that day, you were brought to your feet

5    eventually?

6    A    Yes.

7    Q    In restraints?

8    A    Yes.

9    Q    And you were taken to the special housing unit or

10   SHU.  Is that what you testified to?

11   A    Correct.

12   Q    You testified on direct that you didn't see Barnaby

13   the rest of the day; is that right?

14   A    After the -- no, after the incident, I did not.

15   Q    Okay.  When do you define incident ending?

16   A    Me being -- me being put in the van to go to SHU.

17   Q    Okay.

18           MR. REED:  If you could please just display

19   Exhibit D-F to the jury and the witness.

20           THE COURT:  Sir, no, have a seat.  Do we have

21   any water?  Do we have a bottle of water?

22           (Discussion held off the record)

23   BY MR. REED:

24   Q    Can you see the exhibit, Mr. Tranchina?

25   A    Correct.


                Lisa L. Tennyson, CSR, RMR, FCRR
              UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - CROSS - REED

1    Q    Now, you, on direct, credited this exhibit with

2    causing your subsequent solitary confinement at Upstate,

3    your transfer to Attica, all of that was initiating --

4    caused by this misbehavior report.  Correct?

5    A    Correct.

6    Q    And that was signed at the top there.  I think you

7    can see -- is that Sergeant McGrath's signature or --

8    I'm sorry --

9              MR. REED:  If you can scroll down to show the

10   first signature block, please.  All the way to the

11   bottom.  Thank you.

12   Q    And you testified earlier that that's Sergeant

13   McGrath's signature, correct?

14   A    Correct.

15   Q    He wrote that misbehavior report?

16   A    I believe so.

17             MR. REED:  And could you scroll to the bottom

18   of the page, please.  Thank you.

19   Q    That's signed by a sergeant, is it not?

20   A    I don't know.

21   Q    Well, doesn't the second-to-the-last line say area

22   supervisor endorsement?

23   A    It does but I don't know who -- I don't know who

24   signed it.

25   Q    Okay.  It's fair to say, though, that that looks to

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - CROSS - REED

1    be the name of Sergeant Conto, certainly not Sergeant

2    Barnaby's signature, is it?

3    A    I cannot -- I don't know what Sergeant Barnaby's

4    signature looks like.

5    Q    What do you believe that to say?

6    A    A name.

7    Q    You see a letter "B" in that name anywhere?

8    A    I can see two, maybe three B's potentially,

9    depending on how somebody signs their name.

10   Q    Thank you.  You said on direct, I think, that you

11   were slapped around when you got to SHU.  Is that

12   accurate?

13   A    That is accurate.

14   Q    And you -- in response to some of the questions on

15   cross-examination you were asked how many officers

16   punched and kicked you in the SHU and you said a few but

17   you did not know their names.  Right?

18   A    Yes, sir.

19   Q    And back to that deposition you took with

20   Mr. Hickey and Mr. Miranda, do you recall that again?

21   A    Yes, sir.

22   Q    And, again, that was given under oath?

23   A    Yes, it was.

24   Q    Do you recall being asked on June 28th, 2016, is

25   the only time that a correction officer punches or kicks

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - CROSS - REED

1    you?  Is that when you're in that foyer area of the
2    school?  You answered yes, sir.
3                MR. ROCHE:  Can we have the page number?
4                THE COURT:  Page and line number 3.
5                MR. REED:  Of course.  I apologize.
6                THE COURT:  Start again and don't answer the
7    question until the entire question is out.
8                THE WITNESS:  Sure.
9                MR. REED:  I'm looking at Defendants'
10   Exhibit 18 for identification, page 109, beginning on
11   line 23.  This is being shown to the witness, this is
12   not in evidence yet.
13               THE COURT:  It's okay if you say -- were you
14   asked this question and were you given this answer?
15               MR. REED:  Thank you.
16   BY MR. REED:
17   Q    So the question -- do you recall being asked -- so
18   on January 28th, 2016, is the only time that a
19   correction officer punches or kicks you?  Is -- is that
20   when you're in that foyer area of the school?
21        "ANSWER:  Yes, sir."
22        Do you recall that?
23   A    At the deposition, it's possible.
24   Q    Okay.  And so the deposition you testified that no
25   one punches or kicks you in the SHU, correct?

                   Lisa L. Tennyson, CSR, RMR, FCRR
                   UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - REDIRECT - WEISS

```
 1   A    Did I -- yes, I guess that's what I wrote.
 2   Q    And that was taken -- I'm sorry for interrupting.
 3   That was taken over a year ago?
 4   A    Correct.
 5   Q    And more than one year closer to the event in
 6   question than today?
 7   A    I don't know the exact time but, yeah, probably --
 8   somewhere in between.
 9   Q    Okay.  Is it your testimony that Sergeant Barnaby
10   was not present in the SHU?
11   A    He was not.
12            MR. REED:  No further questions, your Honor.
13            THE COURT:  Any redirect?
14            MR. WEISS:  Yes.  Briefly, your Honor.
15            THE COURT:  Yes, please keep it brief.
16   REDIRECT EXAMINATION
17   BY MR. WEISS:
18   Q    Mr. Tranchina, what was the difference between
19   being slapped around in the SHU and what happened in the
20   vestibule that day?
21   A    Well, love taps.  More just to put me in my place.
22   They're saying like in the -- in the weight of the
23   strike, just light slaps, just grabbing me.
24   Q    Are you referring to the -- what happened in the
25   SHU right now?
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - REDIRECT - WEISS

```
 1    A    Yes.
 2    Q    Okay.  What happened -- and how did that compare to
 3    what happened in the vestibule?
 4    A    In the vestibule it was assault.  It was physically
 5    assaulted with little restraint.
 6    Q    On cross-examination you were asked questions about
 7    when Officer McGrath pulled your legs out from under
 8    you, causing you to fall.  You mentioned that you
 9    clipped the radiator on the way down.  Is that true?
10    A    Correct.
11    Q    And what part of you clipped the radiator going
12    down?
13    A    Below my chin.  Right -- I want to say an inch past
14    the chin.
15    Q    Were those injuries visible?  Were any injuries to
16    your chin visible in the photos that we viewed before?
17    A    They were not.
18    Q    Why not?
19    A    There's no photo of my chin.
20              THE COURT:  Keep your voice up, sir.
21              THE WITNESS:  Yes, ma'am.
22    BY MR. WEISS:
23    Q    Now, there's also a number of questions during
24    cross-examination about who kicked you when inside the
25    vestibule between Officer McGrath and Sergeant Barnaby.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - REDIRECT - WEISS

1    Is that correct?

2    A    Correct.

3    Q    Is there anything -- do you remember these series

4    of events in terms of who kicked you that day?

5    A    Not completely, no.

6    Q    Is there anything that would refresh your

7    recollection?

8    A    No.

9    Q    To the best of your memory, who -- after Sergeant

10   Barnaby entered and kicked you in the face, who kicked

11   you next?

12   A    McGrath.

13   Q    When was that?

14   A    At -- in relation to being kicked in the face?

15   Q    Yes.

16   A    Time-wise?  I would say it's all within seconds.

17   Q    Where did Officer McGrath kick you?

18   A    In the groin area.

19   Q    And did either Officer McGrath or Sergeant Barnaby

20   kick you again after that point?

21   A    It's -- again, a series of events.  It's hard to

22   fully --

23   Q    I understand.  You were also asked a number of

24   questions that when you became aware that you were

25   alleged to have a weapon in the vestibule.  Now, what

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

─TRANCHINA - REDIRECT - WEISS─

1   did you mention that Officer McGrath said when he was

2   frisking your ankle?

3   A    If nothing was going on, then why was I carrying a

4   weapon.

5   Q    When did it become clear to you that he was going

6   to bring disciplinary charges or attempt to bring

7   disciplinary charges against you for having a weapon?

8   A    Not until the next day.

9   Q    On cross-examination you were asked about whether

10  there were other people in this room who had information

11  about your lawsuit that we're here for today, is that

12  correct?

13  A    Correct.

14  Q    Are there any other witnesses in this room right

15  now beside Officer McGrath and Sergeant Barnaby?

16  A    No.

17  Q    Sitting here today, are you aware that Miss Mayer

18  or Officer Mayer is currently subpoenaed to appear here

19  at this trial?

20  A    Potentially, yes.

21  Q    And that there are other witnesses in another room,

22  correct?

23  A    Of course, yes.

24  Q    Last, you were -- you were asked a number of

25  questions by defense counsel for Officer McGrath about

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - REDIRECT - WEISS

```
 1    whether or not you had a broken rib.  Correct?
 2    A    Correct.
 3    Q    And they showed one page of your medical documents
 4    that didn't list it; is that right?  You read --
 5    A    I did just -- one page said -- he was right.  One
 6    page said bruised but the other shows the fracture.
 7    Q    It is true that you read from the one page that
 8    didn't say -- that didn't reflect your injury?
 9    A    Yes, sir.
10    Q    Then you were asked a number of questions by
11    counsel for Defendant Barnaby about how you didn't have
12    blood in your mouth, correct?
13    A    Correct.
14    Q    And all the other injuries that you didn't have.
15    A    Correct.
16    Q    But they didn't list the broken rib, right?
17    A    Correct.
18    Q    Is that because of the fact -- in fact, you did
19    sustain a broken rib?
20    A    I did.
21         MR. WEISS:  Your Honor, I ask that Plaintiff's
22    31 be displayed.
23    Q    Mr. Tranchina, are you aware of the exact doctor
24    that diagnosed your broken rib?
25    A    I am not.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - REDIRECT - WEISS

```
 1   Q    Okay.
 2            MR. WEISS:  I ask the Court to just scroll
 3   down slowly on this page.
 4   Q    Mr. Tranchina, what are the big bold words on this
 5   page from your medical records?
 6   A    Fractured right distal 10th rib.
 7   Q    Okay.
 8            MR. WEISS:  Can you please scroll to the next
 9   page.  Sorry.  The next one.
10   Q    Do you know what this appears to be?
11   A    The same words just in script.
12   Q    Okay.  You were also asked a number of questions
13   about the number of punches that you sustained during --
14   in the vestibule during this incident.  Isn't that true?
15   A    Yes.
16   Q    Do you know the exact number of times you were
17   punched?
18   A    I do not.
19   Q    Where were those punches landing on your body?
20   A    My right side of my head and my ribs, my right side
21   of my ribs.
22   Q    Fair to say you were punched a number of times in
23   the head?
24   A    In the head, side, back, yes.
25   Q    Number of times in the side?
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - RECROSS - BLENK

1    A    Yes.

2    Q    And number of times in the back?

3    A    Yes.

4    Q    Were you -- why weren't you able to concentrate and

5    count specific number of punches that hit you on your

6    body?

7    A    Because I was being punched so repeatedly.

8              MR. WEISS:  Nothing further, your Honor.

9              THE COURT:  All right.  Anything else,

10   Mr. Reed?  Or, actually, I should say Mr. Blenk first.

11   Anything else?

12             MR. BLENK:  If I can just the clean up with

13   one question.

14   RECROSS EXAMINATION

15   BY MR. BLENK:

16   Q    Mr. Tranchina, and I know we went -- we have gone

17   through this a few times but you testified that I

18   believe you guys came up with the two to three minutes

19   when you were testifying to Mr. Reed but you know

20   that -- that the attorneys did not come up with two to

21   three minutes that you were being beaten by Mr. McGrath;

22   is that correct?

23   A    No, it's not the correct.

24   Q    You are saying that the attorneys came up with

25   that?

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - RECROSS - BLENK

```
 1    A    You yourself actually came up with the number in
 2    front of me.
 3              MR. BLENK:  I'd like to show Mr. Tranchina his
 4    deposition transcript, which has been marked as D-AA.
 5    Q    Do you remember being asked at your deposition how
 6    long do you think this went on for the -- him being on
 7    your back and punching your head and your ribs, do you
 8    remember that question?
 9              MR. ROCHE:  What's the page and line number,
10    please?
11              MR. BLENK:  94, 11 through 14.
12              THE COURT:  This question was:  Do you
13    remember being asked at your deposition how long do you
14    think this went on for, you being on your back and
15    punching of your head and your ribs.  Do you remember
16    that question at your deposition?
17    A    Yes.  I do.
18    BY MR. BLENK:
19    Q    Do you remember what you answered?
20    A    I thought I recall remembering one and a half to
21    three minutes.
22    Q    Okay.  But could I refresh your recollection with
23    the -- with the deposition transcript in front of you.
24    A    Yes.
25    Q    Does that -- does that remind you that you answered
```

TRANCHINA - RECROSS - REED

1    that you were -- that Mr. McGrath was on your back for

2    roughly two and a half minutes?

3    A    That is correct, yes.

4    Q    And then to Exhibit D-P again, page 2, four lines

5    down.  Do you see where you wrote in this document that

6    you said that -- you authored that the beating lasted

7    two to three minutes?

8    A    I do see that.

9    Q    Okay.  So, you agree with me that wasn't the

10   attorneys that came up with the idea that you were beat

11   up for two to three minutes; is that correct?

12   A    Correct.

13        MR. BLENK:  Thank you.  No further questions.

14        THE COURT:  Anything else, Mr. Reed?

15        MR. REED:  One.

16   RECROSS EXAMINATION

17   BY MR. REED:

18   Q    I want to make sure, Mr. Tranchina, that

19   I attributed the correct case with the correct person.

20   I'm still not clear, based on the redirect, how many

21   times you were alleging today that Sergeant Barnaby

22   kicked you.

23   A    I believe he kicked me twice.  I received a kick in

24   the face and a kick in the groin.

25   Q    Okay.  And I -- you recall being deposed again?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - RECROSS - REED

```
 1    A    I do recall.
 2              MR. REED:  If you could show the witness
 3    please, it doesn't -- whether -- I have it as D-18 for
 4    identification, page 182, line three.
 5    Q    Mr. Tranchina, you were asked -- okay, thank you.
 6    Other than the kick that you alleged the white officer,
 7    slash, the officer in the white shirt made to the left
 8    side of your face, did that officer use any other
 9    physical force on you on January 28th, 2016, and you
10    answered he did not.  Is that correct?
11    A    I don't have anything in front of me so I don't
12    know what you're reading off of.
13              COURT CLERK:  Did you say P-18?
14              MR. REED:  D-18.  I might have said P.
15              THE COURT:  Just a moment and we will get that
16    in front of you.
17              THE WITNESS:  Sure.
18              COURT CLERK:  What page?
19              MR. REED:  182, line 3.
20    BY MR. REED:
21    Q    Do you see that question there, Mr. Tranchina?
22    A    Yes, I can see it.
23    Q    So is it fair to say that you testified that
24    Sergeant Barnaby only kicked you one time in the face
25    and he did not physically contact you at any other time
```

TRANCHINA - RECROSS - REED

1    that day?

2    A    It is fair to say that's what I testified.

3    Q    Okay.

4            MR. REED:  Thank you, your Honor.  Nothing

5    further.

6            THE COURT:  All right.  Nothing else?

7    Correct?

8            MR. WEISS:  Nothing further, your Honor.

9            THE COURT:  All right.  You may step down,

10   sir.  Take your water and your cup.  Put your mask on.

11           Members of the jury, I promised you lunch;

12   you're probably ready to eat your hands by now but now

13   we will have our lunch break until 1:45.

14           During this break, do not discuss the case

15   amongst yourselves or with anyone else and continue to

16   follow all of the instructions I've given you.  Thank

17   you.

18           (Jurors excused)

19           THE COURT:  Who do we have lined up for this

20   afternoon, Mr. Roche and Mr. Weiss?

21           MR. ROCHE:  Our plan was to call Mr. McGrath

22   next and after that, Sergeant Barnaby.

23           THE COURT:  You know you have a nurse here?

24           MR. ROCHE:  We just found out like an hour ago

25   that there's a nurse here today.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

TRANCHINA - RECROSS - REED

```
 1          MR. WEISS:  I apologize.  Are you referring --
 2    which nurse are you referring to?
 3          THE COURT:  All I know is that there's been
 4    some -- a witness for you gentlemen here since this
 5    morning.
 6          MR. ROCHE:  Your Honor, my understanding is
 7    that's not our witness.  That she was subpoenaed by one
 8    of the defendants.
 9          THE COURT:  Are you trying to get her on
10    today?
11          MR. ABEL:  Yes, we discussed.  I believe
12    she is here today.  I know that she -- it works better
13    with her schedule as far as being here taking care of
14    her grandson.  She is here, it would take no more than a
15    few minutes with --
16          THE COURT:  A few minutes?
17          MR. ABEL:  Yes.
18          THE COURT:  All right.  I think a good thing
19    would be to try to get this nurse on and off, out of
20    order.  Talk about it during the lunch break, see if you
21    can work it out.  Okay?
22          MR. ROCHE:  I just ask for a brief offer of
23    proof as to what this nurse is going to being questioned
24    about.  We just -- make it easier for us to prepare for
25    her since we weren't really expecting her to be called.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA - RECROSS - REED

1              THE COURT:  Is this a nurse who took -- saw

2      the plaintiff at the -- the jail or Alice Hyde?

3              MR. ABEL:  At the facility.

4              THE COURT:  At the facility.  So --

5              MR. ROCHE:  Well, her medical record is in

6      evidence, so is there -- are they intending to ask her

7      anything outside the --

8              THE COURT:  Well, she's not an expert so the

9      only thing she can really testify to is to the notes

10     but they have a right to call her.  They're saying it's

11     going to be brief.  You have the record, it shouldn't be

12     any surprise.  So please talk and see if we can let this

13     nurse get out of this courthouse, okay?

14             MR. ROCHE:  Okay.

15             MR. MIRANDA:  Your Honor, I am sorry.  Just

16     quickly, it's seems like Officer McGrath will be

17     testifying later today, and we had talked about a

18     limiting instructions that was going to given for his

19     testimony.  So I would defer the Court but I don't know

20     perhaps before he testifies that if that might be the

21     right time to give that instruction to -- during opening

22     statement there was some comment that he was actually

23     terminated as a result of the OSI investigation.  So I

24     just wanted to make sure the jury is clear.

25             THE COURT:  Once they ask that question and

1    get an answer, I will give a limiting instruction.

2              MR. MIRANDA:  Thank you.

3              THE COURT:  Okay.  Thank you.  We are in

4    recess until 1:45.

5              (Following recess, 12:45 P.M.)

6              THE COURT:  Who is the next witness going to

7    be?

8              MR. ABEL:  It would be Nurse Katherine

9    Caban-Mulverhill.

10             THE COURT:  Obviously I thank all counsel for

11   their courtesy because I know that this witness has been

12   here for a while.  The record should also reflect that I

13   have told all counsel that if their witnesses need to,

14   they may remove their masks when they testify.  It's not

15   the best practice, but I'm allowing it, and I'll note

16   for the record that Mr. Tranchina chose to remove his

17   mask after just a few questions and that's fine but the

18   record should reflect that he was not in a face mask for

19   his testimony but for approximately four questions and

20   that's an individual decision that every witness can

21   make.

22             So, the witness may come up to the witness

23   stand and then I'll get the jury.  I will tell the jury

24   that we are taking a witness out of order.

25             MR. ROCHE:  You will tell them it's a defense

CABAN-MULVERHILL - DIRECT - ABEL

1    witness.

2              THE COURT:  Absolutely.  Yes.

3              (Jurors enter courtroom, 1:48 P.M.)

4              THE COURT:  I hope you all had a good lunch

5    and had a chance to exercise a little bit.  Our next

6    witness is being called out of order and I want to

7    explain that to you.

8              Our next witness is a defense witness, and

9    we're doing that.  Counsel both have conferred and then

10   graciously agreed to do this so this witness can leave

11   the courthouse after her testimony.

12             The plaintiff has not rested yet.  The

13   plaintiff's case is still going on but by agreement

14   through the cooperation of the attorneys, they're taking

15   one defense witness now.  Does everybody understand?

16   Once this witness is concluded, the case will be back

17   with the plaintiff.  So this is just taking a witness

18   out of order.  You may swear the witness in.

19             COURT CLERK:  Would you please stand and raise

20   your right hand.  Would you please state your full name

21   for the record, please.

22             THE WITNESS:  Katherine Ann Caban-Mulverhill.

23   K A T H E R I N E  C A B A N - M U L V E R H I L L ,

24   having been duly sworn, was examined and testified as

25   follows:

TRANCHINA v McGRATH - 17-cv-1256

136

CABAN-MULVERHILL - DIRECT - ABEL

1          THE COURT:  Who's questioning.  Go right

2     ahead.

3     DIRECT EXAMINATION

4     BY MR. ABEL:

5     Q    Good afternoon, Ms. Caban-Mulverhill.

6     A    Good afternoon.

7     Q    Would you please state your full name.

8     A    Katherine Ann Caban-Mulverhill.

9     Q    And, Ms. Mulverhill, are you currently employed?

10    A    I retired from the Department of Corrections but

11    I retain per diem status.

12    Q    When did you retire from full-time status?

13    A    12/31 of '19.

14    Q    2019?

15    A    Yes.

16    Q    Were you employed by -- I will refer to it as

17    DOCCS -- Department of Corrections and Community

18    Supervision?

19    A    Yes.

20    Q    Were you employed by DOCCS as of January 28th,

21    2016?

22    A    Yes.

23    Q    Where were you employed on that day?

24    A    Bare Hill Correctional Facility.

25    Q    And what was your job title on that date?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

137

CABAN-MULVERHILL - DIRECT - ABEL

```
 1   A    Registered Nurse II.

 2   Q    And how long did you hold that position?

 3   A    With Department of Corrections?

 4   Q    Yes.

 5   A    I started in 1995.

 6   Q    And were you employed there as a registered nurse

 7   on DOCCS?

 8   A    The entire time.

 9            THE COURT:  Just let the attorney get the

10   whole question out before you start to answer.  Would

11   you ask that again, please.

12   BY MR. ABEL:

13   Q    Yes.  Were you employed as a registered nurse with

14   DOCCS continuously throughout that period?

15   A    Yes.

16   Q    Thank you.  What were your job duties at Bare Hill

17   as a registered nurse?

18   A    I was the emergency room nurse.  I had sick call

19   and emergency room evaluations, emergency triage.

20   Q    So were you involved in the treatment of inmates?

21   A    Yes.

22   Q    And did you have certain protocol or procedure that

23   you would follow when you were treating an inmate at

24   Bare Hill?

25   A    Yes.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

CABAN-MULVERHILL - DIRECT - ABEL

1    Q    What was that procedure?

2    A    It would depend on what they were being seen for,

3    and then I would follow the protocol for whatever they

4    were being seen for.

5    Q    Okay.  So, if an inmate were to be brought to you

6    for treatment for head injuries, what procedure would

7    you follow to initiate treatment of that inmate?

8    A    I would take a full set of vitals, and I would do a

9    set full of caudal, headed-to-toe evaluation, and it's

10   typically done when they are in their boxer shorts, and

11   then depending on the outcome of that examination, would

12   determine what treatment would be appropriate.

13   Q    Okay.  Would you initiate a concussion protocol

14   with an inmate who is complaining of head injury?

15   A    Yes.

16   Q    What would that concussion protocol consist of?

17   A    It would depend on how he presents.  If his vital

18   signs are stable, there was no loss of consciousness,

19   then they go on a recheck and is explained to them if

20   they have any change in symptoms, if they are nauseous,

21   if they start vomiting, headache, they need to notify us

22   immediately and then we will re-evaluate them.  If

23   there's a loss of consciousness, then they get sent to

24   the emergency room.

25        A lot of times what the emergency room will do, if

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

139

CABAN-MULVERHILL - DIRECT - ABEL

1    everything checks out, they will end up being admitted

2    to a facility infirmary for 24-hour post-head injury

3    protocol.

4              MR. ABEL:  Your Honor, if I could have Exhibit

5    D-7 on the screen.

6              THE COURT:  Yes.

7              MR. ABEL:  If we can scroll down to the

8    bottom.

9              COURT CLERK:  The bottom of page 1?

10             MR. ABEL:  Page 1, yes.

11             COURT CLERK:  Okay.

12   BY MR. ABEL:

13   Q    Ms. Mulverhill, is that your signature on the

14   bottom of page 1 of the Exhibit E-7?

15   A    Yes.

16   Q    So did you prepare this inmate injury report?

17   A    I did.

18   Q    Do you recall preparing this report?

19   A    Off the top of my head, no.

20   Q    Okay.  But that is your signature?

21   A    That's my writing, yes.

22   Q    Do you -- looking at the top box of page 1 at

23   the -- Exhibit E-7, do you see where it says, "I have

24   nothing to say"?

25   A    Yes.


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

CABAN-MULVERHILL - DIRECT - ABEL

1    Q    Did you write the -- did you write that line?

2    A    I did.

3    Q    And what would prompt you to include a notation of

4    such a statement?

5    A    When I do an inmate injury report, a lot of times

6    the inmate will not tell me what occurred.  That's

7    typical.  And so if they don't tell me what occurred, I

8    will tell them I will put in that you have nothing to

9    say and --

10   Q    So were those the plaintiff's words that you put

11   down into that record?

12   A    Yes.  They will say, yeah, I have nothing to say.

13   Q    Did you prompt the plaintiff to say anything during

14   your treatment of him?

15   A    I asked him questions.  On his exam, typically I'm

16   doing the exam, I'm touching them and ask them to open

17   and close the door and so on with their arms, what have

18   you, and I will ask them if they are having pain, if

19   they -- you know, I try to get -- to engage, to

20   interact, let me know what they're feeling as I'm doing

21   the exam.

22            MR. ABEL:  Your Honor, if I could have

23   Exhibit D-8 up on the screen please.  If we could scroll

24   to the bottom of that page.

25   Q    Ms. Mulverhill, is that your signature on the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

141

CABAN-MULVERHILL - DIRECT - ABEL

 1   bottom of the page?

 2   A    It is.

 3   Q    So did you prepare the -- page 1 of D-8?

 4   A    Yes.

 5   Q    Do you know Sergeant Barnaby, Ms. Caban-Mulverhill?

 6   A    I work with Sergeant Barnaby.

 7   Q    I'm sorry?

 8   A    I work -- in a sense, yes.  I don't know him.  I

 9   don't know him outside of work.

10   Q    Do you recall seeing him during your treatment of

11   plaintiff on January 28th, 2016?

12   A    I don't recall.

13   Q    Do you recall -- strike that.  If a -- if an inmate

14   were to deny loss of consciousness, would you make a

15   note of that in your records?

16   A    Yes.

17            MR. ABEL:  Could we have page 1 of D-8 back,

18   back on the screen.  Looking down to -- scroll down --

19   scroll little bit.

20   Q    Looking down to the third line down in that box

21   where it says inmate denied loss of consciousness.

22   A    Yes.

23   Q    Was that your notation that you put into that

24   report?

25   A    Yes.


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

**142**

CABAN-MULVERHILL - DIRECT - ABEL

1    Q    Okay.  And would you make that notation based upon

2    the plaintiff's statements to you?

3    A    Yes.

4              MR. ABEL:  Your Honor, could I have page or

5    Exhibit D-11 up on the screen.

6    Q    And, Ms. Caban-Mulverhill, do you recognize this

7    document?

8    A    I recognize the document, yes.

9    Q    Did you prepare this document?

10   A    No, I did not.

11   Q    Do you know who did?

12   A    Scroll so I can see it.  Right there.  I recognize

13   the signature of that nurse.

14   Q    Do you know who that is?

15   A    I believe it's Cindy Paige.

16             MR. ABEL:  If I could go to the last page of

17   D-11, to the bottom of the page, the very last notation

18   on that date.

19   Q    Is that your signature on the bottom of that note?

20   A    Yes.

21   Q    So did you prepare the contents of that note?

22   A    Yes, I did.

23   Q    And do you see the second line of that note where

24   it says IM denies LOC?

25   A    Yes.


                    Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

CABAN-MULVERHILL - CROSS - ROCHE

1    Q    What does that mean to you?

2    A    Inmate denies loss of consciousness.

3    Q    Is that based upon the plaintiff's statements to

4    you?

5    A    Yes.

6    Q    Thank you.

7            MR. ABEL:  No further questions, your Honor.

8            THE COURT:  All right.  Thank you.  Plaintiff

9    have any questions of this witness?

10           MR. ROCHE:  Yes, your Honor.

11   CROSS EXAMINATION

12   BY MR. ROCHE:

13   Q   Is it fair to say -- good afternoon, Miss

14   Caban-Mulverhill.  Is it fair to say you don't recall

15   treating Mr. Tranchina at all.  Correct?

16   A   I have some memory of this incident but I saw the

17   pictures of Mr. Tranchina sent to me; I remember

18   evaluating him.

19   Q    Okay.  So the photos made it stand out in your

20   mind?

21   A    A little bit.

22           MR. ROCHE:  Okay.  And I would actually ask

23   that the photographs which are in evidence as

24   Plaintiff's 10 be shown to the witness.  You can just

25   scroll down to the colored photographs.

                Lisa L. Tennyson, CSR, RMR, FCRR
              UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

CABAN-MULVERHILL - CROSS - ROCHE

```
 1    Q    Nurse Caban-Mulverhill, does this photograph fairly
 2    represent how Mr. Tranchina -- how that side of Mr.
 3    Tranchina's face appeared when you examined him back on
 4    January 28th, 2016?
 5    A    Photograph is kind of a little distorted so I'm not
 6    quite sure.  I do recall his ears being red.
 7    Q    Okay.
 8    A    And some purple and swelling to his ears.  That I
 9    remember.
10    Q    Okay.  Can we scroll down a little bit and just
11    showing you another photograph of the other side of
12    Mr. Tranchina's face.
13         Do the injuries shown in that photograph, are they
14    accurate and according to your memory of treating
15    Mr. Tranchina on January 28th?
16    A    Again, they're -- photos are a little distorted but
17    I do remember there being -- swollen and discolored.
18    Q    Okay.  Can we scroll down a little further, and do
19    you know what injury is depicted in this photo?
20    A    The back of the ear.
21    Q    The back -- is there also an injury upper part of
22    the back of his neck?
23    A    There's redness in this picture that -- again, the
24    picture you're showing is pretty distorted.  It's a lot
25    of white and blotchy, so I don't think it's --
```

TRANCHINA v McGRATH - 17-cv-1256

145

CABAN-MULVERHILL - CROSS - ROCHE

1            MR. ROCHE:  At this point, I would ask that
2    D-7 be put back on the screen.  Just scroll down a
3    little bit.
4    Q    Nurse Mulverhill, the narrative portion that's
5    written on this document before you and where it says
6    description of injury, did you prepare that section?
7    A    Yes, I did.
8    Q    Okay.  Could you please read it?
9            THE COURT:  Not too quickly and right into the
10   microphone.  Okay?
11   A    Viewed in shorts, right facial/cheek area swelling
12   and bruising up into ear, auricle discolored, purple and
13   swollen.  Red mark to mid-forehead, left facial cheek
14   bruising and swelling.  Back of left ear, red marks and
15   superficial scratch.
16        Red marks to neck, chest and left upper arm.  Right
17   knee small abrasion; back of right hand, quarter-inch
18   superficial cuts times two.  Inmate denies loss of
19   consciousness; vital signs stable; blood pressure was
20   128/78.
21   Q    Okay.  It's fair to say you wrote this note based
22   on your physical, your head-to-toe examination --
23   A    Yes.
24   Q    -- of Mr. Tranchina?
25   A    Yes.


                 Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

CABAN-MULVERHILL - CROSS - ROCHE

1  Q    And, likewise, the diagrams that appear on that

2  document underneath the narrative portion, you filled

3  that out too?

4  A    Yes, I did.

5  Q    And you circled the areas where you observed

6  injuries?

7  A    Yes.

8  Q    And put X's inside those circles?

9  A    Yes.

10  Q    Okay.  Just -- I noticed that on -- one of the

11  circles Across his chest there's three X's.  Why are

12  there three X's in that area?

13  A    I would -- red marks to the neck, chest and left

14  upper arm.  So he would have had red marks on his chest

15  and those three areas.

16  Q    And fair to say that everywhere that you circle or

17  placed an "X", that represents an injury, right, that

18  you observed?

19  A    An injury or bruise or a red mark, any -- anything

20  noticeable to the skin.

21  Q    Thank you.

22        MR. ROCHE:  Can we please scroll down a little

23  bit.  Actually next page.  Please pull up D-8, the

24  addendum.

25  Q    Nurse Caban-Mulverhill, did you also prepare this

TRANCHINA v McGRATH - 17-cv-1256

147

CABAN-MULVERHILL - CROSS - ROCHE

1    document?

2    A    I did.

3    Q    Is it fair to say all of the handwriting on this

4    documents is yours?

5    A    Yes.

6    Q    And the last document that we looked at, all of the

7    handwriting on that was yours too?

8    A    Except for the facility use of force log number.

9    That's not me.

10           MR. ROCHE:  Okay.  Can we scroll down a little

11   bit?  Scroll down at least to the narrative portion.

12   Okay.

13   Q    Is this a further recitation or further account of

14   Mr. Tranchina's injuries?

15   A    It's another report documenting injuries.

16   Q    Can you please read this entry.

17   A    1/28/16 at approximately 0930, I, R.N. Mulverhill,

18   viewed and Inmate Tranchina, 15R1033, in shorts for

19   injuries, status post-use of force.  The following is

20   noted:  Vital signs stable, 128/78; respiration 18,

21   pulse 82, temperature 97.4.  Inmate denies loss of

22   consciousness.

23       Injuries.  Right facial cheek extending up to ear,

24   red and bruised.  Swelling positive, purple

25   discoloration to right ear auricle with swelling.  Red

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

CABAN-MULVERHILL - CROSS - ROCHE

1    mark to midforehead; left facial cheek bruising and

2    swelling.  Back of left ear, red marks and superficial

3    scratch.  Red marks noted to left neck, chest and left

4    upper arm.

5         Right knee, small abrasion.  Back of right hand,

6    quarter-inch superficial cuts times two.  Right chest

7    wall, red mark positive.  Open skin areas cleansed with

8    Betadine and left open to air.  Verbal order for M.D. as

9    follows:  x-ray facial bones and ribs, arrangements made

10   for x-rays to be done at Franklin Correctional facility.

11   Ibuprofen 2 PO given for discomfort.  Added to R.N.

12   daily, dressing for recheck in A.M.  Can you scroll it

13   up.

14   Q    Can you scroll a little further.

15   A    Inmate advised to request emergency sick call if

16   notice vomiting or other changes occur.

17   Q    So is it fair to say that after your examination of

18   Mr. Tranchina, you discussed your findings with a

19   doctor?

20   A    Yes.

21   Q    And based on your discussion with the doctor, the

22   doctor ordered that facial -- x-rays of the facial bones

23   and his ribs be taken?

24   A    Correct.

25   Q    That's fair to say?  Okay.  Now, when you refer in

CABAN-MULVERHILL - CROSS - ROCHE

1    your report to open skin areas being cleaned and -- is

2    it Betadine?

3    A    Betadine.

4    Q    Describe what that means.

5    A    Betadine is an anti-infecting, it's a -- the brown

6    liquid that they use at -- to scrub out dirty wounds.

7    Q    And when you refer to open skin areas, what do you

8    mean by that?

9    A    Any break in the skin.  Any scratch, scrape.

10   Prisons are pretty dirty so I'll make sure to clean any.

11   Q    It's fair to say that Mr. Tranchina did have open

12   skin areas?

13   A    Yes.

14   Q    Okay.  Did you document in your record where --

15   what injuries had open skin, which ones did not?

16   A    Yes.

17           THE COURT:  I think we have gone over that

18   but --

19   Q    Briefly, can you say what injury had open skin and

20   which ones didn't.

21   A    Back of left ear had a superficial scratch, right

22   knee had a small abrasion, back of right hand had two

23   superficial cuts.

24   Q    Okay.  Now the photographs that you testified about

25   a minute ago, did you take those photos?

CABAN-MULVERHILL - CROSS - ROCHE

1    A    No.

2    Q    Okay.  To your knowledge, who took those photos?

3    A    Security takes the photos.

4    Q    Okay.  So that's handled by corrections officers?

5    A    Officers or sergeants or --

6    Q    Okay.  But you don't know which particular officer

7    or sergeant took those photos, right?

8    A    No, I do not.

9    Q    So would you agree that the injuries that were

10   depicted on the photographs are consistent with the

11   injuries that you described in your report?

12   A    Pretty much.

13   Q    Now, you have testified that it's not unusual for

14   an inmate that comes -- that's brought to the emergency

15   room with injuries to say that they have got nothing to

16   say.

17   A    Correct.

18   Q    Okay.  Did it cause you concern that an inmate with

19   this number of injuries to various parts of his body did

20   not want to tell you how those injuries had been

21   inflicted on him?

22            MR. BLENK:  Objection, your Honor.

23            THE COURT:  Sustained.

24   BY MR. ROCHE:

25   Q    Apart from ordering x-rays, and did you -- did you

TRANCHINA v McGRATH - 17-cv-1256

CABAN-MULVERHILL - CROSS - ROCHE

```
 1    take any further action with regard to Mr. Tranchina?
 2              THE COURT:  Other than what she's already
 3    read?
 4              MR. ROCHE:  Right.
 5    Q    Apart from -- apart from preparing your report and
 6    ordering x-rays, did you take any further action?
 7    A    I didn't order the x-rays; the doctor orders the
 8    x-rays.
 9    Q    Okay.
10    A    I did my evaluation, I contacted the physician and
11    discussed my findings on evaluation.  We collaborate and
12    it was determined to send him to Franklin Correctional
13    for x-rays, and I'm not quite sure I answered your
14    question.
15    Q    Did you notify anybody or did you raise any alert?
16    You were with an inmate that was brought to you with,
17    you know, pretty extensive injuries?
18    A    I notified the physician.
19    Q    Did you notify any supervisors in the Department of
20    Corrections that this inmate had been injured and was
21    brought to you with multiple, unexplained injuries?
22    A    Supervisors, my -- my medical director is the
23    doctor that I spoke with.
24    Q    Okay.
25    A    That's my chain of command.
```

CABAN-MULVERHILL - CROSS - BLENK

1  Q    Right.  But I'm asking did you -- did you raise any

2  alerts with OSI or with any sergeants or lieutenants or

3  anybody up the chain of command in the Department of

4  Corrections regarding any concerns that this inmate had

5  been pretty extensively injured?

6  A    Security staff and sergeant the runs --

7         THE COURT:  Just answer the question.  If you

8  didn't, just say no.

9  A    I don't because those are the people that brought

10 him right to me.  He was seen by me status post use of

11 force.  So security is already aware and the lieutenants

12 or higher-ups in the security, once it's use of force,

13 they are already aware before I even see him.

14        MR. ROCHE:  Thank you.

15        THE WITNESS:  All right.

16        MR. ROCHE:  Thank you.

17        THE COURT:  Any other questions on behalf of

18 your defendant?

19 CROSS EXAMINATION

20 BY MR. BLENK:

21 Q    My name is Jim Blenk and I represent Mr. McGrath in

22 this.  Thank you for being here today.  I just have a

23 couple questions to wrap this up.

24     In the documents that we looked at, Exhibits 7 and

25 8, you didn't note any injury to Plaintiff Tranchina's

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

153

CABAN-MULVERHILL - CROSS - BLENK

1    nose; is that correct?

2    A    I don't know what he's asking me.

3    Q    There's no notation of injuries to Plaintiff

4    Tranchina's nose, correct?

5    A    Not that I recall reading this now.  I can't see

6    it.

7         THE COURT:  Britney, could you scroll that up

8    a little bit.  You want the narrative?  Get back up to

9    that --

10   BY MR. BLENK:

11   Q    I'm also going to ask you if you noted any

12   bleeding.

13   A    Nothing is noted about the nose.

14        THE COURT:  Then you were asked if you noted

15   any bleeding.

16   A    No, nothing about actual bleeding.

17   Q    The same is true in D-8.  If you can just scroll in

18   that area, please.

19   A    No, nothing about the nose or bleeding.

20        MR. BLENK:  I'd like to show a document that

21   hasn't been admitted into evidence yet but I would like

22   to admit.  P-2.  The unusual incident report.

23        THE COURT:  You can show it to the witness.

24        MR. BLENK:  Scroll down.  Continue scrolling

25   to the medical report.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

CABAN-MULVERHILL - CROSS - BLENK

1   Q    Ms.  Mulverhill, you attribute this medical report

2   to an unusual incident report or did you while you

3   worked at Bare Hill?

4   A    This is typed up by somebody's notes that -- it

5   is -- this is typed up.  It reads like my note but I'm

6   not the one who typed this.

7   Q    Do you know who did type it?

8   A    No, I don't.

9   Q    Do you remember treating Mr. McGrath that day?

10  A    I do.

11  Q    Do you recall noting any injuries on Mr. McGrath?

12  A    His hand.  He had injuries to his hand.

13            THE COURT:  Keep your voice up and speak right

14  in that microphone.

15            THE WITNESS:  Sorry.

16  A    Injuries on his hand and some injuries on his face.

17  Q    Do you remember what injuries you saw on his face?

18  A    I don't.  I only -- I read the employee accident

19  report and I recall that he had injuries to his hand and

20  his face.

21  Q    When did you read the employee accident report?

22  A    A week ago maybe.

23  Q    Is that distinct from this medical report that

24  we're looking at?

25  A    This report -- I don't have it.  I don't do these

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

CABAN-MULVERHILL - CROSS - BLENK

```
 1    reports.  This is -- this isn't -- this is a summary
 2    that perhaps somebody higher up in security put together
 3    based on my findings.
 4              MR. BLENK:  Can we show the witness what's
 5    been not admitted into evidence but what's been
 6    previously marked as P-8.  Page 4.
 7              MR. ROCHE:  Your Honor, I object.
 8              THE COURT:  I haven't said it's coming in
 9    evidence.  In fact, I've said the opposite and, you
10    know, this -- is this a form that you filled out, Nurse?
11              THE WITNESS:  This one is.
12              THE COURT:  Okay.  Are you trying to refresh
13    recollection?  Because this is not coming in evidence.
14    BY MR. BLENK:
15    Q    When you said that you reviewed document, you said
16    that it -- that you were, you had completed a inmate or
17    you had completed an accident report; is that correct?
18    A    Correct.
19    Q    Is this the document that you are referring to?
20    A    Yes, it is.
21    Q    Does this refresh your recollection as to the
22    injuries that you viewed on Mr. McGrath's face that day?
23              THE COURT:  Can you scroll that down?  Don't
24    read from it, just tell us if it refreshes your
25    recollection.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

CABAN-MULVERHILL - REDIRECT - ABEL

```
 1   A    I don't remember the knuckles.  I really remember
 2   his hand being -- knuckles were scraped up and his hand
 3   was swollen.
 4   BY MR. BLENK:
 5   Q    You don't recall any injuries to his face?
 6   A    Off the top of my head, I do not but my
 7   accident --- I do a lot of these.
 8            THE COURT:  You don't remember?
 9            THE WITNESS:  No.
10            THE COURT:  You don't have to explain.  Okay.
11   Next question.
12            MR. BLENK:  I don't have any further
13   questions.
14            THE COURT:  Any other question on behalf of
15   Defendant Barnaby?
16            MR. ABEL:  Just very briefly, your Honor.
17   REDIRECT EXAMINATION
18   BY MR. ABEL:
19   Q    Ms. Mulverhill, you don't recall treating Mr.
20   Tranchina but you follow procedures for making your
21   notes?
22   A    Correct.
23   Q    The same every time, correct?
24   A    Yes.
25   Q    Okay.  So the quote where you referenced that the
```

CABAN-MULVERHILL - REDIRECT - ABEL

1    plaintiff told you he had nothing to say, would that
2    represent a verbatim quote from the plaintiff?
3    A    Yes.
4    Q    And just to be clear, did you coerce Mr. Tranchina
5    to say that?
6    A    No.
7    Q    Did anyone else coerce Mr. Tranchina?
8             MR. ROCHE:  Objection as to what anybody else
9    did.
10            THE COURT:  Sustained.
11   Q    Did you observe anyone else?
12   A    No.
13   Q    Thank you.  With regard to your report that he --
14   that the plaintiff denied loss of consciousness, if an
15   inmate said he wasn't sure that he had lost
16   consciousness, would you make that same notation, that
17   he hadn't lost consciousness or would you state
18   otherwise?
19            MR. ROCHE:  Objection, your Honor.
20   Hypothetical question, your Honor.
21            THE COURT:  I will allow it.
22   A    If an inmate was unsure if he lost consciousness, I
23   would put level of consciousness, lost of consciousness
24   unknown.
25   Q    Okay.


                  Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

CABAN-MULVERHILL - RECROSS - ROCHE

1    A    And he would go on a different -- a different

2    protocol.

3    Q    And, Ms. Caban-Mulverhill, do you recall anyone

4    slapping the plaintiff on January 20th, 2016?

5    A    I do not.

6    Q    Do you recall anyone hitting the plaintiff on that

7    date?

8    A    I do not.

9    Q    Do you recall anyone choking the plaintiff on

10   January 28th, 2016?

11   A    No, sir.

12           MR. ABEL:  Thank you.  No further questions.

13           THE COURT:  Anything else from plaintiff?

14           MR. ROCHE:  Your Honor, just briefly.

15           THE COURT:  Very briefly.  This seems to go

16   over the same ground.  Go ahead.

17   RECROSS EXAMINATION

18   BY MR. ROCHE:

19   Q    Ms. Caban-Mulverhill, approximately how long would

20   you estimate your examination of Mr. Tranchina took?

21   A    Probably 15 to 20 minutes.

22   Q    Okay.  And it's fair to say you weren't with him

23   the rest of the time that he was in special housing,

24   right?

25   A    Correct.


                    Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

159

CABAN-MULVERHILL - RECROSS - ROCHE

1   Q    Okay.  That's where your -- that's where your
2   examination took place, in the special housing unit?
3   A    I believe so.
4   Q    Okay.  And after your examination, you ordered that
5   he be transferred to the infirmary, you say.  Is that
6   fair to say?
7   A    After the examination, I went to medical building
8   and I had conversation with the medical director
9   regarding Mr. Tranchina's injuries and what our plan of
10  action would be.
11  Q    Fair to say that Mr. Tranchina was transferred to
12  the infirmary right after you had that discussion?
13  A    Bare Hill Correctional Facility does not have a
14  true infirmary.  Franklin Correctional, which is across
15  the road, does.  We utilize their infirmary so Mr.
16  Tranchina -- I made arrangement to send Mr. Tranchina to
17  Franklin Correctional where he was x-rayed and further
18  evaluation.
19       MR. ROCHE:  Okay.  Thank you.  Just -- I will
20  just ask that the witness be shown Plaintiff's 9.
21  Please scroll down to the colored photographs at the
22  bottom.
23  Q    Ms. Caban Mulverhill, is this a photograph of
24  Officer McGrath that you examined on January 28th, 2016?
25  A    It's a photograph of Officer McGrath.  I don't know

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

160

CABAN-MULVERHILL - RECROSS - ROCHE

```
 1    when this was taken.
 2    Q    Okay.  Do you observe any injuries to Mr. McGrath's
 3    face on this photograph?
 4    A    This photograph is whited out on his right facial
 5    cheek and his right chin and white on his nose.  It's
 6    not very clear picture.
 7    Q    But it's fair to say you can't actually see any
 8    injuries on his face in this photograph.  Is that fair
 9    to say.
10           MR. BLENK:  Objection, your Honor.  Asked and
11    answered.
12           THE COURT:  Sustained.
13    BY MR. ROCHE:
14    Q    Can you tell from this photograph where the
15    photograph -- what's the setting of the photograph where
16    it was taken?
17    A    This is Bare Hill Correctional.
18    Q    Okay.  Can we scroll down to the next photo?  Can
19    you describe what's shown in the photograph now before
20    you?
21    A    It's a photo of -- I believe it's Officer McGrath's
22    hand and his injuries.
23    Q    So does that photograph fairly and accurately show
24    the injuries to Officer McGrath's knuckles on that date?
25    A    Yeah, it's a -- not a great photo but he had -- did
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    have areas to his knuckles and I do remember that.

2             MR. ROCHE:  Thank you.  I have nothing

3    further.

4             THE COURT:  Anything else on behalf of the

5    Defendant McGrath?

6             MR. BLENK:  No, your Honor.

7             THE COURT:  All right.  You may step down.

8    Thank you.

9             (Witness excused)

10            THE COURT:  Ladies and gentlemen, we are going

11   to have another witness in just a moment.  We're just

12   going to have the witness box cleaned and that should

13   take place momentarily.  So, since we are just started

14   up, we will try to stay in place, hope that that gets

15   done right away, and then we'll get another witness on

16   the stand.

17            MR. ROCHE:  Your Honor, may my client have

18   permission to leave the courtroom to go to the bathroom

19   for a second?

20            THE COURT:  Yes, he may.

21            MR. REED:  Your Honor, there's a few notations

22   on the screen when the exhibits were put up I don't

23   think anybody was intending to be there.  I was

24   hoping -- there's a yellow arrow on the bottom right

25   corner.

McGRATH - DIRECT - ROCHE

1              (Discussion held off the record)

2              (Pause in proceeding)

3              THE COURT:  Plaintiff may call their next

4    witness.

5              MR. ROCHE:  Plaintiff calls Justin McGrath.

6              COURT CLERK:  Mr. McGrath, would you please

7    raise your right hand and state your full name for the

8    record.

9              THE WITNESS:  Justin McGrath.

10   J U S T I N    M c G R A T H ,  having been duly sworn,

11   was examined and testified as follows:

12             THE COURT:  Whenever you're ready.

13             MR. ROCHE:  Thank you, your Honor.

14   DIRECT EXAMINATION

15   BY MR. ROCHE:

16   Q    Good afternoon, Mr. McGrath.

17   A    Good afternoon.

18   Q    You started as a corrections officer in 2006,

19   correct?

20   A    Yes.

21   Q    You were suspended from your position as a

22   corrections officer in August 2016, correct?

23   A    Yes.

24   Q    And then eventually you were terminated from your

25   position in April of 2017.  Correct?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

1   A     Yes.

2   Q     And that termination occurred after an

3   investigation by OSI, including a Q-and-A session that

4   you -- where you were questioned in June 2016.  Correct?

5   A     Termination occurred after an arbitration hearing.

6              THE COURT:  Excuse me just one moment,

7   Counsel.

8              Members of the jury, you just heard that

9   Defendant McGrath was terminated following a union

10  arbitration.  You may consider that evidence in your

11  deliberations in light of all of the evidence presented

12  in this trial.  However, you must know that the law

13  applied in a union arbitration is not the same as the

14  law to be applied in this case.

15             You are not to substitute the finding of the

16  arbitrator for your finding.  You should not conclude

17  that because the arbitrator found as he or she did that

18  Defendant McGrath actually engaged in the conduct at

19  issue in the arbitration.  It is up to you, after review

20  of all the evidence in this case, to determine whether

21  Defendant McGrath violated plaintiff's Constitutional

22  rights.  Go ahead, sir.

23             MR. ROCHE:  Thank you.

24  BY MR. ROCHE:

25  Q     And at the arbitration, you were represented at

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

1    that?

2              MR. MIRANDA:  Objection, your Honor.  Your

3    Honor, could we have a sidebar, please?

4              THE COURT:  Your objection is sustained.

5    BY MR. ROCHE:

6    Q    Your suspension and termination were because of the

7    incident involving Inmate Tranchina, correct?

8    A    They were involved because of the arbitration

9    hearing.

10   Q    But the arbitration hearing and the OSI

11   investigation concerned the incident involving

12   Mr. Tranchina.  Would that be fair to say?

13   A    Yes.

14   Q    Okay.  Now, what is your current employment status?

15   A    I work for the Village of Potsdam.

16   Q    So when you were a corrections officer, would it be

17   fair to say that frisking is pretty common activity that

18   a corrections officer has to engage in as part of his

19   job?  Right?

20   A    Yes.

21   Q    Okay.  And being -- in 2016, you had been on the

22   job for approximately ten years.  Right?

23   A    Yes.

24   Q    So you were experienced at frisking at that point,

25   right?

McGRATH - DIRECT - ROCHE

1    A    Yes.

2    Q    Okay.  And you had received training in frisking

3    too, right?

4    A    Yes.

5    Q    It's fair to say it's a regular part of your job at

6    that time?

7    A    Yes.

8    Q    And sometimes you would just frisk, like, one

9    individual for whatever particular reason you had, is

10   that fair to say?

11   A    Yes.

12   Q    Okay.  And other times you would be given a

13   frisking assignment where you would be stationed in a

14   particular area of the jail and you're assigned to frisk

15   inmates either coming in or out of a particular area; is

16   that correct?

17   A    Yes, that's right.

18   Q    Now, did you -- when you were assigned to do a

19   frisk assignment, did you carry a metal or handheld

20   metal detector?

21   A    Only if you were in a frisk shack.

22   Q    Okay.  And so what is it about being in a shack

23   that required you to have a metal hand detector, a

24   handheld metal detector rather than in any other area of

25   the jail?

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

1    A    Because those shacks have walk-through metal

2    detectors and that you walk through, and so, if it was

3    to go off, then you use your hand scanner to clarify the

4    area of origin where the alarm went off.

5    Q    So if you were assigned to do -- sometimes you

6    would be assigned to do frisks in areas where there's

7    not a frisk shack.  Right?

8    A    Yes.

9    Q    Okay.  And is it your testimony that when you got

10   those assignments, you didn't have a handheld metal

11   detecter?

12   A    That's right.

13   Q    And what about latex -- what about gloves?  Were

14   you required to wear gloves while doing a frisk?

15   A    You don't have to.

16   Q    Okay.  So it's not -- it's not a requirement that

17   when you're given a frisk assignment that you have

18   gloves to conduct a frisk?

19   A    You can just wear gloves for sanitary reasons

20   to stay clean.

21   Q    And when you conduct frisks, do you wear gloves?

22   Did you wear gloves?

23   A    Yes.

24   Q    Okay.  And did you always wear gloves if you were

25   given a particular frisk assignment?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

1   A    Yes, if I had gloves available, I wear gloves.
2   Q    And other than metal detector and gloves, were
3   there any other corrections-issued that you would use
4   during a frisk assignment?
5   A    For the actual frisk?
6   Q    For conducting a frisk, yeah.
7   A    No.
8   Q    Now, when you get a frisk assignment, right, that
9   you would be sent to a particular area of the jail to
10  frisk inmates, right?
11  A    Yes.
12  Q    And when you would be sent to a particular area of
13  the jail, would you be required to inform the officer
14  that's assigned to that area that you are there to
15  conduct a frisk?
16  A    Not required but it's helpful that he knows you're
17  there.
18  Q    So would you sit -- would you agree that it was
19  standard practice that if you were assigned to a
20  particular area, that you would check in with the
21  officer that's closest in that area and let them know
22  that you are conducting frisks?
23          THE COURT:  Just answer that.  This is what I
24  mean.  He just said not required but -- you know, it
25  would be a good practice to tell the unit officer.  You

TRANCHINA v McGRATH - 17-cv-1256

168

McGRATH - DIRECT - ROCHE

1   don't have to ask more than once.

2   BY MR. ROCHE:

3   Q    And it's fair to say that if you were conducting a

4   frisk assignment in an area, that's something that would

5   be entered into the logbook of that area?

6   A    We don't have a logbook if you're frisking.

7   Q    Okay.  But it's fair to say that every area of the

8   jail has its own logbook, right?

9   A    Yes.

10  Q    And for people who come into that area, they -- to

11  perform functions, the -- an entry would be put in the

12  logbook, right?

13  A    To the discretion of the officer of the logbook.

14  Q    Okay.  Typically if you are conducting a frisk in

15  an area, would the fact of frisk was -- a frisk

16  assignment was taking place rather than just a frisk of

17  an individual inmate, would that fact be placed in the

18  logbook?

19  A    I would think if they were frisking a whole dorm or

20  of a school, then that would be in there with

21  a sergeant's signature but you wouldn't just put in the

22  logbook someone is frisking.

23  Q    Okay.  But if you were to frisk, let's say a

24  school, the inmates coming in or out of the school, is

25  that something that you would expect to be put in a

McGRATH - DIRECT - ROCHE

 1   logbook?

 2   A     No.

 3   Q     Okay.  And why would that be different from a dorm?

 4   A     No, I'm saying when you frisk a whole dorm, they

 5   occasionally do dorm frisks where a sergeant comes in

 6   with a frisk team to frisk a whole entire dorm, then

 7   it's all documented on per cell or per cubical you frisk

 8   with a list of all the inmates but for a school, there's

 9   no need to put it in a logbook.

10              MR. ROCHE:  I would ask that the witness be

11   shown Plaintiff's 18, which has been marked for

12   identification.  Please scroll down a little bit.

13   BY MR. ROCHE:

14   Q     Can you just identify what the document is that you

15   are being shown?

16   A     This is a copy of a logbook.

17   Q     Okay.  And does it indicate which area, which --

18   which area that's the logbook for?

19   A     Yes.  It's the main school.

20   Q     Okay.  And that's the main school at Bare Hill

21   Correctional Facility?

22   A     Yes.

23   Q     Okay.  And if we can just scroll down a little bit.

24   I just ask -- I direct your attention to time period

25   3:20 P.M.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

1          THE COURT:  It can't be read from because it's

2     not in evidence.  We don't show you something, folks,

3     because it's not in evidence.  If I receive it in

4     evidence, it will come up on your screen.

5          MR. MIRANDA:  I object to the relevance.  I

6     don't think any foundation has been laid.  This is a

7     main school and I think the issue here is the annex

8     school.

9          THE COURT:  Well, it hasn't been offered yet

10    so I'll hold off on making any ruling until it's

11    offered, if it is offered.

12    BY MR. ROCHE:

13    Q    Mr. McGrath, does this document refresh your

14    recollection as to whether notations are made of inmates

15    are being frisked in or out of school?

16    A    This is different.  The main school has different

17    programs in it where inmates are required to be frisked

18    out.

19    Q    So it's fair to say that notations are made in the

20    logbook of the main school of inmates being frisked,

21    right?

22    A    Out of the main school, yes.

23    Q    And it's your testimony that it's different for the

24    annex school?

25    A    Yes, there are different programs.


                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

1   Q    So typically when you conduct a frisk, would you
2   agree that it's a good idea to conduct it in an area
3   where there's enough space?
4   A    Yes.
5   Q    Okay.  And would you agree that it would be a good
6   idea to choose a location for your frisk that can be
7   observed by other correction officers?
8   A    No.
9   Q    You don't think there's any security concerns in
10  conducting frisks, especially frisks of multiple
11  inmates, in an area where no other officers can see?
12  A    No, depending on the area you're in.
13  Q    So when you conduct a frisk of an area such as a
14  school, how do you -- do you frisk every person coming
15  in and out of the school or how do you select?
16  A    You do -- it can be at random but it's a continuous
17  frisk.  So when you're done one inmate frisking, you go
18  on to the next one.
19  Q    So you would -- so you would be conducting an -- or
20  a frisk of inmates as they're coming into the school.
21  Correct?
22  A    Yes.
23  Q    Okay.  So as they're flowing into the school,
24  you're selecting one.  As soon as you're done with that,
25  you select another?

McGRATH - DIRECT - ROCHE

1   A    Yes.

2   Q    Back in January of 2016, what was your height and

3   weight back then?

4   A    Same as now, five-ten, 200 pounds.

5   Q    Okay.  Back in 2016, were you -- would you say you

6   had the same build as you have now or were you working

7   out more back then than you were bigger and stronger

8   now?

9   A    Same.

10  Q    Okay.  Back in 2016, were you married or single?

11  A    Single.

12  Q    Were you in a relationship at that time?

13  A    No.

14  Q    Back in January of 2016, were you familiar with an

15  inmate named Joseph Tranchina?

16  A    No.

17  Q    So on -- when you had an encounter with Mr.

18  Tranchina at approximately a little after 8:00 A.M. on

19  January 28, 2016, was that the first time you ever saw

20  him?

21  A    Yes.

22  Q    Did you know anything about him before then?

23  A    No.

24  Q    Okay.  Did you know that he was assigned to the F-2

25  dorm?

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

```
 1   A    No.
 2   Q    At that time were you aware of what guards were
 3   assigned to the F-2 dorm?
 4   A    No.
 5   Q    Were you aware of a guard name Maura Mayer in the
 6   F-2 dorm at that time?
 7   A    Yes, she was resource.
 8   Q    Okay.  So she was resource working out of the F-2
 9   dorm?
10   A    I believe she was there occasionally.
11   Q    Did you -- on January 28th, 2016, were you aware
12   that Mr. Tranchina had a friendship or relationship with
13   Miss Mayer?
14   A    No.
15   Q    Okay.  Did you know about him passing a note to
16   her?
17   A    No.
18   Q    Did you know -- were you aware that an inmate had
19   passed a note to Guard Mayer?
20   A    Yes.
21   Q    Okay.  It's your testimony that you didn't know it
22   is Mr. Tranchina?
23   A    Excuse me?
24   Q    It's your testimony that you did not know that the
25   inmate that passed that note was Mr. Tranchina?
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

1   A    Right.

2   Q    Okay.  It's fair to say you had been told the

3   cube -- the dorm and cube number of the person who

4   passed that note, correct?

5   A    No.  She mentioned to a bunch of other COs she

6   received a note.  She didn't say who it was.

7   Q    She didn't say who the inmate was?

8   A    No.

9   Q    Okay.  She didn't tell you the -- the cube number

10  and the dorm number of the inmate?

11  A    No.  She worked F-2 occasionally, like I said.  She

12  may have mentioned a cube number to all of us but it

13  wasn't relevant to us, so, no.

14  Q    Okay.  Okay.  Did you -- you were -- you were

15  interviewed by OSI back in 15th of June 2016, correct?

16  A    Yes.

17  Q    That -- that proceeding was under oath?

18  A    Yes.

19  Q    Okay.  Were you asked this question and did you

20  give this answer.

21          THE COURT:  Let us know the page and line,

22  please.

23          MR. ROCHE:  Okay.  So -- first of all, it's at

24  the top of page 38 line one.

25  Q    "QUESTION:  When you mentioned her letter, what did

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

1   she say?

2        "ANSWER:  Just that an inmate threw a letter on her

3   desk."

4        And were you asked that question?  Did you give

5   that answer?

6   A    Yes.

7   Q    And then were you asked the following question, did

8   you give the following answers?  Further down, line 9:

9        "QUESTION:  Do you know what dorm the inmate was in

10  that wrote her the letter?

11       "ANSWER:  F-2.

12       "QUESTION:  Did she state what cube that inmate was

13  in?

14       "ANSWER:  She may have at the time but it

15  doesn't -- I don't remember."

16       Did you get -- were you asked those questions?  Did

17  you give those answers?

18  A    Yes.

19  Q    So back in January 2016, fair to say you were

20  dating Maura Mayer at that time?

21  A    No.

22  Q    Would you say that you were in a relationship with

23  her at that time?

24  A    No.

25  Q    Would you agree that -- were you flirting with her

TRANCHINA v McGRATH - 17-cv-1256

176

McGRATH - DIRECT - ROCHE

1    at that time?

2    A     Yes.

3    Q     Were you dating at that time?

4    A     No.

5    Q     Okay.  So on line -- page 40, line 23, it's also

6    asking about the OSI Q and A.  Were you asked these

7    questions and did you give these answers:

8          "QUESTION:  How long were you dating at that point?

9          "ANSWER:  We weren't.

10         "QUESTION:  She wasn't your girlfriend at the time?

11         "ANSWER:  We were dating, I guess.  She wasn't

12   really my girlfriend."

13         Did you give those answers to those questions?

14   A    I did say that but we were not dating.  We never

15   actually went on a date.  It was strictly texting and

16   hanging out.

17   Q    Okay.  When did you and her start texting?

18   A    I'm not sure exactly.  I met her mid-January, so it

19   was around then.

20   Q    Okay.  And so when you met her in mid-January, did

21   you start texting?  Was it right away after that?

22   A    No.  Probably days after.

23   Q    Okay.  And in the -- between the date that you

24   first met her, you said in mid-January and the date of

25   the incident, did you -- did you visit her at work?

McGRATH - DIRECT - ROCHE

1    A    Yes.

2    Q    Did you call her on the phone?

3    A    I don't recall.

4    Q    You sent texts, right?

5    A    Texts, yes.

6    Q    In fact, you exchanged over 50 text messages with

7    Miss Mayer in between the date of the fire drill on

8    January 14th or 15th and the date of the incident

9    with Mr. Tranchina on January 28th.  Is that correct?

10   A    Yes.

11   Q    And those texts were romantic?

12   A    No, we were just friends.

13   Q    Okay.  So there was no -- no romantic nature to

14   these texts?

15   A    No, it was just friendly conversation.  I just

16   barely met her so --

17   Q    So since you -- you and Miss Mayer were boyfriend

18   and girlfriend.  Right?

19            MR. MIRANDA:  Objection; asked and answered.

20            THE COURT:  I'm sorry.  I didn't really get

21   that whole question.

22            MR. ROCHE:  I will withdraw the question.

23            THE COURT:  Thank you.

24   BY MR. ROCHE:

25   Q    You and Miss Mayer are currently a couple?

                 Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

 1   A    Yes.

 2   Q    You live together?

 3   A    Yes.

 4   Q    So is it your testimony that you weren't

 5   romantically involved with Miss Mayer at all prior to

 6   January 28th of 2016?

 7   A    No, we were not.

 8   Q    Just friends?

 9   A    Yes.

10   Q    You are aware that Miss Mayer has been subpoenaed

11   to testify in -- at this trial.  Correct?

12   A    Yes.

13   Q    So and, in fact, you accepted the subpoena for her.

14   Correct?

15   A    Yes.

16   Q    Okay.  And she is scheduled to testify here

17   tomorrow.  Correct?

18   A    Yes.

19   Q    Now, when in relation to the January 28th incident

20   did you learn of the note?

21   A    A couple of days before.  I can't recall exact

22   days.

23   Q    And Miss Mayer talked about this note out at the

24   bar.  Is that fair to say?

25   A    Yes.


                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

1    Q    Were other correction officers there?

2    A    Yes.

3    Q    The bar -- the bar is the -- called the Pines,

4    right?

5    A    Yes.

6    Q    It's across the street from the jail, from the

7    prison.  Right?

8    A    Yes.

9    Q    Okay.  And it's a -- it's a hangout for corrections

10   officers.  Fair to say?

11   A    Sure.

12   Q    There's three correction facilities in very close

13   proximity in that area.  Right?

14   A    Yes.

15   Q    Okay.  And Miss Mayer told a bunch of fellow

16   correction officers that she had gotten this note

17   from -- this flirtatious note from an inmate while you

18   were present.  Right?

19   A    Yes.

20   Q    How did that make you feel?

21   A    There was no big deal.

22   Q    Did you ask her who the inmate was?

23   A    No.

24   Q    Did anybody ask her who the inmate was?

25   A    No.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

1    Q    But you knew it was an inmate in the dorm, right?
2    In her dorm?
3    A    At Bare Hill, yes.
4    Q    Did Miss Mayer say what the contents of the note
5    were?
6    A    Yeah, she mentioned that it was -- she was pretty
7    and such.
8    Q    How did -- how did she react or how -- what was her
9    demeanor or reaction to this note, that you could see?
10   A    She was just kind of pissed about it.
11   Q    Pissed about it?
12   A    Yes.
13   Q    Okay.  You didn't care, right?
14   A    No.
15   Q    Because you -- you weren't even interested in
16   Miss Mayer at this point.  Is it fair to say?
17   A    No, not in -- it's just a -- passing a note is a
18   game that inmates play, and if you take it personally,
19   then it's not the career for you.
20   Q    Did you know about any intimate touching between
21   Miss Mayer and Mr. Tranchina at that time?
22   A    No.
23   Q    Did you speak to her about it?
24   A    No.
25   Q    Did you ask her if there was anything else that

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

1   happened apart from the note?

2   A    No.

3   Q    You didn't ask who is this guy?  What's his name?

4   A    No.  No.

5            THE COURT:  I think we have gotten that drift.

6   Q    On June 28th of 2016, what was your assignment that

7   day?

8   A    I had a resource bid, it's a 7-to-3 shift.

9   Q    And were you given a particular assignment on that

10  day?

11  A    Yes.  I was instructed to frisk inmates down at the

12  annex school.

13  Q    Where were you when you were given that assignment?

14  A    Right in chart sergeant office.

15  Q    In the what?

16  A    In the chart sergeant office.

17  Q    Okay.  And what is the chart sergeant?

18  A    What is the chart sergeant?

19  Q    Yes.  Just so the jury understands.

20  A    Chart sergeant is in charge of assigning officers

21  jobs every day.

22  Q    Okay.  So which -- which chart sergeant gave you

23  this particular job?

24  A    Sergeant Conto.

25  Q    So you spoke to Sergeant Conto?

McGRATH - DIRECT - ROCHE

```
 1   A     Yes.
 2   Q     And he told you that he wanted you to go to the
 3   annex school to frisk?
 4   A     Yes.
 5   Q     And did he make a notation in the logbook and
 6   stating that that was your assignment?
 7   A     They -- when you walk in, they just check you off,
 8   saying you showed up to work today.
 9   Q     Is it fair to say that the chart sergeant maintains
10   a chart?  Correct?
11   A     Yes.
12   Q     And that's where they keep track of what
13   assignments they have assigned various different
14   officers.  Correct?
15   A     Yes.
16   Q     So did Sergeant Conto write in your assignment into
17   the chart log as he told you where to go?
18   A     I don't know.
19   Q     Do you know any specific reason as to why that
20   frisk was taking place?
21   A     No.  It's very common to be assigned through the
22   facility.
23   Q     Okay.  And were you told what you were going to
24   be frisking for?
25   A     No.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

1   Q    After you were given that frisking assignment, did

2   you go and get any equipment to conduct a frisk?

3   A    Yes.

4   Q    What did you get?

5   A    Two-way radio and a pair of handcuffs.

6   Q    You didn't get a metal detector?  A handheld metal

7   detector?

8   A    No.

9   Q    You said you got gloves?

10  A    No, I carry them in my pocket.

11  Q    Okay.  So you said handheld radio and what else did

12  you say?

13  A    Handcuffs.

14  Q    Okay.  Just to be clear, it's your testimony that

15  the frisking, the -- the annex school was just a random

16  assignment for that day?

17  A    Yes.

18  Q    Okay.  And it's your testimony that frisking

19  Mr. Tranchina was just a random frisk that occurred

20  during that assignment?

21  A    Yes.

22  Q    Okay.  So your testimony that at the time that you

23  frisked Mr. Tranchina, you had no idea that he was the

24  person that had passed the note to Miss Maura?

25  A    Yes.


                Lisa L. Tennyson, CSR, RMR, FCRR
              UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

184

McGRATH - DIRECT - ROCHE

1    Q    So when you got to the school annex, did you -- did
2    you check in with the officer there?
3    A    Yes.
4    Q    Okay.  Who was the officer there?
5    A    Officer Patnode.
6    Q    Okay.  And you told Officer Patnode that you were
7    going to be conducting a frisk there that day?
8    A    Yes.
9             MR. ROCHE:  I ask that the witness be shown
10   Plaintiff's 16.  I believe it's in evidence.
11            COURT CLERK:  It's not.
12   BY MR. ROCHE:
13   Q    Do you recognize what Plaintiff's 16 is?
14   A    Another copy of the logbook from the annex school.
15   Q    Okay.  So this is different from the last logbook
16   that I showed you.  Correct?
17   A    Yes.  This is where the annex school is.
18   Q    Okay.  And so the -- there's two different schools,
19   right?  Main school and then an annex school.  Correct?
20   A    Yes.  They are in opposite sides of the facility.
21   Q    Okay.  And this logbook is -- would be maintained
22   by Officer Patnode who is the officer who assigned to
23   that area.  Correct?
24   A    Yes.
25   Q    And that would be -- logbook would be kept in the

McGRATH - DIRECT - ROCHE

```
 1   regular course of his job, right?
 2   A     His -- yes.
 3              MR. MIRANDA:  Objection.
 4              THE COURT:  I'm sorry.  Was there --
 5              MR. MIRANDA:  Objection, your Honor.
 6              THE COURT:  It hasn't been offered yet so --
 7              MR. MIRANDA:  He was calling for speculation
 8   as to Mr. Patnode's knowledge of what he does in his
 9   job.
10              THE COURT:  Overruled, but if he has
11   knowledge, he can testify to that.
12   BY MR. ROCHE:
13   Q     And he would make -- typically he would make the
14   notations in this logbook as the -- the things he was
15   recording were occurring.  Correct?
16   A     The recordings that he deemed necessary to have
17   been there, yes.
18   Q     He times them, correct.  He times the notations --
19   A     Yes.
20   Q     -- in the logbook?  And this is made in the regular
21   course of his job.  Right?
22   A     Yes.
23   Q     Okay.
24              MR. ROCHE:  So I would ask that Plaintiff's 16
25   be moved into evidence.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

```
 1              THE COURT:  Any objection to Plaintiff's 16?
 2              MR. MIRANDA:  No, your Honor.
 3              THE COURT:  Plaintiff's 16 is received.
 4              (Plaintiff's Exhibit 16, received)
 5   BY MR. ROCHE:
 6   Q    I ask you to look through this document and let me
 7   know if it indicates your -- your presence in the annex
 8   school on that date or your assignment in the annex
 9   school on that date.
10              THE COURT:  Could you scroll that up, Britney?
11              (Discussion held off the record)
12              MR. ROCHE:  Starting at January 28th, go down
13   a little bit.
14   Q    So on the page that's shown on the screen right
15   now, do you see any indication that any -- any record of
16   your assignment, your assignment to frisk the annex
17   school on January 28th, 2016?
18   A    No, only puts in there the program runs and when a
19   civilian is there.
20   Q    So the answer would be no, your assignment does not
21   appear in this logbook.  Right?
22   A    Right.
23   Q    Okay.  So approximately how many students entered
24   the annex next school that morning?
25   A    It's usually between 80 and a hundred.  There's
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

187

McGRATH - DIRECT - ROCHE

1    about 20-plus per class.

2    Q    Okay.  And were you there from when the inmates

3    started to come in for school in the morning?

4    A    Yes.

5    Q    Okay.  And approximately how many inmates did you

6    frisk?

7    A    Around 10 to 15.

8    Q    Okay.  Where did you frisk them?

9    A    Excuse me?

10   Q    What part of the annex school did you frisk the

11   inmates in?

12   A    In the foyer on the way in.

13   Q    Fair to say that the foyer is a small, cramped room

14   right?  It's a very small space, right?

15   A    Yes, it's a -- it's a room where it enters two

16   doors, one in and one out, and it's just an area where

17   they stomp their feet off when they come in the next

18   area.

19   Q    And it's fair to stay there's, like, a steel door

20   leading to the exterior of the building, fair to say?

21   A    Yes.

22   Q    And another steel door leading from the little

23   foyer into the annex school.  Correct?

24   A    Yes.

25   Q    Okay.  And it was in between those two doors that

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

1   you conducted your frisk operation, right?

2   A    Yes.

3   Q    Okay.  And there's -- on the doors there's -- maybe

4   a tiny little window, right?  But other than that, it's

5   not possible for anybody to see into that area.  Right?

6   A    Yes.  There's a narrow stripped window.

7   Q    Okay.  And there's no cameras in that location,

8   right?

9   A    There's no cameras anywhere.

10   Q    Okay.  When you say there's no cameras anywhere,

11   what does that mean?

12   A    There's no camera anywhere in the facility.

13   Q    There's cameras outside the facility?

14   A    On the fence, yes.

15   Q    And so in the frisk booths or the frisk shacks

16   outside the facility, there's -- or outside the

17   buildings, there's cameras there.  Correct?

18   A    There's cameras that go along the fence of the

19   facility.

20   Q    Okay.  So when -- if an inmate was to be frisked in

21   the frisk shacks, that would be captured on video,

22   right?

23   A    I'm not certain if there's a camera on the frisk

24   shacks.

25   Q    So basically you decided -- the area that or the

McGRATH - DIRECT - ROCHE

1    location that you selected for these frisks was a very
2    small area where nobody could -- nobody else could see
3    what was happening in there.  Fair to say?
4    A    Inside out of the cold, yes.
5    Q    And when you conduct your frisks, you would -- you
6    would select an inmate, right?
7    A    Yes.
8    Q    Okay.  And you say you select -- randomly select
9    the inmate?
10   A    Yes.
11   Q    Okay.  And you would tell them -- you get them in
12   the frisk position.  Correct?
13   A    Yes.
14   Q    Okay.  And that's feet apart, couple feet out from
15   the wall, and arms high and flat.  Right?
16   A    Yes, not necessarily a couple of feet out from the
17   wall, but they just hold hands high above the wall.
18   Q    And then you would frisk them from behind.
19   Correct?
20   A    Yes.
21   Q    Okay.  So, your testimony was while you would be
22   frisking an inmate, the other inmates would be just
23   walking behind you?
24   A    True.
25   Q    And you didn't consider that a security risk?

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

```
 1  A    No.
 2  Q    Now the frisk shacks are right outside the door to
 3  the annex, right?  Or very close to the front of door of
 4  the annex?
 5  A    The only frisk shack there is is down at the
 6  compound gate which separates the main compound from the
 7  annex compound.
 8  Q    Okay.  But the inmates that would be going to the
 9  school annex would have to pass that area to get to the
10  annex.  Fair to say?
11  A    Yes.
12  Q    Okay.  So you could have conducted the frisk of the
13  annex school at the frisk shacks.  Right?
14  A    No.
15  Q    Why not?
16  A    Because then you would only get the main inmates.
17  Q    Your testimony is that you could not frisk the
18  annex inmates?  How do you mean the main inmates?  I
19  don't understand.
20  A    The main inmates come from the main compound.
21  Q    Okay.
22  A    Back from the compound gate to the annex compound.
23  Q    So are frisks of the annex school ever conducted at
24  the frisk shack?
25  A    No.  Otherwise you wouldn't get -- be able to frisk
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

1   the annex inmates.

2   Q    Is it your testimony that the only place that annex

3   inmates are frisked is in the foyer or vestibule where

4   you conducted your frisk?

5   A    The only place to frisk all inmates from the annex

6   and main that go to the annex school would be at the

7   annex school.

8   Q    Okay.  Fair to stay that they are -- would be large

9   or more open spaces inside the annex building that you

10  could have conducted your frisk in, right?

11  A    You could do it out on the porch in the weather or

12  you could do it somewhere inside.

13  Q    You could do it somewhere inside, right?

14  A    You could.

15  Q    And if you were to do it somewhere inside, you

16  could do it where Officer Patnode or some other officer

17  could see what was going on.  Right?

18  A    You could do a frisk anywhere.

19  Q    Okay.  You chose to do -- you chose a location

20  where nobody could see.  Right?

21  A    No, I chose a location in the foyer.

22  Q    Your hand was injured during your interaction

23  with -- your incident with Mr. Tranchina.  Correct?

24  A    Correct.

25  Q    This skin on the knuckles of your right hand

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

192

McGRATH - DIRECT - ROCHE

```
 1    were -- was scraped off, right?

 2    A    Correct.

 3    Q    Okay.  And your hand was bleeding, right?  It was

 4    all red and raw?

 5    A    Correct.

 6    Q    And you were -- and Mr. Tranchina's face was

 7    beaten, right?

 8    A    No.

 9    Q    You saw the photographs of Mr. Tranchina's face as

10    you were sitting here in the courtroom.  Correct?

11    A    Correct.

12    Q    Okay.  And would you describe that as a face that

13    was beaten?

14    A    The one picture looks like it's just scratches on

15    the one side of his cheek, and the other photo looks --

16    appears when he hit his head on -- going down to the

17    ground.

18    Q    So is it your testimony that you wouldn't consider

19    those being photographs of somebody who had been beaten?

20    A    Correct.

21    Q    And you heard the testimony of Nurse

22    Caban-Mulverhill.  You heard the injuries that she

23    described?

24    A    Yes.

25    Q    Would you consider those injuries of someone who
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

1    has been beaten?

2    A    You could, yes.

3    Q    And do you know how Mr. Tranchina sustained those

4    injuries?

5    A    Yes.

6    Q    Okay.  How did he sustain them?

7    A    When I took Inmate Tranchina to the floor, we went

8    down and he hit his head on the -- on the floor.

9    Q    So all of those injuries were caused by you

10   bringing him to the floor and hitting his head off the

11   floor?

12   A    No.

13   Q    Well, what injuries do you believe were caused by

14   taking him to the floor?

15   A    So when I got the inmate in a bear hug maneuver, I

16   turned to my right to take him down to the floor,

17   straight behind us was a -- a floor heater.  We both

18   went into the floor heater on our sides, which hit my

19   side and his at the same time, and then went down to the

20   floor.

21   Q    That's what caused his injuries?

22   A    Yes.

23   Q    Okay.  Did anything else, apart from that,

24   contribute to his injuries?

25   A    Yes.  He was thrashing back and forth on the floor

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

```
 1    when I was trying to gain control of his arm.
 2    Q    Was he smacking his head off the floor?
 3    A    No, he was going back and forth trying to get out
 4    of my grasp so he could get back up.
 5    Q    How did that cause an injury?
 6    A    That's what caused the scrapes on his body because
 7    the floor was carpeted and a carpet runner covering.
 8    Q    So how about the injuries to his cheeks?  How did
 9    he get these injuries?
10    A    His injury to his right cheek he caused when we
11    went down to the floor.
12    Q    So how about his left cheek?
13    A    That to me, when I saw it, was scrapes and stuff
14    from the carpet and the rock salt.  I had the same cause
15    of injury myself.
16    Q    So is it your testimony, Mr. McGrath, that those
17    injuries to your knuckles were caused by rock salt?
18    A    Yes.  When I was underneath him trying to pull his
19    arms out, my hands were upside-down on top of the carpet
20    runner, and essentially rug burn from pulling -- trying
21    to pull his arms out.
22    Q    So is it rug burn or rock salt?
23    A    It's both.  That's where the inmates walk in and
24    stomp their foot off the carpet runner.
25    Q    Now, you're right-handed.  Right?
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

1  A    Yes.

2  Q    You didn't sustain any other injuries to your hands

3  or your -- your body other than the knuckles of your

4  dominant right hand.  That's fair to say?

5  A    No.

6  Q    It's not the fair to say?

7  A    No, I had two more injuries.

8  Q    What were your other injuries?

9  A    I had injury to my right cheek where the inmate

10  elbowed me and I had an injury to my right side where we

11  went to the heater.

12  Q    Okay.  Was that injury to your right side

13  documented in any of your medical reports?

14  A    Yes.

15  Q    Okay.  Where is -- and the -- the injury to your

16  face, right, there was a photograph taken of your face

17  that -- that we saw in court earlier with Nurse

18  Mulverhill?

19  A    Yes.

20  Q    So that was a photograph of the injury to your face

21  that you claim you sustained?

22  A    Yes.

23  Q    Is it fair to say you didn't -- you didn't sustain

24  any injuries to your left hand, right?

25  A    No.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

1  Q    And you said you brought him down in a bear hug.
2  Right?
3  A    Yes.
4  Q    So you had both of your hands around him when you
5  hit the ground.  Right?
6  A    Yes.
7  Q    Okay.  You only sustained injuries to your right
8  arm?
9  A    Yes, because I was in -- right-handed, I was using
10 my right hand to try to pull his right arm out to apply
11 restraints on him.
12 Q    Now, were you wearing gloves while you were
13 conducting the frisk?
14 A    I was.
15 Q    What kind of gloves were you wearing?
16 A    The blue medical latex gloves.
17 Q    Were photos taken of the gloves after the incident?
18 A    No.
19 Q    What happened to them?
20 A    They were just left there.
21 Q    They weren't saved in evidence or anything like
22 that?
23 A    Not to my knowledge, no.
24 Q    Now, you claimed to have found a weapon on
25 Mr. Tranchina, correct?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

1    A    I did, yes.

2    Q    And you claimed that you pulled it from his sock.

3    Right?

4    A    I pulled it from his ankle area, yes.

5    Q    Well, if it was in his ankle area, it must have

6    been in his sock.  Right?

7    A    Yes.

8    Q    Okay.  And after you retrieved that item what --

9    actually, can you describe what was the item that you

10   say you recovered?

11   A    So when I felt the object, I didn't know what it

12   was.  When I actually retrieved the item later on, it

13   was a six-inch long Plexiglas material things sharpened

14   down to a point.

15   Q    How do you know -- when you say you retrieved it

16   later on, what do you mean by that?

17   A    After I had the inmate secured and in restraints is

18   when I retrieved the weapon from his ankle area.

19   Q    So what did you do with it -- okay.

20            MR. ROCHE:  Withdrawn.

21   Q    And when you retrieved it from his ankle area, what

22   did you do with it?

23   A    I put it in my pocket.

24   Q    And did there come a time that you took it back out

25   of your pocket?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

1    A    Yes.

2    Q    And when was that?

3    A    When you process the weapon through any contraband

4    form, you have to take pictures and photos of the weapon

5    up at the captain's office.

6    Q    Okay.  So, before you went up to the captain's

7    office, did you speak to any supervisors while you were

8    in the foyer or vestibule?

9    A    On my way out after I transferred the inmate over

10   to the first CO walking in, I walked out of the yard and

11   reported to the infirmary.

12   Q    You weren't just reporting to the infirmary to get

13   treatment for your injuries.  Correct?

14   A    Yes, I was.

15   Q    Okay.  Isn't it true that you were required to

16   report to the infirmary if you were involved in the use

17   of force incident?

18   A    Yes.  You have to go to the infirmary for every

19   accident you sustained.

20   Q    And that the purpose of that is to document what

21   injuries you might have obtained during this incident.

22   Right?

23   A    And treatment, yes.

24   Q    But part of it is to determine whether you used

25   appropriate force or not.  Right?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

1   A     No.  At that point it's strictly for medical

2   treatment.

3   Q     But it's fair to say that you're in a use of force

4   incident and you don't have any injuries, you're still

5   required to go to the infirmary.  Correct?

6   A     I'm not sure.  I believe you would, yes.

7   Q     So before you left the foyer area, Sergeant Barnaby

8   responded to that area.  Correct?

9   A     The response team responded, also the sergeant.

10  Q     And did you show the weapon that you say you

11  recovered to Sergeant Barnaby?

12  A     No, the weapon remained in my pocket.

13  Q     Did you show it to anybody?

14  A     No.

15  Q     Okay.  So it's fair to say that nobody at the scene

16  of the incident saw this weapon except for you?  Is that

17  fair to say?

18  A     That's very fair.  It was secured in my pocket.

19  Q     There was nothing to prevent you from handing over

20  the weapon to Sergeant Barnaby, correct?

21  A     Yes, there is.  You can't -- you have to maintain a

22  chain of custody on a weapon.  You can't let it leave

23  your person.

24  Q     That's -- you're saying that's a rule?  That you

25  are not allowed to hand over a weapon that you recovered

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

1   in an incident to a supervisor?

2   A    You have to remain with your chain of custody.  So

3   I retrieved the weapon and I stored it in my pocket and

4   it stayed there until it was put in an evidence locker.

5   Q    Doesn't chain of custody mean that it's just -- you

6   record who the -- who the item gets transferred to?

7   A    Yes, I suppose it goes it -- I suppose, yeah, I

8   suppose it goes from one person to the next.  You would

9   keep transferring it and keep it.

10  Q    It's fair to say that there wouldn't be a chain of

11  custody problem if you were to hand over the weapon to

12  somebody else so long as that chain of custody was

13  documented.  Correct?

14  A    Correct.

15  Q    Now, prior to Sergeant Barnaby and the response

16  team arriving, had you shouted out for help or anything?

17  A    As soon as I had the inmate in restraints, I

18  grabbed my radio and radioed for assistance.

19  Q    But before radioing for assistance, while you

20  were struggling with Inmate Tranchina, you didn't shout

21  out for somebody to help you?

22  A    No, I didn't.

23  Q    Okay.

24  A    It was literally 30 seconds to a minute and as soon

25  as I had him restrained, I grabbed my radio and called

McGRATH - DIRECT - ROCHE

```
 1    for assistance.
 2    Q    You didn't shout out for Officer Patnode to help
 3    you?
 4    A    He would have not heard.
 5    Q    He would have been seated pretty close to there,
 6    right?
 7    A    He's through two -- he would have been through
 8    additional doors and two rooms away.
 9    Q    And, like, how close would the nearest officers
10    have been outside the front door of the annex?
11    A    They are stationed in small little shacks of the
12    walkway.
13    Q    Of the walkway.  And how far is the walkway from
14    the front of -- the front door of the annex?
15    A    One is a little closer than the other but
16    another -- at least 150 feet away, if not more.
17    Q    It's fair to say when Sergeant Barnaby arrived, he
18    came into the foyer area.  Right?
19    A    Yes, I -- by that time, I had already raised him to
20    his feet and handed him over to the first responding
21    officer.
22    Q    But Sergeant Barnaby did enter, correct?
23    A    Yes, as I was going out, they were all coming in.
24    Q    Yes or no?
25    A    Yes.
```

McGRATH - DIRECT - ROCHE

1   Q    Okay.  And it's fair say that he was the only -- he
2   was the only sergeant that came into the foyer.
3   Correct?
4   A    Correct.
5   Q    Did you tell Sergeant Barnaby that you had found an
6   ice pick-type weapon?
7   A    When I was up front --
8           THE COURT:  Just answer the question.  Did you
9   tell him?
10  A    I can't recall.
11  BY MR. ROCHE:
12  Q    Now, as part of the process, after you're involved
13  in the use of force, you're required to get photographs
14  taken of your injuries.  Correct?
15  A    If you have been injured, yes.
16  Q    And that's so that your injuries are properly
17  documented for any investigation into that use of force,
18  correct?
19  A    The injuries are done by the fire and safety
20  officer, that's why he takes photos.
21  Q    But it's -- would you agree that it's to preserve
22  evidence of the incident so that -- to aid in any
23  investigation of that use of force incident?
24  A    No, they are made because there was an accident.
25  That's why they took them.

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

1          MR. ROCHE:  I ask that Plaintiff's 10 be put
2     on the screen again.  Scroll down to the colored
3     photographs.
4     Q    So, Mr. McGrath, the photo that you are looking at
5     there, did you cause those injuries to Mr. Tranchina?
6     A    No.
7     Q    So the injury to his cheek, which is -- appears to
8     be four or five long or lacerations or deep scratches,
9     did you cause that injury?
10    A    No.
11    Q    Do you know who caused that injury?
12    A    Those are caused by the same issue I had on the
13    floor -- the same reason I had my injuries, from the
14    rock salt on the carpet.
15    Q    The redness and swollen ears, did you cause that
16    injury?
17    A    No.
18    Q    Okay.  And what caused that injury?
19    A    No, same thing.  His face was against the floor.
20    Q    Are the injury to Mr. Tranchina's nose that you can
21    see in that photograph, what caused that injury?
22    A    Appears to me also a scratch, like the rest.
23         MR. ROCHE:  Can we scroll down a little bit.
24    Q    So the photographs that are shown in this
25    photograph of the right side of Mr. Tranchina's face.

McGRATH - DIRECT - ROCHE

1   Did you cause any of those injuries?

2   A   No.

3   Q   So those injuries were caused by rolling around on

4   the floor, too?

5   A   Rolling around on the floor and also when I took

6   him to the floor.

7   Q   So the swollen and deep red ears, the injury to his

8   cheek, the injury to his forehead, that they were all

9   caused by him falling to the floor?

10   A   Going to the floor and also when he was on the

11   floor thrashing, yes.

12   Q   And you heard that he sustained a fractured rib.

13   Correct?

14   A   Yes.

15   Q   Okay.  And what's your explanation for how he

16   sustained the fractured rib?

17   A   We both went into the heating register that was

18   behind us.

19   Q   So did he hit -- what part of his body hit off of

20   the heating register?

21   A   The same as mine.  The right side, rib area you

22   would call it.

23   Q   Did you tell Maura Mayer about this incident?

24   A   No, just told her that I had a use of force at

25   work.

McGRATH - DIRECT - ROCHE

1   Q    Did you tell her that an inmate was taken to the

2   hospital because of your use of force report?

3   A    No.

4   Q    Or use of force incident?  You spoke to her the

5   same day?

6   A    Yes.  That night I would have told her.

7   Q    And did you tell her about your injuries on your

8   fist?

9   A    Yes, that's what she asked, if I was okay, I had a

10  use of force and I said yes, minor.

11  Q    And you didn't tell her who the inmate was that was

12  involved?

13  A    No.

14  Q    You didn't tell her it was an inmate -- with an

15  inmate from her -- from the dorm that she was

16  the assigned officer in?

17  A    No, and I didn't really -- I didn't know that then

18  either.

19  Q    But you -- you have found out pretty soon, right?

20  What -- who the inmate was, correct?

21  A    Well, I did paperwork that afternoon, and I knew it

22  was off -- where his dorm was.

23  Q    So that by that afternoon, you knew what dorm he

24  was assigned to.  Right?

25  A    Yes, of course.

                    McGRATH - DIRECT - ROCHE

 1    Q    And you didn't speak to Ms. Maura about it and say,
 2    oh, I had an incident with one of your inmates?
 3    A    No, she wasn't even working there then.
 4    Q    So you prepared a misbehavior report?
 5    A    Yes.
 6    Q    Correct?
 7              MR. ROCHE:  And so I would ask the witness be
 8    shown D-7.
 9              THE COURT:  That's in evidence, correct?
10              COURT CLERK:  Yes.
11              THE COURT:  That's in evidence.
12    Q    Okay.  So the misbehavior report --
13              COURT CLERK:  You said D-7?
14              MR. ROCHE:  D-F.
15              COURT CLERK:  This is also in evidence, Judge.
16    BY MR. ROCHE:
17    Q    Is this the misbehavior report that you prepared
18    for Joseph Tranchina?
19    A    Yes.
20    Q    And can we scroll down?  That's your signature that
21    appears at the bottom of the first page?
22    A    Yes.
23    Q    Okay.  And fair to say that this misbehavior report
24    was -- you signed this misbehavior report under the
25    penalty of perjury?

McGRATH - DIRECT - ROCHE

1    A    On what?

2    Q    Under the penalties of perjury?  It's a sworn

3    statement?

4    A    Yes, yes.

5    Q    So if you were to provide false information in such

6    a statement, that would be perjury?

7    A    Right.

8    Q    The following -- after you filed this misbehavior

9    report, it led to a Tier III hearing, right?

10   A    Yes.

11   Q    Which is to adjudicate on the misbehavior report,

12   right?

13   A    Yes.

14   Q    And you testified at that Tier III hearing, right?

15   A    Yes.

16   Q    And you testified under oath at that too, correct?

17   A    Yes.

18   Q    So if you were to testify untruthfully at that,

19   that would be perjury too.  Correct?

20   A    Yes.

21   Q    When you signed your misbehavior report and

22   testified at the hearing, you were aware that the

23   incident had not been photographed or videotaped or

24   surveilled and hadn't been observed by anybody apart

25   from you.  Correct?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

```
 1    A    Yes.
 2    Q    You knew when you signed the misbehavior report
 3    that the only defense that Mr. Tranchina would have had
 4    would be his own word denying what you accuse him of.
 5    Right?
 6    A    Yes.
 7    Q    You knew when you signed that misbehavior report
 8    you were alleging that Mr. Tranchina had committed an
 9    assault on a corrections officer.  Correct?
10    A    He did, yes.
11    Q    Okay.  And you were also accusing him of possessing
12    a weapon in the correctional facility.  Correct?
13    A    He did, yes.
14    Q    Okay.  And you knew that when you found that
15    misbehavior report, that could result in criminal
16    charges being brought against him.  Right?
17    A    Yes.
18    Q    So the District Attorney could have decided to
19    bring criminal charges against Mr. Tranchina based on
20    your complaint in the misbehavior report.  Correct?
21    A    I suppose he could have, yes.
22    Q    And the District Attorney did not do that.
23    Correct?
24    A    No.
25    Q    But you knew that whether or not the DA pressed
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - DIRECT - ROCHE

1  charged against Mr. Tranchina, that he would be facing

2  significant solitary confinement time if your report and

3  your testimony at the hearing were to be believed.

4  Correct?

5  A    Yes, depending on what the tier officer hit him.

6  Q    That's in fact what happened, right?  He was

7  sentenced to 210 days in solitary confinement.  Right?

8  A    Yes.

9  Q    And you were also aware that later on several

10  months later the -- the misbehavior report, finding of a

11  Tier III hearing finding was reversed, right?

12  A    Yes.

13  Q    You testified that you were not dating Miss Mayer

14  back in January of 2016, correct?

15  A    Correct.

16  Q    As you sit here today, are you aware that Miss

17  Mayer told New York State Police that in fact you and

18  her had --

19          MR. MIRANDA:  Objection, your Honor, hearsay.

20          THE COURT:  Sustained.

21  Q    Now, you -- it's fair to say you and --

22          MR. ROCHE:  Withdrawn.

23  Q    It's fair to say that a few days before your

24  incident with Mr. Tranchina, Miss Mayer transferred to

25  another facility, right?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - DIRECT - ROCHE

 1   A     Correct.

 2   Q     And she had requested that transfer?

 3   A     Correct.

 4   Q     And it's fair to say that a few weeks later, a

 5   couple weeks later she transferred back, right?  To Bare

 6   Hill?

 7   A     At some point, yes.

 8   Q     But it was pretty close in time, right?  Sometime

 9   in February she requested a transfer back to Bare Hill?

10   A     Yes.

11   Q     And then she was transferred back in April, early

12   April.  Correct?

13   A     Yes.

14   Q     When she came back in early April she actually

15   moved in with you, right?

16   A     Correct.

17   Q     Okay.  And you guys have been living together?

18   A     Correct.

19         MR. ROCHE:  Thank you.  I've got nothing

20   further.

21         THE COURT:  All right.  Let's take five

22   minutes.  Try to really limit it to five minutes, just

23   to stretch and you need to use the restrooms and then we

24   will do the cross-examination.  Officer, would you put

25   your mask on and go back to your seat before I have the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

211

McGRATH - CROSS - MIRANDA

```
 1   jury go to the jury room.  Thank you.  We stand in
 2   recess for five minutes.
 3              (Jurors excused)
 4              (Following recess; jury present)
 5              THE COURT:  Counsel for Officer Mr. McGrath,
 6   go right ahead.
 7   CROSS EXAMINATION
 8   BY MR. MIRANDA:
 9   Q    Good afternoon, Officer McGrath.
10   A    Good afternoon.
11   Q    You started working for DOCCS in January of 2006
12   you testified earlier?
13   A    Correct.
14   Q    And why did you want to work for the Department of
15   Corrections?
16   A    Corrections is very popular in my family.  My dad
17   is also a CO his whole life, and I knew I wanted to fall
18   in his footsteps so I took the test and scored well and
19   got hired.
20   Q    Did you have to go to training once you started
21   training with the department of corrections?
22   A    Yes, I did.
23   Q    And how long was training?
24   A    Training academy in Albany was for eight weeks.
25   Q    And what did they teach you in training academy?
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - CROSS - MIRANDA

1  A    They taught you every aspect of the job you need to

2  perform.

3  Q    What were some of those topics?

4  A    Anywhere from first aid, to securing prisons, to

5  contraband, to pat frisks, contraband retrieves, and

6  certain laws inside the facility.

7  Q    And what exactly do they teach you about pat

8  frisking?

9  A    Pat frisking is almost a whole week of training.

10 It's every aspect from the start to finish of pat

11 frisking for how to find or -- how to find a contraband

12 on inmates and also where to look, how to retrieve it,

13 and what ways to do it safely so no one gets hurt.

14 Q    We've thrown around these terms I think we take

15 granted sometimes.  The jury doesn't understand the

16 terminology.  Could you explain to us what exactly

17 contraband is.

18 A    Contraband is anything in the facility that an

19 inmate cannot have.  It could be a weapon or drugs or

20 any sort of things they are not allowed to have in

21 there.

22 Q    And are inmates made aware of what they are not

23 allowed to have?

24 A    Yes.

25 Q    Where did you go with the department of corrections

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

213

McGRATH - CROSS - MIRANDA

1  after the training academy?

2  A    After graduating, I reported to Downstate

3  Correctional Facility.

4  Q    And did you eventually find your way to the Bare

5  Hill Correctional Facility?

6  A    Yes.  After approximately a month at Downstate, I

7  transferred over to Fishkill Correctional Facility

8  across the street, and approximately two years later, I

9  transferred to Bare Hill Correctional Facility.

10  Q    Why did you come back to Bare Hill Correctional

11  Facility?

12  A    Because Bare Hill was closest to my hometown.

13  Q    And was your role at Bare Hill Correctional

14  Facility to be a corrections officer?

15  A    Yes.

16  Q    At a high level, what is the main role of the

17  corrections officer in New York State prison facility?

18  A    The officers are taught to provide security and

19  care, custody and control of inmates.

20  Q    Fast forwarding to January of 2016.

21     Were you still working at Bare Hill Correctional

22  Facility at that time?

23  A    Yes.

24  Q    Were you assigned to any specific part of Bare Hill

25  facility?

McGRATH - CROSS - MIRANDA

1   A    I had a 7-to-3 resource bid.

2   Q    What does a resource officer do?

3   A    So, a resource officer basically fills in the holes

4   through the facility.  If a regular officer had a job,

5   has every day, if he was off that day, the sergeant will

6   backfill the jobs through resource officers -- resource

7   officer will backfill jobs in the facility that are open

8   that day.

9   Q    And just to back up.  You said 7-to-3 bid.  Does

10  that mean you work the 7 A.M. to 3 P.M. shift?

11  A    Yes.

12  Q    And to go back to your testimony about what a

13  resource officer is, so does that mean that you don't

14  know where you will be working in the facility on any

15  given day?

16  A    That's correct.

17  Q    So when you go in to work, how do you find out

18  where you are to report to?

19  A    Everyone reports to the chart sergeant in the

20  morning when they arrive.

21  Q    And in January of 2016, where was the chart

22  sergeant located at Bare Hill?

23  A    In his office.

24  Q    Was he the only person who worked in that office?

25  A    No.  There's two other desks in the office where --

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - CROSS - MIRANDA

1   in the morning.  The other sergeants will hang out and

2   also work in.

3   Q    And when you go ask to determine where you are to

4   report, does the chart sergeant and -- tell you in

5   writing?  Do you look at a computer?  How does it

6   happen?

7   A    It's verbalized.

8   Q    Do you know when the chart for the day of which you

9   are to work is prepared?

10  A    Yes.  The sergeant working dayshift will report his

11  own chart for the next day.

12  Q    So the chart, for example, for January 28th, would

13  have been prepared on January 27th?

14  A    Correct.

15  Q    Now, moving to January 28th of 2016, before you

16  arrived at work that day, did you know where you were to

17  report?

18  A    No.

19  Q    How did you learn where you were going to report

20  that day?

21  A    The sergeant, when I checked in, told me to frisk

22  the annex school.

23  Q    And I think you testified earlier that that

24  sergeant was Sergeant Conto?

25  A    Yes.


                    Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

216

McGRATH - CROSS - MIRANDA

1   Q    Prior to January 28th, 2016, had you ever been
2   assigned to pat frisk a specific part of the facility
3   before as a resource officer?
4   A    Several times.
5   Q    In what parts of the facility had you been assigned
6   to frisk before?
7   A    They will assign you places that have most flow of
8   inmates.  So mess halls, rec areas, and schools.
9   Q    And had you ever been assigned to pat frisk at the
10  main or annex school before?
11  A    Yes.
12  Q    Why do they assign you to the areas where there's a
13  flow of inmates?
14  A    They assign to those areas because they want you to
15  have the biggest flow of inmates because that's when
16  they will carry contraband and pass it amongst each
17  other.
18  Q    On January 28th, 2016, after you learned that you
19  were assigned to the school annex for a pat frisk, did
20  you receive any equipment to do this job?
21  A    Yes.
22  Q    What was that?
23  A    My two-way radio and a pair of handcuffs.
24  Q    And where did you retrieve the radio and handcuffs
25  from?

TRANCHINA v McGRATH - 17-cv-1256

217

McGRATH - CROSS - MIRANDA

```
 1   A     From the arsenal.

 2   Q     And where did you go after the arsenal?

 3   A     I went to lineup.  Preshift briefing.  Excuse me.

 4   Q     And then after lineup, did you go to the annex

 5   school?

 6   A     I reported to the mess hall.

 7   Q     And why did you go to the mess hall?

 8   A     That time of morning all the inmates are going

 9   to -- for breakfast, chow.  So they want extra security

10   where the highest flow of inmates are at that time.

11   Q     And what time do you think you got down to the mess

12   hall?

13   A     Preshift briefing is 6:45 to 7, so it was shortly

14   after 7:00.

15   Q     Do you know how long you were in the mess hall for?

16   A     In the mess hall until the mess hall cleared.

17   Usually around 8:00.

18   Q     And then where did you report to after you were at

19   the mess hall?

20   A     After that, I reported back down to the annex

21   school.

22   Q     There's been some time testimony about it but I

23   think it will helpful if you could describe for us the

24   physical layout of Bare Hill.  Is it one building?

25   A     So Bare Hill is a very large facility.  It
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - CROSS - MIRANDA

```
 1    stretches between quarter and half mile front to back.
 2    It's two large compounds.  The front compound is called
 3    the main compound, and then down back through a compound
 4    gate is the -- turns into annex compound.
 5          Main compound has dorms for inmates seven and eight
 6    and also houses the main school, main gym, mess hall,
 7    and down in the annex is two more schools and also
 8    another health center for the annex inmates are.
 9    Q    The annex school was not connected to where the
10    mess hall was located?
11    A    No, they are very far apart and all building there
12    are all separate.
13    Q    Could you describe -- I think there's been bits and
14    pieces.  Maybe you could connect this together for
15    everybody.  Could you describe the physical layout of
16    the school annex for us.
17    A    Sure.  The annex school is a old dorm.  The dorm
18    are is where the inmates sleep at night, and it is a
19    brick building, has a front porch and entryway in the
20    front, through a foyer to another entry door.  After you
21    go into the second door, it goes into the dayroom, which
22    is used to be a dayroom when it was a dorm and now it's
23    a school.  So it's just a passageway that inmates go to
24    the bathroom, talk to their counselors, and then inside
25    that is another door that leads to a classroom area.
```

McGRATH - CROSS - MIRANDA

```
 1   Through that door, you have officers desk to your left
 2   and then beyond that it's four classrooms.
 3   Q     And where does the school annex officer sit?
 4   A     He sits inside that third door by the classrooms.
 5   Q     So there's the vestibule area, which is enclosed
 6   with doors?
 7   A     Yes.
 8   Q     There's another old rec room that's enclosed by
 9   doors and then there's a third room where the school
10   annex officer is?
11   A     Correct.
12   Q     And then in that third room, that's where the
13   classrooms are located?
14   A     Correct.
15   Q     And does -- in January of 2016, did the school
16   annex officer -- where did he sit in that third room?
17   A     He sits at his desk.
18   Q     And is he facing the doors that are looking towards
19   the vestibule area?
20   A     He is facing almost the opposite way.
21   Q     All right.  So when you were pat frisking
22   Mr. Tranchina, if he was sitting down in his chair, he
23   likely would have been facing other way?
24   A     Correct.
25   Q     What time does the -- at January 2016, what time
```

McGRATH - CROSS - MIRANDA

1    does the first school session start?

2    A    The program run is announced an after the mess hall

3    clears.  So usually around 8:15 to 8:20, sometimes a

4    little later.

5    Q    Do inmates arrive all at once?

6    A    No.

7    Q    Why not?

8    A    Because the annex school is in the annex, so annex

9    inmates will generally arrive faster because it's a

10   short walk for them, whereas main inmates have to walk

11   all the way down to the back.

12   Q    How long, on January 28th, 2016, between when the

13   first inmates started arriving and when Mr. Tranchina

14   arrived?

15   A    It was approximately 35 minutes.

16   Q    And during that time period, were you pat frisking

17   inmates the entire time?

18   A    Yes.

19   Q    And you testified earlier that you will pat frisk

20   inmates randomly; is that right?

21   A    Correct.

22   Q    But you do it continuously?

23   A    Correct.  As long as there is a flow of inmates

24   coming in, yes.

25   Q    And on January 28th, 2016, you were doing this

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - CROSS - MIRANDA

1   inside the vestibule area?

2   A    Correct.

3   Q    And why were you doing it inside the vestibule

4   area?

5   A    That's where the frisker done in the annex school,

6   inside, out of the weather, and it's just inside the

7   front door.

8   Q    How many inmates do you think you pat frisked that

9   day before Mr. Tranchina?

10  A    I -- in total, I pat frisked between 10 and 15

11  inmates.

12  Q    When you were pat frisking one inmate, would an

13  inmate who is arriving at the annex school have to stop

14  or would they continue on in the school?

15  A    Go straight through.

16  Q    Do you remember what time Mr. Tranchina arrived at

17  the school annex that day?

18  A    It was around 9:00.  Just before 9:00.

19  Q    And you testified earlier that you didn't recognize

20  him when he arrived.  Correct?

21  A    Correct.

22  Q    And where were you when Mr. Tranchina arrived at

23  the school?

24  A    I was just inside the front door of the school.

25  Q    And what happened after Mr. Tranchina arrived at

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - CROSS - MIRANDA

1   the school annex?

2   A    I asked Mr. Tranchina, I said, you're late.  He

3   said I was at sick call, and I said okay, give me your

4   I.D. and do a pat frisk.

5   Q    And did you pat frisk him?

6   A    Yes.

7   Q    Where did you pat frisk him?

8   A    I had -- as you walk in the front door, I pat him

9   on the left-hand wall.

10            MR. MIRANDA:  Ms. Norton, could you pull up

11   Exhibit D-Z.

12   Q    Do you see this photo?

13   A    Yes.

14   Q    I'm sorry.  Do you recognize what is the location

15   in this photo?

16   A    Yes.

17   Q    And what is it?

18   A    It is a picture taken of the foyer from the school

19   side out to the road or walkway.

20   Q    So this is looking into the vestibule area where

21   you performed a pat frisk but from inside of the

22   facility?

23   A    Inside the school, yes.

24   Q    And what's that on the left-hand side of the photo?

25   A    That is the heater.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - CROSS - MIRANDA

1    Q    And so when you're walking into the school area

2    from the outside, the radiator would be on your

3    right-hand side?

4    A    Correct.

5    Q    And where did you perform the pat frisk if you were

6    looking at this photo?  Can you tell us where you

7    performed the pat frisk on Mr. Tranchina?

8    A    On the right-hand side.

9    Q    So when you are walking in from the door, you would

10   have performed the pat frisk on the left-hand side with

11   the radiator behind you?

12   A    Correct.

13            MR. MIRANDA:  Could you also pull up P-32,

14   which I believe was already in evidence.

15   Q    Do you recognize the content of this photo?

16   A    I do.

17   Q    What is it a picture of?

18   A    It is a picture of -- taken from the front door

19   facing inside towards the school.

20   Q    So basically is it the same thing as what we just

21   looked at from the opposite side?

22   A    That's correct.

23   Q    It's the same photo as what we just looked at but

24   from the opposite vantage point?

25   A    Correct.


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

224

McGRATH - CROSS - MIRANDA

1    Q    Is there a radiator on the left-hand side of that
2    wall?
3    A    No.
4    Q    And that wall is where you would have performed the
5    pat frisk?
6    A    Yes.
7    Q    So what happened as you started pat frisking
8    Mr. Tranchina?  Did you start at the top of his arms?
9    A    Yes, I do.
10   Q    And what happens next?
11   A    I will always start top of the arms, I will work my
12   way down each arm one at a time, squeezing, feeling for
13   objects.  I work my way down his chest area, rubbing
14   down his chest down to his waist area, reaching behind,
15   grab his back area, rub that down.  Reaching in to his
16   waistband, run fingers around his waistband, make sure
17   nothing is in his waistband, go through his pockets and
18   then start doing frisking of the legs.  That's when I
19   ordered inmate to raise his right leg.
20        When he raised his right leg, I started at his
21   thigh area.  Worked my way down past his knee.  Got to
22   his ankle area, and that's when I felt the foreign
23   object.
24   Q    And what happened when you felt that foreign
25   object?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - CROSS - MIRANDA

```
 1   A    As soon as I felt the foreign object, I stated to
 2   the inmate what is this?  And at the same time, he
 3   twisted to his right and struck his elbow to my right
 4   cheek.
 5   Q    Did you know why at that time he tried to strike
 6   you with his elbow?
 7   A    No.
 8   Q    And did he strike you with his right elbow?
 9   A    Yes, he did.
10   Q    What happened after he struck you?
11   A    He struck me in the check and it caused me to flare
12   back for a second, and then I reached around and grabbed
13   him in bear-hug hold.
14   Q    And was he compliant at that time?
15   A    No.
16   Q    What did you do once you got him in the bear hug?
17   A    I grabbed him in the bear-hug hold and I swung to
18   my right backwards to take him to the floor.  At that
19   time, we came in contact with the heater you see in the
20   picture, and after we came in contact with the heater,
21   we spun again and went down to the floor.
22   Q    Did you throw him to the back wall?
23   A    No.  I spun with him and he was still in my
24   control.
25   Q    And did you just -- you just testified that you
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - CROSS - MIRANDA

1   both hit the radiator?

2   A   Correct.

3   Q   Where did you hit the radiator?

4   A   On my right ribcage area.

5   Q   Did you see where Mr. Tranchina hit the radiator?

6   A   Our bodies were lined up together, so we both hit

7   in the same spot.

8   Q   And then when you -- did you fall to the ground

9   after that?

10  A   That's when I twisted down and went down to the

11  floor with him.

12  Q   And when you landed on the ground, how were your

13  bodies positioned?

14  A   Inmate was landing face down, and I was directly on

15  top of him.

16  Q   And where were your -- where was your body in

17  relation to the radiator at that point in time?

18  A   After I was on the floor, the radiator was to the

19  left of me.

20  Q   Are you looking at the entrance door at that point

21  in time?

22  A   Yes, I am.  The entrance door to the outside of the

23  school.

24  Q   Thank you.  Was Mr. Tranchina compliant at that

25  point in time?

McGRATH - CROSS - MIRANDA

1  A    Mr. Tranchina was not complying.  He was trying to

2  force his way out of my hold.

3  Q    And did you give him any directives?

4  A    Yes, I just -- I told him to stop resisting and

5  told him to place his hands behind his back.

6  Q    Did he follow those directives?

7  A    No.

8  Q    What was he doing on the floor?

9  A    Inmate was frailing [sic] back and forth trying

10 to -- trying to get out of my control.

11 Q    Where were you hands?

12 A    At this time my hands were underneath his stomach

13 area.

14 Q    What was he doing with his body?

15 A    Inmate was rocking back and forth, just trying to

16 get out of my grasp so he could get up.

17 Q    How long did this go on for with Mr. Tranchina

18 rocking back and forth on the floor?

19 A    From 30 seconds to a minute from start to finish.

20 Q    Was it a slow rocking?  A fast rocking?

21 A    It was fast.

22 Q    Were you -- at that point in time, did you believe

23 that he was trying to get away from you?

24 A    Yes.

25 Q    So this continues for half a minute to a minute and

McGRATH - CROSS - MIRANDA

1  then what happens?

2  A    I was finally able to get his right arm out from

3  underneath his body, and I reached over and grabbed my

4  handcuffs and I was able to restrain his right arm.

5  Q    And what happened after you restrained him with

6  your handcuffs?

7  A    As soon as I got his right arm restrained, inmate

8  finally complied and brought his left out so I could

9  restrain his left hand.

10  Q    And what did you do next?

11  A    As soon as inmate was in restraints, I got on my

12  radio and I called for assistance.

13  Q    Did you make a specific radio call?

14  A    Yes, I announced 9, 11, 12 report to the annex

15  school.

16  Q    What did that mean?

17  A    9 is the sergeant and 11 and 12 are the red dot

18  response officers.

19  Q    What did you do after you radioed for help?

20  A    As soon as I radioed for help, I reached down to

21  the ankle area on the inmate and retrieved the --

22  retrieved the weapon from his ankle area and secured in

23  my in my pocket.

24         MR. MIRANDA:  Ms. Norton, could you pull up

25  D-Q.

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - CROSS - MIRANDA

1    Q    I'm showing you a picture already in evidence.
2    Exhibit D-Q.  Do you recognize the item in this picture?
3    A    I do.
4    Q    And what is it?
5    A    That is the weapon I retrieved from Inmate
6    Tranchina on the 28th of January '16.
7    Q    You indicated that this object was in his sock.  To
8    be more precise, was it between his skin and his sock?
9    A    No.  It was cold out in January and they call it
10   Bare Hill for a reason.  It's freezing cold there when
11   the wind blows.  Inmates wear long johns.  So inmates
12   wear long johns and they tuck their socks -- so inmates
13   wear long johns at Bare Hill because it's freezing out
14   when the wind blows.  Typically they -- because it's so
15   windy, most of them wear these long johns but they are
16   tucked into the socks, and between the socks and the
17   long johns is where I retrieved the weapon.
18   Q    When you grabbed the item, was it Mr. Tranchina's
19   skin, long john, weapon, sock?
20   A    Yes.
21   Q    Had you ever seen the Plexiglas shank in Exhibit
22   D-Q before that moment and the time that you pulled it
23   out of Mr. Tranchina's sock?
24   A    No.
25   Q    When you recover a weapon, what are you trained to

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - CROSS - MIRANDA

 1    do with it?
 2    A    After you recover a weapon, you're trained to
 3    secure it on your person until you're in the captain's
 4    office where the locker is so you can bag it, take
 5    pictures of it, and log it in the evidence locker.
 6    Q    So when you recovered the item, based on your
 7    training, you were to take it to the evidence locker?
 8    A    Correct.
 9    Q    Is the material Plexiglas be found within the Bare
10    Hill Correctional Facility?
11    A    Yes.
12    Q    And where is that?
13    A    All of the refrigerators and all of the inmate
14    dorms are all made out of the same material.  All the
15    shelving in inmate dorms are all made out of the same
16    material.
17    Q    And what material is that?
18    A    The Plexiglas.
19    Q    Were those shelves always made out of Plexiglas?
20    A    No.  They were wire framed shelves but they took
21    those all out because inmates were making weapons out of
22    the wire frames.  So they put these Plexiglas shelves in
23    place of them.
24    Q    Do you know where the facility procured the
25    Plexiglas shelving from?

McGRATH - CROSS - MIRANDA

1    A    Yes, brought in outside agency and it was all

2    stored and built inside the work control building.

3    Q    And the work control building on the grounds at

4    Bare Hill?

5    A    Correct.

6    Q    And do inmates work in the work control room?

7    A    Yes.

8    Q    Going back to January 28th of 2016, you retrieved

9    the Plexiglas shank off of Mr. Tranchina and what

10   happens at that point in time?

11   A    That's when I -- that's when I stored it in my

12   pocket.

13   Q    How come you waited until you handcuffed

14   Mr. Tranchina to radio for help?

15   A    Because if I would have taken one hand off of my

16   hold of the inmate to grab a radio, then that would have

17   gave him advantage to get -- a better advantage to get

18   up.

19   Q    Was there a schooling annex officer right in the

20   next room?

21   A    He was two rooms away, yes.

22   Q    So how many doors were between you and where the

23   school annex office where?

24   A    Two steel doors and two concrete block walls.

25   Q    Did you ever punch Mr. Tranchina during this

TRANCHINA v McGRATH - 17-cv-1256

232

McGRATH - CROSS - MIRANDA

1    incident?

2    A    No.

3    Q    Did you ever kick Mr. Tranchina during this

4    incident?

5    A    No.

6    Q    Did anyone respond your radio?

7    A    Yes.

8    Q    Who was that?

9    A    When I called unit 9, 11 and 12, the red dot

10   response team responded to the incident.

11   Q    And what happened when they arrived?

12   A    First officer walked in the front door.  I stood

13   the inmate to his feet, handed him over to the officer,

14   and then I exited the room.

15   Q    And where did you go?

16   A    Outside, met by the sergeant and other officers and

17   then I responded -- reported to the van and I was off to

18   the infirmary.

19   Q    Why did you need to go to the infirmary?

20   A    Because I had injuries.

21   Q    And you testified earlier that the injuries were

22   the abrasions to your face from the elbow and your

23   knuckles.  Correct?

24   A    Correct.

25   Q    And your knuckles were injured.  Could you explain

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - CROSS - MIRANDA

```
 1    how that came to be?
 2    A    Yes.  As we were on the floor, there's a carpet
 3    runner that runs door to door.  When I was trying to
 4    pull out inmate's arms underneath him, the floor is
 5    covered in rock salt because January they sprinkle salt
 6    every day and the carpet burn on the floor plus the rock
 7    salt tore the skin on my hand.
 8    Q    Do you recall whether it was snowing that day?
 9    A    I do not recall the weather that day.
10    Q    Do you know how often they put rock salt down and
11    then -- in the facility at Bare Hill?
12    A    Bare Hill almost every day.
13    Q    Even if it's not snowing, they will put rock salt
14    down?
15    A    Correct.  It's very windy there so if they have any
16    snow melt, there's a lot of ice there.  So inmates will
17    walk outside and they sprinkle salt.
18    Q    Before you left the school annex, did Mr. Tranchina
19    indicate to you at all that he was hurt?
20    A    No.
21    Q    Did you see any blood on Mr. Tranchina before you
22    left the school annex?
23    A    No.
24    Q    Did you see Mr. Tranchina later that day?
25    A    No.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - CROSS - MIRANDA

1          MR. MIRANDA:  Ms. Norton, would you pull up
2    Exhibit D-F.
3    Q    I'm showing you an inmate misbehavior report which
4    is already in evidence.  Do you recognize this document?
5    A    Yes.
6    Q    And did you author this document?
7    A    Yes.
8          MR. MIRANDA:  Ms. Norton, could you just
9    scroll down so we can see the whole report?
10   Q    Mr. McGrath, were there any inmates in the
11   vestibule area when you were pat frisking Mr. Tranchina?
12   A    No, there were not.
13   Q    So the last sentence here says there were
14   approximately 15 other inmates in the annex school area
15   at the time of the incident that stopped what they were
16   doing and took notice of this disturbance.
17        If there was nobody in the vestibule area while you
18   were pat frisking, why would you write that?
19   A    Because the classroom, as you're entering the front
20   door to your first left, is a computer lab which houses
21   about 15 inmates, and when your response team came in,
22   all the inmates went to the windows to that classroom,
23   so it disrupted their class.
24   Q    So in this document, when you are talking about a
25   disturbance, you mean the entire incident that occurred

McGRATH - CROSS - MIRANDA

```
 1   that morning?
 2            MR. ROCHE:  Objection; leading.
 3            THE COURT:  Overruled.  Overruled.  You may
 4   answer.
 5   A    Can you repeat that question, please.
 6   Q    What exactly were you referring to when you used
 7   the word "disturbance"?  The pat frisk itself or the
 8   entire incident?
 9   A    No.  The -- the disturbance on the bottom on left
10   sentence?
11   Q    Yes.
12   A    Yes.  So the disturbance was caused by a whole
13   incident from the red dot response team responding to
14   the use of force.
15   Q    So when you refer to inmates taking notice of the
16   disturbance, you're not talking about the pat frisk
17   itself.  Correct?
18   A    Correct.
19   Q    So Maura Mayer, who is she to you?
20   A    She's my girlfriend.
21   Q    Do you have children together?
22   A    Yes.
23   Q    How many?
24   A    Two.
25   Q    How old are they?
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

236

McGRATH - CROSS - MIRANDA

1    A    Two months old and three years old.

2    Q    And how did you meet Maura?

3    A    At Bare Hill.

4    Q    And you testified earlier that this was

5    approximately January of 2015 or '16?

6    A    Yes.

7    Q    And when exactly in January of 2016 was it?

8    A    It was mid January on the 14th, 15th.

9    Q    And where at Bare Hill do you recall meeting her?

10   A    I was a fire and safety officer so I was doing fire

11   drills in all the dorms in the main compound that night,

12   and she was on the F-2 dorm and that's when I met her.

13   Q    And did you talk to her for a little bit that

14   evening?

15   A    Yes.

16   Q    Between that meeting and January 28, 2016, I think

17   you testified earlier that you continued speaking with

18   her?

19   A    Yes.

20   Q    Via text message?

21   A    Yes.

22   Q    And I think you testified earlier that -- also at

23   on the dorm of F-2 you went back and saw her there?

24   A    Yes.  I stopped by there occasionally different

25   nights.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - CROSS - MIRANDA

```
 1   Q    And when you had been at F-2 talking to her between
 2   the middle of January and January 28th, were there
 3   inmates around?
 4   A    Of course.
 5   Q    Could they see you speaking with her?
 6   A    Of course.
 7   Q    Before January 28th, 2016, had you ever been on a
 8   date alone with Miss Mayer?
 9   A    No.
10   Q    Did you socialize with her outside of work during
11   that period?
12   A    Yes, through texting, yes, and sometimes we would
13   go across the road with all the other COs to the Pines.
14   Q    And was it at the Pines where you learned that an
15   inmate passed a note to her?
16   A    Yes.
17   Q    And did Miss Mayer tell you who the inmate was that
18   paced the note?
19   A    No.
20   Q    Did she indicate to you -- strike that.
21        If she told you what cube number the inmate was
22   that passed the note, would you be able to identify who
23   the inmate was?
24   A    No, not then.  There's 1700 inmates in that prison,
25   so, cube number wouldn't identify an inmate.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

238

McGRATH - CROSS - MIRANDA

1  Q    So at the time of January 28th, 2016, how would you

2  characterize your relationship with Miss Mayer?

3  A    Just friends.  Flirting through texting and that's

4  it.

5  Q    Would you see your relationship was beginning to

6  grow at that time?

7  A    We were -- didn't really know each other at that

8  time.  So we were just kind of friendly and getting to

9  know each other.

10  Q    You liked her, though?

11  A    Yeah.

12  Q    Did you think you might have a romantic interest

13  with her?

14  A    Yes.

15  Q    Were you upset when you learned that an inmate

16  passed a note to her?

17  A    No.

18  Q    How come?

19  A    Like I said before, it's -- inmates pass notes all

20  the time.  It's a game they play.  You really can't take

21  it to heart because it would be a long career for you if

22  you did.

23  Q    There was some testimony earlier that you were

24  terminated as a result of an arbitration award.  Did you

25  agree with that decision?

TRANCHINA v McGRATH - 17-cv-1256

239

McGRATH - CROSS - REED

1   A    No, not at all.

2            MR. ROCHE:  Objection.

3            THE COURT:  Overruled.

4   A    No, not at all.

5   BY MR. MIRANDA:

6   Q    Why not?

7   A    The arbitration was --

8            THE COURT:  I would just like to say to you,

9   Counsel, that I rendered a decision in this matter, and

10  if a door is opened, I'm going to amended that decision

11  very quickly.

12           MR. MIRANDA:  All right.  Nothing further,

13  Mr. McGrath.

14           THE WITNESS:  Okay.

15           MR. REED:  Again, I'm going to remain seated.

16  CROSS EXAMINATION

17  BY MR. REED:

18  Q    I will be brief but I just want to run through some

19  of this chronologically again.

20       You mentioned on I think both direct with

21  plaintiff's counsel and your own counsel, that you were

22  assigned to frisk that morning.  Correct?

23  A    Correct.

24  Q    And the chart sergeant made that assignment?

25  A    Yes.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - CROSS - REED

1   Q    And that day it was Sergeant Conto --
2   A    Yes.
3   Q    -- correct?  But based on I think what came out
4   with -- on technically cross, it was with previous day's
5   chart sergeant in who made that assignment how does that
6   work?
7   A    Yes.  But he's there, you know, every day other
8   than two days a week.
9   Q    Okay.  So it was Sergeant Conto that made that
10  assignment to your --
11  A    Yes, that is.
12  Q    It is not Sergeant Barnaby?
13  A    No.
14  Q    Sergeant Barnaby had not, in fact, served as a
15  chart sergeant at that time, had he?
16  A    No.
17          MR. REED:  And if the Court could put P-21 up,
18  which is in evidence already and just scroll to the very
19  bottom of the first page please, just above Bates
20  number.
21  Q    That notation there that says McGrath J. Frisk
22  annex school, that would not have been made by you,
23  would it?
24  A    No.
25  Q    To your knowledge, that was made by Sergeant Conto?

McGRATH - CROSS - REED

1    A    The sergeant, yes.

2    Q    Okay.  Now, I'll jump ahead a little bit.  We heard

3    about the altercation in the vestibule foyer as we're

4    using those terms interchangeably I believe.

5         When that ended, you first radioed for help?

6    A    Correct.

7    Q    Had the use of force completely terminated at that

8    point?

9    A    Yes.

10   Q    So before any other responding officers came

11   through that exterior door, you had Mr. Tranchina under

12   control and in handcuffs?

13   A    Absolutely, yes.

14   Q    The first folks you saw come through that door were

15   wearing blue shirts, weren't they?

16   A    Yes.

17   Q    And just fresh the jury for us.  Blue shirts

18   signify what?

19   A    They are correction officers.

20   Q    And a white shirt would be different how?

21   A    White shirt is sergeant or lieutenant or higher.

22   Sergeants, lieutenants and higher all wear white shirts.

23   Q    At that time again use of force had completely

24   ended?

25   A    Correct.


                    Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

**242**

McGRATH - CROSS - REED

1    Q    Now, you mentioned there's a frisk shack.  Do you

2    know and if -- whether those responding officers came

3    from that frisk shack or where they came from?

4    A    Well, the frisk shack I was speaking of was down in

5    the compound gate.

6    Q    Okay.

7    A    That's a area where the two compounds come together

8    through a gate.  The gate is wide open but if they are

9    frisking down there, the officer at the station there

10   sends them through a metal detector.

11   Q    Where did those responding officers come from, if

12   you know?

13   A    So outside of the annex school and directly outside

14   there's two small little shacks where officers sit on

15   the walkway.

16   Q    Okay.  So relatively close by?

17   A    Yeah, it's -- like I said, one is a little farther

18   away but it's about, you know, one is -- one that -- the

19   closest one is around 150 feet away.

20   Q    Thanks.  Now, if you remember, do you remember

21   Sergeant Barnaby coming into the vestibule?

22   A    As I was -- that I -- as I picked the inmate up,

23   assisted him to his feet, made it over to the other

24   officer, that's when the rest of the team was arriving.

25   Q    Okay.  And was Sergeant Barnaby part of the rest of

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - CROSS - REED

1    this team?

2    A    Yes.

3    Q    So the inmate was already on his feet?

4    A    Yes.

5    Q    He wasn't even in your possession anymore, sounds

6    like you had given him to one of the responding

7    officers?

8    A    Yes.  Very first officer and took him in his hand.

9    Q    Now, you talked about the injuries sustained and

10   I'll spare you reviewing pictures again but you recall

11   those scratches, you witnessed them, left side of the --

12   Mr. Tranchina's face?

13   A    Yes.

14   Q    And you said you had similar scratches on your

15   hand.  Correct?

16   A    Yes, I had my -- two abrasions, yes.

17   Q    Those would be attributed to that rock salt that

18   you described as pretty heavily applied?

19   A    Rock salt and just the carpet in general.

20   Q    Was that a runner right down the middle of the

21   room?

22   A    Yes.

23   Q    When you were laying face down, you described how

24   you spun and then sort of spun a second time to end up

25   on the floor next to that radiator.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - CROSS - REED

1       How close to the radiator were you?

2   A   Approximately a foot gap between.  I would say.

3   Q   So your face wasn't touching the radiator --

4   A   No.

5   Q   -- at that point?  Was the right side of your face

6   facing the middle of the room or the left?

7   A   My right side of my face facing the middle of the

8   room, yes.

9   Q   And facing entrance door --

10  A   Right.

11  Q   -- from the outside.  Sorry.

12  A   Lined up through the outside door, yes.

13  Q   You described flailing back and forth by Mr.

14  Tranchina, that was right there on that carpet in the

15  rock salt?

16  A   Correct.

17  Q   And that was while you were on top of him.

18  Correct?

19  A   Correct.

20          MR. REED:  If the Court could please put D-F

21  back on the screen.  If I can ask another question.

22  Q   Mr. McGrath, you just discussed the misbehavior

23  report you authored, correct?  With both counsel?

24  A   Yes.

25  Q   And you wrote that on the same day that the

McGRATH - CROSS - REED

1    incident occurred?

2    A    Correct.

3    Q    And those typically signed by a supervisor?

4    A    Correct.

5    Q    In this case, was that done?

6    A    Yes.

7              MR. REED:  You scroll to the bottom,

8    Ms. Norton.  Just to page 1, sorry.

9    Q    Is that Sergeant Conto's signature there next to

10   area supervisor endorsement?

11   A    That is.

12   Q    Not Sergeant Barnaby?

13   A    No.

14   Q    Sergeant Barnaby had nothing to do with the

15   creation of this document?

16   A    No.

17   Q    Now, you also described this document eventually

18   led to a tier hearing for Mr. Tranchina that you

19   testified at.  Correct?

20   A    Correct.

21   Q    To your knowledge, did -- Sergeant Barnaby did not

22   testify that the hearing, did he?

23   A    No.

24   Q    Did anyone else testify at that hearing besides

25   you?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - CROSS - REED

1   A    I was on the phone, so I could only tell you
2   what -- what happened while I was on the phone.
3   Q    At any time on January 28th, 2016, when you and
4   Sergeant Barnaby were in the vestibule together, did you
5   see Sergeant Barnaby kick Mr. Tranchina?
6   A    No.
7   Q    Did he make any contact with Mr. Tranchina at all?
8   A    No.
9   Q    Did you talk with Sergeant Barnaby about this
10  incident ever again after that brief conversation in the
11  vestibule?
12  A    Yes.  Later that evening, that shift we were all in
13  front of the bid work and we discussed it.
14  Q    After the 28th, though, did you ever discuss it?
15  A    Oh, no.  No.
16  Q    Lastly, just, again, Maura Mayer, when you both
17  worked together at Bare Hill, you were not friends with
18  Sergeant Barnaby, were you?
19  A    No.
20  Q    To your knowledge was Miss Mayer?
21  A    No, I don't know.
22  Q    Had he ever supervised her, do you know?
23  A    I do not know.
24  Q    Did he know about what you just -- you called him
25  flirtatious when you spoke with plaintiff's counsel.

McGRATH - REDIRECT - ROCHE

```
 1   Did he know about those?
 2   A    No.
 3   Q    Aside from the minimal interaction you had with
 4   Sergeant Barnaby at work back in January of 2016, you
 5   didn't really know him, did you?
 6   A    Not at all.
 7   Q    When Miss Mayer was in the Pines I think it's
 8   called, with you and your fellow COs and she discussed
 9   this F-2 incident, Sergeant Barnaby wasn't there, was
10   he?
11   A    No.
12   Q    She didn't tell him about that, did she?
13   A    No.
14   Q    Neither did you?
15   A    No.
16          MR. REED:  Nothing further, your Honor.
17          THE COURT:  Any redirect?
18          MR. ROCHE:  Yes, your Honor.
19          THE COURT:  Please just don't be repetitious.
20   Keep it brief.
21   REDIRECT EXAMINATION
22   BY MR. ROCHE:
23   Q    You testified on cross-examination that you -- when
24   you recovered the Plexiglas weapon, you recovered it
25   from in between the -- the sock and the long johns; is
```

McGRATH - REDIRECT - ROCHE

1    that correct?

2    A    That's correct.

3    Q    Okay.  And it's fair to say that in your -- in the

4    paperwork you prepared, the misbehavior report, the

5    other paperwork, you prepared them right after the

6    incident, you wrote in that paperwork that you recovered

7    it from his sock.  Right?

8    A    Yes.

9    Q    From Mr. Tranchina's sock?

10   A    His ankle area, yes.

11   Q    In your misbehavior report, you wrote that you

12   recovered it from his sock.  Right?

13   A    Yes, it was inside his sock.

14   Q    And you didn't mention anything about long johns at

15   that time.  Right?

16   A    No, not that.

17   Q    And you didn't mention long johns in any of your

18   other paperwork either.  Right?

19   A    No.

20   Q    And then you were interviewed in a Q and A by OSI

21   in June of 2016.  Right?

22   A    Yes.

23   Q    Okay.  And at that point, your job was in some

24   danger, right?  You were being investigated?

25                MR. MIRANDA:  Objection.

McGRATH - REDIRECT - ROCHE

1          THE COURT:  Overruled.

2   Q    You were being investigated for this incident,

3   right?

4   A    I was called down just for a Q and A.

5   Q    Okay.  Okay.  But it was a Q and A as part of an

6   investigation into what really happened in the incident

7   with Mr. Tranchina.  Right?

8   A    Yes.

9   Q    And you were -- that was an opportunity for you to

10  explain what happened between you and Mr. Tranchina was

11  not anything wrong or any wrongdoing on your part,

12  right?

13  A    Say that again?

14  Q    Okay.  That was an opportunity for you to explain

15  what happened on that day, right?

16  A    Yes.

17  Q    And to present any facts that were favorable to

18  you?

19  A    Yes.

20  Q    Okay.  And you didn't mention in that Q and A that

21  Mr. Tranchina was wearing long johns, right?

22  A    No.

23  Q    And would it be fair to say that the -- the first

24  time that you ever mentioned to anybody that

25  Mr. Tranchina was wearing long johns was after the DNA

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - REDIRECT - ROCHE

```
 1   report came back showing that there was -- Mr.
 2   Tranchina's DNA was not on the weapon.  Right?
 3   A    It was during the arbitration.
 4   Q    Okay.  And during the arbitration, that was after
 5   you already found out that Mr. Tranchina's DNA was not
 6   on the weapon?
 7   A    Timewise, I'm not sure what time the investigator
 8   did a report.  I'm not sure.
 9   Q    Okay.  Bare Hill is -- it's upstate New York,
10   it's -- it gets very cold in the wintertime.  Right?
11   A    Yes.
12   Q    Okay.  But would you agree that a 30-degree day is
13   not a cold day for Bare Hill?
14   A    30-degree day with the wind blowing non-stop is
15   pretty cold.
16   Q    But temperatures go down to minus -- how low do the
17   temperatures go at Bare Hill?
18   A    Around zero to below; windshield is below that.
19   Q    Okay.  So it would be -- for a January day, would
20   you agree that 30-degree day is relatively mild for a
21   facility in that location?
22   A    The temperature would be.
23            MR. ROCHE:  Ask that the witness be shown
24   what's being been marked as Plaintiff's Exhibit 33.
25            COURT CLERK:  This is not in evidence yet.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

251

McGRATH - REDIRECT - ROCHE

1           THE COURT:  Just show it to the witness for

2      now, Britney.

3      BY MR. ROCHE:

4      Q    It's fair to say that this document is local

5      climatological data provided by the National Oceanic and

6      Atmospheric Administration.  Do you see that from the

7      document?

8      A    From Massena, New York, yes.

9           MR. MIRANDA:  Object to the relevance of this

10      line of question.  Meteorology data from a location

11      that's 30 miles from the correctional facility, I think

12      there's been testimony as to the weather that day.

13           THE COURT:  Just give me a legal basis for

14      your objection.  What's your legal basis?

15           MR. MIRANDA:  Relevance, your Honor.

16           THE COURT:  Sir, you say that Massena is

17      30 miles away from Bare Hill?

18           THE WITNESS:  Yes, ma'am.

19           THE COURT:  Go ahead.

20           THE WITNESS:  At least.

21      BY MR. ROCHE:

22      Q    But it would be -- it's -- are you aware of any

23      weather stations that's closer than the weather station

24      that's shown in this -- in this document?

25      A    Yeah, they were taken -- local weather from Malone,

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - REDIRECT - ROCHE

1     New York.  Yes.

2     Q    But 30 miles, if -- you would agree that if the

3     temperature is 30 degrees in Bare Hill, 30 miles away --

4              MR. MIRANDA:  Objection.  Qualify the

5     question.

6              MR. ROCHE:  Just common sense.

7              THE COURT:  Here's the thing.  If you want

8     to -- if you want to offer it to show what the

9     temperature was in Massena, you can, but I have to agree

10    that it's not an hourly summary for precisely where Bare

11    Hill is, and that really goes to the quality of the

12    evidence as opposed to its admissibility.

13             MR. ROCHE:  That's fine.  Thank you, your

14    Honor.

15    BY MR. ROCHE:

16    Q    So, you would agree that this is the weather data

17    from Massena International Airport weather station,

18    correct?

19    A    Yes.

20    Q    Okay.  And it's your testimony that's approximately

21    30 miles from Bare Hill, right?

22    A    Yeah.  Around 30 miles, I guess.

23             MR. ROCHE:  I would ask that the document be

24    moved into evidence.

25             THE COURT:  You have an objection, correct?


              Lisa L. Tennyson, CSR, RMR, FCRR
            UNITED STATES DISTRICT COURT - NDNY

McGRATH - REDIRECT - ROCHE

```
 1              MR. MIRANDA:  For the purposes of these, it's
 2    fine, your Honor.
 3              THE COURT:  All right.  I will receive
 4    Plaintiff's Exhibit -- what number?
 5              COURT CLERK:  33, Judge.
 6              THE COURT:  33, which shows the climate in
 7    Massena, New York, on -- in January of 2016.  Not at
 8    precisely at Bare Hill.
 9              (Plaintiff's Exhibit 33, received)
10    BY MR. ROCHE:
11    Q    So the -- the time of the incident was
12    approximately 9:00 A.M., correct?
13    A    Correct.
14    Q    Okay.  Can I direct your attention to the date --
15    you can see on the left-hand column, the date of
16    January 28th, and if you go down to the line where it
17    says the time 0853, do you see that?
18    A    Yes.
19    Q    And if you just follow that line across to -- and
20    where it shows that temperature, can you see what the
21    temperature was for that date and time?
22    A    Yes.
23    Q    And it was 30 degrees, correct?
24    A    Yes.
25    Q    You testified on cross-examination that knowing the
```

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - REDIRECT - ROCHE

1   cube number, the dorm number and the cube number for an

2   inmate wouldn't enable you to identify it.

3       Surely Bare Hill Correctional Facility keeps a

4   record of what inmates are housed in each dormitory and

5   cube.  Would you agree?

6   A    Well, sure.  Yes.

7   Q    Okay.  And so you would agree that a record exists

8   for where who put -- who was the inmate in a particular

9   cube on a particular day?

10  A    On that day, yes.

11  Q    Okay.  It's fair to say that inmates generally stay

12  in the same cube.  They don't move them around every

13  day, right?

14  A    They move around quite often.

15  Q    But an inmate would generally have a cube for --

16  they wouldn't be moving every week, every month.

17  Correct?

18  A    They move throughout the facility all the time

19  based on programs or -- if you had a main school

20  program, a main school just -- a lot of reasons why you

21  move from the facility.

22  Q    It would be fair to say that you as a corrections

23  officer wanted to look up what inmate was in a

24  particular cube on a particular day, you would be able

25  to a look up that information.  Right?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - REDIRECT - ROCHE

1    A    You could call the dorm and ask them.

2    Q    So is that yes?

3    A    Yes.

4    Q    Yes?  Just to clarify, when I was asking you

5    earlier about the location of the frisk shacks, I

6    believe you told me that they were in another area

7    where most of the inmates that come into the annex would

8    not go through.  Right?  Isn't that what you told me?

9    A     I told you that the frisk shack that is located

10   between the main compound and the annex compound, only

11   the main inmates come through it to go to the annex

12   school because annex inmates already live in the annex

13   compound.

14   Q    But there is a -- there is a frisk shack within

15   150 feet or so of the front door of the annex.  Right?

16   A    No.  You're talking at least 400 feet.

17   Q    Didn't you say on cross-examination it was

18   approximately 150 feet away?

19   A    That's where the officers shacks are that sit

20   outside.  They are not frisk shacks.  Those are shacks

21   that are on the walkway that provide security on the

22   walkway.

23   Q    Okay.  Now, you were examined by Nurse

24   Caban-Mulverhill after -- when you were brought to the

25   infirmary, right?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

McGRATH - REDIRECT - ROCHE

1    A    Correct.

2    Q    Okay.  And you told her about all -- whatever

3    injuries that you had suffered, right?

4    A    Yes.  She asked for injuries, yep.

5    Q    And fair to say that you didn't tell her about any

6    injury to your rib area?

7    A    I can't recall without seeing the accident report.

8    Q    Okay.

9              MR. ROCHE:  Your Honor, I would ask that the

10   witness be shown what I believe is Plaintiff's 8.

11             COURT CLERK:  I don't have this in evidence

12   but I can show it to the witness.

13             THE COURT:  You can show it to the witness but

14   it's not in evidence so you can't read from it.

15             MR. ROCHE:  If I asked you to scroll down

16   to -- to the accident report.

17   BY MR. ROCHE:

18   Q    So is this the accident report that was prepared by

19   Nurse Caban-Mulverhill?

20   A    You have to scroll down so I can see the rest of

21   it.  No.

22   Q    Okay.

23             MR. ROCHE:  Can you scroll down a little bit

24   further.

25   Q    So what's shown on the screen now, is that the

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - REDIRECT - ROCHE

1    employee accident/injury report?

2    A    Once again, that's -- scroll down so I can see the

3    bottom.  Yes.

4    Q    Okay.  You can scroll back up again?

5    A    Yes.

6             COURT CLERK:  How far up?

7             MR. ROCHE:  Up to the top of the document.

8    Q    It's fair to say that your name is on the top of

9    the document, employee name, Justin McGrath?

10   A    Yes.

11   Q    And this is the report that pertains to injuries

12   sustained in the use of force on January 28th, 2016,

13   correct?

14   A    That they treated, yes.

15   Q    It pertains to the injuries sustained in that

16   accident, correct?

17   A    Yes.

18   Q    Okay.  When you were -- you were examined by Nurse

19   Caban-Mulverhill, she asked you what injuries you had

20   sustained.  Correct?

21   A    Yes.  The treatment injury, which were where I was

22   bleeding.

23   Q    Can you please just answer the question?

24   A    Yes.

25   Q    Did she ask you about any injuries you had

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

258

McGRATH - REDIRECT - ROCHE

1     sustained?

2     A     Yes.

3     Q     And did she file -- did she prepare a report or

4     take notes based on what you were telling her?

5     A     Yes.

6     Q     And is this report to your knowledge?

7     A     Yes.

8     Q     Okay.

9             MR. ROCHE:  Your Honor, I would ask that this

10    report be moved into evidence.

11            THE COURT:  Any objection?

12            MR. MIRANDA:  No, your Honor.

13            THE COURT:  Exhibit is received.

14            (Plaintiff's Exhibit 8, received)

15            MR. ROCHE:  So I would ask that scroll down to

16    the next part of the document.

17    BY MR. ROCHE:

18    Q     It's fair to say that the -- the report documents

19    redness and soft tissue and soft tissue swelling

20    to right hand.  Correct?

21    A     Yes.

22    Q     Okay.  It's fair to say that this document does not

23    mention anything about injuries to a rib area or any

24    part of your torso?

25    A     Right.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

McGRATH - REDIRECT - ROCHE

1    Q    Okay.  But is it your testimony that you told Nurse
2    Caban-Mulverhill that you had hit your ribs against the
3    heater and had sustained an injury?
4    A    That was not a reportable injury to the nurse.
5    That was not a reportable to the nurse.
6    Q    Okay.  And you -- reason for stating it's not a
7    reportable injury was because, what?  The injury wasn't
8    significant enough?  Is that it?
9    A    Correct.  And she cleaned up the -- she cleans up
10   the wounds that are open.
11   Q    Okay.  But it's fair to say that the incident that
12   you described with Mr. Tranchina, you described you get
13   into a bear hug and you're pulling him backwards so that
14   you both had similar momentum at the time you hit the
15   heater.  Correct?
16   A    Correct.
17   Q    And you said that you hit the heater in pretty much
18   the same way that he had, correct?
19   A    Correct.
20   Q    But, meanwhile, Mr. Tranchina suffered a fracture
21   rib and you suffered no injury.
22   A    No injury.
23   Q    So you testified that you pat frisked approximately
24   10 to 15 inmates in this small six-foot-by-six-foot
25   vestibule --

McGRATH - RECROSS - MIRANDA

1   A     Yes.

2   Q     -- that morning, right?

3   A     Yes.

4   Q     And as you frisked each inmate, the other inmates

5   had to pass.

6            THE COURT:  We have gone all over this.  You

7   went over this, they went over it.  Move on.

8            MR. ROCHE:  Judge, can I just ask a --

9            THE COURT:  You went over that when you called

10  him.  I have heard that testimony.  I have written those

11  answers down.  Inmates were going through while he was

12  pat frisking the plaintiff.

13           MR. ROCHE:  Thank you.  I have nothing

14  further.

15           THE COURT:  Anything further on behalf of

16  Officer McGrath?

17           MR. MIRANDA:  Very briefly, your Honor.

18  RECROSS EXAMINATION

19  BY MR. MIRANDA:

20  Q     At the time of the Q and A that was referred to

21  before, did you think at that point in time that you had

22  any reason you should indicate that Mr. Tranchina had

23  long johns on?

24  A     No, I did not.

25  Q     Did you indicate what shoes he was wearing?

                    Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - RECROSS - MIRANDA

```
 1    A     I do not.
 2    Q     Did you become aware if the results of the DNA
 3    tests that Plexiglas shanks during the OSI
 4    investigation?
 5    A     No, it was during arbitration.
 6    Q     What was your understanding of the results of the
 7    DNA test of the Plexiglas shank?
 8    A     That there was one major contributor and several
 9    minor contributors, and the inmate was not the major
10    contributor.
11    Q     Was the inmate's DNA a match of the minor
12    contributors?
13    A     That was unknown.
14              MR. ROCHE:  Objection, your Honor.
15    Mischaracterizes of the evidence.
16              MR. MIRANDA:  He character --
17              THE COURT:  There wasn't an objection, and
18    unless this witness is a DNA expert, the answer is
19    stricken in terms of what was ruled in or what was ruled
20    out.
21    BY MR. MIRANDA:
22    Q     Mr. McGrath, I'm going to point your attention to
23    P-A before we finish here.
24              Under Section 20 it says RT facial cheek, S/I
25    redness and soft tissue swelling noted.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - RECROSS - MIRANDA

1       Is that an injury that you reported to Miss
2   Mulverhill?
3   A    Yes.
4   Q    And what was that injury from?
5   A    That was from the inmate's elbow.
6   Q    Under Section 21 it says wounds to hands cleansed.
7   Was that something that Ms. Mulverhill did to your
8   hands?  Was that something that Miss Mulverhill did to
9   your hands?
10  A    Yes.
11  Q    Did she have to clean anything out of your hands?
12  A    Yeah, she went over -- I had some -- burning
13  sensation from salt, so she cleaned out salt out of my
14  wound.
15  Q    Did she comment on that to you?
16  A    Yes.
17  Q    What did she say?
18  A    Just that -- you know, what's your hand --
19          MR. ROCHE:  Objection.  Objection, hearsay.
20          THE COURT:  Sustained.
21          MR. MIRANDA:  Nothing further, your Honor.
22          THE COURT:  Anything else?
23          MR. REED:  No, your Honor.
24          THE COURT:  You may step down.
25          MR. ROCHE:  Can I ask you two questions?


                 Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH - 17-cv-1256

McGRATH - FURTHER REDIRECT - ROCHE

```
 1            THE COURT:  If it relates to the questions
 2   that were just asked.  Go ahead.
 3   FURTHER REDIRECT EXAMINATION
 4   BY MR. ROCHE:
 5   Q    Did you submit a DNA sample to be compared to the
 6   DNA that was found on the weapon?
 7   A    No.
 8   Q    Okay.  The injury that counsel was just asking you
 9   about that was documented on Nurse Mulverhill's report,
10   the redness to your cheek, and would you characterize
11   that as a treatable injury?
12   A    Yes.  She cleaned the area.
13            MR. ROCHE:  Okay.  Okay.  No further
14   questions.
15            THE COURT:  Anything else?
16            MR. MIRANDA:  No.
17            THE COURT:  You may step down, sir.  Put your
18   mask on and take your water, please.
19            (Witness excused.)
20            THE COURT:  All right, members of the jury,
21   it's approximately 5:00 P.M.  and I know that you have
22   been here since early this morning so this will conclude
23   today's testimony.
24            I would ask you to be back tomorrow morning
25   ready to start promptly at 9:00 A.M.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1           During this evening break do not discuss this
2    case amongst yourselves, do not discuss it with anyone
3    else.  Do not try to do any research about this case.
4           Continue to follow all of the instructions I
5    have given you.  If you should ever become aware of a
6    juror not following the instructions, please bring that
7    to my attention as soon as possible but do not bring it
8    to the attention of any other juror.
9           Hope you have a good night and I will see you
10   tomorrow morning at 9:00 A.M.
11           (Jurors excused).
12           THE COURT:  Mr. Roche, what do you have on tap
13   for tomorrow for the plaintiff's case?
14           MR. ROCHE:  Next witness will be Sergeant
15   Barnaby.  We have some other witnesses subpoenaed for --
16   short witnesses, chart sergeants for tomorrow.  We have
17   subpoenaed Miss Mayer to come in for the early afternoon
18   and chart sergeants.  The other witness that we have are
19   a nurse who would very short testimony.
20           THE COURT:  We need another nurse?
21           MR. ROCHE:  Yes.  Just to clarify one issue.
22           THE COURT:  What nurse is this?
23           MR. ROCHE:  It's Nurse Sherwood from --
24   she's -- she -- like the reason, there is a to-from that
25   this nurse prepared that if we can stipulate that into

1    evidence, that would obviate the need to call her as a

2    witness.

3              THE COURT:  What exhibit is that?

4              MR. ROCHE:  Exhibit P-4.

5              THE COURT:  Have a seat because I want to take

6    a look at it as soon as Britney comes in.  Now, if this

7    is going to be a three- or four-day trial, you would

8    have to be concluding your testimony sometime before

9    5:00 tomorrow.  Right?

10             MR. ROCHE:  Yes.

11             THE COURT:  So you really need to think about

12   what you need to do to prove a prima facie case and what

13   you don't need.

14             MR. MIRANDA:  My understanding is there's two

15   chart sergeants coming and I think that there's -- one

16   of them that was actually the chart sergeant that

17   prepared the chart for the day in question.

18             I think anything beyond that is just

19   bolstering.

20             MR. WEISS:  Similarly to the situation with

21   Nurse Sherwood, if we were able to stipulate with

22   opposing counsel to the to-from memos so those two

23   sergeants, that obviate the need to call them as well.

24             THE COURT:  Let me just handle one thing at a

25   time.

1            So you want to put this to-from in from

2    somebody named Laramay to Sherwin for what?  To prove

3    that he had a fractured rib?

4            MR. ROCHE:  It's from Sherwin to Laramay and

5    it is regarding the fractured rib and counsel questioned

6    the witness earlier about the -- our client earlier

7    about his medical records.  There's one page of his

8    medical records which seemed to indicate that his ribs

9    were merely bruised rather than fractured, and it's just

10   to clear that up.  There was a --

11           THE COURT:  Didn't the nurse say that there

12   was a fracture already?  I think she did.

13           MR. ROCHE:  Yeah.

14           THE COURT:  So, you know --

15           MR. WEISS:  Your Honor, if I may, the fear

16   would be that the jury were to go deliberate and they

17   had the evidence, they would have one set of medical

18   records that show a bruised rib and another set of

19   medical records that show a broken rib without this

20   clarification, that the only reason that one set said a

21   bruised rib is because they x-rayed the wrong location.

22           THE COURT:  You know what?  Plaintiff's

23   Exhibit 4 that you want to get in, this to-from, it says

24   he had an x-ray of his right rib, chest x-rays and

25   facial bones.  Per doctor telephone orders, the films

1    were sent to Alice Hyde.  Per radiologist Dr. Reddy,

2    there is a distal ten rib fracture.  The inmate was

3    examined by Dr. Medved in the x-ray room at Franklin and

4    sent to AMCAAHMC for trauma, Alice Hyde received a chest

5    x-ray and the tenth rib -- it says were not noted on the

6    films.

7               So, it giveth and taketh away.  This memo,

8    which is full of hearsay, you want to call a witness for

9    the purpose of putting a witness who has no personal

10   knowledge of any of this information to get Plaintiff's

11   Exhibit number 4 which on one hand says maybe he did

12   have a fracture, and then another hospital repeated it

13   and it was not noted on the film.  Is that what you're

14   telling me?  So that's all I'll say.  I'd give that some

15   thought.

16              So you have Ms. Mayer, we have Officer

17   Barnaby, and you have, what, two staff sergeants that

18   you want to call?

19              MR. ROCHE:  Yes, two.  And then the forensic

20   scientist for the DNA report, which should be short.

21   Just a report.

22              THE COURT:  Okay.  Well, again, I told the

23   jury that this was a four-day trial.  In making -- I'm

24   not practicing law for you.  I'm just pointing out that

25   we do have a lot of repetition in this record.  I

1    imagine Officer Barnaby's testimony will be much shorter

2    than Officer McGrath's testimony and as far as whether

3    to stipulate to the to-froms, counsel can confer this

4    evening again, but we really -- we really need to get

5    moving tomorrow.

6            How many witness does the defense anticipate

7    calling once the plaintiff rests?

8            MR. MIRANDA:  Defendant McGrath will be

9    calling two short witnesses, your Honor.

10           THE COURT:  All right.  We will be in recess

11   until tomorrow at 9:00 A.M.  Once we're able to finish

12   the proof, we will stay as long as necessary to have our

13   charge conference and to get this case to the jury.

14           We are in recess until 9:00 A.M.

15       (Proceeding adjourned until August 20, 2020)

16               * * * * * * * * *

17

18

19

20

21

22

23

24

25

              Lisa L. Tennyson, CSR, RMR, FCRR
              UNITED STATES DISTRICT COURT - NDNY

C E R T I F I C A T I O N


I, Lisa L. Tennyson, RMR, CSR, CRR, Federal

Official Realtime Court Reporter, in and for the United

States District Court for the Northern District of New

York, do hereby certify that pursuant to Section 753,

Title 28, United States Code, that the foregoing is a

true and correct transcript of the stenographically

reported proceedings held in the above-entitled matter

and that the transcript page format is in conformance

with the regulations of the Judicial Conference of the

United States.


_____

Lisa L. Tennyson, RMR, RPR, FCRR




Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY