UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

**************************************************

JOSEPH TRANCHINA,                                    *

                              Plaintiff,        *

                    -v-   17-cv-1256             *

C.O. JUSTIN McGRATH, et al.,                     *

                              Defendants.        *

**************************************************


TRANSCRIPT OF TRIAL TESTIMONY
BEFORE THE HONORABLE MAE A. D'AGOSTINO
August 20 & 21, 2020
445 Broadway, Albany, New York


FOR THE PLAINTIFF:

SIVIN, MILLER & ROCHE, LLP.
20 Vesey Street, Suite 1400
New York, New York 10007
By:  David Roche, Esq.
     Andrew Weiss, Esq.


FOR DEFENDANT McGRATH:

LIPPES MATHIAS WEXLER FRIEDMAN, LLP.
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
By:  Vincent M. Miranda, Esq.
     James P. Blenk, Esq.


FOR DEFENDANT BARNABY

NEW YORK STATE ATTORNEY GENERAL
The Capitol
Albany, New York 12224
By:  Matthew P. Reed, AAG.
     Ryan Abel, AAG.

1              (Held out of presence of jury)

2              THE COURT:  Britney advised me, Mr. Miranda,

3      that you have some issues?

4              MR. MIRANDA:  Thank you, your Honor.  On

5      August 4th we subpoenaed Lieutenant Jerome Laramay.  He

6      was served on August 8th.  He is not showing up today.

7      I don't think we could take him today anyway.  So we

8      haven't been able to start our proof yet, and he's not

9      going to be showing up tomorrow.  He did indicate that

10     he may be able to come on Monday; however, we're very

11     aware that the Court is trying to move this along as

12     quickly as possible.  We have deposed him in this

13     matter.

14             From our prospective, we believe he is

15     unavailable because he is not showing up.  He's not

16     going to show up tomorrow.  So we would offer his

17     deposition transcript in, if we could read portions of

18     that to the jury when we have our proof.

19             THE COURT:  All right.  I will deal with that

20     in just a little bit.  I'd like to get going with the

21     testimony.  Would you bring the jury in, please.

22             COURT CLERK:  Yes, Judge.

23             (Jurors present)

24             THE COURT:  Plaintiff may call their next

25     witness.  Good morning, folks.  Thank you for being here

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

271

BARNABY - DIRECT - ROCHE

```
 1    right on time.
 2              MR. ROCHE:  Good morning, your Honor.
 3    Plaintiff calls Matthew Barnaby.
 4              COURT CLERK:  Mr. Barnaby, would you please
 5    raise your right hand and state your full name for the
 6    record please.
 7              THE WITNESS:  Matthew Barnaby.
 8    M A T T H E W   B A R N A B Y ,  having been duly sworn,
 9    was examined and testified as follows:
10              MR. ROCHE:  May I inquire, your Honor?
11              THE COURT:  Yes, you may.
12              MR. ROCHE:  Thank you.
13    DIRECT EXAMINATION
14    BY MR. ROCHE:
15    Q    Good morning.
16    A    Good morning.
17    Q    Is it Sergeant Barnaby or --
18    A    Yes, sergeant.
19    Q    Okay.  So, Sergeant Barnaby, were you the annex
20    school sergeant on the morning of January 28th, 2016, at
21    Bare Hill Correctional Facility?
22    A    Yes.
23    Q    And did that mean that you were in charge of the
24    annex area on that day?
25    A    Yes.
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

272

BARNABY - DIRECT - ROCHE

 1   Q    So you were in charge of all of the corrections
 2   officers working in that area on that morning.  Correct?
 3   A    Yes.
 4   Q    As a sergeant, it's fair to say part of your
 5   uniform is a white shirt, right?
 6   A    Yes.
 7   Q    And you were wearing a white shirt that day.
 8   Correct?
 9   A    Yes.
10   Q    Currently the only officers that wear white shirts
11   are sergeants, lieutenants and above.  Correct?
12   A    Yes.
13   Q    The regular corrections officers all wear blue
14   shirts, right?
15   A    Yes.
16   Q    All right.  Directing your attention to that
17   morning of January 28, 2016.  Did you receive a radio
18   call from the school annex sometime after 8:00 A.M. in
19   the morning?
20   A    Yes.
21   Q    Okay.  And was that -- that call was for unit 9, 11
22   and 12.  Right?
23   A    Correct.
24   Q    And number 9, that would be you?
25   A    Yes.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

BARNABY - DIRECT - ROCHE

1  Q    So number 9 was the sergeant number that you were
2  assigned to that day?
3  A    Yes.
4  Q    Okay.  And 11 and 12, who were they?
5  A    They were roundsmen correction officers.
6  Q    What are roundsmen?
7  A    They are correction officers that -- their duties
8  are to confirm security checks throughout the entire
9  facility.
10 Q    And those roundsmen were wearing blue shirts on
11 that day, correct?
12 A    Yes.
13 Q    So when you got that radio call at 8:00 A.M., there
14 was no siren that accompanied it.  Right?
15 A    No.
16 Q    Okay.  So if there was a siren to accompany it,
17 what would that indicate to you?
18 A    Usually it's an alarm that triggered, just that an
19 officer needs immediate assistance.
20 Q    Okay.  So this was just a straight radio call,
21 right?
22 A    Yes.
23 Q    And the reason that you were specifically called
24 was that it would have been your assignment that day to
25 respond to any incident that happened in the annex

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

274

BARNABY - DIRECT - ROCHE

1    school, correct?

2    A    Correct.

3    Q    Okay.  What was is the chart log?

4    A    The chart log?

5    Q    Yeah.  The chart assignment log?

6    A    There's no logbook in the chart office.

7    Q    Okay.  But is it fair to say that the chart

8    sergeants maintain a log that indicates what officers

9    and what sergeants are performing?  What functions?

10   A    They are paper copies of the charts.

11   Q    Okay.  And so the chart log for that day would have

12   indicated that you were the sergeant for the annex area,

13   correct?

14   A    As far as that goes, the lieutenant has the

15   sergeants' assignments, not the chart sergeant.

16   Q    Okay.  So when you received the radio call and --

17   you proceeded directly to the school annex, correct?

18   A    Correct.

19   Q    And how long did it take to get there?

20   A    Between 35 and 45 seconds.

21   Q    And when you arrived, were there other officers

22   there already?

23   A    Yes.

24   Q    Okay.  And were there -- how many officers were

25   there when you arrived?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

275

BARNABY - DIRECT - ROCHE

```
 1   A     I do believe there was two other officers that were
 2   inside the foyer before I arrived.
 3   Q     Okay.  And did they arrive the same time as you or
 4   did you -- did they arrive before you?
 5   A     Those two officers were there before me.
 6   Q     Were they already in the vestibule before you got
 7   there?
 8   A     Yes.
 9   Q     Were there -- did any other white shirts respond to
10   the incident?
11   A     Yes.
12   Q     And how many other white shirts were there?
13   A     I do believe two other.
14   Q     Okay.  Who were they?
15   A     I don't know their names.
16   Q     And who were the blue shirts that were there before
17   you?
18   A     I don't know their names.
19   Q     Did you recognize them?  Did you recognize the blue
20   shirts?
21   A     Just through my report.  One of them was Officer
22   Rabideau.  I don't recall who the other ones were.
23   Q     And did the white shirts -- who were they?
24   A     I don't know their names.
25   Q     Okay.  Did you recognize them?
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

276

BARNABY - DIRECT - ROCHE

1    A    They were sergeants that worked at Bare Hill, yes.

2    Q    Okay.  Since this incident, have you made any

3    efforts to try to find out who they were?

4    A    No.

5    Q    So did those two other officers that you say were

6    there, did they enter into the foyer area?

7    A    They were inside before I was, yes.

8    Q    They were inside the foyer area before you were?

9    A    Yes.

10   Q    Now, you testified at a deposition in this matter,

11   right?

12   A    Correct.

13   Q    And that was back in May of 2019, correct?

14   A    I don't know the specific date.

15            THE COURT:  Members of the jury, this is not

16   the first time that you have heard reference to a

17   deposition, so I want to tell you just so that you fully

18   understand.  Some of the testimony in this case before

19   you is in the form of depositions, which have been

20   received in evidence.

21            A deposition is simply a procedure where the

22   attorneys for one side may question the witness or an

23   adversary party under oath before a court reporter prior

24   to trial.  This is part of what we call pretrial

25   discovery.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

BARNABY - DIRECT - ROCHE

1          You may consider the testimony of a witness

2    given at a deposition according to the same standards

3    you would use to evaluate the testimony of a witness

4    given at trial.

5          Yesterday you did hear reference to

6    depositions, you're hearing it now, that's exactly what

7    it is.  It's testimony given under oath prior to the

8    trial, and as I said, you may consider the testimony of

9    a witness given at a deposition according to the same

10   standards you would use to evaluate the testimony of a

11   witness given at trial.  Go ahead.

12          MR. ROCHE:  Thank you, your Honor.

13   BY MR. ROCHE:

14   Q    So were you at your deposition -- were you asked

15   these questions and did you give these answers?  Page

16   63, line 17:

17        "QUESTION:  Putting aside normal protocol, do you

18   have a specific recollection of seeing any of the white

19   shirts there?

20        "ANSWER:  I know there was other white shirts

21   there.  I do not recall who they were.

22        "QUESTION:  How many other white shirts did you see

23   there?

24        "ANSWER:  I want to say two.

25        "QUESTION:  Okay.  Where did you see these other

TRANCHINA v McGRATH, et al. - 17-cv-1256

278

BARNABY - DIRECT - ROCHE

```
 1   white shirts?
 2        "ANSWER:  They were standing outside of the
 3   building.
 4        "QUESTION:  Did they ever enter the foyer?
 5        "ANSWER:  Not that I recall."
 6        Were you asked those questions and give those
 7   answers at your deposition?
 8   A    Yes.
 9   Q    Is it fair to say that at your deposition you
10   testified that you were the only white shirt to enter
11   the foyer?  Correct?
12   A    Yes.
13   Q    Now, when you entered the foyer, was Mr. Tranchina
14   handcuffed?
15   A    Yes.
16   Q    Okay.  And was he injured at that time?
17   A    He was standing facing the corner.  I did not see
18   any injuries when I entered.
19   Q    Okay.  Did you check him for any injuries?
20   A    Not at that immediate time, no.
21   Q    Did you notice anybody being injured at that time?
22   A    Officer McGrath stated that he was in a use of
23   force and that his hand was injured.
24   Q    And did you look at his hand?
25   A    He showed me it, yes.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

279

BARNABY - DIRECT - ROCHE

1    Q    And did you see injuries, like skin scraped off his
2    knuckles?
3    A    Yes.
4    Q    Did you have any concerns as to how he received
5    those injuries?
6    A    At that time, no.
7    Q    Did you do anything at all to examine whether
8    Mr. Tranchina had suffered any injuries?
9    A    Not in the foyer, no.
10   Q    Did you ask Officer McGrath how he had injured his
11   hand?
12   A    I had asked him what had just happened.
13   Q    Okay.  And did you have any suspicions that he
14   might have suffered those injuries from punching
15   Mr. Tranchina?
16   A    No.
17   Q    Did you ask Mr. Tranchina if he would like any
18   medical attention?
19   A    Not at that time in the foyer, no.
20   Q    So you made the decision to transport him to SHU
21   rather than to the infirmary?
22   A    Yes.
23          MR. ABEL:  Your Honor, he's asking leading
24   questions.  This is direct examination.
25          THE COURT:  It is direct examination but of

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - DIRECT - ROCHE

1    course this is an adverse party.  So I'm going to allow
2    him to a certain extent.
3    BY MR. ROCHE:
4    Q    Okay.  So did you direct that Mr. Tranchina be
5    brought to the solitary housing unit?
6    A    The special housing unit, yes.
7    Q    And did you accompany him to the special housing
8    unit?
9    A    Yes, I did the escort.
10   Q    And when you say you did the escort, does that mean
11   you were in the van that transported him there?
12   A    Yes.
13   Q    And were other officers in the van too?
14   A    One other officer.
15   Q    Okay.  And while he was at the special housing
16   unit -- he was at the special housing unit for a few
17   hours, right?
18   A    I don't know the timeframe he was there.
19   Q    Okay.  But is fair to say that you were at the
20   special housing unit up until after the time that he was
21   examined by the nurse, correct?
22   A    Yes.
23   Q    So when you transported -- you say you transported
24   Mr. Tranchina to the SHU.
25   A    I said I escorted.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - DIRECT - ROCHE

1    Q    You escorted.  Okay.  So -- but you were in the van

2    with another officer.  Who was the other officer that

3    was in the van?

4    A    Officer Rabideau.

5    Q    And when you -- so were you involved in placing

6    Mr. Tranchina into the van?

7    A    No.  The officer would have done that.

8    Q    He would have placed him in the back of the van; is

9    that correct?

10   A    Yes.

11   Q    Okay.  Then you and Officer Rabideau sat in the

12   front of the van?

13   A    Yes.

14   Q    So fair to say that from where Mr. Tranchina would

15   have been placed in the back of the van, he wouldn't

16   really be able to see who else was in the van?  Would

17   that be fair to say?

18   A    Yes.

19   Q    So when you got to the SHU, did you speak to the

20   sergeant at the SHU and other officers at the SHU?

21   A    There was no other sergeant present when I arrived.

22   Just the officers that were working the SHU that day.

23   Q    Okay.  And did you speak to the officers at the

24   SHU?

25   A    Once the inmate -- Mr. Tranchina was brought into

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

282

BARNABY - DIRECT - ROCHE

```
 1    the admission room, I did speak to one of them.
 2    Q    Okay.  And did you tell these officers that
 3    Mr. Tranchina had been involved in a use-of-force
 4    incident?
 5    A    Yes.
 6    Q    By Officer McGrath?  With Officer McGrath?
 7    A    Just that he was involved in a use of force and a
 8    strip frisk needed to be completed.
 9    Q    What were you wearing that day?
10    A    My state-issue pants, my white sergeant shirt, my
11    state-issue coat.  I believe that nylon, winter cap.
12    Q    So you remember that you are wearing a coat on that
13    day?
14    A    Yes.
15    Q    Once again, at your deposition, were you asked this
16    question and did you give this answer?  Page 12, line 7:
17        "QUESTION:  Do you recall one way or the other
18    whether you were wearing your coat at the time that you
19    responded to this incident?
20        "ANSWER:  I don't recall."
21        Did you give that -- were you asked that question?
22    Did you give that answer at your deposition?
23    A    Yes.
24    Q    So what were you wearing on your feet?
25    A    Black Bates boots.
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - DIRECT - ROCHE

1   Q    What kind of boots are Bates boots?

2   A    They're a boot that comes up about mid-shin, they

3   have a zipper on the outside, they tie.

4   Q    Fair to call them military-style boots?

5   A    I don't know.  I never been in the military so I

6   don't know what style boots they were.

7   Q    Okay.  But for -- let's say for someone who is

8   never in the military, do these look like military-type

9   boots?

10          MR. ABEL:  Objection, your Honor.  Calls for

11   speculation.

12          THE COURT:  Overruled.  You may answer.

13   A    I guess you could.  I don't know fully.

14   BY MR. ROCHE:

15   Q    What -- heavy boots, correct?

16   A    No, the Bates are very light.

17   Q    Okay.  But they -- do they have a hard toe on them?

18   A    No.

19   Q    They have got thick soles?

20   A    They have soles, yes.

21   Q    Sergeant, is there ever a time that kicking an

22   inmate is an acceptable use of force?

23   A    No.

24   Q    And would you agree that kicking an inmate who's

25   restrained on the ground would be particularly

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

BARNABY - DIRECT - ROCHE

```
 1   unacceptable?
 2   A    Yes.
 3   Q    Sergeant, if you were to see another corrections
 4   officer assault an inmate, would it be your duty to
 5   intervene?
 6   A    Yes.
 7   Q    Sergeant, would it be fair to say that an officer
 8   assigned to frisk duty should be wearing gloves while
 9   performing those duties?
10   A    That's at his discretion.
11   Q    So it's totally up to the officer.  That's your
12   testimony?
13   A    Yes.
14   Q    Now, when you arrived in the foyer of where this
15   incident occurred, did you see any gloves on the ground?
16   A    I don't recall.
17   Q    When you arrived in the foyer, was Officer McGrath
18   wearing any gloves?
19   A    I don't recall.
20   Q    So when you were deposed in this matter, were you
21   asked this question and did you give this answer?  Page
22   79, line 3:
23        "QUESTION:  Was he wearing gloves?
24        "ANSWER:  When I arrived, I'm going to say no."
25        Were you asked that question and did you give that
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

285

BARNABY - DIRECT - ROCHE

1    answer?

2    A    Yes.

3    Q    Now, would it be fair to say that your job -- part

4    of your job as the responding sergeant would be to make

5    sure that any evidence pertaining to the incident would

6    be properly secured?

7    A    Yes.

8    Q    So if there were gloves that were on the scene and

9    looked like they were involved in the incident, would

10   you secure those gloves?

11   A    No.

12   Q    Why not?

13   A    It's not protocol to secure the used gloves.

14   Q    You don't think the condition of the gloves could

15   be relevant to determining what happened during the

16   incident?

17   A    No.

18   Q    Okay.  So -- but if one glove was totally ripped up

19   and the other glove was not, you don't think that there

20   would be any relevant information from a fact such as

21   that?

22   A    No.

23   Q    Did you observe Officer McGrath's hands?

24   A    He showed me his one hand that was injured.

25   Q    Okay.  And fair to say he only had -- was only one

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - DIRECT - ROCHE

1   hand that was injured, the other hand was totally fine?

2   A     That I saw, yes.

3   Q     Fair to say you didn't see any rock salt on the

4   carpet in the foyer?

5   A     I'm not exactly sure what was on it.  It was a

6   mixture of mud, dirt, and probably rock salt.

7   Q     At your deposition, were you asked these questions

8   and did you give these answers:

9         "QUESTION:  What was on the foyer?"  Sorry.  42,

10   line 18.

11         "QUESTION:  What was on the floor of the foyer?

12         "ANSWER:  It was a carpet.

13         "QUESTION:  Okay.  Was it clean?

14         "ANSWER:  I do not recall.

15         "QUESTION:  Okay.  Do you remember if there was

16   anything on the carpet?

17         "ANSWER:  Given the time of year, I'm going to

18   assume there's probably mud and dirt.

19         "QUESTION:  Okay.  Anything else?

20         "ANSWER:  Not that I recall.  Not that I can

21   recall."

22         Were you asked those questions and did you give

23   those answers?

24   A     Yes.

25   Q     Okay.  So does that refresh your recollection as to

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - DIRECT - ROCHE

1   whether you saw any rock salt on the rug back on

2   January 28th?

3   A     Mixed in with the dirt and everything else.

4   Q     Is it fair to say that when you testified at your

5   deposition, you didn't say that you saw mud and dirt,

6   you said you assumed it would be there because of the

7   time of year.  Wasn't that your testimony?

8   A     Correct.

9   Q     Okay.  So is it fair to say that you -- you don't

10  recall seeing any rock salt or mud and dirt on the rug

11  at that time?  Correct?

12  A     At that time of year there would have been mud and

13  dirt.

14  Q     You don't recall it, right?

15  A     Specifically, right now, no.

16  Q     When you were inside the foyer -- when you

17  responded to this incident and you were inside the

18  foyer, did you see a weapon?

19  A     No.

20  Q     So you saw in court yesterday when the weapon, the

21  shiv or knife that was -- Plexiglas knife that was

22  recovered, you saw that here in court, right?

23  A     The picture of it, correct.

24  Q     Yes.  And when did you first see that knife?

25  A     I saw a picture of it in the administration

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

288

BARNABY - DIRECT - ROCHE

1  building.

2  Q    And when was that?

3  A    That afternoon of the incident.

4  Q    So you never saw the actual Plexiglas item on that

5  particular day, right?

6  A    No.

7  Q    You have never seen it since either, right?

8  A    No.

9  Q    Now, did Officer McGrath tell you when you were in

10  the foyer that he recovered a weapon?

11  A    Yes.

12  Q    Okay.  And did he in fact tell you that the type of

13  weapon he found was a ice stick-type weapon?

14  A    Yes.

15  Q    But he didn't show it to you, right?

16  A    No.

17  Q    So you -- so you didn't ask to see what it was that

18  you had recovered.  Right?

19  A    No.

20  Q    Okay.  So you -- as the responding sergeant, you

21  could have taken custody of that item to make sure it

22  was properly secured.  Right?

23  A    That is not protocol for our department.

24  Q    Okay.  Did Officer McGrath tell you where he had

25  the weapon while you were in the foyer?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

289

BARNABY - DIRECT - ROCHE

1    A    He said he had secured it on his person.

2    Q    Okay.  Did he tell you he put it in his pocket?

3    A    Just that it was secured on his person.

4    Q    Would putting evidence of a crime in your pocket be

5    considered protocol in securing evidence?

6    A    Yes.

7    Q    And would it be protocol for the supervising

8    sergeant to ask to see the weapon at the location where

9    the officer was claiming that he found it prior to a use

10   of force?

11   A    No.

12   Q    From the foyer, Officer McGrath was required to go

13   to the infirmary, right?

14   A    Correct.

15   Q    Okay.  And that's protocol, right?

16   A    Yes.

17   Q    In the use-of-force incident, the officer that used

18   the force are required to go to the infirmary right

19   after?

20   A    Yes.

21   Q    Okay.  So if you were involved in the use of force,

22   even though you're a sergeant, you would be required to

23   go too.  Right?

24   A    Correct.

25   Q    And it's also protocol that photographs must be

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - DIRECT - ROCHE

1  taken of any officer that's been involved in the use of

2  force?

3  A    Only if there's injuries to that officer.

4  Q    But if there are injuries to the officer,

5  photographs must be taken of those injuries?

6  A    Correct.

7  Q    Correct?  As the area sergeant, you were

8  responsible for making sure that the proper steps are

9  taken after use of force, right?

10  A    Correct.

11  Q    And one of those steps would be if the inmate had

12  been injured, proper step would be to make sure that the

13  inmate is brought to the infirmary.  Correct?

14  A    Not always to the infirmary, no.

15  Q    But if an inmate had suffered significant injuries,

16  would it be fair to say he should be brought to the

17  infirmary, right?

18  A    No.  Medical observes them in the SHU also.

19  Q    And medical did observe, a nurse was -- came to the

20  SHU and saw Mr. Tranchina, correct?

21  A    Yes, at my request.

22  Q    And once the nurse saw him, she immediately

23  directed that he be taken to an outside facility,

24  correct?  An outside medical facility?

25  A    I do believe she testified that she talked to her

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - DIRECT - ROCHE

1    medical director and then they decided that he deemed to

2    have x-rays taken.

3    Q    So it was directed that he be taken to a hospital

4    for x-rays of his face and ribs.  Correct?

5    A    Correct.

6    Q    Is it fair to say that for a use-of-force incident,

7    the proper step to be ordered would be to videotape the

8    escort of the inmate from the scene of the incident to

9    the SHU, right?

10   A    Not always, no.

11   Q    Okay.  But that is something that -- that is often

12   done?

13   A    It could be done, yes.

14   Q    And it would be particularly appropriate in a

15   situation where the inmate has been injured, correct?

16   A    Not always, no.

17   Q    Well, in what circumstance, then, would it be

18   appropriate for video of the escort of the inmate from

19   the incident to the SHU?

20   A    Video escort is deemed by the lieutenant, the watch

21   commander.  He would call and say he wants the escort

22   done on video.

23   Q    Okay.  And typically would that usually be ordered

24   in circumstances where the inmate has sustained

25   injuries?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

292

BARNABY - DIRECT - ROCHE

1    A     Inmate, officer, could be either.

2    Q     So it would be more likely that that would be

3    ordered in an incident where injury was caused.  Right?

4    A     If it's feasible.

5    Q     That was not done in this case, right?

6    A     No, it was not.

7    Q     Did you ask -- who was the watch commander on that

8    day?

9    A     I don't recall which lieutenant was on.

10   Q     Was it Lieutenant Garvey?

11   A     Very possible.  I don't recall which one was on.

12   Q     Okay.  Did you consult with your lieutenant or

13   whoever the watch commander was to get advice as to

14   whether Mr. Tranchina's escort from the incident to the

15   SHU should be videotaped?

16   A     I don't recall if I called him or not.

17   Q     So would it be fair to say that as the supervisor

18   of that unit, it would be your job to determine what

19   happened in the use of force.  Right?

20   A     I collected the facts and got the statements from

21   both parties involved.

22   Q     So you were involved in trying to get to the bottom

23   of whatever happened.  Right?

24   A     Correct.

25   Q     In this case, did you determine how Mr. Tranchina

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

293

BARNABY - DIRECT - ROCHE

1   suffered a fractured rib?

2   A    Just by what Officer McGrath told me.

3   Q    So you totally relied upon Officer McGrath told

4   you?

5   A    Yes, because Inmate Tranchina would not make a

6   statement to me.

7   Q    So is it fair to say that the only information that

8   you had was provided by Officer McGrath?

9           MR. ABEL:  Objection.  Asked and answered.

10          THE COURT:  Sustained.

11  Q    In your investigation, did you determine how

12  Mr. Tranchina sustained the other injuries that were

13  reported by the nurse?

14  A    Just as the officer reported to me.

15  Q    Okay.  So -- okay.  So did the -- so what did you

16  determine?  How did you determine on that date how

17  Mr. Tranchina had sustained his injuries?

18  A    He was involved in a use of force.  The officer

19  stated that he was -- fell into the heating register,

20  and then they were forced to the ground.  He said there

21  was a violent struggle where Inmate Tranchina kept

22  violently turning side to side on the carpet until he

23  was able to apply mechanical restraints.

24  Q    Fair to say he didn't mention anything about rock

25  salt?

TRANCHINA v McGRATH, et al. - 17-cv-1256

294

BARNABY - DIRECT - ROCHE

```
 1   A    At that time, no, I don't think so.
 2   Q    So fair to say that Officer McGrath just told you
 3   that it was -- this whole thing was caused by him taking
 4   down and Mr. Tranchina and rolling around on the ground
 5   a little bit?
 6              MR. ABEL:  Objection; asked and answered.
 7              THE COURT:  Sustained.
 8   BY MR. ROCHE:
 9   Q    Fair to say that his explanation of rock salt is --
10   came at a later time, right?
11   A    I don't know when rock salt came in.
12   Q    Did Officer McGrath provide you an explanation as
13   to what had caused the injuries to his knuckles?
14              MR. ABEL:  Objection; asked and answered.
15              THE COURT:  Sustained.  Please don't be
16   repetitious.  You asked that at the beginning.
17   Q    Sergeant, did you find it questionable that a frisk
18   process with a hundred students would take place in a
19   tiny little foyer or tiny vestibule?
20   A    No.
21   Q    Did you find it questionable that an officer
22   would choose to conduct a pat frisk of a student body
23   of approximately a hundred people in an area where
24   there's -- it can't be used viewed by another officer
25   and there's no cameras present?  Did you find that
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

295

BARNABY - DIRECT - ROCHE

 1   questionable?

 2   A     No.

 3   Q     Sergeant, would you have any security concerns as a

 4   supervisor in a prison, would you have any security

 5   concerns about an officer conducting a pat frisk in a

 6   tiny vestibule where other inmates would have to pass by

 7   the back of the officer where he wouldn't be able to see

 8   them as he's conducting his pat frisk?  Would you have

 9   any security concerns about that?

10   A     That is at the discretion of the officer.  If he

11   feels comfortable, then he continues his pat frisk.

12   Q     And as a supervisor, you wouldn't advise not to

13   conduct a pat frisk in circumstances like that?

14   A     If the officer feels comfortable, so do I.

15   Q     Would you agree that there would be a security risk

16   in conducting a pat frisk operation in such

17   circumstances?

18             MR. ABEL:  Objection.  Asked and answered.

19             THE COURT:  Overruled.  You may answer.

20   A     Not necessarily, no.

21   Q     So when you were dealing with this situation on

22   January 28th, did you reach any correlation in your mind

23   between the injuries that Mr. Tranchina had sustained

24   and the injuries that Officer McGrath had sustained to

25   his fist?

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - DIRECT - ROCHE

```
 1    A    Can you say that again?
 2    Q    While you were investigating, processing this
 3    use-of-force incident on January 28th, 2016, did you
 4    realize any correlation or did you believe that there
 5    was any connection or consider that there was any
 6    connection between the injuries that Mr. Tranchina had
 7    sustained to his face and head and body and the injuries
 8    that you observed on Officer McGrath's knuckles?
 9    A    No.
10    Q    Did you examine the annex logbook for that day to
11    find out if there was any frisks, pat frisks, searches
12    assigned or authorized for that day?
13    A    No, that would not have been in the annex logbook.
14    Q    Did you examine the logbook to see if there was any
15    entry regarding pat frisks?
16    A    As far as pat frisks, no.
17    Q    Did you find it questionable on January 28th that
18    Officer McGrath had told you at the scene that he had
19    recovered an ice pick-type weapon and later he was
20    claiming that it was a shiv or a knife that you saw in
21    the photograph?
22    A    No.
23              MR. ABEL:  Objection.  He's already asked that
24    question.
25              THE COURT:  This one is a little bit
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

297

BARNABY - DIRECT - ROCHE

1   different.  Overruled.  The answer will stand.

2   BY MR. ROCHE:

3   Q    Were you protecting Officer McGrath when you filled

4   out your paperwork?

5   A    No.

6   Q    Were you protecting him when you testified at his

7   disciplinary hearing?

8   A    No.

9   Q    So there's no question that Officer McGrath was

10  present when you entered the foyer that morning.

11  Correct?

12  A    Correct.

13  Q    So whatever you did or didn't do inside that foyer,

14  Officer McGrath would have seen it, right?

15  A    I would assume so.

16  Q    So he would know what it was that you did or didn't

17  do that morning?

18           MR. ABEL:  Objection; calls for speculation.

19           THE COURT:  Sustained.

20  Q    So you are aware that Mr. Tranchina's not only

21  accusing Officer McGrath of this matter, right?  He's

22  also accusing you of kicking him.  Correct?

23  A    Yes.

24           MR. ROCHE:  Just one second.

25           THE COURT:  Yes.


                Lisa L. Tennyson, CSR, RMR, FCRR
              UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

298

BARNABY - CROSS - ABEL

1           MR. ROCHE:  Thank you, Sergeant.  I have no
2   further questions.
3           THE COURT:  Any questioning on behalf of the
4   Defendant McGrath?  Any cross-examination?
5           MR. BLENK:  Your Honor, if we could just
6   reserve until after -- we are just going to reserve
7   until Mr. Barnaby's counsel ask questions.
8           THE COURT:  All right.  Go right ahead.
9   CROSS EXAMINATION
10  BY MR. ABEL:
11  Q    Good morning, Sergeant.
12  A    Good morning, sir.
13  Q    Can you hear me okay?
14  A    Yes.
15  Q    Okay.  Sergeant, how long have you been employed by
16  the New York State Department of Corrections and
17  Community Supervision?
18  A    Just over 15 years.
19  Q    We'll refer to that as DOCCS if that is okay.
20  A    Yes.
21  Q    And at what facility are you currently employed?
22  A    Clinton Correctional.
23  Q    And how long have you worked at Clinton?
24  A    In this supervisor's role, for about three years.
25  Q    And, Sergeant, can you tell me your current height

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

BARNABY - CROSS - ABEL

```
 1    and weight?
 2    A    About five-eight, 230.
 3    Q    And can you tell me what your height and weight
 4    would have been in January 2016?
 5    A    About five-eight, 215.
 6    Q    So prior to your current bid at Clinton, where did
 7    you work?
 8    A    As officer or sergeant?
 9    Q    As a sergeant.
10    A    I got promoted September of 2015, I reported to
11    Green Haven Correctional Facility, I worked 30 days
12    there; October 17th I reported to Bare Hill Correctional
13    Facility.  I worked for Bare Hill from October of '15 to
14    August of '17, then I reported to Clinton.
15    Q    Okay.  Let's back up to when you first started
16    working for DOCCS.
17         When you began your employment, did you receive any
18    training?
19    A    Yes.
20    Q    Where was that?
21    A    Albany training academy.
22    Q    Is that the DOCCS training academy?
23    A    Yes.
24    Q    How long does that training last?
25    A    Eight weeks.
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - CROSS - ABEL

```
 1   Q    What kind of training did you generally receive at
 2   the academy?
 3   A    It's a general overview of what to expect of the
 4   job from firearms to handcuffing, transport of inmates
 5   to chemical agents to legal terms.  Pretty much
 6   everything that -- all aspects of the job.
 7   Q    And you mentioned earlier that you are now a
 8   sergeant, correct?
 9   A    Correct.
10   Q    And that you have been a sergeant since 2015?
11   A    Correct.
12   Q    Is that considered a promotion from your position
13   you held prior to that time?
14   A    Yes.
15   Q    And what was your title prior to your promotion to
16   sergeant?
17   A    Correction officer.
18   Q    Did you seek out that promotion to become a
19   sergeant?
20   A    Yes.
21   Q    What did you have to do in order to receive that
22   promotion?
23   A    You have to take a separate promotional test.
24   Q    And what did that test consist of?
25   A    General knowledge of directives, some scenarios how
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - CROSS - ABEL

```
 1   you would handle.
 2   Q    Is it a written test?
 3   A    Yes.
 4   Q    And so from the time that you began working to earn
 5   that promotion until you ultimately received it, how
 6   long did that take?
 7   A    Three, four years.  I'm not exactly sure.
 8   Q    So, Sergeant Barnaby, can you tell me why some of
 9   the reasons why a corrections officer might seek out a
10   promotion to become a sergeant?
11   A    It's more pay, for starters.  It's -- only way to
12   advance in the department is to take these promotions,
13   and if you eventually want to be able to get captain or
14   anything above, you have to take rank of sergeant first.
15   Q    Okay.  So as of January 28th, 2016, how long have
16   you been a sergeant with DOCCS again?
17   A    I got promoted September 17th, so roughly four
18   months.
19   Q    So as of that date, had you achieved permanent
20   status as a sergeant?
21   A    No.
22   Q    What status did you hold on that date?
23   A    I was still on probation.
24   Q    What does it mean to be a probationary sergeant?
25   A    When you're a new officer or new sergeant, anytime
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - CROSS - ABEL

1  you're new to the rank that you come into, DOCCS puts

2  you on a one-year probational status to determine if

3  you're qualified or capable of doing that job.

4  Q    And what would happen if they found reason to not

5  keep you as a sergeant?

6  A    I would have lost my sergeant status and been

7  demoted back to a officer.

8  Q    To a correction officer?

9  A    Yes.

10  Q    What are some of the things that could result in a

11  demotion for you from sergeant to a correction officer?

12  A    For poor attendance, poor reports, any disciplinary

13  charges, excessive force, any outside charges.

14  Q    So if you are found to be using excessive force

15  upon an inmate while you were probationary status was in

16  effect, that could result in your demotion.  Correct?

17  A    Correct.

18  Q    And if you were found to have failed to intervene

19  to prevent excessive force on an inmate, that also could

20  result in your demotion back to a correction officer.

21  Correct?

22  A    Correct.

23  Q    And Sergeant Barnaby, can you explain to the jury

24  how you arrived at Bare Hill Correctional from

25  Green Haven?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

BARNABY - CROSS - ABEL

```
 1   A    You fill out a form to -- transfer form, and then
 2   if there's an opening, central office in Albany will
 3   fill that spot with whoever has the most seniority to
 4   get it.
 5   Q    Did you request a reassignment from Green Haven
 6   to -- or transfer, I should say, from Green Haven to
 7   Bare Hill?
 8   A    Yes.
 9   Q    Why is that?
10   A    Location.
11   Q    Where is Green Haven Correctional Facility located?
12   A    Stormville, New York.  About an hour above New York
13   City.
14   Q    Okay.  And why did you want to be transferred to
15   Bare Hill?
16   A    Closer to my home.
17   Q    And where is that?
18   A    I live in Dannemora, New York.
19   Q    And is that closer to Clinton Correctional
20   Facility?
21   A    Yes, I live across the road.
22   Q    So you live across the street from Clinton?
23   A    Yes.
24   Q    And what is the distance between Bare Hill and
25   Clinton?
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

304

BARNABY - CROSS - ABEL

```
 1   A     42 miles.
 2   Q     So in 2016, were you driving that distance to
 3   arrive from your -- from your home in Dannemora to
 4   Bare Hill?
 5   A     Yes.
 6   Q     And in January of 2016, how long would that drive
 7   take you each way?
 8   A     Between an hour and 15 to an hour and a half.
 9   Q     And do you have an expectation, as of 2016, as to
10   what you would have to do to receive a transfer to
11   Clinton?
12           THE COURT:  How is this relevant?
13           MR. ABEL:  Well, your Honor, I'll just -- I'm
14   showing --
15           THE COURT:  What do you have to do to get a
16   transfer?  I don't think it's relevant.
17           MR. ABEL:  I'm just trying to show what -- why
18   he was not engaging in any sort of --
19           THE COURT:  I understand that but that's not
20   relevant.  Try to stick with relevant stuff.
21   BY MR. ABEL:
22   Q     Have you ever worked at Bare Hill prior to this
23   assignment?
24   A     No.
25   Q     Did you socialize with Bare Hill coworkers on your
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

BARNABY - CROSS - ABEL

```
1    off time in January 2016?
2    A    No.
3    Q    Prior to this assignment at Bare Hill, did you know
4    Officer McGrath?
5    A    No.
6    Q    Prior to this assignment, did you know the
7    plaintiff?
8    A    No.
9    Q    And so as of the date of this incident,
10   January 28th, 2016, did you know Officer McGrath by that
11   time?
12   A    Just the few times I had seen him working in my
13   area.
14   Q    What area was that?
15   A    The annex.
16   Q    And as of January 28th, 2016, did you personally
17   know the plaintiff?
18   A    No.
19   Q    And did you know who Maura Mayer is as of that
20   date?
21   A    I might have seen her at the facility but I did not
22   know her, no.
23   Q    So as of January 2016 -- January 28th, 2016?
24   A    My shift at the facility was the afternoon shift,
25   2 to 10.
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - CROSS - ABEL

1    Q    I think you -- there's been in some testimony early

2    about the layout of Bare Hill Correctional Facility with

3    regards to main facility and the annex.  What dorms

4    comprised the annex?

5    A    Would be H, I, J, K, L, M and N dorms.

6    Q    So would the F dorm be part of the main?

7    A    Yes, F was in the main compound.

8    Q    So in January of 2016, can you please describe your

9    duties as a sergeant at Bare Hill.

10   A    I was assigned the annex sergeant.  I would make

11   daily rounds through all of the dorms in the annex.  I

12   did routine -- what the state calls -- swaps.  I worked

13   a different shift for another sergeant; in return, he

14   worked one of my shifts.

15        So on the day shifts that I was working for another

16   sergeant, I would also have the annex school and

17   transitional services building that is in the annex as

18   part of my area.  Do daily rounds and then help the

19   other sergeants cover the chow runs.

20   Q    Okay.  So, for example, the 2-to-10 shift, can you

21   please describe the daily schedule that you would go

22   through as far as that shift January 2016?

23   A    I would report to the watch commander, which is the

24   lieutenant, see if there's anything relevant for

25   pre-shift, anything I needed to know.  Check my mailbox

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - CROSS - ABEL

1  that's in the administration building, see if there's

2  any grievance claims, any paperwork that I needed to

3  complete.

4      Then I would go to my area, start my daily rounds.

5  Shortly after 3:00, after shift change for the officers,

6  I do rounds in all of the areas.  I observe the

7  afternoon chow run.  I observe the rec runs, and I --

8  just available if a call came up that I needed to be.

9  Q    So with regard to, say, 2 to 10, would you work

10 generally with a certain group of officers each time?

11 A    For the most part, the officers at Bare Hill had

12 what the state considers a bid.  It means you do the

13 same job every day, every shift.  That is your set bid,

14 so, yes.

15 Q    So this incident is alleged to have occurred

16 morning of January 28, 2016.  So what shift were you

17 working on that day?

18 A    I was doing a double.  I was working for another

19 sergeant in the morning, and I had my shift in the

20 afternoon.

21 Q    So the morning shift was not your regular shift; is

22 that correct?

23 A    Correct.

24 Q    And why were you working the morning shift?

25 A    It was a swap for another sergeant.  I worked his

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - CROSS - ABEL

```
 1    shift and he works a different day and my shift for
 2    another day off.
 3    Q    Going to the incident alleged in this matter, how
 4    do you first hear about the incident involving the
 5    plaintiff?
 6    A    It came across my two-way radio.
 7    Q    Where were you when you received this call?
 8    A    I was making my daily rounds.  I do believe I was
 9    in H dorm.  I'm not exactly sure, H or I dorm.
10    Q    Do you recall --
11    A    Sorry.  And it came across my two-way for me to
12    report to the annex school.
13    Q    Do you recall what you were doing when you received
14    this call?
15    A    Signing the logbooks, discussing with my officers
16    if they had any issues that I needed to know about.
17    Q    So, Sergeant, when you received a call like this
18    over a two-way radio, are you given an incident to which
19    you are responding?
20    A    No.
21    Q    Are you made aware of the purpose of your response?
22    A    No.
23    Q    Are you made aware at the time you receive the call
24    the officer who you are assisting?
25    A    No.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - CROSS - ABEL

```
 1   Q    Are you made aware of any inmates who may have --
 2   who may be involved in the -- in the incident to which
 3   you are responding?
 4   A    No.
 5   Q    So when you received this call over your two-way,
 6   would you have known that this incident involved Officer
 7   McGrath or the plaintiff, Joseph Tranchina?
 8   A    No.
 9   Q    So, you testified earlier that you walked to the
10   annex school building; is that correct?
11   A    Correct.
12   Q    And how long did it take you to walk from your post
13   at the annex school?
14   A    From where I was located, 35 to 45 seconds.
15   Q    Did you walk with anyone else?
16   A    No.
17   Q    And when you arrived at the annex school, what did
18   you observe?
19   A    There was other officers arriving at the same time
20   I was.  I went to the door, opened the door, I do
21   believe two other officers entered the foyer before me.
22   I entered the foyer, the plaintiff was standing in the
23   corner, two officers, one on each side of him.
24   Officer McGrath was towards the back of the foyer
25   standing with a third officer.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

310

BARNABY - CROSS - ABEL

1   Q    Just back up one second.  Sergeant, when you

2   receive a radio call like the one you received that

3   morning, who else would receive that call?

4   A    Anybody with a two-way radio.

5   Q    Would that include other C.O.s?

6   A    Other officers, other sergeant, lieutenants.

7   Q    Would that include officers just to the annex

8   section or the main as well?

9   A    The two-way radios are for everybody.

10  Q    So when you first arrived at the annex school

11  building, was the exterior door open or closed?

12  A    Closed.

13  Q    And was Officer McGrath among those officers in the

14  foyer?

15  A    Yes.

16  Q    So you said earlier that the plaintiff was

17  standing; is that correct?

18  A    Correct.

19  Q    Was he standing under his own power?

20  A    Yes.

21  Q    Was he in restraints?

22  A    Yes.

23  Q    When you arrived?

24  A    Yes.  He was handcuffed from the rear.

25  Q    What do you mean?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - CROSS - ABEL

1    A    His hands behind his back.

2    Q    Okay.  You said the -- the plaintiff was standing

3    in the corner.  Correct?

4    A    Correct.

5    Q    Which direction was he facing?

6    A    He was facing the corner.

7    Q    Okay.

8    A    If you come in the exterior door, he was in the top

9    left-hand corner facing the corner.

10   Q    So as you walk into the foyer, could you see the

11   plaintiff's face?

12   A    No.

13   Q    Did you speak with Officer McGrath upon arriving at

14   the annex school?

15   A    Yes.

16   Q    Did he apprise you of the situation upon your

17   arrival?

18   A    Yes.

19   Q    One other issue, Sergeant.

20        There was some testimony earlier about frisks in

21   the outside or the exterior of the buildings.  Are

22   exterior frisks generally acceptable practice at

23   Bare Hill?

24   A    At Bare Hill, no.

25   Q    Why is that?


Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - CROSS - ABEL

1   A    Bare Hill is going through a lengthy lawsuit that

2   comprised -- before I had gotten there -- about a

3   sergeant frisking inmates in the winter months where

4   some of the inmates received frostbite.  So we were

5   advised unless it was a dire necessity, not to frisk

6   outside during winter months.

7   Q    Are there cameras near the annex school building?

8   A    No.

9   Q    Where would they be located at the facility?

10  A    The only cameras at Bare Hill are on the exterior

11  fence line.

12  Q    Okay.  So when Officer McGrath apprised you of the

13  situation, what did he report to you?

14  A    He stated to me that he was --

15           MR. ROCHE:  Objection, hearsay.

16           THE COURT:  Overruled.

17  A    He stated that he was just involved in a use of

18  force with Mr. Tranchina, that he had recovered a

19  weapon.

20  Q    And how long were you in the foyer?

21  A    Matter of 30 seconds maybe.

22  Q    Did you examine the plaintiff, Mr. Tranchina?

23  A    At that time, no.

24  Q    Why is that?

25  A    He was standing on his own power, that -- did not

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

313

BARNABY - CROSS - ABEL

1    observe any injuries at the time.  I talked to
2    Officer McGrath, I directed him to report to the
3    infirmary to be seen for his injuries.  I turned -- I
4    asked the plaintiff what happened, he didn't make any
5    statements to me.
6         I directed the officer that was controlling the
7    mechanical restraints to exit the foyer with him and
8    place him in the van.
9    Q    So you said that the plaintiff was -- didn't say
10   anything to you about his condition when you asked him?
11   A    No.
12   Q    Did he appear nonresponsive or did he just appear
13   he did not want to make a statement to you?
14   A    He just -- he turned his head in the opposite
15   direction.  I was standing behind him.  He kind of just
16   moved his head, didn't make any comments to me.
17   Q    Was his back still to you at that time?
18   A    Yes.
19   Q    You said -- what happened next?
20   A    We exited the foyer, myself and the officer that
21   was doing the escort.  We brought him to the rear of a
22   state-issue van, both rear doors were opened, the
23   officer had placed him -- told him to sit in the van,
24   put his feet in, the doors were shut.  I sat in the
25   front passenger side and the officer sat -- well, in the

314

BARNABY - CROSS - ABEL

```
 1    driver's side and we left the area and went straight to

 2    the special housing unit.

 3    Q    Who drove the van?

 4    A    Officer Rabideau.

 5    Q    And where did you sit?

 6    A    In the passenger side up front.

 7    Q    And where in relation to the school building is the

 8    special housing unit?

 9    A    You have to leave the annex, go up through the

10    compound gate, all the way up on the right-hand side of

11    the main compound.  There's a separate building for the

12    special housing unit.

13    Q    And how long a drive approximately from the annex

14    school building to the special housing unit?

15    A    Approximately 30 seconds.

16    Q    Did the plaintiff make any complaints to you at

17    that time about his condition?

18    A    No.

19    Q    So upon the arrival of the escort van at special

20    housing unit, did you bring the plaintiff out of the van

21    into the building?

22    A    No.  Officer Rabideau would have exited the

23    plaintiff out of the rear of the van.  I would have

24    radioed into the special housing unit, the officer would

25    have met us at the door.  The plaintiff would have
```

BARNABY - CROSS - ABEL

1    stepped in, Officer Rabideau's escort would have been
2    completed at that time; he would have left, and I would
3    have entered the special housing unit with the
4    plaintiff.
5    Q    Just the two of you?
6    A    Yes.
7    Q    So upon your entry into the special housing unit,
8    what did you do next?
9    A    He's brought into the admission room with the
10   special housing unit officers.  I do believe it was one
11   officer at the time.  I directed him to perform a strip
12   frisk of the plaintiff.  Inmate was stripped, no further
13   contraband was found on his persons, and as soon as the
14   strip frisk was complete, I had requested medical to
15   evaluate him.
16   Q    From the time you entered into the special housing
17   unit until the time that you requested a medical exam of
18   the plaintiff, how much time passed?
19   A    As soon as I got to the special housing unit,
20   medical would have been notified that he was there.  So
21   maybe a matter of a minute or two.
22   Q    The medical exam was at your request, correct?
23   A    Yes.
24   Q    And do you recall who performed that medical exam?
25   A    I do believe it was R.N. Mulverhill.

TRANCHINA v McGRATH, et al. - 17-cv-1256

316

BARNABY - CROSS - ABEL

1   Q    So while you were in the foyer, did you observe any
2   use of force upon the plaintiff?
3   A    No.
4   Q    When you were in the escort van, did you observe
5   any use of force upon the plaintiff?
6   A    No.
7   Q    What about when you were in the special housing
8   unit?  Did you observe any use of force upon the
9   plaintiff?
10  A    No.
11  Q    Did you observe anyone slapping the plaintiff?
12  A    No.
13  Q    Or hitting the plaintiff?
14  A    No.
15          MR. ABEL:  Ms. Norton, if I could have D-7.
16  I'm sorry.  Could I have D-F.
17  Q    Do you recognize this document?
18  A    Yes.
19  Q    What is this document?
20  A    It's an inmate misbehavior report.
21  Q    And do you see the incident date on this document?
22  A    Yes, 1/28/16.
23  Q    If I could just -- scroll down.
24          COURT CLERK:  On the first page?
25          MR. ABEL:  Yes.


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

317

BARNABY - CROSS - ABEL

1   Q    Do you see the signature at the very bottom of the

2   screen?

3   A    Yes.

4   Q    Is that your signature?

5   A    No.

6            MR. ABEL:  Thank you.

7   Q    Sergeant, did you ever kick the plaintiff on

8   January 28th, 2016?

9   A    No.

10  Q    Did you ever otherwise strike the plaintiff on that

11  date?

12  A    No.

13  Q    Have you -- in your 15 years as a correction

14  officer, now sergeant, have you ever used excessive

15  force upon an inmate?

16  A    No.

17  Q    Have you ever in that same period of time witnessed

18  other officers using excessive force from failure to

19  intervene?

20  A    No.

21  Q    Sergeant, did you have anything to do with the

22  transfer of the plaintiff at the Attica Correctional

23  Facility?

24  A    No.

25  Q    In your role as a sergeant, are you involved in

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

318

BARNABY - CROSS - ABEL

1    arranging for the transfers of inmates in general?

2    A    No.

3    Q    Where is -- who handles those matters?

4    A    All transfers come through central office in

5    Albany.

6    Q    During the medical exam by Nurse Mulverhill, did

7    you instruct her to make any notation into her notes?

8    A    No.

9         MR. ABEL:  One second, your Honor.

10   Q    Sergeant, did you -- back in January of 2016 was

11   Miss Mayer under your supervision as a sergeant?

12   A    I don't ever recall her being in my area.  It's

13   very possible she was resource.  She might have for a

14   shift or two but I don't recall.

15   Q    You recall your deposition that you testified about

16   earlier.  Correct?

17   A    Yes.

18   Q    I'm just looking at page 89, line 2.  Do you recall

19   this question, giving this answer:

20        "QUESTION:  Okay.  And when you went into the

21   school annex on January 28th, 2016, you testified

22   earlier that you recall seeing mud and dirt.  That's

23   correct?  Right?

24        "ANSWER:  Yes."

25        MR. ROCHE:  Your Honor, I object to this.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

BARNABY - CROSS - ABEL

```
 1              THE COURT:  Are you trying to impeach your
 2     witness?
 3              MR. ABEL:  I'm just trying to present a prior
 4     consistent statement that he offered.
 5              THE COURT:  No.  I mean, that's in response to
 6     impeachment?  Just can't --
 7              MR. ABEL:  In response to impeachment, yes.
 8     It's regarding --
 9              THE COURT:  Well, ask a threshold question
10     so -- you know, in other words, during your direct
11     testimony -- you can't just use a transcript to bolster
12     his testimony.
13     BY MR. ABEL:
14     Q    During your direct exam you testified regarding
15     your deposition that you didn't recall seeing any rock
16     salt.
17              MR. ROCHE:  Objection, your Honor.
18              THE COURT:  Let me hear the question.  Go
19     ahead.
20     Q    You testified earlier that you -- you don't recall
21     seeing rock salt or mud or dirt on the floor of the
22     foyer; is that correct?
23              THE COURT:  You may answer that.
24     A    Correct.
25     Q    But do you recall testifying during your
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

320

BARNABY - CROSS - ABEL

1    deposition -- do you recall Mr. Roche asking you during

2    your deposition -- during your direct exam you did not

3    see rock salt on floor?

4    A    Correct.

5    Q    Do you recall testifying during your deposition,

6    however, that you -- that there was --

7              MR. ROCHE:  Objection, Judge.

8              THE COURT:  Go ahead.  Get the question out.

9    Q    Do you recall being asked during your deposition it

10   was possible that you saw mud or rock salt on the floor

11   of the foyer?

12   A    Yes.

13   Q    Okay.

14             THE COURT:  Do you have a question and answer

15   in the transcript that you can read to him?  Were you

16   asked this question and did you give this answer?

17             MR. ABEL:  Yes, page 89, line 7.

18             THE COURT:  Do it that way.

19             MR. ROCHE:  Your Honor --

20             THE COURT:  I'm going to allow it but it has

21   to be in the form of were you asked this question and

22   did you give this answer.  Go ahead.

23   BY MR. ABEL:

24   Q    Referring to line 7, were you asked this question

25   and did you give this answer:  Is it possible that there

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - CROSS - BLENK

```
 1   was also rock salt, and answer, yes.
 2   A    Yes.
 3   Q    Thank you.
 4           MR. ABEL:  No further questions.
 5           THE COURT:  Okay.  Any questions, Mr. Reed?
 6   Mr. Blenk?
 7           MR. BLENK:  Yes, your Honor.
 8   CROSS EXAMINATION
 9   BY MR. BLENK:
10   Q    Thank you for being here today, Mr. Barnaby, just
11   like yesterday, but you heard some testimony yesterday
12   about whether at Bare Hill on that day and whether on
13   Bare Hill on -- in general, and Mr. Tranchina testified
14   to the fact that Bare Hill -- it was -- on the 28th it
15   was nicer-than-normal winter day.  Do you remember that
16   testimony?
17   A    Yes.
18   Q    Bare Hill is a pretty rough climate; is that
19   correct?
20   A    Correct.
21   Q    So even on a above-average day, the Bare Hill --
22   the climate at Bare Hill is unforgiving?
23   A    Correct.
24   Q    You testified, Mr. Barnaby, that Mr. Miranda didn't
25   tell you that rock salt had caused his injuries at the
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - CROSS - BLENK

1    time you saw him in the vestibule; is that correct?

2    A    Correct.

3    Q    Did you ask Mr. Miranda what had caused his

4    injuries?

5    A    No.

6    Q    And in putting together the paperwork for

7    use-of-force report, you wouldn't -- it wouldn't be

8    unusual for you to leave out the floor conditions in

9    describing a use of force; is that correct?

10   A    Correct.

11   Q    And you testified that it was your decision to

12   bring Mr. Tranchina to the infirmary rather than

13   bringing -- or -- I'm sorry -- bringing him to the SHU

14   rather than bringing him immediately to the infirmary.

15   Correct?

16   A    Correct.

17   Q    If you would have encountered an inmate who looked

18   like he had been punched 40 to 50 times, would you have

19   brought him to the infirmary?

20   A    Depending on the severity of the injuries, yes.

21   Q    Were you aware of Plexiglas shanks circulating at

22   the Bare Hill Correctional Facility around the time of

23   January 2016?

24   A    Yes.

25   Q    How did you become aware of that?

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - CROSS - BLENK

1    A     On a daily report, our pre-shift in the morning,

2    any weapons or contraband had been found, lieutenant

3    would relay the information via photos of the weapons.

4    I do believe there were a few others found that month.

5    Q     So you had seen photographs of Plexiglas shanks?

6    A     Yes.

7    Q     I believe that you testified that you don't

8    generally socialize with Bare Hill, that you did not

9    generally socialize with the Bare Hill Correctional

10   Facility staff while you worked there.  That's -- that

11   applies specifically to Mr. McGrath, correct?  You did

12   not socialize outside work with Mr. McGrath?

13   A     No, I did not.

14   Q     You did not socialize with Mr. McGrath or with

15   Miss Mayer?

16   A     I did not.

17   Q     In fact, by the time of the incident, you had only

18   been working at Bare Hill for about three months; is

19   that correct?

20   A     Correct.

21   Q     Thank you.  Mr. Barnaby, were you aware of any

22   rules or contraband issues -- rule breaking or

23   contraband issues going on the school annex around the

24   time of the incident?

25   A     Yes.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256
BARNABY - REDIRECT - ROCHE

1    Q    Can you tell me about those.

2    A    The regular officer that worked the school had

3    relayed to me that there had been excessive amounts of

4    tobacco being brought into the school, that the inmates

5    were smoking in the bathroom, which is rule violation.

6    But more so, that they continued to go from classroom to

7    classroom to use the bathroom to smoke was more of a

8    distraction, disturbance in the area.

9    Q    What did you do about that issue?

10    A    I discussed it with the watch commander the day

11    before.  I had requested that if we had unassigned

12    staff, if I could get an officer to -- to do random pat

13    frisks at the annex school to curtail the excessive

14    tobacco coming in.

15    Q    Specifically, you're testifying that on

16    January 27th the day before the incident, you requested

17    an officer to be placed at the school annex for pat

18    frisking?

19    A    Correct.

20    Q    Thank you.

21          MR. BLENK:  No further questions.

22          THE COURT:  Anything else, Mr. Roche?

23          MR. ROCHE:  Yes, your Honor.

24    REDIRECT EXAMINATION

25    BY MR. ROCHE:

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - REDIRECT - ROCHE

```
 1   Q    So with regards to your testimony just now that you
 2   requested a pat frisk at the annex school on
 3   January 28th, who did you make that request of?
 4   A    It would have been the watch commander on the 27th.
 5   Q    And who was that?
 6   A    I don't know.
 7   Q    And do you know --
 8            MR. ROCHE:  I would ask that the witness be
 9   shown -- I believe it's Plaintiff's 21.
10            COURT CLERK:  Plaintiff's 21?
11            MR. ROCHE:  Yes.  Can we scroll down?
12   BY MR. ROCHE:
13   Q    Sergeant, do you recognize this document?
14   A    Yes.
15   Q    And is this the control chart log for the
16   7-to-3-shift on January 28th, 2016?
17   A    No.  This is a tracking sheet used for what other
18   sergeants and certain officers know who's working what
19   areas.
20   Q    Okay.  So you call it what?  A tracking chart?
21   A    Tracking sheet.
22   Q    Tracking sheet.  Okay.  So you see the -- the entry
23   at the bottom right-hand corner of that -- of that
24   document?
25   A    Yes.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

BARNABY - REDIRECT - ROCHE

```
 1    Q    Okay.  And it's McGrath J., frisk annex school?
 2    A    Correct.
 3    Q    Is that your -- is that in your handwriting?
 4    A    No.
 5    Q    Do you know whose handwriting that is?
 6    A    I do not.
 7              MR. BLENK:  Objection, your Honor.
 8              THE COURT:  Overruled.  If you know, he may
 9    answer.
10    Q    And who would make that entry, which -- which
11    sergeant or which officer would make an entry such as
12    that in the -- in this tracking sheet?
13    A    The day sergeant would fill out that tracking sheet
14    the day before.
15    Q    Okay.  And so the -- the day sergeant from the day
16    before would fill it out the day before stating what the
17    assignments are for the next day.  Correct?
18    A    Yes.
19    Q    Okay.  Thank you.  Now, just bringing you back to
20    the incident, I believe you testified in response to my
21    questions that you -- when you arrived at the annex,
22    there were other officers already there.  Is that
23    correct?
24    A    Yes.
25    Q    Okay.  And then -- I was unclear from your
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

327

BARNABY - REDIRECT - ROCHE

 1    testimony.

 2              THE COURT:  Just ask the question.  Just ask a

 3    question, don't tell us if you're unclear.

 4              MR. ROCHE:  Okay.

 5              THE COURT:  Just ask a question.

 6    BY MR. ROCHE:

 7    Q    Okay.  Now in your -- you testified at a deposition

 8    and in this matter, right?  We have talked about that

 9    already.

10    A    Yes.

11    Q    So just going to page 38, line 7.  Were you asked

12    these questions and did you give these answers:

13         "QUESTION:  Well, would you -- you said you

14    responded and other officers were responding at the same

15    time.  So among you and those other responding officers,

16    were you the first one through that door or were there

17    other officers first?

18         "ANSWER:  I opened the door and were other officers

19    that went in before I stepped inside.

20         "QUESTION:  Okay.  So, now, would you open the

21    door?

22         "ANSWER:  Yes.  And then some of those other

23    officers stepped?  Is that what you're saying? [Sic]

24         "ANSWER:  Yes."

25              MR. ABEL:  Objection.  I don't think he's

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - REDIRECT - ROCHE

1   testified to anything inconsistent with this, your

2   Honor.

3            THE COURT:  What was that?

4            MR. ABEL:  I don't think he's testified to

5   anything that's inconsistent with this.

6            THE COURT:  I think that the question goes to

7   the timing of who was in first or who came after.  So

8   overruled.

9   BY MR. ROCHE:

10  Q    Were you asked these questions, did you give those

11  answers?

12  A    Yes.

13  Q    Okay.  So does that refresh your recollection that

14  you had arrived at the door to the annex before any

15  officers went inside?

16  A    No, there was also officers inside the foyer before

17  I arrived.

18  Q    But in this question, you said that you opened the

19  door and the other officers went?

20  A    For the responding officers that responded at the

21  same time as I did.

22  Q    Okay.  So when you opened the door and the other

23  officers were inside, did you -- did you know -- find

24  out who those officers were?

25  A    No.


                Lisa L. Tennyson, CSR, RMR, FCRR
              UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - REDIRECT - ROCHE

1   Q    Did you question those officers about what they had

2   seen?

3   A    No.

4   Q    Okay.  Did you ever find out whether those officers

5   were witness to the use-of-force incident?

6   A    Officer McGrath said he was the only one present at

7   the time of the use of force.

8   Q    So you didn't ask any other officers what if

9   anything they had seen?

10  A    No.

11  Q    So it's fair to say you prepared a to-from report

12  in this matter, right?

13  A    Correct.

14  Q    And that was directed to your -- your direct

15  supervisor.  Correct?

16  A    To the captain's office.

17  Q    Okay.  And that to-from was an account of what

18  happened in this use of force.  Correct?

19  A    Yes.

20  Q    Okay.  And your account of what happened was based

21  on -- just solely upon what Officer McGrath had told you

22  what had happened?

23  A    What he had reported to me.

24  Q    Okay.  And also in your to-from you included

25  information -- medical information, right? from

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

330

BARNABY - REDIRECT - ROCHE

1    Nurse Mulverhill?

2    A    Correct.

3              MR. ROCHE:  Okay.  I would ask that the

4    witness's to-from, which I believe is Plaintiff's 5,

5    would be shown to him.

6              COURT CLERK:  That's not in evidence.  I can

7    show it to the witness.

8              THE COURT:  You can show it to the witness,

9    it's not in evidence.  Don't read from it, please.  Is

10   it your intention to offer it?

11             MR. ROCHE:  Yes, your Honor.

12             THE COURT:  Is there any objection?

13             MR. BLENK:  No, your Honor.

14             MR. ABEL:  No, your Honor.

15             THE COURT:  Plaintiff's 5 is received.  You

16   may read from it.

17             (Plaintiff's Exhibit 5, received)

18             MR. ROCHE:  Your Honor, I don't need to read

19   from it at this time.

20             THE COURT:  Okay.  Well, it's in evidence.

21             MR. ROCHE:  Thank you.

22   BY MR. ROCHE:

23   Q    That when you went into the vestibule area, you

24   asked Mr. Tranchina if he wanted to speak to you, right?

25   A    I had asked him what had happened.


                 Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

BARNABY - REDIRECT - ROCHE

1   Q    Okay.  And he didn't respond, right?

2   A    No.

3   Q    And when you asked that, Officer McGrath was

4   standing right there, right?

5   A    No, he had exited already.

6   Q    I believe you testified in response to your

7   lawyer's questions that you never socialized with the

8   Bare Hill correction staff.

9   A    Up until that point, no, I did not.

10  Q    But at that time, you would go to the -- on

11  occasion to The Pines bar.  Correct?

12  A    Not at that time, no.

13  Q    So is it your testimony that you had never been to

14  The Pines bar prior to this incident?

15  A    Prior to this incident, no.

16  Q    So when -- in your deposition were you asked these

17  questions and did you give these answers?  Page 66,

18  line 5:

19       "QUESTION:  Do you know of a bar called The Pines?

20       "ANSWER:  Yes."

21            MR. ABEL:  Objection, your Honor.

22            THE COURT:  What's your objection?  I'm sorry.

23            MR. ABEL:  There's nothing in here that

24  contradicted anything he's testified.

25            THE COURT:  Well, you know, he just elicited

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

BARNABY - REDIRECT - ROCHE

 1    an answer that the witness had never socialized and had
 2    never been to The Pines bar so I won't know until I hear
 3    the impeachment attempt.  Go ahead.
 4    BY MR. ROCHE:
 5    Q    So when you were at your deposition, you were being
 6    asked questions of -- about the incident and events
 7    around the time of the incident, correct?
 8    A    Correct.
 9    Q    Okay.  And were you asked these questions and did
10    you give these answers:
11         "QUESTION:  Do you know a bar called The Pines?
12         "ANSWER:  Yes.
13         "QUESTION:  Had you ever been there?
14         "ANSWER:  Yes.  Was it a regular place that you
15    went to?  [Sic].
16         "ANSWER:  Not regular, no.  I'm not from that
17    location.  When I did my doubles, I stayed at a friend's
18    house that was in that area.  On occasion after a shift,
19    I would go there to have a beverage."
20         Were you asked those questions and did you give
21    those answers?
22              THE COURT:  You may answer.
23    A    Yes.
24    Q    When a weapon is recovered at the Bare Hill
25    Correctional Facility, what's -- when it's recovered

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

BARNABY - RECROSS - ABEL

```
 1    from an inmate, what's the -- what's done with the
 2    actual physical items after it's recovered?
 3    A    When the officer would secure it on his person,
 4    report to the administration building just outside the
 5    captain's office.  Digital photos and dimensions of the
 6    weapon would be taken.
 7         It would be secured in an evidence bag and locked
 8    into the evidence locker for a Directive 4910A.
 9    Q    Would it be fair to say that at any particular time
10    the evidence locker would be likely to contain various
11    weapons that were recovered from inmates at the
12    facility?
13              MR. ABEL:  Objection.
14              THE COURT:  Overruled.  You may answer.
15    A    Any contraband that's recovered.
16              MR. ROCHE:  Thank you, Sergeant.  Nothing
17    further.
18              THE COURT:  Any recross, Mr. Abel?
19    RECROSS EXAMINATION
20    BY MR. ABEL:
21    Q    Have you ever worked as the chart sergeant at Bare
22    Hill?
23    A    Up to this point, no.
24    Q    And prior to January 28th, 2016, have you worked as
25    a chart sergeant?
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

334

BARNABY - RECROSS - ABEL

1    A    No.

2    Q    What about on that day?

3    A    No.

4    Q    So you requested a pat frisk at the annex school,

5    correct?

6    A    Correct.

7    Q    Did you specifically assign Officer McGrath to

8    perform the pat frisk?

9    A    No.

10   Q    Why did you ask for that frisk to be conducted at

11   the annex school?

12   A    The officer in the school had relayed to me that

13   he --

14               MR. ROCHE:  Objection.  Objection.  Hearsay.

15               THE COURT:  I'm sorry?

16               MR. ROCHE:  Withdraw.  I will withdraw.

17               THE COURT:  It's repetitious but go ahead and

18   finish it.  Is this about the cigarettes?

19               THE WITNESS:  Yes.

20               THE COURT:  Okay.

21   A    There's excessive amounts of tobacco being brought

22   in.  Inmates were using the bathroom more frequently to

23   smoke.  It's disrupting classrooms.

24   BY MR. ABEL:

25   Q    So did you know who would be assigned?

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

335

BARNABY - RECROSS - BLENK

1   A     No.

2               THE COURT:   The answer was no?

3   A     No.

4               MR. ABEL:   No further questions?

5               THE COURT:   Anything else, Mr. Blenk?

6               MR. BLENK:   Just quickly, your Honor.

7   RECROSS EXAMINATION

8   BY MR. BLENK:

9   Q     You were aware of the procedure with respect to the

10  chart at Bare Hill Correctional Facility at the time?

11  A     Yes.

12  Q     And was it ordinary for after the first draft of

13  the chart is created by the sergeant the day prior to,

14  was it ordinary for that chart to be edited after that

15  point?

16  A     It's possible.  And if an officer had called in

17  sick, the -- whoever the chart sergeant was working when

18  the officer called in, would have to fill that position

19  for the other sergeant's charts.

20              MR. BLENK:   Thank you.  That's it.

21              THE COURT:   Anything else?

22              MR. ROCHE:   Nothing further, your Honor.

23              THE COURT:   You may step down, sir.  Put your

24  mask on, please, and take your water with you.

25              (Witness excused)


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

1          THE COURT:  Members of the jury, we have to
2    sanitize the witness box, and I think we will take
3    about -- I say five but I'm sure it will end up being
4    ten minutes to get the witness box sanitized and then we
5    will have the next witness.
6          During this break, do not discuss this case
7    amongst yourselves or with anyone else.  Continue to
8    follow all of the instructions that I have given you.
9    Thank you.
10          (Jurors excused)
11          THE COURT:  Who is the plaintiff's next
12    witness?
13          MR. WEISS:  We are going to call Lieutenant
14    Conto.
15          THE COURT:  On the issue of Officer Laramay
16    that you brought up this morning, right?
17          MR. MIRANDA:  Yes, your Honor.
18          THE COURT:  What day did you subpoena him?
19          MR. MIRANDA:  We -- for today, your Honor.
20          THE COURT:  Okay.  And did he give you a
21    reason or is it just I'm not showing up because I'm
22    busy?
23          MR. MIRANDA:  He -- he indicated -- Mr. Blenk
24    spoke with him.
25          MR. BLENK:  He indicated that he had family in

1    from out of town and that he was four hours away.  So

2    those are the -- that was the explanation that he had

3    given.

4            THE COURT:  Is that the first time he

5    indicated he had any problem with a subpoena?

6            MR. MIRANDA:  Yes.  I can tell you that from

7    speaking with Mr. Sturgess and trying to contact

8    Mr. Laramay several times, he had indicated before he

9    was amenable to coming down.

10           THE COURT:  What is the defense position with

11   respect to me allowing -- what is the plaintiff's

12   position with respect to me allowing the defense to read

13   from portions of a transcript, with the plaintiff being

14   able to read from other portions of the transcript that

15   you think are important to your case?

16           MR. ROCHE:  Your Honor, we would oppose it.  I

17   believe that we -- our office wasn't even present at the

18   deposition of Lieutenant Laramay.  From the

19   representations that's being made by counsel, that's --

20   doesn't qualify I believe as unavailability.

21           THE COURT:  Why weren't you there?

22           MR. ROCHE:  Because I -- I -- I believe it

23   was -- the deposition was conducted by counsel for

24   Officer McGrath.  I wasn't involved in the case back

25   then but I believe we may have just decided not to

1    appear.

2              MR. MIRANDA:  If I may.

3              THE COURT:  Yes.

4              MR. MIRANDA:  We were coming up to the close

5    of discovery in front of Magistrate Lovric, and we had

6    been trying to schedule the depositions for some time.

7    We got to the conference and plaintiffs all of a sudden

8    indicated that they thought that discovery was closed.

9    We had to file A letter motion in front of THE

10   magistrate.  He essentially admonished plaintiffs on the

11   record for their conduct.  He allowed us to move forward

12   with the depositions, and then plaintiffs didn't show

13   for five or six of them that took place in November of

14   2019 in Massena.

15             THE COURT:  Let me just make clear that no

16   witness has a right to ignore a subpoena.  Period.  End

17   of story.  And Monday is not going to work for me

18   because I'm hoping that we have a verdict sometime

19   tomorrow.  So highlight whatever you think it is you

20   want to read, get me a copy, and then I will make a

21   decision, but if I decide that the reading of the

22   transcript is inappropriate, then I will send the

23   marshal to get this officer.

24             People -- and this goes for every witness in

25   this case.  No one can get a subpoena and just say no,

TRANCHINA v McGRATH, et al. - 17-cv-1256

CONTO - DIRECT - WEISS

1    thanks, and we should have known well before today that

2    this isn't convenient for him and he would rather come

3    Monday.  Witnesses do not control my court.

4            I have jurors here.  I'm not yelling at you, I

5    am raising my voice because it ticks me off.  I have

6    jurors here under COVID conditions, I have all of you

7    here under COVID conditions, and I have law enforcement

8    saying it's not convenient?  That's nonsense.

9            So, while we're on this break, communicate

10   with your witness and tell him that I said it's nonsense

11   and that if I order him to be here later today or

12   tomorrow, he will be here or I will send the marshals to

13   get him.  This is absolute nonsense.  Subpoenas are not

14   light suggestions.  They are orders.

15           We stand in recess for ten minutes.  I'm not

16   angry at you.  I realize that I'm raising my voice but

17   this is the second time that I've been told during this

18   trial that a witness doesn't feel like showing up, and I

19   think all witnesses, if we are going to have any more

20   who have this feeling, need to be talked to by counsel.

21           (Recess taken)

22           COURT CLERK:  Take a seat at the witness

23   stand.  State your full name for the record.

24           THE WITNESS:  Daniel Conto.

25   D A N I E L   C O N T O ,  having been duly sworn, was

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

340

CONTO - DIRECT - WEISS

1    examined and testified as follows:

2           THE COURT:  Have a seat, sir.  I've let other

3    witnesses know that if you feel you need to remove your

4    mask to testify, you may.  It's entirely up to you.

5           Record will reflect that our last two

6    witnesses, the defendants chose to remove their masks as

7    they had the right to do, and so they were not having

8    face covering while they testified and, again, it's up

9    to -- I see you are removing it.  Go ahead.  That was

10   quick.

11          Whenever you're ready, Mr. Roche or Mr. Weiss.

12          MR. ROCHE:  It's Mr. Weiss.

13   DIRECT EXAMINATION

14   BY MR. WEISS:

15   Q    Thank you.  Good morning, Mr. Conto.

16   A    Good morning.

17   Q    How long have you been working at Bare Hill

18   Correctional Facility?

19   A    At Bare Hill, six years.

20   Q    And when were you promoted to lieutenant?

21   A    Three years ago.

22   Q    Were you working at Bare Hill Correctional back in

23   January of 2016?

24   A    I was.

25   Q    And what was your designation back then?

TRANCHINA v McGRATH, et al. - 17-cv-1256

CONTO - DIRECT - WEISS

```
 1    A    I was a sergeant.
 2    Q    Did you work as a chart sergeant ever around that
 3    time?
 4    A    Yes, that was my bid-on days.
 5    Q    Can you briefly describe the duties and
 6    responsibilities of a chart sergeant.
 7    A    You're in charge of the shift as far as assigning
 8    officers to the posts that -- make sure they're where
 9    they're supposed to be, where they're covering mess
10    hall, rec runs and being at their allotted locations at
11    the time they are supposed to be.
12    Q    Were you working as a chart sergeant on
13    January 27th and 28th of 2016?
14    A    Yes.
15               MR. WEISS:  I ask that the Court display
16    what's in evidence as Plaintiff's Exhibit 21.
17    Q    Do you recognize this document?
18    A    I do.
19    Q    Can you briefly explain to the jury what this
20    document is and what its purpose is.
21    A    We call it a cheat sheet.  When we do a -- grids
22    for the day, day shift alone has 14 pages of tracking.
23    This is just a condensed version.  It's on a legal-sized
24    paper and it has everybody's name and job number that's
25    working that day, as opposed to going through all the
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

CONTO - DIRECT - WEISS

1   relief officers and stuff.  It's just a condensed
2   version.  We call it a cheat sheet because it helps us
3   verify who is there and where they're supposed to be.
4   Q    Would this be used by the chart sergeants to tell
5   correction officers where to put -- what their
6   assignment was for the day in the morning?
7   A    Yes.
8   Q    What day is this assignment sheet for?
9   A    1/28/16.
10   Q    What shift?
11   A    7 to 3.
12          MR. WEISS:  Now, if the Court would please
13   scroll down.  That's good.
14   Q    I noticed that most of the assignments are typed.
15   What's the difference between the typed and the
16   handwritten ones?
17   A    I created the form and as I do it, I type it in.
18   What happens is when somebody, through the body, calls
19   in sick, they get whited out, and then where it says the
20   extras, their name was down there at one point and then
21   they get highlighted or whited from down there and put
22   into the jobs.
23          So, for instance, Charlin was a resource officer
24   that day.  You know, Jim Loffinbeck called in sick, so
25   he was assigned to cover the Jim Loggins so his name was

CONTO - DIRECT - WEISS

1    handwritten up into that position, which is why

2    there's the white-out at the bottom.

3    Q    Now, this is the assignment sheet for January 28th,

4    2016.  Would this have been created or would the

5    assignments have been decided on January 28th or the day

6    before, January 27th?

7    A    It's made the day before.  The day prior.

8    Q    Did you make this chart on January 27th, 2016?

9    A    I did.

10   Q    I'd like to direct your attention to the bottom

11   right-hand corner.  Do you see where it says McGrath J.,

12   frisk annex school?

13   A    Yes.

14   Q    Did you make that entry?

15   A    I wrote McGrath, J. -- McGrath, J. on the 27th.

16   When I came in on the day of the 28th, it was written --

17   frisk annex school was written by somebody else, and

18   then the 62 is the radio number that he was assigned for

19   the day.  So the beginning of that and the ending of

20   that is my writing.

21   Q    Do you know who wrote in frisk annex school?

22   A    No, I don't.

23   Q    Who would be allowed to make that kind of entry?

24   A    Supervisors have access to it.  If they have an

25   ongoing investigation, they come across something, they

CONTO - DIRECT - WEISS

1    need an area frisked or a cube frisked or something.  I

2    have had captains make notes on there for certain tasks

3    to be completed.  I have had lieutenants.  Sergeants

4    would technically go through, have to get authorization

5    but they also written stuff on it.

6        I have had the dep of security go down and put

7    stuff on, make notations on there to cover certain

8    things.  If there's ongoing investigations, I go on

9    through the whole day, weeks, whatever for the facility,

10   and if somebody comes across something, they come up and

11   they put it on there because as long as there's bodies,

12   they will assign people to cover to do the tasks.

13   Q    Would it be fair to say that a lot of corrections

14   officer have access to this chart?

15   A    Officers?

16   Q    Yeah.

17   A    It's -- when we finish it the day before, it's

18   normally between 9:30, 10:00.  Again, I say "regularly"

19   because you don't know what happens if you have an

20   emergency medical trip or if you have something else

21   going on, you can't stop doing the emergency stuff to do

22   your charts.  When it gets completed, it's put on a

23   clipboard and it's hung behind the chart desk, it gets

24   hung on the wall by a shift.  It's not locked down as

25   far as to where nobody can touch it.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

345

CONTO - DIRECT - WEISS

1      So do officers have access to it?  Yes.  They -- as

2   a rule -- all as a rule, they can't alter it.

3   Q    And just to be clear, so when you left work on

4   January 27th, 2016, you had written McGrath, J., but you

5   didn't write anything next to it?

6   A    No.

7   Q    And then --

8   A    On the 28th, I wrote 18, whatever the next day, I

9   wrote the 62 because that was the radio he was assigned

10  that morning.

11  Q    So when you came in on the morning of the 28th and

12  you looked at this, had somebody already written in

13  frisk annex school?

14  A    Yes.

15  Q    Was any other regular chart sergeants there that

16  day that were able to explain who wrote that in?

17  A    I never asked them.  It was nothing out of the

18  norm.  It happens quite frequently but during an

19  investigation into -- it's not out of norm for somebody

20  to write down to frisk.  So when I saw it there, I

21  didn't question it because I didn't feel the need to

22  because it happens frequently.

23  Q    So it didn't arouse any suspicions, is what you're

24  saying?

25  A    Yes.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

346

CONTO - DIRECT - WEISS

1   Q    Okay.  Did there ever come a time that an

2   investigator from the Office of Special Investigations

3   asked you about this -- this chart?

4            MR. MIRANDA:  Objection.  Hearsay.

5            THE COURT:  Overruled.  You may answer yes or

6   no.  Did an officer ask you about this chart?

7   A    Yes.

8   Q    Do you remember --

9   A    It was, like, five years ago I'm assuming.

10  Q    Do you -- so tough to remember?

11  A    Well, I've talked to a lot of people about it.  I

12  don't know exactly what the jobs these people have

13  but --

14  Q    Okay.

15           MR. WEISS:  I ask the Court display just to

16  the witness Plaintiff's 29-G now in evidence.

17           THE COURT:  All right.  Just to the witness,

18  please.

19  BY MR. WEISS:

20  Q    If you could scroll down, Lieutenant Conto, just

21  take a second to read this document and then let me know

22  when you're finished.

23  A    Yes.

24  Q    Does this refresh your recollection at all?

25  A    Yes.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

347

CONTO - DIRECT - WEISS

1   Q    Okay.  What is this document?

2   A    Pardon?

3   Q    What is this document that you are looking at?

4   A    It's a memo that I wrote to OSI Mitchell.

5   Q    And do you remember creating this document in

6   relation to being asked about the chart that we were

7   looking at before?

8   A    Yes.

9   Q    And is this a fair and accurate copy of the memo

10  that -- the to-from memo that you created?

11  A    Yes.  It's got my signature on it.

12         MR. WEISS:  Your Honor, I ask what's been

13  marked as Plaintiff's 29-G be admitted into evidence.

14         THE COURT:  Any objection on behalf of

15  Defendant McGrath?

16         MR. MIRANDA:  No objection, your Honor.

17         THE COURT:  Any objection on behalf of

18  Defendant Barnaby?

19         MR. REED:  No, your Honor.

20         THE COURT:  Okay.  29-G is received.

21         (Plaintiff's Exhibit 29, received)

22  Q    Now can you explain just briefly why you wrote this

23  memo and what you were explaining to OSI.

24         THE COURT:  I'm just going to point out that I

25  think the answer is going to be completely cumulative to

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

348

CONTO - DIRECT - WEISS

1    the testimony that he just gave.  You can answer that

2    question but we're not going to continue to be

3    repetitive.

4    A    Memo just states that on the 27th and 28th that I

5    worked and that I didn't write to assign Officer McGrath

6    to do the pat frisks in the school, and then that he was

7    given radio 62 from the arsenal, which is why I know his

8    name and the radio number was what I wrote in my

9    handwriting.

10   Q    Were you ever made aware why OSI was asking these

11   questions?

12              MR. MIRANDA:  Objection.

13              THE COURT:  Sustained.

14   Q    Lieutenant Conto, are you aware of anybody else who

15   was asked these same questions by OSI to asked to

16   generate similar to-from memos?

17   A    I don't personally know of anybody but I'm --

18   it's always whoever is working that day, whoever is

19   involved in that area writes memos of what's going on.

20   Q    Do you remember anybody else working as chart

21   sergeant on January 27th, 2016?

22   A    I don't remember.  I did the -- only one chart

23   sergeant per shift so I don't know who worked before me

24   or after me.

25              MR. WEISS:  Your Honor, I'd ask the Court show

TRANCHINA v McGRATH, et al. - 17-cv-1256

349

CONTO - DIRECT - WEISS

```
 1    the witness what's been marked as Plaintiff's 29-F not
 2    admitted into evidence.
 3                THE COURT:  Please just show it to the
 4    witness.
 5                MR. WEISS:  If you scroll down.  That's good.
 6    BY MR. WEISS:
 7    Q    Lieutenant Conto, do you know what this document
 8    is?
 9    A    It appears to be a memo from Lieutenant Hellijas to
10    Captain Boyd.
11                MR. MIRANDA:  Your Honor, this document is
12    hearsay, prepared six months after.
13                THE COURT:  It hasn't been offered yet.  No
14    one can read from it because it's not in evidence.
15    Q    Is this a document that would have been created in
16    the normal course of business?
17    A    Yes.
18    Q    And is this a document that's maintained by DOCCS
19    and the Office of Special Investigations?
20                MR. MIRANDA:  Your Honor, he can't speak to
21    what another agency -- he has no personal.  He doesn't
22    work for OSI, he works for DOCCS.
23                THE COURT:  Question was, and does this
24    document that's maintained by DOCCS -- and is this a
25    document that's maintained by DOCCS and the Office of
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

CONTO - DIRECT - WEISS

1    Special Investigations?  I will allow him to answer if

2    he knows.

3    A    I have no idea what they do with it.

4    BY MR. ROCHE:

5    Q    Do you know what DOCCS is -- is this a document

6    that would normally be maintained by the Department of

7    Corrections?

8    A    It's a memo.  They maintain them for certain amount

9    of years.

10   Q    Was this memo prepared around the same date as the

11   memo that you prepared that we were just looking at?

12   A    I don't remember when I did mine.  I'm not sure.

13   This was six months after the incident.  I don't

14   remember when I did mine.

15   Q    If I told you that your memo was drafted on

16   July 22nd, 2016, would that refresh your recollection?

17   A    Then it would be approximately the same time.

18   Q    Were you asked around that time by the Office of

19   Special Investigations to generate that to-from memo?

20   A    Yes.  I was called in and interviewed down in one

21   of our conference rooms and wanted me to create a memo

22   to -- to write what we discussed.

23   Q    Okay.  So just to be clear, so when you were asked

24   to generate this memo, you weren't asked to think back

25   to the incident that happened in January of 2016.  You

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

351

CONTO - DIRECT - WEISS

1   were just -- you had a discussion a few days prior and

2   then were asked to generate this to-from?

3           MR. MIRANDA:  Can we clarify what memo we are

4   talking about?

5           THE COURT:  What's your objection?  Don't talk

6   to counsel.  What's your objection?

7           MR. MIRANDA:  I guess if we would ask some

8   clarity, I'm not sure.

9           THE COURT:  Objection to the form, sustained.

10  Just state your legal objection.

11          MR. MIRANDA:  Thank you.

12  BY MR. WEISS:

13  Q   Was your memo based on the review of the chart that

14  was -- was your to-from memo based on review of the

15  cheat sheet that you were referring to earlier?

16  A    It was through the interview with the OSI

17  investigator.  His question and the review of

18  the charts.

19          MR. WEISS:  Your Honor, I ask what's been

20  premarked as Defendants' 29-F be moved into evidence.

21          THE COURT:  Any objection from Defendant

22  McGrath?

23          MR. MIRANDA:  Your Honor, the witness hasn't

24  indicated he has any personal knowledge of this document

25  and he did create it.  It's hearsay.  It's between two

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

352

CONTO - DIRECT - WEISS

 1    other individuals.

 2            THE COURT:  Any objection from Defendant

 3    Barnaby?

 4            MR. REED:  None, only to join the objection of

 5    Defendant McGrath.

 6            MR. WEISS:  Your Honor, if I may, this

 7    document has been -- the authenticity has been

 8    stipulated and we have now established that it was

 9    created contemporaneously to what it describes.

10            THE COURT:  How did you prove that it was

11    created contemporaneously?

12            MR. WEISS:  The witness testified that this

13    memo was -- that his memo is similar to this one, was

14    created around the same time that they were both

15    interviewed by the Office of Special Investigations

16    regarding the chart that we were previously looking at

17    and that when asked to generate these to-from memos,

18    they weren't asked to remember something from months

19    prior.  They were shown the chart just a few days

20    beforehand.

21            THE COURT:  Is this a record, sir, that's

22    ordinarily kept in the course of the business of the

23    Bare Hill Correctional Facility?

24            THE WITNESS:  This memo wouldn't normally be

25    created.

TRANCHINA v McGRATH, et al. - 17-cv-1256

353

CONTO - DIRECT - WEISS

1          THE COURT:  It would -- it was not normally
2   created?
3          THE WITNESS:  No.  Not unless there's -- like
4   I said, it's an investigation.  OSI must have talked to
5   the lieutenant to have him write something.
6          THE COURT:  All right.  The objection is
7   sustained.
8          MR. WEISS:  Okay.
9   BY MR. WEISS:
10  Q    Lieutenant Conto, when an officer at Bare Hill
11  Correctional is assigned to do a frisk at a specific
12  area, is that normally reported in the logbook for that
13  area?
14  A    It usually is.
15  Q    And according to the DOCCS directives that are in
16  place, a set of rules, is the frisk supposed to be
17  reported in the logbook of that area?
18  A    It's common practice to put it in.  When you enter
19  the area to do frisking, you are supposed to sign in to
20  the logbook.  Embarrassed to say I'm not a hundred
21  percent sure if it's part of the directives that says
22  you have to.
23  Q    But it's a normal practice?
24  A    Normal practice.
25  Q    So would there be any differentiation if the

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

354

CONTO - DIRECT - WEISS

1   officer is going to do a frisk of the inmates on the way

2   into an area versus a way out?  Would it make a

3   different entry into the logbook?

4   A    No, it would just say pat frisking.  Just pat

5   frisking and the time that they were there and their

6   names.

7   Q    Okay.  Hypothetically, an officer assigned to the

8   annex school to do a frisk of the inmates on the way in,

9   then on the annex school block it would say the name of

10  that officer and that they were frisking?

11  A    Yes.

12  Q    Okay.

13          MR. WEISS:  Your Honor, I ask the Court to

14  display what's been admitted into evidence as -- no, if

15  you could display for the witness Plaintiff's 16.

16          COURT CLERK:  I have 16 in evidence.

17          THE COURT:  Is this 15 or 16 that we are going

18  to show the witness?

19          MR. WEISS:  16 in evidence currently?  Okay.

20          THE COURT:  Yes.

21          MR. WEISS:  Just display then.

22          MR. MIRANDA:  Object to the relevance of this

23  line of questioning.  The witness doesn't work in the

24  annex at this time.

25          THE COURT:  Well, I don't know the relevance

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

355

CONTO - DIRECT - WEISS

```
 1   yet, so you can make that objection when I hear a
 2   question.
 3              MR. WEISS:  If the Court would just scroll
 4   down a little further.  That's good.
 5   BY MR. WEISS:
 6   Q    Lieutenant Conto, upon reviewing this entry and
 7   this logbook for the annex school, does it indicate that
 8   anybody was doing a frisk that day?
 9   A    It doesn't appear to be a notation in there.
10              MR. MIRANDA:  Was this admitted?
11              THE COURT:  Yes.  The answer will stand.  It
12   doesn't appear to be a notation in there.
13   BY MR. WEISS:
14   Q    I'd just like to ask you a couple of questions
15   about frisking generally.  At Bare Hill Correctional, is
16   it commonplace -- well, say specifically for the annex
17   school, would it be commonplace to frisk inmates on the
18   way into the annex school in the vestibule of the annex
19   school?
20   A    A lot has changed --
21              THE COURT:  Just answer the question.
22   A    Not normally.
23   Q    Why wouldn't that normally be the procedure?
24   A    Because you have other inmates walking past and you
25   have congestion in the area.  So normally when they walk
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

CONTO - DIRECT - WEISS

1    into the door area, you identify the inmate that you

2    want to pat frisk and you take them out of that area and

3    pat frisk them in the -- in the part -- it's like a dorm

4    area, but it's a -- it's a open -- more open area.  You

5    have more maneuverability as opposed to being in a

6    congestion of the actual doorway.

7    Q    How big would you say one of the those vestibules

8    are?

9    A    Actual vestibule -- maybe six, six and a half foot

10   by six, six and a half foot.  It's not very big.  That's

11   why we don't normally pat frisk in the doorway.

12   Q    What would be the security or safety concern with

13   having inmates walking directly behind an officer who's

14   trying to pat frisk somebody in the vestibule?

15   A    It's all safety.  Safety reasons.  You don't want

16   somebody walking behind you that could potentially

17   injure the officer or injure the -- you know, take --

18   take a swing at you.  I mean, it's -- luckily it doesn't

19   happen a lot but it does happen.

20   Q    As a lieutenant, if you saw an officer frisking an

21   inmate in the vestibule while other inmates -- multiple

22   inmates were walking behind him, would you admonish that

23   officer and tell them to do it somewhere else?

24   A    Again, it would depend on the situation.  Depending

25   on the amount of traffic that's in that area, but as a

TRANCHINA v McGRATH, et al. - 17-cv-1256

CONTO - DIRECT - WEISS

1    rule, we don't -- you don't do it in the area during a

2    run because that's where there's a lot of movement,

3    congestion.  One way in, one way out is where you got a

4    lot of traffic.

5    Q    And when officers are assigned to frisk locations,

6    have you ever heard of them primarily looking for

7    tobacco?

8    A    I don't have any knowledge of that.  When I was

9    a area sergeant, they were more concerned about weapons

10   and stuff but they do have limits on amount of tobacco

11   that they are allowed to carry but I -- I don't have any

12   firsthand knowledge of -- specifically for tobacco.

13   Q    Fair to say that frisks are typically conducted to

14   find weapons or drugs?

15   A    Yes.

16   Q    Lieutenant Conto, I just have a quick couple of

17   questions about cube numbers.  Can you describe for the

18   jury what a cube number is.

19   A    Each dorm has a dorm layout for where we are.  It's

20   a dorm layout and they have the dorm -- cubes are number

21   1 through 50.  There's ten beds that are double bunked

22   and then each cube there's a Plexiglas screen, and then

23   we have the inmate's name and number, and they put the

24   name and DIN number on the location so you know where

25   each inmate lives or houses or whatever you want.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

CONTO - DIRECT - WEISS

1   Q    And they keep that chart where each inmate lives at
2   each dorm?
3   A    Yes.  Each dorm has their own inmate, their -- the
4   dorms are all cut out the same way and they all have the
5   same number of cubes, same number of beds, and if the
6   bed is empty, they will have a -- no name there.
7   Q    And, yeah, just to be clear, the cube -- the
8   assigned cube is where that inmate sleeps?
9   A    Yes.
10  Q    So if, for instance, hypothetically you were given
11  the -- you know, cube number and a dorm letter, like,
12  for example, F-2, would you be able to walk over to that
13  dorm and figure out what inmate was in that specific
14  cube?
15  A    Yes.
16  Q    And how would you do that?
17  A    Well, there's two different ways.  With a -- if you
18  have access to the computer and you have the codes, you
19  can pull up the dorm sheet and it would have every
20  inmate that's assigned to that dorm with their bed
21  location.
22       If you go to the dorm itself, you could look on
23  that board and you can go that one, two, three, four --
24  go to whatever bed you're looking for and his name and
25  DIN number will be on that bed.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

CONTO - CROSS - MIRANDA

```
 1              MR. WEISS:  Thank you.  One moment.  Nothing
 2    further, your Honor.
 3              THE COURT:  All right.  Thank you.  Any cross
 4    by Defendant McGrath?
 5              MR. MIRANDA:  Yes, your Honor.
 6    CROSS EXAMINATION
 7    BY MR. MIRANDA:
 8    Q    Good morning, Lieutenant Conto.
 9    A    Good morning.
10    Q    Thanks for coming.  You just testified that you may
11    not want inmates walking behind officers during a pat
12    frisk because of concern for officer safety; is that
13    correct?
14    A    Yes.
15    Q    And why is that?
16    A    Because inmates and injuries -- inmates can -- they
17    can injure you or the person that you are pat frisking,
18    if they have any issues with that inmate as well, but
19    you just -- you get in the habit of watching your back,
20    and it's a safety issue for yourself as well as the
21    people that are involved.
22    Q    So, is it your testimony that sometimes inmates are
23    violent at Bare Hill Correctional Facility?
24    A    Absolutely.
25    Q    What do you mean by "absolutely"?
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

Case 9:17-cv-01256-MAD-ML   Document 167   Filed 03/22/21   Page 92 of 259
TRANCHINA v McGRATH, et al. - 17-cv-1256
360

CONTO - CROSS - MIRANDA

```
 1   A    We have had -- as a matter of fact, last week --
 2            THE COURT:  No, that's not relevant, what
 3   happened last week.  The answer will stand that inmates
 4   can be violent in prison.
 5   BY MR. MIRANDA:
 6   Q    Were they violent in January of 2016, to your
 7   knowledge?
 8            MR. WEISS:  Objection.  That's a -- objection.
 9            THE COURT:  That's a very broad question.  I
10   will allow you to answer.
11   A    There's always incidents that happen.  As far as a
12   certain date, I honestly could not give you a yes or no
13   but there is always unusual incidents that is happening.
14   Q    Are inmates having drugs and tobacco?
15            THE COURT:  Back in the -- back when this
16   claim arose in 2016?
17            MR. MIRANDA:  Correct, your Honor.
18            THE COURT:  Go ahead.
19   A    Yes.
20   Q    What kind of drugs were they hiding in tobacco in
21   January of 2016?
22   A    It's -- they call it K2 now.  I don't know where --
23   exactly it was called back then but it's synthetic
24   marijuana, regular marijuana.  They have all kinds of
25   different medical -- different kinds -- I don't know the
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

CONTO - CROSS - MIRANDA

1   exact names of them but there is -- there's a K2 is what
2   they call it now.  I don't know exactly what it's called
3   five years ago.
4           THE COURT:  Okay.  Next question.
5   Q    And January of 2016, were you aware of what the
6   effects of K2 were on an inmate?
7           THE COURT:  That's irrelevant.  Sustained.
8   Q    Lieutenant Conto, you testified earlier that you
9   worked a 7-to-3 shift at Bare Hill in January of 2016;
10  is that correct?
11  A    Yes.
12  Q    And when you were completing a chart as a chart
13  sergeant at Bare Hill at that time, you would complete
14  the chart for any given day the day before?
15  A    Yes.
16  Q    So, if you were completing the chart for
17  January 28th, 2016, is it fair to say that you likely
18  would have completed it in the morning of January 27th?
19  A    Yes.
20  Q    And you also testified that there was a host of
21  individuals who were supervisors that had authority to
22  edit that chart; is that correct?
23  A    Yes.
24  Q    And those individuals were comprised of ranks of
25  captain; is that correct?

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

CONTO - CROSS - MIRANDA

 1   A     Yes.

 2   Q     Lieutenant; is that correct?

 3   A     Yes.

 4   Q     You said deps.  Explain what that means.

 5   A     Dep of security.  He's the -- like one of the

 6   superintendents, the highest in the jail, then it goes

 7   the dep of security and on down to the dep of

 8   administration, dep of programs, dep of captains.

 9   Q     And sergeants as well have the authority to edit

10   that document?

11   A     Yes.

12   Q     So, and in January of 2016 how many deps, captains,

13   lieutenants and sergeants were working on a 24 -- over a

14   24-hour period at Bare Hill, to your knowledge?

15   A     Approximately 14 people.

16   Q     And your shift on January 27th would have ended at

17   approximately 3:00 P.M.?

18   A     2:00.  6 to 2.  7-to-3 shift but we work 6 to 2.

19   Q     Is it fair to say that any of those individuals

20   could have edited that chart after you left?

21   A     Yes.

22   Q     You indicated that chart was located behind you.

23   Is that correct?

24   A     Yes.

25   Q     Between on your shift on January 27th, 2016, at

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

CONTO - CROSS - MIRANDA

```
 1   this point did you see Justin McGrath touch that chart?
 2   A    No.
 3   Q    Did you see him write on that chart?
 4   A    No.
 5   Q    You were working on January 28th, 2016?
 6   A    Yes.
 7   Q    And you assigned -- strike that.
 8        Did Mr. McGrath check in with you to receive his
 9   assignment that day?
10   A    Yes.
11   Q    And what did you indicate to Mr. McGrath when he
12   checked in?
13   A    I directed him to go to the annex school to perform
14   pat frisks.  Random pat frisks.
15   Q    Did you have any reason to believe that Mr. McGrath
16   should have been at the school annex on January 28th,
17   2016?
18   A    No.
19   Q    And January of 2016, were resource officers
20   regularly assigned to pat frisk at different spots of
21   the Bare Hill Correctional Facility?
22   A    Yes.
23   Q    Did you socialize with Mr. McGrath in January of
24   2016?
25   A    Outside of work, no, I don't know him outside of
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

364

CONTO - CROSS - MIRANDA

```
 1    work.
 2            MR. MIRANDA:  Ms. Norton, could we show the
 3    witness P-21.  Just scroll down a little bit for me.
 4    Q    There's a column here.  What was the word next to
 5    training?
 6    A    Extras.  Extra resource officers that are extra for
 7    the day that are -- don't have a actual duty.
 8    Q    How come there's two blank spaces underneath that
 9    column?
10    A    I can see up above where the -- it's handwritten,
11    those names would have been down below there then some
12    location and the person that has handwritten that was
13    actually down before, called in sick, and they were
14    taken out of the resource role or extra column and put
15    into that to cover that job because the -- the jobs up
16    above have to be filled; the resource guys we don't have
17    to.  So we take the extras and put them up and cover
18    those other jobs.
19    Q    So there were names there, in those two blank
20    spaces before?
21    A    Yes.
22    Q    And then the document was edited; is that true?
23    A    Yes.  Well, I did those because when you take them
24    from here and put them up there, the handwriting up top,
25    like for 14, Charlotte, that's my handwriting.  So I
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

CONTO - CROSS - MIRANDA

1    know I took those two guys from down below and stuck

2    them into those two jobs.

3    Q    And on the bottom right hand of the chart there's a

4    word above Mr. McGrath's name.  Will you read that for

5    the jury.

6    A    Extras.  That was a -- I ran out of room on that

7    column.  I just made another extras.  It looks like

8    there might have been one more name above his and one

9    name below his.

10   Q    You were shown a document before by plaintiff's

11   counsel to-from memorandum that you authored.  Is that

12   true?

13   A    Yes.

14   Q    Did you author any other memorandums to anybody in

15   the facility about this chart?

16   A    I believe it was two memos but I think I said

17   it's five years ago, four years ago, five years ago and

18   my recollection -- I don't remember yesterday.

19           MR. MIRANDA:  Your Honor, I'd like to present

20   the witness with a document as rebuttal evidence to

21   refresh his recollection.  I have a bunch of copies here

22   that -- I was going to try to do the electronic exhibits

23   for times we're in.

24           THE COURT:  It's not rebuttal.  You are doing

25   a cross-examination.  If there's something that -- if

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

366

CONTO - CROSS - MIRANDA

```
 1    you develop an answer where he needs to have his memory
 2    refreshed, yes, but it is not rebuttal.
 3    BY MR. MIRANDA:
 4    Q    Mr. Conto, did you author another memorandum about
 5    this chart?
 6              MR. WEISS:  Objection; asked and answered.
 7              THE COURT:  Did somebody just say something
 8    over here?
 9              MR. WEISS:  I said objection.  Asked and
10    answered.
11              THE COURT:  I didn't hear the answer.  Did you
12    author another memorandum about this chart?
13    A    I -- I -- the memo itself referred to another memo
14    but, like I said, I don't remember what -- what the
15    first memo that I was reading referred to, this is to
16    elaborate on my prior memo.  So I -- I'm assuming I did
17    but I don't recall it.
18              MR. MIRANDA:  Would I be able to present him
19    with a document, your Honor, to refresh his
20    recollection?
21              THE COURT:  Is it in your evidence binder?
22              MR. MIRANDA:  It is not, your Honor.
23              THE COURT:  Does the other side have it?
24              MR. MIRANDA:  It was in discovery.
25              THE COURT:  Let me see it, please.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

367

CONTO - CROSS - MIRANDA

1           MR. WEISS:  Would we be able to see a copy as

2    well?

3           THE COURT:  All of the documents in this

4    folder are the same.  Correct?

5           MR. MIRANDA:  That's correct.

6           THE COURT:  To make sure.  All right.  I will

7    have Britney mark one.  Just hang on a second.  I will

8    have Britney mark one of them as the next sequential

9    McGrath exhibit.

10          COURT CLERK:  That would be Defendant McGrath

11   Exhibit D-GG.

12          MR. MIRANDA:  Correct, Defendant D-GG.

13          COURT CLERK:  D-GG.

14          THE COURT:  Defense McGrath Exhibit has now

15   been marked as D-GG.  Go ahead.

16   BY MR. MIRANDA:

17   Q    Sir, do you have that document in front of you?

18          THE COURT:  Record will reflect that I'm

19   handing Defendants' D-GG to the witness.

20   Q    You have just been handed a document D-GG that's

21   been marked for identification purposes.

22        Would you take a moment to read that document and

23   let me know when you're finished.

24   A    (Witness complies).  Okay.

25   Q    After reading this document, do you remember

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

368

CONTO - CROSS - MIRANDA

1    creating this?

2    A    Not really but, yes, it's my signature.  It's one I

3    created.

4    Q    Is that your name next to the "from" line?

5    A    Yes.

6    Q    Is that your signature down at the bottom?

7    A    Yes.

8    Q    Is this document a true and accurate copy of a

9    memorandum you prepared on June 11th, 2016?

10   A    Yes.

11          MR. MIRANDA:  Your Honor, we would ask that

12   this document be moved into evidence.

13          THE COURT:  Is there any objection to

14   Defendant McGraw GG?

15          MR. WEISS:  Your Honor, I don't believe this

16   document was ever exchanged during discovery but we have

17   no objection.

18          THE COURT:  All right.  Defendant McGrath GG

19   is received.

20          (Defendant's Exhibit McGrath GG, received)

21          MR. MIRANDA:  Has that been provided to the

22   jury?

23          THE COURT:  We don't have this in electronic

24   version.

25          MR. MIRANDA:  I understand.


                Lisa L. Tennyson, CSR, RMR, FCRR
              UNITED STATES DISTRICT COURT - NDNY

1            THE COURT:  So, no, we can't.

2            MR. MIRANDA:  Okay.

3            THE COURT:  Nor did we know we were going to

4    use it because it's not in your evidence submissions.

5            MR. MIRANDA:  Understood, your Honor.

6    BY MR. MIRANDA:

7    Q    Lieutenant Conto, I'd like to refer your attention

8    to the first sentence of the second paragraph.  Could

9    you read that sentence for us.

10   A    It says this memo is in response to Investigator

11   Mitchell's request for --

12   Q    I'm sorry.  The second paragraph.

13           THE COURT:  Second paragraph that begins with

14   the word "there" and right into the microphone please.

15   A    There have been several occasions where I have had

16   my completed -- my charts completed for the following

17   day shift and when I returned to work the following

18   morning, there was handwritten requests on the charts

19   indicating various tasks to be performed utilizing extra

20   officers as long as it didn't incur overtime.

21   Q    When you made that statement in this memorandum,

22   were you referring to the fact that various supervisors

23   in the facility could edit that chart after you left?

24   A    Yes.

25   Q    And in that sentence you referred to utilization of

CONTO - CROSS - MIRANDA

```
 1    extra officers.  Was Mr. McGrath, to your knowledge, on
 2    January 28th an extra officer?
 3    A    Yes, he was.
 4    Q    I'd like to go to the same paragraph, second last
 5    sentence.  Could you please read that out loud for us.
 6    Starting with "I have never."
 7    A    I have never questioned any reasonable request nor
 8    have I ever had to verify authenticity of anything that
 9    was written on the charts.  I simply followed through
10    and ensured that the tasks requested were completed
11    utilizing the extra officers assigned for that date.
12    Q    With respect to the chart P-21 that was presented
13    to you for January 28th, do you have any reason to
14    question the authenticity of that chart?
15    A    No.
16    Q    And you indicated that that was preferred to as a
17    cheat sheet?
18    A    Yes.
19    Q    And there was another document that the facility
20    maintained for assignments?
21    A    Yeah.  They are grids.  They are, like, 14 to
22    15 pages long for day shifts.  Just makes it easier to
23    have the cheat sheet to keep track of everybody.
24              MR. MIRANDA:  No further questions.
25              THE COURT:  Any questions on behalf of
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

371

CONTO - REDIRECT - WEISS

```
 1   Defendant Barnaby?
 2             MR. REED:  Yes.
 3   CROSS EXAMINATION
 4   BY MR. REED:
 5   Q    Do you recall working with Sergeant Barnaby at
 6   Bare Hill?
 7   A    Yes.
 8   Q    Prior to January 28th, 2016?
 9   A    Yes.
10   Q    As of that date, he had only been there a few
11   months, correct?
12   A    I don't recall when he got there but we worked
13   together.
14   Q    Were you aware he was brand new probationary
15   sergeant?
16   A    Yes.
17   Q    He didn't work as a chart sergeant at any time on
18   that or prior to that date, did he?
19   A    I don't recall if he ever has.
20   Q    Did you socialize with Sergeant Barnaby outside of
21   work at that time?
22   A    No.
23             MR. REED:  Nothing further.
24             THE COURT:  Any redirect?
25   REDIRECT EXAMINATION
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

CONTO - REDIRECT - WEISS

```
 1   BY MR. WEISS:
 2   Q    Lieutenant Conto, is it fair to say there's no
 3   regular bid for being assigned to frisk at the school
 4   annex?
 5   A    No, that's not a job per se.  It's a -- if you have
 6   extras, we always keep them thinking.  Keep the inmates
 7   wondering when we are going to pat frisk them.  You
 8   always try to catch them off guard so you don't have
 9   them -- we are not going to do to today, today is
10   Tuesday.
11        Whenever there's extras and there's resource guys,
12   we always pick a different area.  We go to the gym,
13   going out to the yard, we will pat frisk.  Go to
14   different locations.
15   Q    And last -- did the Office of Special
16   Investigations ever follow up with you and inform you
17   that they couldn't figure out --
18             MR. MIRANDA:  Objection, your Honor.
19             THE COURT:  You may answer that with a yes or
20   no.
21   A    No.
22             MR. WEISS:  Can I finish asking the question?
23             THE COURT:  What was that?
24             MR. WEISS:  I just had a few more words.  I
25   just wanted to know if I can repeat my full question.
```

373

```
 1              THE COURT:  Sure.
 2    BY MR. WEISS:
 3    Q    Did the Office of Special Investigations ever
 4    follow up with you and inform you that they were unable
 5    to figure out who wrote that entry assigned to Officer
 6    McGrath to frisk the annex school that day?
 7    A    No.
 8              MR. WEISS:  Nothing further.
 9              THE COURT:  Anything else?
10              MR. MIRANDA:  Nothing further.
11              THE COURT:  If you will reapply your mask,
12    your testimony is concluded and you may leave.
13              (Witness excused)
14              (Pause in proceeding)
15              MR. MIRANDA:  Could we be heard outside of the
16    presence of the jury before the next witness is called?
17              THE COURT:  Of course.  Who is the next
18    witness?
19              MR. WEISS:  I believe the next witness is
20    Stacy Weir.
21              THE COURT:  Okay.
22              MR. MIRANDA:  It can wait, your Honor.
23              THE COURT:  Okay.
24              MR. WEISS:  Your Honor, may I ask this time to
25    provide Stacy Weir with the questionnaire?  I don't
```

WEIR - DIRECT - WEISS

```
 1    believe she's received it yet.
 2                THE COURT:  Yes.  Absolutely.
 3                MR. WEISS:  Thank you, your Honor.
 4                (Pause in proceeding)
 5                THE COURT:  The record will reflect that the
 6    last witness, Sergeant Conto, chose not to wear his mask
 7    during his testimony, which was his right.
 8                COURT CLERK:  Would you please raise your
 9    right hand and state your full name for the record
10    please.
11                THE WITNESS:  Stacy Weir.
12    S T A C Y   W E I R ,  having been duly sworn, was
13    examined and testified as follows:
14                THE COURT:  Good morning.  I'm letting
15    witnesses know that it's entirely up to you as to
16    whether you'd like to keep your mask on or if you'd like
17    to take it off to testify.  No matter what you do,
18    please use the microphone and keep your voice up.
19                THE WITNESS:  Okay.
20                THE COURT:  You may proceed.
21                MR. WEISS:  Thank you, your Honor.
22    DIRECT EXAMINATION
23    BY MR. WEISS:
24    Q    Good morning, Ms. Weir.
25    A    Good morning.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

WEIR - DIRECT - WEISS

```
 1   Q    What do you do for a living?
 2   A    I am a forensic scientist at the New York
 3   State Police Forensic Investigation Center in Albany,
 4   New York.
 5   Q    And how long have you been doing that?
 6   A    Since January of 2007, so about 13 and a half
 7   years.
 8   Q    Can you briefly describe what you do as a forensic
 9   scientist.
10   A    As a forensic scientist, I examine items of
11   evidence that are submitted to the laboratory.  I
12   perform serology, which is where we look for the
13   possible presence of biological fluids on an item of
14   evidence, such as blood or seminal fluid, and I also
15   perform DNA analysis.
16   Q    Did there ever there come a time that you worked in
17   your capacity as a forensic scientist on a case
18   involving a Joseph Tranchina?
19   A    Yes, I did.
20   Q    And do you remember around when that was?
21   A    I think it was in March of 2016.
22   Q    And what was your role in that case?
23   A    In that case, I was a forensic scientist that
24   performed analysis on a Plexiglas shank that was
25   submitted and a buccal swab collection kit from
```

WEIR - DIRECT - WEISS

1    Joseph Tranchina.

2         I performed serology and DNA analysis on the

3    Plexiglas shank and DNA analysis on the buccal swab.

4    Q    Just to be clear, would it be fair to call a buccal

5    swab, like, a cheek swab?

6    A    Yes, that's what it is.  A swab that is collected

7    from the inside of the cheek.

8    Q    Now, what if any information were you given about

9    what had happened in that incident before you started

10   working on your analysis?

11   A    The submission paperwork that I received just

12   stated that a weapon was found on an inmate.

13   Q    Do you remember what that Plexiglas shank, as you

14   described it, looked like?

15   A    It was a triangular-shaped clear piece of

16   Plexiglas.

17   Q    And what if any effect does the shape of the object

18   have on your testing?

19   A    I separated the item into two sections to collect

20   swabs from it.  So I refer to one end as a pointed end

21   and one end as a handle-type end, but it doesn't affect

22   my analysis.  It's just basically how I separated the

23   item to conduct my testing.

24   Q    And can you just briefly describe the process that

25   you were asked to go through or that you went through in

TRANCHINA v McGRATH, et al. - 17-cv-1256

WEIR - DIRECT - WEISS

1    analyzing this piece of Plexiglas.

2    A    I was assigned by my supervisor to swab the piece

3    of Plexiglas, test those swabs for the possible presence

4    of blood, and then perform DNA analysis on the swabs.

5    Q    And was there any blood found on the Plexiglas?

6    A    No.  The presumptive screening test was -- did not

7    detect any possible presence of blood.

8    Q    Can you take us through your DNA analysis of the

9    Plexiglas.

10   A    For DNA analysis, I collect swabs.  They're sort of

11   like a Q-Tip but a bit longer, a wooden stick on them.

12   I take a cutting from that swab, majority of the cotton

13   goes into a small tube and chemicals, reagents are added

14   to that substrate or that piece of cotton swab, and

15   those reagents are meant to remove any cellular material

16   that's on the swab, break those cells open and verify so

17   that only DNA is left behind.

18        After that extraction process is what's that

19   referred to, I perform quantitation to see how much DNA

20   is present on that item, and then after that,

21   amplification is performed in order to target specific

22   regions for testing the DNA, and then a profile is

23   generated after running it through a genetic analyzer,

24   and that's data that I then analyze, interpret, and

25   write a report from my findings.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

WEIR - DIRECT - WEISS

1   Q   Was DNA recovered from the Plexiglas that allowed

2   you to create a full profile?

3   A   Yes.  There were DNA profiles present on the two

4   sets of swabs that I collected.  One from the pointed

5   end and one from the handle end.

6   Q   Can you briefly describe what you mean by the

7   profiles or can you describe the profiles that were

8   recovered from the Plexiglas?

9   A   So, my conclusion for those two profiles, they were

10   both mixture profiles that were consistent with DNA from

11   an unknown male donor, John Doe, and mixed with DNA from

12   at least two additional donors with John Doe being the

13   major contributor.

14   Q   Why were you unable to not make a profile of the

15   minor contributors?

16   A   In mixture profiles or mixtures where there's more

17   than one person's DNA present on an item, when it gets

18   beyond two to three donors and above that, the remainder

19   of the profile that isn't the major contributor can be

20   very complex and also very low information to make any

21   conclusions on.

22       So a major contributor is determined by doing a

23   mathematical calculation of the peak -- peak heights

24   that are present because a DNA profile kind of looks

25   like an EKG with peaks in it.  So the major is

TRANCHINA v McGRATH, et al. - 17-cv-1256

WEIR - DIRECT - WEISS

1    determined by looking at whether there's a three-to-one

2    ratio of DNA there compared to the rest of the profile.

3         So basically once there's a major determined in a

4    mixture, such as a case like this, the remainder of the

5    profile or the minor contributors become too

6    insufficient to make any further comparisons to.

7    Q    Was there anything abnormal about testing this

8    Plexiglas?

9    A    No.  Everything went as usual for this type of a

10   case.

11   Q    Any issues you encountered during the process?

12   A    No, I didn't have any.

13   Q    During the testing, what if any steps were taken to

14   control for any possible human error?

15   A    Well, throughout our testing, we have many

16   different controls for positive and negative controls.

17   So positive controls make sure that our processes are

18   working the way they are supposed to, and the negative

19   controls make sure that no contamination occurred

20   throughout the process.

21   Q    What was the result of your test -- your DNA

22   testing of the Plexiglas?

23   A    So, the DNA conclusion, again, was that the mixture

24   profiles from the swabs from the handle end and the

25   swabs from the pointed end of the Plexiglas shank are

TRANCHINA v McGRATH, et al. - 17-cv-1256

WEIR - CROSS - BLENK

```
1    consistent with the DNA from an unknown male donor John
2    Doe and mixed with DNA from at least two additional
3    donors with a major contributor being John Doe, and
4    Joseph Tranchina can be excluded as being the major
5    contributor of DNA to these mixture profiles.
6         And due to insufficient genetic information, no
7    further comparisons can be made to the minor
8    contributors to the profiles.
9    Q    Now, in terms of Mr. Tranchina being excluded as
10   being the major donor of the DNA that was on the
11   Plexiglas, what -- do you know what the statistical
12   accuracy of that result is?
13   A    There's no statistical calculation performed in our
14   cases when it's an exclusion, only when there's an
15   inclusion.  So I didn't perform any statistics for this
16   case.
17   Q    Were you given samples of anybody else's DNA to see
18   if that matched the DNA that was on Plexiglas?
19   A    No, I wasn't.
20            MR. WEISS:  Nothing further.
21            THE COURT:  Cross-examination by counsel for
22   Defendant McGrath?
23            MR. BLENK:  Yes, your Honor.  Thank you.
24   CROSS EXAMINATION
25   BY MR. BLENK:
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

WEIR - CROSS - BLENK

1   Q    Thank you for being here today.  We previously met
2   when you had a deposition of a few months ago but it's
3   nice to see you again.
4   A    Yes, you too.
5   Q    My name is JP Blenk, I represent Justin McGrath.
6        When -- so, just to clarify, you found DNA from
7   three different individuals on that weapon; is that
8   correct?
9   A    At least three.  So it could be more than three.
10  Q    Okay.  It could be more than three and you
11  didn't -- you weren't able to confirm that Mr. Tranchina
12  was not one of those other two individuals.  Correct?
13  A    Right.  There's no comparisons that I can make to
14  the minor contributor, so there's no conclusion made
15  other than that I can't make comparisons.
16  Q    Okay.  And did anybody tell you where the weapon
17  was found?
18  A    So, the submission paperwork that I received said
19  that a weapon was found on an inmate.  I did testify in
20  an arbitration hearing for this case back in December
21  of 2016, and I believe the attorney involved in that
22  case --
23           MR. BLENK:  That's hearsay.
24           THE COURT:  The latter portion of that answer
25  is stricken but narrow down your question.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

WEIR - CROSS - BLENK

1  Q    At the time you completed your report, nobody had

2  informed you where the weapon had been found; is that

3  correct?

4  A    Not specifically, just on an inmate.

5  Q    Okay.  And if it had been important, you would have

6  asked for that information before preparing the report?

7  A    I'm sorry.  Can you repeat that?

8  Q    If it had been important for you to know that, you

9  would have asked for that information before preparing

10  your report?

11  A    Yes.  I generally just use what's in the submission

12  paperwork, and I don't tend to ask for more information.

13  Q    So nobody told you who had handled the weapon

14  before it got there?

15  A    I think the labeling on the packaging had a

16  recovered by CO Justin McGrath written on it.

17  Q    I think you testified that there wasn't blood found

18  on the actual weapon; is that correct?

19  A    Yes.  My testing for blood did not detect any.

20  Q    And so compared to other possible conveyances for

21  DNA, like sweat and skin, blood would be more likely

22  to -- would be more likely to result in positive DNA

23  results; is that correct?

24           MR. WEISS:  Objection, your Honor.

25           THE COURT:  Overruled.  You may answer.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1   A    In general, bodily fluids such as blood do leave

2   more DNA, depending on the item, than just touching it

3   or sweating on it, yes.

4   Q    You don't know if -- if Inmate Tranchina -- if

5   Mr. Tranchina had touched the shank, right?

6   A    I do not know, no.

7   Q    And you can't rule out that Mr. Tranchina was one

8   of the two minor DNA contributors?

9   A    I can't make any comparisons to the minor

10  contributors at all.

11           MR. BLENK:  Thank you.  No further questions.

12           THE COURT:  Any questions on behalf of

13  Defendant Barnaby?

14           MR. ABEL:  No question, your Honor.

15           THE COURT:  Thank you.  Any redirect?

16           MR. WEISS:  No, your Honor.

17           THE COURT:  Thank you.  You may step down.

18  That concludes your testimony.

19           (Witness excused)

20           THE COURT:  Who is the plaintiff's next

21  witness?

22           MR. ROCHE:  Our next witness is Maura Mayer.

23           THE COURT:  We have been advised that she will

24  be here at 1:00.  Good time to break.

25           Members of the jury, we are going to take our

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    lunch break now.  During this break, please do not

2    discuss this case amongst yourselves or with anyone else

3    and continue to follow all of the instructions I've

4    given you.  Thank you.

5                (Jurors excused)

6                THE COURT:  Mr. Miranda, was there something

7    that you wanted to put on the record before this coming

8    witness?

9                MR. MIRANDA:  No, your Honor.

10               THE COURT:  All right.  What witness are you

11   concerned about?

12               MR. MIRANDA:  Only to the extent that

13   plaintiffs were going to call -- I'm not sure if it's

14   Sergeant but Joseph Danussi, D-a-n-u-s-s-i.  I

15   understand he's here with Lieutenant Conto.

16               THE COURT:  So Sergeant Danussi is on the

17   plaintiff's witness list.  Are you intending to call?

18               MR. ROCHE:  Your Honor, we decided not to call

19   him.

20               THE COURT:  So no concerns.  After Miss Mayer,

21   how many other witnesses do you have before you rest?

22               MR. ROCHE:  I believe that we will rest after

23   Miss Mayer.

24               THE COURT:  Okay.  So be ready to go with any

25   defense testimony.

                     Lisa L. Tennyson, CSR, RMR, FCRR
                     UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

1          I've looked at the testimony of Officer

2     Laramay that Defense McGrath wants to read.  Have you

3     given them a highlighted copy?

4          Here's what I'm going to say about that.  Most

5     of what's highlighted is already in the record.  It's

6     about Plexiglas being available in the prison.  We have

7     had testimony to that effect.  It's about court officers

8     being concerned about tobacco and drugs.  That's already

9     in the record.  While I think the reading is cumulative,

10    I will give you the lunch hour to take a look at it and

11    did you want to say something?

12          MR. ROCHE:  Yes, I would like to say

13    something.  Sergeant or Lieutenant Laramay was the -- I

14    think the watch commander on the date of the incident.

15    He was on duty on the date of the incident and he isn't

16    a material witness but we should be able to have an

17    opportunity to cross-examine him.  He's not unavailable.

18    He's an employee of DOCCS.  He should be -- he should

19    honor his subpoena that was served on him.

20          THE COURT:  Believe me, I know he should honor

21    the subpoena.  You know, I'm a practical judge, and I'm

22    trying to keep this case moving.  Maybe after you take a

23    look at what it is they want to read, it is possible you

24    may withdraw your objection.  Review what they want to

25    read over the lunch hour, it's not a lot, and then we

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

386

```
 1    will talk again.  All right?
 2             I understand what you're saying, I will be --
 3    if I allow this testimony to be read, I will be speaking
 4    to Officer Laramay, I will be speaking to the Attorney
 5    General, and I will be speaking to Officer Laramay's
 6    immediate supervisor because this is -- as I said, this
 7    notion that I got a subpoena and I don't feel like
 8    coming is totally unacceptable to the Court.
 9             Let me be clear, if I do allow this to be
10    read, I'm not exonerating Officer Laramay because what
11    he is doing is unacceptable but read it and see if you
12    have any objection.
13             MR. ROCHE:  Thank you, your Honor.
14             THE COURT:  We're in recess until 1:00 P.M.
15             (Following recess)
16             THE COURT:  Plaintiff may call their next
17    witness.  Let's get the jury, please.
18             MR. ROCHE:  Plaintiff calls Miss Mayer.
19             (Discussion held off the record)
20             (Jurors enter courtroom, 1:04 P.M.)
21             THE COURT:  Be seated, everyone.
22             Members of the jury, we are just getting the
23    witness from the hallway.  We will be ready to begin in
24    just one moment.
25             COURT CLERK:  Miss Mayer, would you please
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

387

MAYER - DIRECT - ROCHE

```
 1    raise your right hand and state your full name for the
 2    record.
 3              THE WITNESS:  Maura Mayer.
 4    M A U R A   M A Y E R ,  having been duly sworn, was
 5    examined and testified as follows:
 6              THE COURT:  Miss Mayer, I have given each
 7    witness a choice as to whether to testify with the mask
 8    or without the mask.  It's entirely up to you.
 9              THE WITNESS:  I will take it off.
10              MR. ROCHE:  May I inquire, your Honor?
11              THE COURT:  Yes.
12    DIRECT EXAMINATION
13    BY MR. ROCHE:
14    Q    Good afternoon, Miss Mayer.
15    A    Hi.
16    Q    Do you currently live with Justin McGrath?
17    A    I do.
18    Q    And for how long have you lived with him?
19    A    April 2016.
20    Q    And you were subpoenaed to testify here today,
21    correct?
22    A    I was.
23    Q    At some point, were you employed by New York State
24    as a corrections officer?
25    A    Yes.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

388

MAYER - DIRECT - ROCHE

1   Q    Okay.  And when was that?

2   A    August 24th, 2015, to sometime in June 2016.

3   Q    And were you terminated?  Was your employment

4   terminated in June of 2016?

5   A    It was.

6   Q    And was it terminated in connection with an

7   incident involving Joseph Tranchina?

8   A    I was a probationary officer, and I was never

9   actually given a reason for my termination.  A specific

10  reason.

11  Q    Was it your understanding that you were not

12  continued as a correction officer, was it your

13  understanding that that decision was related to the

14  incident with Joseph Tranchina?

15  A    Yes.

16  Q    Did you work for a time at Bare Hill Correctional

17  Facility?

18  A    I did.

19  Q    And was that from August 2015 to the end of

20  January 2016?

21  A    No.

22  Q    When was it?

23  A    I -- after I got out of the academy, I was at

24  Wende Correctional Facility, and then from there I was

25  at Bare Hill.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

389

MAYER - DIRECT - ROCHE

1   Q    So approximately when did you arrive at Bare Hill?

2   A    Roughly the fall.

3   Q    Fall of 2015?

4   A    Yes.

5   Q    Okay.  And then you transferred out of Bare Hill at

6   the very end of January 2016, correct?

7   A    I did.

8   Q    Okay.  And you transferred to Willard Correctional

9   at the end of January, right?

10  A    I did.

11  Q    Okay.  And you had requested that transfer, right?

12  A    Yes.

13  Q    And approximately two weeks after you arrived at

14  Willard, you requested a transfer back to Bare Hill.

15  Correct?

16  A    I don't think it was two weeks.

17  Q    Well, if -- would it be fair to say that you -- in

18  mid-February of 2016 you put in a request to transfer

19  back to --

20  A    Yes.

21  Q    From Willard to Bare Hill?

22  A    Yes, that sounds about right.

23  Q    The reason that you put in that request was to be

24  closer to Mr. McGrath.  Is that fair to say?

25  A    It was.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

390

MAYER - DIRECT - ROCHE

```
 1    Q    When you started at Bare Hill in 2015, in the fall
 2    of 2015, did you know Justin McGrath?
 3    A    I did.
 4    Q    So you met him while you were colleagues at
 5    Bare Hill?
 6    A    Yes.
 7    Q    And at some point while you were assigned to
 8    Bare Hill, you started dating Justin McGrath, correct?
 9    A    I wasn't dating him at that time.
10    Q    Is there a -- is it fair to say you became
11    romantically involved with him while you were at
12    Bare Hill?
13    A    Not when I was at Bare Hill.
14    Q    So when -- pursuant to an OSI investigation, you
15    gave testimony and question-and-answer session in May of
16    2016.  Correct?
17    A    Yes.
18    Q    And you gave another follow-up Q and A in June of
19    2016.  Correct?
20    A    I only had one Q and A.
21    Q    Okay.  Well, in May of 2016 you met with
22    investigators from Office of Special Investigations.
23    Correct?
24    A    Yes.
25    Q    And during that Q and A, you swore to tell the
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

MAYER - DIRECT - ROCHE

 1   truth, right, in that -- for that Q and A?

 2   A    Yes.

 3   Q    Your testimony was under oath?

 4   A    Yes.

 5   Q    Okay.  And during the Q and A, were you asked this

 6   question and did you give this answer?  And I'm

 7   referring to page 12 line 5, it's Bates number 549.

 8           MR. MIRANDA:  Your Honor, is this in evidence?

 9           THE COURT:  It doesn't have to be in evidence

10   if it's going to be used solely for impeachment.  What

11   is read from will be admitted for the purpose of the

12   impeachment, if indeed it is impeachment.  I don't know

13   yet.

14   BY MR. ROCHE:

15   Q    So, Miss Mayer, were you asked this question and

16   did you give this answer:

17       "QUESTION:  When did you start dating Officer

18   McGrath?

19       "ANSWER:  Maybe, like, I don't know.  We started

20   talking maybe, like, right after Christmas, New Year's

21   Eve."

22       Did you give that answer for that question?

23   A    I did.

24   Q    And were you also asked this question and did you

25   give this answer?  This is from the second deposition

                  Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

MAYER - DIRECT - ROCHE

1    transcript, page 11, line 7, Bates number 587.
2         Were you asked this question?  Did you give this
3    answer:
4         "QUESTION:  And you have lived together since
5    April.  You have been continuously dating, you said, for
6    how long?  How long have you been dating for?
7         "ANSWER:  December."
8         Did you give that answer to that question?
9    A    I did.
10   Q    So is it fair to say you broke up with or you broke
11   up with Mr. McGrath at some point after you started
12   dating?
13   A    We never broke up.
14   Q    It's fair to say that when you transferred to
15   Willard, you were going through a breakup, a breakup
16   situation with Mr. McGrath at that time?
17   A    Absolutely not.
18   Q    Okay.  Now, also in relation to your incident with
19   Mr. Tranchina, there was a state investigation, state
20   police investigation.  Correct?
21   A    Yes.
22   Q    And you were interviewed by an Investigator David
23   Hart of the New York State Police on May 11th, 2016?
24   A    I don't know the exact date, but, yes.
25   Q    And isn't it true that you told Investigator Hart

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

MAYER - DIRECT - ROCHE

1    that you and Mr. McGrath were going through a breakup

2    when you requested a transfer?

3    A    I never told him that we broke up.

4    Q    Okay.

5              MR. ROCHE:  So I ask that the witness be

6    shown -- it's Plaintiff's Exhibit 34 I believe.  I would

7    ask to scroll down to page 94 through 96.

8              COURT CLERK:  This is not in evidence.

9              MR. MIRANDA:  Your Honor, we had a prior

10   ruling on this exhibit.

11             THE COURT:  This is not in evidence.  Correct?

12   It's going to be shown to the witness.  I don't know

13   where this is going yet, but when you do and I do, if

14   you have a legal objection, please make it.  Right now

15   all I know is the witness is being asked to look at a

16   document.

17             COURT CLERK:  Mr. Roche, 94?

18             MR. ROCHE:  Okay.  Yes.

19   BY MR. ROCHE:

20   Q    Miss Mayer, do you recognize this document?

21   A    I do not.

22   Q    Okay.  So I'm going to --

23             MR. ROCHE:  Actually, can you go up a little

24   bit more?

25   Q    So this is -- what's shown on the screen right now,

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

394

MAYER - DIRECT - ROCHE

1    do you see your name as person interviewed?

2    A    I do.

3    Q    Okay.  So would you agree that this is a report

4    concerning an interview of you by New York State Police

5    in May of 2016?

6    A    Yes.

7    Q    I ask that we scroll down now to page 3 of that

8    document.

9           THE COURT:  I'm not going to let you read from

10    it so I really don't know what you're doing.

11    Q    Miss Mayer, I would ask that you read from this

12    document, about halfway through -- halfway down the

13    first paragraph where it states -- directing your

14    attention to the sentence that begins Mayer stated.

15           MR. MIRANDA:  Objection, your Honor.  This

16    isn't a document that's authored by Miss Mayer, and

17    based on your prior ruling, it's not in evidence and

18    should therefore not be read.

19           THE COURT:  It's not in evidence and I don't

20    recall the witness saying that she lacks recollection.

21    I don't know what you're trying to do with the document.

22    BY MR. ROCHE:

23    Q    Well, does this document refresh your recollection

24    as to what you said?

25    A    I have never seen this document.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

MAYER - DIRECT - ROCHE

1    Q    Okay.  But can you read the line that begins Mayer
2    stated and tell me whether that sentence refreshes your
3    recollection as to what you told Investigator Hart.
4            THE COURT:  Read it to yourself, please.
5    A    Just that sentence?  That small sentence?
6    Q    Okay.  That sentence and the following sentence.
7    A    Okay.
8            (Pause in proceeding)
9    A    Okay.  I read it.
10   Q    Okay.  And does that refresh your recollection that
11   you told Investigator Hart that you were going through a
12   breakup at the time you transferred to Willard?
13           MR. MIRANDA:  Objection, your Honor.
14           THE COURT:  Overruled.  You may answer.  She
15   testified that she didn't -- was not undergoing a
16   breakup.  She was asked if something would refresh her
17   recollection.  She read it silently and now she may
18   answer the question.
19   A    Justin McGrath and I never broke up.
20   Q    Okay.  My question was:  Does that refresh your
21   recollection as to what you told Investigator Hart?
22   A    I never said that.  That is not why I went to
23   Willard.
24   Q    At some point you were placed on administrative
25   leave --

                    Lisa L. Tennyson, CSR, RMR, FCRR
                   UNITED STATES DISTRICT COURT - NDNY

MAYER - DIRECT - ROCHE

```
 1   A     Yes.
 2   Q     -- with regard to the incident with Mr. Tranchina,
 3   correct?
 4   A     Yes.
 5   Q     Okay.  And at the time you were on administrative
 6   leave, Mr. McGrath was also on administrative leave at
 7   the same time.  Correct?
 8   A     Yes.  I -- they overlapped.
 9   Q     Okay.  And it was a condition of your -- both of
10   your administrative leave at that time that you had to
11   stay at home.  Is that fair to say?
12   A     Yes.
13   Q     And during that time, did you discuss with
14   Mr. McGrath the facts of the case, of each of your cases
15   involving Mr. Tranchina?
16   A     No.  I was advised to talk to the union and my
17   lawyer and not anybody else.
18   Q     So you and Mr. McGrath never talked to each other
19   about each of your, basically, suspensions due to
20   incidents involving Mr. Tranchina?
21   A     No.  I listened to my lawyer.
22   Q     So back in January of 2014 at specifically --
23         Back in January 2014 or 2016 -- sorry, before you
24   were transferred to Willard, what was your assignment at
25   Bare Hill?
```

MAYER - DIRECT - ROCHE

1   A    I was a resource officer.

2   Q    Were you assigned to any particular location at

3   that time?

4   A    I just worked multiple dorms.

5   Q    Okay.  Would it be fair to say you worked at --

6   pretty often at dorm F-2?

7   A    I worked at many dorms.

8   Q    Were you ever assigned to the F-2 dorm during that

9   time period?

10  A    Yes.

11  Q    And was Joseph Tranchina housed in the F-2 dorm at

12  that time?

13  A    Yes.

14  Q    And do you recall what was the designation or the

15  number of his assigned cubical at that time?

16  A    I do not.

17  Q    From the time you -- you started in F-2 or you

18  first went to F-2 to January 24th of 2016, which is your

19  last day.  Correct?

20  A    Yes.

21  Q    With what frequency would you engage with

22  Mr. Tranchina at some type of communication?

23  A    No more than any other inmate on the dorm.

24  Q    And were any of the communications you had with him

25  a -- would you consider them a violation of rules for

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

MAYER - DIRECT - ROCHE

```
 1    correction officers?
 2    A    No.
 3    Q    And would any of the interactions you had with him,
 4    would you consider them to be violations of conduct for
 5    an inmate?
 6    A    His conduct?
 7    Q    Yes.
 8    A    I mean, he would ask me for supplies that he wasn't
 9    allowed to get at that time.  So -- and I would just
10    tell him to go back to his cube.
11    Q    During that time period, were you dating
12    Mr. McGrath?
13    A    I was not.
14    Q    Were you in contact with him at that time?
15    A    I had met him a couple of weeks before I left to go
16    to Willard.
17    Q    So had you met him in -- on New Year's Eve of 2015?
18    A    No, and I did say that.  I met in December and at
19    the time of the questioning, I -- it had been four
20    months since the incident and anyone that's in a
21    relationship, I don't think you remember specifically
22    when you meet them but I remember that I met him right
23    before I left because I was like, oh, you know, I was
24    interested in him.
25    Q    It's fair to say that you told the investigator
```

MAYER - DIRECT - ROCHE

1    that you met him in -- on New Year's Eve.  Right?

2    A    I said sometime after that and I was also being

3    questioned trying to save my job that I cared about and

4    I was upset, and when you're being asked --

5              THE COURT:  Just a moment.  Just going to take

6    a minute.  I'm just going to ask you to center on the

7    question that's asked and just answer the question.  If

8    you ever need a break, just let me know and we will take

9    a break, but just listen to the question and do your

10   best to answer the question directly.  Go ahead and put

11   a question to the witness, please.

12   BY MR. ROCHE:

13   Q    During this time period in January 2016, prior to

14   you being transferred out to Willard, did you have

15   communication with Mr. McGrath during that time?

16   A    Can you please repeat that?  I'm sorry.

17   Q    During the month of January up to January 24th,

18   which was your last day, were you in communication with

19   Mr. McGrath during that time?

20   A    Yeah, we were probably texting here and there.

21   Q    Would he come up to visit you and -- and at your

22   assigned dorm from time to time?

23   A    No.

24   Q    So is it your testimony that Mr. McGrath never

25   visited you in the F-2 dorm?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

MAYER - DIRECT - ROCHE

1    A    He did a fire drill, that's how I met him.

2    Q    But he never visited you personally on any other

3    occasion?

4    A    No, I was -- I only worked there for a couple more

5    weeks.

6    Q    On your last day at Bare Hill, did you receive a

7    note from Mr. Tranchina?

8    A    I did.

9    Q    And did you accept it?

10   A    I did.

11   Q    And did you take any administrative steps regarding

12   that note?

13   A    Not administrative.

14   Q    What did the note say, as best you can recall?

15   A    I mean, it was four years -- over four years ago.

16   That I was pretty, to contact him when he gets out.

17   Q    Would you consider a note like that being passed

18   from an inmate as a violation of the prison rules?

19   A    Yes.

20   Q    Okay.  And that's something that an inmate would be

21   written up for, right?

22   A    Yes.

23   Q    Okay.  And did you report -- did you file an

24   infraction against him?

25   A    I did not write a ticket.


                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

401

MAYER - DIRECT - ROCHE

1    Q     Okay.  And did you report him to -- did you report
2    the incident to any of your supervisors?
3    A     Not my supervisors.
4    Q     Did you tell Mr. McGrath about it?
5    A     I mentioned it like -- you know, an inmate give me
6    a note.  This is -- you know, this is annoying.
7    Q     What did you do with the note?
8    A     I threw it out.
9    Q     You didn't make a copy of it before you threw it
10   out?
11   A     No.
12   Q     So did Mr. McGrath ask you who the inmate was?
13   A     No.
14   Q     Did you -- did you tell him who the inmate was?
15   A     I might have mentioned like, you know, bed five,
16   bed seven, but no name.
17   Q     Okay.  Fair to say that it would be pretty easy for
18   Mr. McGrath to find out who the inmate was from that
19   information?
20   A     I have no idea how he would be able to find that
21   out.
22   Q     Is it fair to say that inside the dorm there's a
23   list of all the inmates and their cube numbers?  Right?
24   A     Honestly, I can't remember -- recall.  I have had
25   different jobs since then.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

MAYER - DIRECT - ROCHE

```
 1   Q    So you don't have any recollection of whether there
 2   was a sheet or a --
 3   A    There -- yeah, there --
 4             THE COURT:  Just a moment.  One at a time.
 5   Finish that question, please.
 6   Q    And you don't have any recollection of whether
 7   there was any sheet of paper posted in the dorm
 8   indicating what inmates were in each cube?
 9   A    There has to be a -- because it's a prison.
10   Q    So would it be -- would you agree that if you
11   were --
12   A    Yes.
13   Q    If you were to -- let me finish the question.  If
14   you were to give -- tell Mr. McGrath the cube number of
15   the inmate, he would be able to go and look at that list
16   and determine who -- the identity of the inmate.  Fair
17   to say?
18   A    No.
19   Q    And why would that not be?
20   A    Because in a prison, the dorm is not just an open
21   door where you can just walk in and out.  You couldn't
22   just go in and say, hey, I want to see the list of the
23   inmates here.
24   Q    So you are saying that Mr. McGrath would not have
25   been able to get access to the F-2 dorm?
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

MAYER - DIRECT - ROCHE

1   A    I have no idea when he would be able to or what his
2   job was or what it entailed.  I had barely known him.
3   Q    But you said that he was a fire officer, right?
4   A    I did.
5   Q    Okay.  So a fire officer would have access to the
6   dorms, correct?
7   A    I have no idea what -- what -- how often they can
8   go in.  Is it just a fire drill?  Is it monthly?  I
9   don't know.
10  Q    But it's fair to say if he -- if he did manage to
11  get into the dorm to look at that list, he would be able
12  to tell who the inmate was based on the cube number,
13  right?
14  A    I honestly do not know.
15  Q    When, if ever, did you learn that there was a force
16  incident between Mr. McGrath and Mr. Tranchina?
17  A    When he got locked out.
18  Q    What do you mean by "when he got locked out"?
19  A    On the administrative leave.
20  Q    When was that?
21  A    May, I believe.  May 2016 I think.
22  Q    Okay.  So it's your testimony that between January
23  of 2016 when the incident occurred and May 2016 when he
24  was locked out, he never told you that he had an
25  incident with Mr. Tranchina?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

404

MAYER - DIRECT - ROCHE

```
 1   A    No.
 2   Q    And is it your testimony that during that same time
 3   period you never told him that you were being
 4   investigated with regard to an incident involving
 5   Mr. Tranchina?
 6   A    Like I said, the lawyer told me to talk to the
 7   lawyer and the union.
 8   Q    And is it your testimony, then, for approximately
 9   four months or so neither of you knew that the other one
10   had an incident with Mr. Tranchina?
11   A    When he got locked out or when he was put on
12   administrative leave they said the name.
13   Q    That was the first time you heard the name?
14   A    Yes.
15   Q    And at that point did you say to -- did you tell
16   Mr. McGrath that you had an incident with the same
17   inmate?
18   A    No.
19   Q    So fair to say that when you got transferred back
20   to Bare Hill from Willard, you moved in with Mr. McGrath
21   right away.  Right?
22   A    I did.
23   Q    But yet you -- you said you weren't even dating him
24   prior to January of -- prior to the end of January 2016?
25   A    That's correct.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

**405**

MAYER - CROSS - MIRANDA

```
 1              MR. ROCHE:  I've got nothing further.
 2              THE COURT:  All right.  Thank you.  Any
 3    cross-examination on behalf of Defendant McGrath?
 4              MR. MIRANDA:  Yes, your Honor.  It will be
 5    brief.  Can I just have a minute to confer.
 6              THE COURT:  Of course.
 7              MR. MIRANDA:  Thank you, your Honor.
 8              (Pause in proceeding)
 9    CROSS EXAMINATION
10    BY MR. MIRANDA:
11    Q    Good afternoon, Miss Mayer.
12    A    Good afternoon.
13    Q    When did you return to the Bare Hill Correctional
14    Facility from Willard?
15    A    April 2016.
16    Q    So was it at that point that you moved in with
17    Mr. McGrath?
18    A    It is.
19    Q    You testified earlier that you worked on the F-2
20    dorm at Bare Hill?
21    A    Yes.
22    Q    Before -- and you were familiar with Mr. Tranchina
23    when you worked on the F-2 dorm?
24    A    No more than any other inmate.
25    Q    But you knew who he was at that time?
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

406

MAYER - CROSS - MIRANDA

1    A    Yes.

2    Q    Correct?  When you were at Bare Hill in December or

3    January of 2016, did Mr. Tranchina ever give you pens?

4    A    No.

5    Q    Did you ever, in December or January of 2016, bring

6    Mr. Tranchina snacks from the commissary?

7    A    Absolutely not.  I have never been in the

8    commissary room.

9    Q    In January of 2016, did you ever kiss

10   Mr. Tranchina?

11   A    Absolutely not.

12   Q    Did you ever attempt to kiss Mr. Tranchina?

13   A    No.

14   Q    Did you ever put your hands on Mr. Tranchina in

15   January of 2016?

16   A    No.

17   Q    For the purposes of performing your duties?

18   A    No.

19   Q    Did you ever do it in a sexual way at all?

20   A    Absolutely not.

21   Q    On January 24th, were you passed a note by

22   Mr. Tranchina?

23   A    I was.

24   Q    And what was your reaction when you received that

25   note?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

407

MAYER - CROSS - MIRANDA

1    A    I was letting out the other inmates to go to
2    programs or to the yard, and he just handed it to me so
3    put it in my pocket and was going to deal with it later.
4    Q    How come you didn't look at it right away?
5    A    I was letting inmates out of a secure dorm, that is
6    my responsibility.  They get out.
7    Q    And you came to look at that note that day?
8    A    I did after.
9    Q    And do you remember what the substance of that note
10   was?
11   A    Just that I was -- you know, pretty, contact me
12   when I get out.  Along those lines.
13   Q    And how did receiving that note make you feel?
14   A    Angry.
15   Q    Why?
16   A    Because being a female officer in a -- in a prison
17   that is predominantly male employees, something like
18   that is just going to make my work life hard.
19   Q    Did you write Mr. Tranchina up for that?
20   A    I did not.
21   Q    Why not?
22   A    Because it was my last day at the facility, and
23   I -- I asked my senior officer his advice and he told me
24   to throw it away.
25   Q    Did Mr. McGrath learn that the inmate passed you a

TRANCHINA v McGRATH, et al. - 17-cv-1256

MAYER - CROSS - MIRANDA

```
1    note before January 28th, 2016?
2    A    I had mentioned it probably after my last day that
3    I got a note from an inmate.
4    Q    And what was Mr. McGrath's reaction?
5    A    Just that, you know, that's annoying.
6    Q    Did you want something done about the note?
7    A    No.
8    Q    Did you ask Mr. McGrath to do something about the
9    note?
10   A    No.
11   Q    Did you tell him that Joseph Tranchina passed you
12   the note?
13   A    No.
14   Q    Did Mr. McGrath expect that he was to do something
15   about the note based on you telling him?
16            MR. ROCHE:  Objection.
17            THE COURT:  Let me just review that question.
18   Overruled.  You may answer.  Did you expect.  As to the
19   form of it, I'm going to sustain the objection.  If you
20   can rephrase that, you can ask it.
21   BY MR. MIRANDA:
22   Q    Based on what you had communicated to Mr. McGrath,
23   did you anticipate that he was going to do something
24   about the note?
25   A    No.
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

409

MAYER - CROSS - MIRANDA

1    Q    Do you smoke?

2    A    I do not.

3    Q    In January of 2016 did you smoke?

4    A    I have never smoked.

5    Q    Were you in a relationship with another individual

6    before you were in a relationship with Mr. McGrath?

7    A    I was.

8    Q    And when did that relationship end?

9    A    Roughly in the fall, early winter 2015.

10   Q    How long had you been in that relationship?

11   A    We had started dating roughly 2012.

12   Q    About three years?

13   A    Yes.

14   Q    So at the time you met Mr. McGrath, you were just

15   coming out of a three-year relationship?

16   A    I was.

17   Q    When you met Mr. McGrath in the middle of

18   January 2016, were you romantically interested in him?

19   A    I was interested in him.  You know, I like the

20   conversation we had and we seemed to get along.

21   Q    You have two kids now, correct?

22   A    I do.

23   Q    So you became -- you -- you have eventually became

24   romantically interested in him, correct?

25   A    I did.


                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

410

MAYER - CROSS - ABEL

1   Q    When do you think that took place?

2   A    A little while -- I mean, I had just gotten out of

3   a relationship and I wasn't looking for anything

4   serious, and we just were talking.  I was taking it how

5   it went, just taking things how it went, the more you

6   talk to somebody and get to know them.  You know, you

7   either like them or you don't.

8           MR. MIRANDA:  Thank you.  No further

9   questions.

10          THE COURT:  Any questions on behalf of

11  Defendant Barnaby?

12          MR. ABEL:  Very briefly.

13  CROSS EXAMINATION

14  BY MR. ABEL:

15  Q    Good afternoon, Miss Mayer.

16  A    Hi.

17  Q    As of January 28, 2016, did you know Sergeant

18  Barnaby?

19  A    I can't say if I knew -- I mean, we worked in the

20  same facility.  I don't -- I don't know.

21  Q    You said you worked in the F-2 dorm?

22  A    Yes.

23  Q    Is that in the main part of Bare Hill?

24  A    It is.

25  Q    So, as far as -- was Sergeant Barnaby your regular

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

MAYER - REDIRECT - ROCHE

1   supervisor at that time?

2   A    Honestly, I -- at this point, I can't tell you who

3   was normally the supervisor.

4   Q    Had you ever been out socially with Sergeant

5   Barnaby outside of work?

6   A    No.

7   Q    Did you ever see Sergeant Barnaby at a place known

8   as The Pines?

9   A    Not that I recall.

10  Q    Miss Mayer, you referenced a senior officer that

11  told you to throw the note from Mr. Tranchina away?

12  A    I did, yes.

13  Q    Do you recall who that senior officer was?

14  A    Yes, Officer Jewtraw, J-E-W-T-R-A-W.

15          MR. ABEL:  No further questions.

16          THE COURT:  Any redirect?

17          MR. ROCHE:  Yes, your Honor.

18  REDIRECT EXAMINATION

19  BY MR. ROCHE:

20  Q    Miss Mayer, are you aware that Officer Jewtraw

21  was interviewed by OSI in relation to the -- their

22  investigation into the incident involving you and

23  Mr. Tranchina?

24  A    I was never told that.

25  Q    Okay.  You were never told that Officer Jewtraw

TRANCHINA v McGRATH, et al. - 17-cv-1256

412

MAYER - REDIRECT - ROCHE

```
 1    said that he never told you to throw out the --

 2              MR. MIRANDA:  Objection.

 3              THE COURT:  Sustained.  Hearsay.

 4    Q    Now, you said that you were angry when this note

 5    was passed to you, right?

 6    A    I did.

 7    Q    And you told Mr. McGrath that you were angry about

 8    it?

 9    A    I don't think I told him I was angry.  It was

10    probably my tone of voice that I was annoyed.

11    Q    So you would agree that it was clear from how you

12    told him that you were angry about this note being given

13    to you?

14    A    I don't know.  I don't know how he took it.

15    Q    Okay.  But did you express anger as you were

16    telling him about it?

17    A    I was probably like, oh, my god, I got a note.  You

18    know, this is annoying.  I wasn't screaming or --

19    Q    And was that in the same conversation that you told

20    him about the cube number, how the inmate had passed you

21    the note?

22    A    I had said before, like, I probably said oh, I got

23    a note from bed two or cube five or that's just how

24    people refer to inmates in prison.

25    Q    So that's how corrections officers identify inmates
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    in prison?  By their cube number?

2    A     Usually or -- yes.

3    Q     Now, you had been assigned to the F-2 dorm pretty

4    constantly for at least a month prior to being

5    transferred out of Bare Hill, correct?

6    A     Yeah, my last month there I was in F-2.

7    Q     Okay.

8              MR. ROCHE:  Thank you.  I have nothing else.

9              THE COURT:  Anything else?

10             MR. MIRANDA:  No, your Honor.

11             THE COURT:  All right.  If you would kindly

12    put your mask back on, that concludes your testimony

13    and you are free to leave.

14             THE WITNESS:  Thank you.

15             (Witness excused)

16             THE COURT:  Plaintiff may call their next

17    witness.

18             MR. ROCHE:  Your Honor, may we have a brief

19    sidebar?

20             THE COURT:  Do you have any more witnesses?

21             MR. ROCHE:  Not at this time but we may have

22    some additional evidence.  No witnesses at this point.

23             THE COURT:  All right.  I'm just going to step

24    out in the hallway for one moment to discuss some legal

25    matters with counsel.  I'll have you remain in place so

1    that we can continue.  Please feel free to stand up and

2    stretch.  No parties in the jury box when I come out in

3    the hallway.  Don't talk about the case and continue to

4    follow all of the instructions.

5              (Discussion held out of jury's presence)

6              THE COURT:  Okay, go ahead.

7              MR. ROCHE:  So, yes, we don't have any

8    additional witnesses.  We do have some depositions that

9    we would like to read.  Nothing very extensive but there

10   are some portions that we would like to read.

11             THE COURT:  Of the parties?

12             MR. ROCHE:  No, of some witnesses.  So there

13   were some corrections officers that responded to the

14   scene.  There's an Officer Hurteau, an Officer Rabideau

15   and Officer Debia (phonetic), that I would like to read

16   just portions of their testimony, mostly about their

17   arrival on the scene and what they observed.

18             THE COURT:  Is there any objection to that on

19   the part of Defendant McGrath?

20             MR. MIRANDA:  I think Mr. Hurteau is going to

21   be here by 3:00 and he was going to be our first

22   witness.  I anticipate it will be very brief.  So

23   perhaps that would eliminate that issue.  I don't think

24   I have any objection to the other responders.  If we

25   would be extended the same so that we can read anything

TRANCHINA v McGRATH, et al. - 17-cv-1256

415

1    we like.

2              THE COURT:  Well, why don't you go ahead and

3    read from -- I mean, they're not parties so --

4              MR. ROCHE:  Right.

5              THE COURT:  But if there's no objection, you

6    can read from them and hold off on Hurteau because it

7    sounds like you're going to have an opportunity to

8    cross-examine him.

9              MR. REED:  I'm confused as to why they weren't

10   called as witnesses if they wanted their testimony in at

11   trial.

12             THE COURT:  Well, I mean, I don't want to get

13   into that because that -- you know, I don't know why

14   they weren't called.  If you have an objection to it,

15   just let me know.

16             MR. REED:  I object, that's evidence.

17             THE COURT:  Under what authority do you

18   have -- under what federal rule do you have the right to

19   read from non-party depositions?

20             MR. ROCHE:  Well, just, your Honor, I would

21   just argue that just in the interest of expediency, it

22   just makes more sense to.  I know Your Honor was anxious

23   to get this trial done as soon as possible.  It would be

24   much quicker to just read in the relevant portions that

25   the -- these witnesses previously testified to at

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    deposition rather than taking up the time, the Court's

2    and the jury, for live testimony.  So I'm just proposing

3    that as kind of a pragmatic solution.

4              THE COURT:  Mark up for me what you want to

5    read, I'll give it consideration.

6              MR. ROCHE:  Thank you.

7              THE COURT:  But other than that, you're

8    resting?

9              MR. ROCHE:  Yes.  And just -- if for some

10   reason Officer Hurteau does not testify, we would just

11   ask that we be permitted to submit some portions of his

12   testimony later too.

13             THE COURT:  All right.  I'm going to have you

14   gentlemen -- I'm going to let you reserve on your

15   motions, I'm going to let you make motions but not right

16   now.  I'll let the jurors know that the plaintiff is

17   resting.  If I do agree to allow you to read some

18   deposition testimony, I'll say something to the jurors

19   as an into to that so they'll understand.  Who is the

20   first defense witness?

21             MR. MIRANDA:  That would be Patrick Hurteau,

22   your Honor.

23             THE COURT:  Is he here?

24             MR. MIRANDA:  He texted at lunch, said he was

25   in Glens Falls and I hope he's here by now.

1            THE COURT:  Do you have anybody else you can

2     put on?

3            MR. MIRANDA:  Not if he's not here, no, your

4     Honor.

5            THE COURT:  Who do you have after Hurteau?

6            MR. MIRANDA:  The only other witness would be

7     the Jeremy Laramay issue, your Honor, and then we would

8     rest, and of course if -- we might want to read some

9     deposition transcripts in of the other first responders

10    if defense counsel do but these first -- like,

11    Mr. Hurteau will be very brief.

12            THE COURT:  So just have -- assuming I allow,

13    you want to read from Laramay's transcript and then you

14    have Mr. Hurteau.  Would you have your colleague give

15    him a call and see where he is and get him here like

16    right now.

17            MR. MIRANDA:  Yes.  Absolutely.

18            THE COURT:  Okay.  Can you do that now?  I

19    don't want -- I really don't want to wait until 3:00.

20    It's only 10 of 2.

21            MR. ROCHE:  Your Honor, may I be heard briefly

22    about the Laramay portion?

23            THE COURT:  Yes.

24            MR. ROCHE:  So, counsel marked for us the --

25    there's one particular passage or one minor, little

1    passage just identifying that this witness Laramay was

2    the -- what was his -- the watch commander on the date

3    of the incident, and then there was another portion that

4    they asked us to consider but all of the second portion

5    did was talk about the prevalence of weapons in

6    facilities and inmates making weapons out of Plexiglas,

7    which I would submit is -- it's cumulative to begin with

8    but it's also wholly irrelevant.

9            It doesn't shed any light on the issue of

10   whether or not Mr. Tranchina possessed a weapon or not

11   and it's -- it's prejudicial and because it's kind of --

12   it's basically suggesting that inmates do this -- kind

13   of lumps them all in together, and it doesn't shed light

14   on any of the issues that have to be decide by the jury

15   in this particular case.  So, based on that, I would

16   object to the testimony.  I believe it's wholly

17   irrelevant.

18           THE COURT:  Go ahead.

19           MR. MIRANDA:  Thank you.  We were trying to

20   narrow the issues and I think what was submitted to the

21   Court there was a bit more that we were seeking.  Before

22   the break, we went to counsel and as Mr. Roche

23   indicated, we identified two portions of the transcript,

24   one just to lay some foundation so the jury understands

25   for Mr. Laramay.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

1        And I don't have the testimony in front of me

2   but what we would like to extract from that specific

3   deposition transcript is that Mr. Laramay was aware of a

4   missing Plexiglas investigation, which is different than

5   what anyone else has testified into this incident.

6   There has been testimony about weapons and contraband

7   but he specifically as watch commander can speak to

8   missing Plexiglas investigation which we believe

9   directly bears on Mr. Tranchina potentially having

10  access to the weapon.

11        THE COURT:  Well, here's the thing.  There's

12  been plenty of testimony about the fact that weapons are

13  made out of Plexiglas.  There's been plenty of testimony

14  that inmates can be dangerous, there's been plenty of

15  testimony about Plexiglas being available in all areas

16  of the prison.

17        I carefully reviewed the testimony that you

18  wanted to read.  I certainly don't find it prejudicial

19  but on the other hand, I do find it totally cumulative

20  and we're not trying a criminal case here as to try to

21  prove that Mr. Tranchina is the one who was stealing

22  Plexiglas and making shanks.

23        The only question for the jury is whether or

24  not that was his shank or whether it was a plant, and

25  for that reason, not because of prejudice but because I

TRANCHINA v McGRATH, et al. - 17-cv-1256

```
1    find it cumulative, I'm not going to allow the reading
2    of the Laramay deposition as you requested.  I see
3    absolutely no prejudice to Defendant McGrath because
4    that is all in the record.
5              When can that witness be here?
6              MR. BLENK:  He said he's five minutes out.
7              THE COURT:  Good.  What I'm going to do, then,
8    is I'm going to give the jury a break.  You need to
9    immediately show me what you want to read.  My chance of
10   allowing you to do that is slim to none but I will look
11   at it because it's really not an appropriate use of a
12   deposition and -- but I will take a look at it.
13             In the meantime, I will hear arguments on
14   motions that anybody wants to make.  Okay?  So either
15   you or Mr. Weiss get to me what it is you want read to
16   the jury and I will make a decision.  I can multiple
17   task.
18             (Return to the courtroom)
19             THE COURT:  Ladies and gentlemen, trials are
20   pretty dynamic.  It's like live T.V.
21             There are a couple of things that I want to
22   say.  In just a moment, from talking to the attorneys,
23   the plaintiff is going to rest his case, and if there
24   are going to be other witnesses, they are about ten
25   minutes out.  So that's a good thing, and I want to talk
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    to you about timing because I told you on Tuesday that

2    we hope that we could finish this case in four days.

3          I'm very hopeful that we will have this case

4    to you for your consideration tomorrow, which is four

5    days.  So I know that as jurors, you wonder about, you

6    know, the personal responsibilities and where you have

7    to be.  With the way we are moving, I am fairly

8    confident that we will be able to get this case to you

9    for your deliberations tomorrow.

10          So just so you know that but because it's

11    going to take about ten minutes to get another witness

12    here, should another witness be called, I'm going to

13    have you retire to the jury deliberation room so that

14    you don't have to sit here staring at all of us, and as

15    soon as that witness gets here, I'll have Britney bring

16    you in.

17          Don't discuss the case amongst yourselves or

18    with anyone else and continue to remember all of the

19    instructions I have given you.  Thank you.

20          (Jurors excused)

21          THE COURT:  Be seated.  Does the Defendant

22    McGrath have any motions?

23          MR. MIRANDA:  If we could have -- the Attorney

24    General wants to make a motion first.

25          THE COURT:  Is Mr. Abel going to make a motion

TRANCHINA v McGRATH, et al. - 17-cv-1256

422

1    for both?  Mr. Reed, you want to make a motion for both

2    defendants?

3              MR. REED:  Just for Defendant Barnaby, your

4    Honor.

5              THE COURT:  Okay.  Go ahead.

6              MR. REED:  I can go first.  Pursuant to

7    Federal Rule of Civil Procedure 50, Defendant Barnaby

8    moves for a judgment as a matter of law based on the

9    lack of proof that's been offered indicating Sergeant

10   Barnaby's involvement in this incident, coupled with the

11   evidence of the injuries attributed to Sergeant Barnaby,

12   are not consistent with the alleged actions taken by

13   him.

14             THE COURT:  All right.  Thank you.  Does the

15   Defendant McGrath want to make a motion at this time?

16             MR. BLENK:  Your Honor, the Defendant McGrath

17   would like to make the same motion for a directed

18   verdict.

19             THE COURT:  All right.  I'll render a decision

20   in about five minutes.  Thank you.

21             MR. MIRANDA:  Thank you, your Honor.

22             MR. REED:  Thank you, your Honor.

23             THE COURT:  We will stand in recess.  Well,

24   what I will do is I will ask you, Mr. Miranda, to get

25   ahold of Britney as soon as your witness gets here.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    Thank you.

2            (Following recess)

3            THE COURT:  On the motions, is it all right if

4    I proceed rendering a decision on the motions without

5    Mr. Weiss here?

6            MR. ROCHE:  Yes, your Honor.

7            THE COURT:  Okay, thank you.  Federal Rule of

8    Civil Procedure 58 provides that if a party has been

9    fully heard on an issue during a jury trial and the

10   Court finds that a reasonable jury would not have a

11   legally sufficient evidentiary basis to find for the

12   party on that issue, the Court may grant a motion for

13   judgment as a matter of law on that issue.  That is

14   Federal Rule of Civil Procedure 50(a)(1).

15           That motion may be made at any time before the

16   case is submitted to the jury and it must specify the

17   judgment sought and the law and facts that entitle to

18   move on to the judgment.  That is Federal Rule of Civil

19   Procedure 50(a)(2).

20           The Court may grant a Rule 50 motion only when

21   considering the evidence in the light most favorable to

22   the non-moving party and drawing all reasonable

23   evidentiary inferences in that party's favor there was

24   no legally evidentiary basis for a reasonable jury to

25   find in favor of a non-moving party; *Nimely versus City*

1    *of New York*, 414 F.3d 381, 390, Second Circuit 2005.

2              In the present matter, there is a sharp

3    contrast to the facts which must be resolved by the

4    jury.  Plaintiff has testified that while he was lying

5    on the ground, Defendant Barnaby kicked plaintiff in the

6    face upon arriving in the annex school on January 28,

7    2016.  Contrastingly, Defendant Barnaby has testified

8    that by the time he arrived in the annex school,

9    plaintiff was already handcuffed and standing by another

10   corrections officer.

11             Similarly, plaintiff and Defendant McGrath

12   have testified to drastically different accounts of the

13   events on January 28, 2016.  The Court finds that these

14   questions of fact most definitely preclude the Court

15   from granting defendants' motions.  Construing the

16   evidence in the light most favorable to the plaintiff as

17   I must, the Court finds that a reasonable jury could

18   find in favor of plaintiff on this claim against the

19   defendants; therefore, the defendants' motions -- both

20   motions are denied.

21             Now, Mr. Weiss, I'm going to give you an

22   opportunity to rest in front of the jury.  Obviously I

23   have not had a chance to review those transcripts that

24   you want me to see yet.  I will do that and get back to

25   you on that.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

425

HURTEAU - DIRECT - BLENK

1          Let's get the jury, please.

2          (Jurors enter courtroom, 2:15 P.M.)

3          THE COURT:  Mr. Weiss, does the plaintiff have

4   any other witnesses?

5          MR. ROCHE:  Your Honor, plaintiff does not

6   have any other witnesses.  Plaintiff rests at this time.

7          THE COURT:  Does the plaintiff rest?

8          MR. ROCHE:  Yes.

9          THE COURT:  All right.  Members of the jury,

10  the plaintiff has now rested his case and the defendants

11  may, if they wish, call witnesses.

12          Does the Defendant McGrath have any witnesses?

13          MR. BLENK:  Defendant McGrath calls Patrick

14  Hurteau.

15          COURT CLERK:  Would you please raise your

16  right hand and state your full name for the record.

17          THE WITNESS:  Patrick John Hurteau, correction

18  officer.

19  P A T R I C K   H U R T E A U , having been duly sworn,

20  was examined and testified as follows:

21          THE COURT:  Officer Hurteau, I've left it up

22  to each witness as to whether they would like to testify

23  with their mask on or off.  So that's something that you

24  can decide.  Either way, please speak right into the

25  microphone and speak as clearly as you can.


                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

Case 9:17-cv-01256-MAD-ML   Document 167   Filed 03/22/21   Page 158 of 259
TRANCHINA v McGRATH, et al. - 17-cv-1256
426

HURTEAU - DIRECT - BLENK

```
 1   DIRECT EXAMINATION
 2   BY MR. BLENK:
 3   Q    Good afternoon, Mr. Hurteau.  My name is James
 4   Blenk and I represent the Defendant McGrath, along with
 5   my colleague, Mr. Miranda.
 6        Just some background.  Are you here pursuant to a
 7   subpoena that my office served upon you?
 8   A    Yes, I am.
 9   Q    Thank you.  And are you still employed by DOCCS?
10   A    Yes, I am.
11   Q    When did you start working for DOCCS?
12   A    January 9, 1989.
13   Q    And have you been a correction officer that entire
14   time?
15   A    Yes, I have.
16   Q    You were employed by DOCCS on January 28th, '16,
17   when the incident at issue in this case happened?
18   A    Yes, I was.
19   Q    Okay.  Were you working at Bare Hill Correctional
20   Facility?
21   A    Yes.
22   Q    Do you recall what your job duty was that day?
23   A    I was a roundsman number two on dayshift.
24   Q    Is that a bid job that you do regularly?
25   A    At that time, yes, it was my bid.
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

427

HURTEAU - DIRECT - BLENK

1    Q    And now you're a different bid?

2    A    Yes.

3    Q    Okay.  When did you first learn of the incident

4    occurring on January 28th, 2016?

5    A    I was in the van with my partner, rounds number

6    one.  We were monitoring the program in the main

7    compound and --

8    Q    Let me stop you there.  I'm sorry.  So are you in a

9    van throughout the course of your duties?

10   A    No.  Just at that moment I was in, watching the

11   program run.

12   Q    And when you say "program run," do you mean inmates

13   going from what would be their breakfast, to or from

14   their dorms to programming?

15   A    Yes.  From the dorms to programs.

16   Q    And when that's occurring, describe to us what

17   you're doing on a normal day.

18   A    At that time for the program run?

19   Q    That's correct.

20   A    They have certain points throughout the compound

21   where the officers have to watch the walkways because

22   the inmates are walking freely to their programs, and we

23   monitor that, make sure there's no fights on the walkway

24   or they're going where they are supposed to.

25   Q    And who are you with at the time?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

**428**

HURTEAU - DIRECT - BLENK

```
 1   A    I was with Officer Rabideau, he was rounds number
 2   one.
 3   Q    Can you tell us how you heard about the incident.
 4   A    We have a -- a system where if there's a problem,
 5   it comes over our two-way radios.  We hear, like, a
 6   chime that let us know that something's come in and
 7   then the arsenal will let us know that there was a red
 8   dot in the annex school.
 9   Q    What do you mean by "red dot?"
10   A    That means there's a problem we have to -- there's
11   certain people that are assigned to respond.  We had to
12   respond to it.
13   Q    Was Officer Rabideau also on the red dot team?
14   A    Yes, he was.
15   Q    And was there anybody else on the red dot team as
16   you recall as you sit here today?
17   A    As I sit here today?
18   Q    As you here today?
19   A    Oh.  Yeah, there's other people.
20   Q    On the red dot response team?
21   A    Yes.
22   Q    Okay.  Do you know who else was on the red dot
23   response team?
24   A    I remember that Barry Debia -- they have different
25   levels.  He had a rounds number three in the annex
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

HURTEAU - DIRECT - BLENK

```
 1   compound.  See, it's broke down because there's some
 2   that respond just to the main, some that respond just to
 3   the annex.  So it's --
 4   Q    And on that day, would you have responded to either
 5   the annex on the main or would you have only responded
 6   to --
 7   A    Because we're mobile with a van, we respond to
 8   both.  Yes.
 9   Q    Understood.  So how long did it take for you to get
10   to the school annex?
11   A    Approximately a minute.
12   Q    Did you go straight to the annex or were you doing
13   something else that you had to get to the van or --
14   A    No, we were in the van already but we have to --
15   it's not a straight shot.  We have to go around
16   different ways, and then there's inmates walking on the
17   roadway on the side, so we -- you have to watch out for
18   that too.
19   Q    Okay.  Did you see -- did you see Defendant Justin
20   McGrath when you arrived at the school annex?
21   A    When we got there, I got out of the van and when I
22   entered the foyer area, yes, he was in the foyer.
23   Q    Okay.  And was Plaintiff Tranchina there as well?
24   A    Yes, he was.
25   Q    And was Plaintiff Tranchina standing up or on the
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

HURTEAU - DIRECT - BLENK

1    ground?

2    A    He was standing up in the corner, he had already

3    had mechanical restraints, handcuffs.  His hands were

4    behind his back, he was already handcuffed, and he was

5    facing the corner.

6    Q    When you got there, was Defendant McGrath touching

7    Plaintiff Tranchina?

8    A    No.

9    Q    Were they right next to each other?

10    A    He was standing behind him.

11    Q    Okay.  Could you see Mr. Tranchina's face?

12    A    No, because he was facing the corner.

13    Q    Okay.  Did you see Defendant McGrath kick or punch

14    Mr. Tranchina?

15    A    No.

16    Q    Did you see anybody kick or punch Mr. Tranchina?

17    A    No.

18    Q    Did you know Mr. McGrath before arriving at the --

19    at the school annex in January 28th, 2016?

20    A    I knew his face and his name but we have had so

21    many -- so much turnover for officers, that I didn't

22    know him personally.

23    Q    Did you ever socialize with him outside of work?

24    A    No.

25    Q    Did you see Mr. Tranchina -- or Mr. McGrath leave

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

431

HURTEAU - DIRECT - BLENK

1    the vestibule in front of the school annex?

2    A    No.

3    Q    Did you go back to your van after this interaction?

4    A    No.  I -- I stayed in the -- in the foyer area with

5    McGrath and the inmate, and at some point, Sergeant

6    Barnaby came out to us.  Officer Rabideau was behind me

7    at that point and we were both there.  And when Sergeant

8    Barnaby came out, he give Officer Rabideau and I an

9    order that we were going to be taking the inmate to SHU,

10   special housing unit.

11   Q    Okay.  How many officers were in the room when

12   Sergeant Barnaby got there?

13   A    Just Officer McGrath and myself and Officer

14   Rabideau were standing in the doorway in the foyer.

15   Q    So did you assist in bringing Mr. Tranchina to the

16   van?

17   A    Yes.

18   Q    Did he walk on his own accord?

19   A    Yes, he did.

20   Q    Did he complain of any injuries?

21   A    No, he did not.

22   Q    Did he tell you what had happened?

23   A    He didn't talk to me at all.

24   Q    Did Mr. McGrath tell you what had happened?

25   A    No.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

432

HURTEAU - CROSS - REED

1  Q    Mr. Hurteau, were you aware of any issues with

2  Plexiglas at the Bare Hill facility around the time of

3  January 2016?

4  A    As far as the time limit, I'm not sure.  I know

5  that we did have some Plexiglas come up missing in the

6  work control area at one point and the inmates were

7  making weapons out of them.  They are undetectable in

8  the metal detectors.

9  Q    So you're saying compared to other materials, the

10 Plexiglas weapons have an advantage because they're not

11 caught?

12         MR. ROCHE:  Objection, your Honor.  This is

13 totally cumulative.

14         THE COURT:  Lisa, can you read back that

15 question.

16         (Question read by court reporter)

17         THE COURT:  Sustained.

18         MR. BLENK:  I don't have any further

19 questions.

20         THE COURT:  Any questions on behalf of

21 Defendant Barnaby?

22         MR. REED:  Yes, your Honor.

23 CROSS EXAMINATION

24 BY MR. REED:

25 Q    So when you arrived at the school annex foyer that

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

HURTEAU - CROSS - REED

1    day, the inmate was already on his feet?

2    A    Yes, he was.

3    Q    And it's unclear.  Did you arrive with Sergeant

4    Barnaby?

5    A    No.

6    Q    He was not yet in the foyer yet though when you got

7    there?

8    A    All I remember is he was -- at some point he came

9    out of the foyer, I believe he might have already been

10   inside the annex school talking to the lieutenant on the

11   phone about what was going on of the incident.

12   Q    Okay.  So this is four years ago.  You're not

13   really sure what time he arrived?

14            MR. ROCHE:  Objection.

15   A    No.

16            THE COURT:  I'm sorry.  I'm often looking at

17   my screen so -- you made an objection?

18            MR. ROCHE:  Your Honor, I will withdraw the

19   objection.

20            THE COURT:  Thank you.

21   BY MR. REED:

22   Q    Mr. Tranchina was on his feet when you arrived?

23   A    Yes.

24   Q    In handcuffs?

25   A    Yes.


              Lisa L. Tennyson, CSR, RMR, FCRR
              UNITED STATES DISTRICT COURT - NDNY

HURTEAU - CROSS - ROCHE

1    Q    Facing away from the outer door to that foyer.

2    Correct?

3    A    Yes.  When I walked in, he was facing the corner,

4    the left corner of the foyer.

5    Q    You didn't see Sergeant Barnaby kick the plaintiff,

6    did you?

7    A    No.

8    Q    You didn't see him punch the plaintiff, did you?

9    A    No.

10   Q    Did you see him make any physical contact with the

11   plaintiff at all on January 28, 2016?

12   A    No.  No.

13          MR. REED:  Nothing further, your Honor.

14          THE COURT:  Any cross?

15          MR. ROCHE:  Very briefly, your Honor.

16   CROSS EXAMINATION

17   BY MR. ROCHE:

18   Q    Good afternoon, Officer Hurteau.  So, I believe

19   you testified -- I just want to clarify that you believe

20   that Sergeant Barnaby was already at the incident

21   location before you arrived.  Correct?

22   A    I would be speculating.  All I remember is he came

23   out to the foyer at one point.  I mean, there's

24   different entryways to this building.  He could have

25   came in the other side.  I -- I do remember him coming

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

435

HURTEAU - CROSS - ROCHE

```
 1    out and he gave us an order to put the inmate in the
 2    van, we were going to take him to special housing unit.
 3    Q    Okay.  So when you first saw him at the location,
 4    he came into the foyer area from the school, is that
 5    fair to say?
 6    A    From the other side, yes.
 7    Q    So he didn't come in from the exterior of the
 8    building.  He came from the interior?
 9    A    Yes.
10    Q    Okay.  And I believe you -- you testified that it
11    was your belief that he was communicating with
12    Lieutenant Laramay at -- prior to you seeing him walk
13    into the foyer?
14              MR. BLENK:  Objection.  Mischaracterizes the
15    testimony.
16              THE COURT:  Overruled.  You can answer.  Do
17    you need it read back?
18              THE WITNESS:  Yes, please.
19              THE COURT:  Lisa, would you read it back.
20              (Question read by court reporter)
21    A    Yes, because the lieutenant would have to authorize
22    what happens.  When he came out, he ordered us that we
23    were taking him to SHU so that he would have had to talk
24    to the lieutenant.
25    Q    So he would have had to talk to the lieutenant
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

436

HURTEAU - CROSS - ROCHE

```
 1   before giving you that order --
 2   A    Yes.
 3   Q    -- to go to SHU?  Okay.  Fair to say that when you
 4   arrived at the foyer area, there were no other officers
 5   in the area other than Officer McGrath?
 6   A    No.
 7   Q    Is that -- is that -- sorry.  Are you saying no,
 8   there were no other officers or no, what I just the said
 9   is not accurate?
10   A    No, there was no other officers at that point when
11   I got there.
12   Q    Okay.  So all you saw in the foyer when you got
13   there was Mr. Tranchina facing the corner and
14   Officer McGrath standing behind him?
15   A    Yes.
16   Q    Okay.
17              MR. ROCHE:  Thank you.
18              THE COURT:  Anything else on behalf of
19   Defendant McGrath?
20              MR. BLENK:  No, your Honor.
21              THE COURT:  Anything else on behalf of
22   Defendant Barnaby?
23              MR. REED:  No, your Honor.
24              THE COURT:  All right, sir, if you would
25   reapply your mask, that concludes your testimony and you
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

437

1    are free to leave.  Thank you.

2              (Witness excused)

3              THE COURT:  While we're waiting for the

4    witness box to be sanitized, does Defendant McGrath have

5    further witnesses?

6              MR. BLENK:  We would just reserve the right to

7    call Rabideau and Officer Debia in rebuttal if

8    necessary.

9              THE COURT:  Other than talking about rebuttal,

10   are you resting?

11             MR. BLENK:  Yes.

12             THE COURT:  All right.  So the Defendant

13   McGrath, members of the jury, has rested his case.

14             Does the Defendant Barnaby have any witnesses?

15             MR. REED:  He does not, your Honor.

16             THE COURT:  All right.  Is there

17   any additional rebuttal on behalf of plaintiff at this

18   time?

19             MR. ROCHE:  No rebuttal, your Honor.  Just a

20   matter we previously discussed.

21             THE COURT:  Yes.  Members of the jury, would

22   you please return to the jury room as I discuss a few

23   matters of law.  Don't discuss this case amongst

24   yourselves and don't discuss it with anyone else, don't

25   come to any conclusions because this case is not over at

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

438

1    this time.

2              (Jurors excused)

3              THE COURT:  Everyone may be seated.  The

4    record should reflect that we're in open court, outside

5    the presence of the jury.

6              With respect to the plaintiff's request to

7    read portions of the testimony of witness Hurteau, that

8    request is denied.  Officer Hurteau just testified and

9    could be asked any questions that plaintiff thought were

10   pertinent during cross-examination.

11             With respect to the plaintiff's request to

12   read portions of the testimony of Barry Debia, on page 7

13   was requested to read the following:  Page 7, line 13.

14             "QUESTION:  Okay.  Under the column

15   January 28, 2016, your name is listed below next to

16   roundsman number three annex.  Is that -- was that your

17   job on January 28th, 2016?

18             "ANSWER:  Yes, it was."

19             I'm denying that request.

20             On the same page, line 21.  Okay.  Was there a

21   time where you received your radio call to respond as a

22   red dot response?"  The answer is yes.  I'm denying that

23   request.

24             On page 8, beginning on line 17, it was

25   requested that lines 17 through 24 be read.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

439

1              "QUESTION:  Annex school and were you with
2    the -- and were you with anybody when you went to the
3    school annex?
4              "ANSWER:  No.
5              "QUESTION:  What did you see when you arrived
6    at the school annex?
7              "ANSWER:  I saw Officer Rabideau escorting an
8    inmate to the -- in handcuffs and putting him in the van
9    with sergeant supervising."  I'm denying that request.
10   I believe that there's already ample testimony about
11   what people saw when they arrived and actually all of
12   the officers that I heard said the same thing, that the
13   inmate was in handcuffs standing up.
14             MR. ROCHE:  Your Honor, I'm sorry to interrupt
15   you but I just -- upon review it, I actually agree with
16   Your Honor.  At this point we would withdraw our request
17   to read these portions for both Officer Debia and
18   Officer Rabideau.  I believe we got --
19             THE COURT:  Okay.
20             MR. ROCHE:  -- testimony we needed from
21   Officer Hurteau.
22             THE COURT:  Thank you.  So there will not be
23   any reading from the testimony of Mr. Debia or
24   Mr. Hurteau.  I take it that both defendants renew their
25   motions for a directed verdict?

                 Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

```
1              MR. BLENK:  That's correct, your Honor.

2              MR. MIRANDA:  Yes, your Honor.

3              THE COURT:  For the reasons I previously set

4    forth, those motions are denied.

5              Here's what we are going to do.  In just a few

6    minutes my law clerk is going to hand out the proposed

7    charge to you.  As I said from day one, this is a pretty

8    basic charge in which I will be charging the jury on the

9    count on the claim of excessive force and failure to

10   intervene.

11             I would ask counsel to review the charge and

12   the proposed jury verdict sheet, and as soon as you have

13   a chance to do that, please let my courtroom deputy,

14   Britney, know.  I'll hear any exceptions or requests

15   that you have.  It is my plan to move right into

16   summations.  It's only 2:36, the day is young.

17             MR. ROCHE:  Your Honor, I would request -- I

18   would request that we be allowed to testify -- or

19   allowed to sum up first thing in the morning.

20             THE COURT:  No.  I'm not -- you know, I am

21   very, very thoughtful of jurors' time.  There isn't a

22   reason in the world that we can't start with summations.

23   I believe that we can finish both summations today.  I

24   don't keep jurors who are traveling a distance any

25   longer than I have to keep them.  As I say, I don't
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

441

1    think the charge is difficult.  All attorneys have -- I

2    think all attorneys know what the issues are.

3             So, as soon as my law clerk brings the

4    proposed charge in, please take a look at it and I will

5    then hold a charge conference in the courtroom and we

6    will move into summations.  Thank you.

7             (Following recess)

8             THE COURT:  Let the record reflect that we're

9    in open court, outside the presence of the jury, and

10   that I've given to both counsel a copy of the proposed

11   charge and proposed jury verdict form.

12            Has the plaintiff reviewed the proposed jury

13   instructions?

14            MR. WEISS:  Yes, your Honor.

15            THE COURT:  Do you have any exceptions on

16   behalf of the plaintiff to the instructions?

17            MR. WEISS:  No, your Honor.

18            THE COURT:  All right.  Thank you.  Has

19   defendant for Officer McGrath had an opportunity to

20   review the proposed jury instructions?

21            MR. BLENK:  Yes, your Honor.

22            THE COURT:  Are there any objections or

23   requests?

24            MR. BLENK:  On page 14 I would ask for the

25   last sentence in the first paragraph, the paragraph that

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

442

1    continued from 13, an excessive force claim, the element

2    have you established the victim does not suffer serious

3    or significant injury, so long as the -- as he has

4    suffered some injury.

5              I think that's redundant of the prior sentence

6    and encourages the -- is -- is akin to influence the

7    jury to look for a lower quantum of injury than just if

8    they had just read the word injury as it appears in the

9    prior sentence.  It might be an appropriate matter for

10   clarification that the jury has questions but I would

11   ask that that sentence to be removed.

12             THE COURT:  Did you say that was page 14?

13             MR. MIRANDA:  That's correct.

14             THE COURT:  Tell me where on that page again.

15   I'm just not finding it.

16             MR. BLENK:  The first full sentence on that

17   page.  In an excessive force claim.

18             THE COURT:  Okay.  In an excessive force

19   claim, this element may be established even if the

20   victim has not suffered serious or significant injury so

21   long as he's suffered some injury.  Is that the

22   sentence?

23             MR. BLENK:  Correct.

24             THE COURT:  And tell me again what your issue

25   is.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1           MR. BLENK:  I think that's implied by the --
2    prior sentence it says an injury, and it already
3    instructs an injury is required.  There's no suggestion
4    that a serious or significant injury would be necessary,
5    so I don't think that there's any reason to address
6    that.
7           THE COURT:  Okay.  I mean, that's pretty
8    standard language and I don't find it prejudicial.  So
9    that request is denied.  Anything else?
10          MR. BLENK:  No, your Honor.
11          THE COURT:  Does Defendant Barnaby have any
12   objection or requests?
13          MR. REED:  No, your Honor.
14          THE COURT:  All right.  Have you had an
15   opportunity to take a look at the verdict sheet?  The
16   jury verdict form?
17          MR. WEISS:  Yes, your Honor.
18          THE COURT:  Does the plaintiff have any
19   objections for the jury verdict form?
20          MR. WEISS:  No, your Honor.
21          THE COURT:  Does the Defendant McGrath have
22   any objections to the jury verdict form?
23          MR. BLENK:  No, your Honor.
24          THE COURT:  Does the Defendant Barnaby have
25   any objections to the jury verdict format?

1              MR. REED:  No, your Honor.

2              THE COURT:  When it originally was printed

3    out, it printed double side but it is not going to go in

4    double sided to the jury.  We are going to make that

5    single page.

6              So just so you know, I send in one copy of the

7    jury instructions to the jury while they're

8    deliberating.  I do give every juror a copy of the jury

9    verdict form.  After I recite the charge, I will give

10   all sides an opportunity to point out if I made an

11   error, which can happen, and I take no umbrage if I

12   misstated something and you want to fix it, so you will

13   have that opportunity as well.

14             We will be starting summations with Defendant

15   Barnaby, we will be going in reverse order.  About how

16   long do you think the Defendant Barnaby's summation will

17   take?

18             MR. ABEL:  10, 15 minutes.

19             THE COURT:  Okay.  Believe me, I'm not going

20   to hook you off, you know, if you get to 15 minutes.

21   I'm just trying to gauge it.  How about Defendant

22   McGrath?

23             MR. MIRANDA:  Probably the same, your Honor.

24             THE COURT:  Okay.  And plaintiff?

25             MR. ROCHE:  Your Honor, I would say 20 minutes

1    to half an hour.

2              THE COURT:  All right.  Let's get the jury,

3    please.

4              One of my law clerks just said maybe I should

5    send in eight copies of the charge so they're not all

6    touching, and I will do that in this case.  They will

7    have eight forms but we'll send in eight instructions as

8    well.

9              MR. MIRANDA:  Your Honor, Ms. Norton indicated

10   that I could you use the wireless microphone.  Is that

11   okay?

12             THE COURT:  That's fine.

13             MR. MIRANDA:  I will stand -- I'll stay

14   stationed.

15             THE COURT:  Yes.

16             MR. ROCHE:  And, your Honor, just -- I'm

17   just -- ask for some guidance regarding summing up on

18   punitive damages.  I can be prepared to sum up.

19             THE COURT:  You can ask for them because that

20   will be on the verdict sheet as to whether they want to

21   award them.  Stay away from the amount because they will

22   have a separate hearing if they get to that point.

23             MR. ROCHE:  Okay.

24             (Jurors enter courtroom)

25             THE COURT:  Members of the jury, thank you for

1    your patience as I was going over a multitude of legal

2    issues with the defense attorneys -- with all of the

3    attorneys, not just the defense attorneys, but plaintiff

4    and defense attorneys so that we can get this case ready

5    for summations.

6            We have now reached that point where the

7    attorneys are going to sum up.  Summations are not

8    evidence; however, to the extent that you find them

9    helpful, please consider them but remember the testimony

10   that you heard from the witness stand and the documents

11   that will be received by the Court, that is the

12   evidence, and the way we do summation is that we go in a

13   reverse order of the trial.

14           When we began the trial, the plaintiff went

15   first and the defendants went second and third but now

16   we reverse that.  So we're going to hear from the

17   attorney for Defendant Barnaby first.

18           MR. ABEL:  Good afternoon, ladies and

19   gentlemen.  First of all, I'd like to thank you all for

20   your time, your patience this week, especially under

21   these conditions.  I know this has been a long week and

22   we are almost at the point where you can begin

23   deliberating.  Before we do that, I would like to offer

24   my thanks on behalf of myself, my colleague, Matt Reed,

25   and most of all Officer Barnaby; he also thanks you for

1   your time this week and for your careful consideration

2   of the evidence.

3          And I'd like to keep in mind what the judge

4   told you a while ago about the burden of proof here.  I

5   think for comparison and use of the scale is apt here.

6   It's the plaintiff's burden here to prove more likely

7   than not that Sergeant Barnaby used excessive force on

8   the plaintiff and that he failed to intervene to prevent

9   the use of that force by others, and we respectfully

10   submit that the plaintiffs have not met the burden.

11          You heard a lot of testimony this week and you

12   have seen a lot of the evidence but I'd like to take you

13   back real quick to the very beginning of this trial and

14   I bring plaintiff's opening and maybe some -- they made

15   certain promises to you about what you will see and hear

16   during the trial this week and they simply failed to

17   deliver on those promises.

18          They told you that you would see and hear

19   evidence of a conspiracy between Sergeant Barnaby and

20   Mr. McGrath arising out of this page, report, for

21   example.  That there's a conspiracy about getting the

22   plaintiff transferred to Attica.  What -- what have you

23   seen to support that?  Nothing.

24          They told you that -- that they conspired the

25   misbehavior report but what you have seen?  The fact

1    that Sergeant Barnaby didn't sign it, he had nothing to

2    do with this, so they comport with nothing to

3    demonstrate any sort to get Mr. Tranchina to Attica.

4    That's a promise not kept.

5            They also told you that you would hear

6    evidence of a illegal escort by Sergeant Barnaby but,

7    once more, they show you no proof of illegal escort.

8    Plaintiff himself could not even tell you that he saw

9    Sergeant Barnaby for the rest of after the use of force

10   in the foyer.  So, once again, that's another promise

11   that they did not deliver on to you.

12           Now, remember the contradictions in the

13   plaintiff's testimony that you heard during his --

14   during his testimony.  He testified that he had no idea

15   of an allegation that he had a weapon on him in the

16   foyer but in a statement he wrote that very night, he

17   expressly referenced a weapon allegation.

18           Plaintiff also testified that there were no

19   witnesses to his relationship with Miss Mayer but,

20   again, the documentary evidence before you demonstrates

21   otherwise.  So keep in mind that you have to judge the

22   proof based on the credibility of the witnesses.

23           Sergeant Barnaby has consistently stated his

24   account of the event that morning of January 28th, 2016.

25   He's told you the truth.  He's been forthright with you.

TRANCHINA v McGRATH, et al. - 17-cv-1256

449

1    Keep in mind it's the plaintiff who has been
2    contradictory here.
3          Now, remember what you heard about this
4    incident.  Sergeant Barnaby was doing his rounds that
5    morning.  He's covering a shift for another officer.  He
6    gets called over a two-way radio to respond to the
7    annex.  He doesn't know what the incident is about.  He
8    doesn't know that it involves Officer McGrath.  He
9    doesn't know that it involves the plaintiff.  All he
10   knows is he has to go to respond.  40 seconds later,
11   he's in the annex school building, he sees the plaintiff
12   standing up, facing the corner of the room with
13   Officer McGrath and several other officers there.
14   That's it.
15         He's escorted to the van to the SHU with
16   Officer Rabideau.  He's taken to SHU, he's given a
17   medical exam and really that's it.  That's the extent of
18   Sergeant Barnaby's involvement here.
19         He didn't kick the plaintiff, he didn't see
20   any use of force being used upon the plaintiff.  There's
21   been no evidence to the contrary.
22         So the plaintiff also promised you that you
23   would hear corroboration of his claim but there's no
24   testimony from Officer Rabideau about any illegal
25   escort.  There's no testimony from Inmate Cordero about

1    the conditions of his frisk in the school foyer of

2    the -- of the annex school building.

3            There's been no other evidence or testimony

4    from any other -- of the other responding officers who

5    could corroborate his claim that Sergeant Barnaby struck

6    him or that Sergeant Barnaby stood by while others

7    struck him.  There's just -- there's no testimony from

8    any other person that corroborates his claim.

9            You heard Officer Hurteau testify that he did

10   not see Sergeant Barnaby strike the plaintiff or that

11   any other strike the plaintiff.  You also heard Officer

12   McGrath corroborate the story.  So, we respectfully

13   submit the plaintiff has failed to meet their burden of

14   proof on this issue and they have told you that they

15   did -- you would hear things you have not heard them.

16           Now, I'd like you to consider Sergeant Barnaby

17   here just for a second.  He's been an officer for ten

18   years.  He had just gotten a promotion he worked years

19   to achieve, something that would allow him to work his

20   way up the ladder in his chosen profession.  He took a

21   test, he passed, and he had finally got a transfer to

22   the area of the state that is closer to his home but he

23   wasn't done yet.  He -- he wasn't done.  In fact,

24   Clinton is where he wanted to be.

25           He worked at Bare Hill, and he had to keep his

1    record clean to complete that, to a complete that trip.

2    He wanted to get back to -- he lived across the street;

3    at that point he was still working in the facility

4    40 miles away.  He was close but he wasn't there.

5             If he was found to have used excessive force

6    on an inmate, he would lose that promotion.  Why would

7    he get to call, walk 40 seconds, open the door, and kick

8    a man he had never had any contact with?  And that's --

9    the plaintiff had no contact with.  To assist an officer

10   that he had passing knowledge of?  You have to use your

11   common sense, ladies and gentlemen.  It just doesn't add

12   up.

13            Why would a sergeant lose his stripes, as they

14   say in the profession, for a gratuitous, momentary act

15   of violence that served no purpose to him?  That makes

16   no sense.  I think, ladies and gentlemen, you will find

17   that Sergeant Barnaby did not do the acts plaintiff is

18   claiming he performed.

19            And if I could have the picture up.

20            Let's consider the plaintiff's injury just for

21   one moment.  The plaintiff is claiming Sergeant Barnaby

22   walked straight through a door, kicked him square in the

23   face two seconds after walking into that room with a

24   black leather boot on.

25            Now this picture was taken a day after this

1    incident.  He has scratches on his face but you see no

2    black and blue marks, you see no swelling, you see

3    nothing that would -- that would support injuries from a

4    swift kick from Sergeant Barnaby that the plaintiff is

5    claiming here.

6            Now, we have all been injured.  We all know

7    that injuries look a lot worse the day after.  You feel

8    sore, you're bruised, you're swollen.  This is not --

9    this is not evidence of a swift kick to the face by a

10   man who's five-eight and approximately 215 pounds.

11           So, ladies and gentlemen, you now get to

12   assess the credibility of the evidence that's been

13   presented to you.  You listened to the testimony, you

14   heard the proof.  You now have to find that Sergeant

15   Barnaby did not use excessive force.  We respectfully

16   suggest the proof does not support such a claim and,

17   furthermore, any use of force by anyone upon plaintiff

18   at any point before Sergeant Barnaby arrived, he simply

19   was not a witness in the use of force at any time on

20   January 20th, 2016.  Thank you.

21           THE COURT:  Thank you, Mr. Abel.  Now

22   recognize counsel for Officer McGrath.

23           MR. MIRANDA:  So as our co-counsel indicated,

24   we really do appreciate your being here.  We understand

25   the sacrifice and this country really can't function

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    once again without juries of our peers deciding cases.
2    It's been a long few days.  Thank you and thank you very
3    much.
4             So you have been presented with two entirely
5    different versions of what has happened on January 28th,
6    2016.
7             As you'll hear from the judge, you have to
8    decide, based on the credible evidence, whether Officer
9    McGrath used force maliciously and sadistically for the
10   purpose of causing harm against Joseph Tranchina or, as
11   we submit, did he use force in a good faith manner to
12   restore the situation and to protect himself as he
13   thought he was under attack.
14            We told you at the beginning of this that the
15   case was going to be straightforward.  Our proof and
16   witnesses we believe have testified that this was
17   nothing more than a routine pat frisk at a dangerous
18   medium security facility.  So dangerous that, as Officer
19   Hurteau put it, they have to have people just monitor
20   the inmates on the walkway.
21            You will hear instructions from the judge and,
22   as counsel indicated, plaintiff has the burden in this
23   matter.  They have to tip the scale, not the defendant.
24   For -- so we need to look at Mr. Tranchina's story.  I'm
25   not really sure which one we can start with but we think

TRANCHINA v McGRATH, et al. - 17-cv-1256

454

1   the proof has been that there's been different versions

2   presented even as soon as the next day or a few days

3   after that.

4          So, to believe in Mr. Tranchina's story, we

5   submit that you have to buy into a grand conspiracy of

6   several officers corroborating together who, because of

7   a note that was passed, that they would take this action

8   against Mr. Tranchina.  But we have heard lots of

9   testimony that these officers did not even really know

10  each other, that there was a lot of turnover at Bare

11  Hill Correctional Facility.

12         So let's look at three crucial legs of

13  plaintiff's story they are trying to stand on right now.

14         The first, that Mr. McGrath planted the shank.

15  Mr. Tranchina has not put forth any evidence, not even a

16  reason, as to how Mr. McGrath got the shank.

17         Mr. Tranchina has trotted out a DNA forensic

18  scientist, but on the stand we all heard her, she

19  indicated that she could not rule out that Mr.

20  Tranchina's DNA was on the weapon, that there were at

21  least three other contributors, that she could not

22  compare Mr. Tranchina's cheek swab against on that

23  weapon.

24         We have indicated that almost every officer

25  has -- has every officer that has testified that there's

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    Plexiglas in the facility.  Mr. Hurteau said that it was
2    missing from the working chill room, Mr. Barnaby has
3    testified that he saw morning reports around the time of
4    the incident in question that had photos of Plexiglas
5    shanks.
6               We submit that the evidence is that
7    Mr. Tranchina could have access to a Plexiglas shank and
8    there were plenty of testimony about contraband problems
9    at Bare Hill.
10              The second thing of the story, the note.
11   There's been no testimony that Mr. McGrath knew who
12   passed the note to Maura Mayer at the time of the
13   incident.  As Mr. McGrath said in his testimony, this is
14   what inmates do.  You can't take it personally.
15              So, how do they try to distract us?  They have
16   this story about a relationship between Mr. Tranchina
17   and Miss Mayer.  She was here today.  You watched her.
18   Who do you believe?
19              Plaintiff's own story with respect to Miss
20   Mayer isn't even consistent.  He said that she gave him
21   snacks from the commissary; she testified that she
22   didn't even know where the commissary was.  He said in
23   one of his statements that you can review which is in
24   evidence that they smoked; she testified that she
25   doesn't smoke.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

1          His own statements indicate that they never
2    kissed.  He testified here that they did kiss.  There's
3    testimony from -- there's, again, that same statement in
4    evidence that there was two different people who saw
5    these exchanges between Mr. Tranchina and Miss Mayer.
6    One of them was Mr. Goode.  None of these people have
7    come here to testify today.
8          I query this.  If Maura actually did what
9    Mr. Tranchina has alleged and testified to, why would
10   she out herself that she received a note?  She is
11   essentially admitting that they are engaged in a
12   relationship.  It doesn't make any sense.
13         The last leg, the chart that Mr. McGrath
14   somehow put his name on that chart so he could be at the
15   school annex on the day in question.  We didn't even get
16   to see the official chart.  What we heard was that this
17   was a cheat sheet and that there's a 14-page chart out
18   there.  Now, Lieutenant Conto testified, but his
19   testimony was clear that on a 24-hour period, there were
20   approximately 14 people -- deputies, captains,
21   lieutenant, sergeants -- all who could have added to
22   that chart.
23         Mr. Barnaby's testimony was that he requested
24   to the watch commander that someone pat frisk at the
25   school annex on the day -- on the day before the

1    incident because of tobacco and what did Lieutenant

2    Canto say?  That inmates hide -- so it all ties

3    together.  Inmates hide drugs in tobacco.  So that's why

4    they would have someone down there to pat frisk.

5              Why would Mr. Tranchina put this all together?

6    Let's look to his own testimony.  He testified that he

7    knew contraband could lengthen his sentence, and he

8    testified that his prison philosophy was to survive.  He

9    also had testimony that he knew about the loss of

10   privileges.  As he says, he didn't want to leave the day

11   camp.

12             So, what does he do?  Note was passed.  He is

13   smitten with Miss Mayer.  He's caught, he's taken to

14   SHU, he has a couple of hours to reflect on the

15   consequences, and what has Mr. McGrath's testimony been?

16   He has been on F-2 and there's been testimony that

17   there's open sight lines, so Mr. Tranchina puts it all

18   together and he has his story so he can avoid leaving

19   day camp.

20             So, you have to decide what's more plausible

21   to you, and I think another indication of this in the

22   evidence is looking at the injuries that the attorney

23   general's office has just discussed.

24             Mr. Tranchina's testimony is that he was

25   severely beaten for somewhere between one and a half and

458

1    three minutes.  The length of it is indicated in the

2    testimony is different every time he's asked about it.

3            If I sat here for just one and a half minutes,

4    it would be incredibly awkward.  So think about how much

5    can transpire during that minute and a half.

6            Mr. Tranchina's testimony was that he was

7    punched at least 40 to 50 times, that he was kicked

8    twice in the vestibule area, and that he was kicked

9    again in SHU.  His own testimony here contradicts prior

10   statements about the kicks but think about all those

11   actions and look at those pictures and you have to ask

12   yourself whether those injuries are consistent with

13   someone who received a beating of that nature.

14           If you look to P-31, he told the nurse that

15   his pain was a six out of ten, not that, as he testified

16   here, he thought he was near the end.  Mr. Tranchina's

17   own statement is belied by where it takes place.  He

18   can't even get right where the pat frisk took place.

19           We have walked through photos in evidence of

20   that small vestibule area.  Mr. Tranchina's testimony

21   was that the pat frisk took place on -- excuse me --

22   that the radiator was on the left side of the vestibule

23   area.

24           If you look through the testimony of Officer

25   McGrath and how we walked him through those two

1    pictures, the radiator is on the other side.  The pat
2    frisk took place on the left side, lining up with
3    Officer McGrath's story how he takes Mr. Tranchina to
4    the ground, and it is a small area, the radiator is
5    behind him.  They both fall.  Mr. Tranchina's ribs hit
6    the radiator and then he falls to the ground.  The
7    ground, the radiator, what are the injuries more
8    consistent with?
9              So, we have asked you here to use your common
10   sense.  Was Officer McGrath assigned to randomly pat
11   frisk in a facility like he had testified to he had done
12   in the past.  You heard testimony about contraband being
13   in the facility.  Mr. McGrath did not know when he
14   arrived at work that day that he would be in the school
15   annex.  He was a resource officer.  He never knew where
16   he was going to be and, yes, he did pat frisk with
17   inmates walking behind him.  So he would have zero
18   expectation of privacy when this was taking place.  If
19   he was actually going to plant a shank on Mr. Tranchina,
20   why would he try to do it there when other inmates are
21   walking behind him?  It just doesn't add up.
22             Mr. McGrath and Miss Mayer have indeed lost
23   their jobs but Mr. McGrath finally has his real day in
24   court.  We submit that based on the evidence before you,
25   you should end the saga for them and return a verdict in

460

1    our favor.  Thank you.

2              THE COURT:  Thank you, Mr. Miranda.

3    Mr. Roche.

4              MR. ROCHE:  Thank you, your Honor.  Good

5    afternoon, everybody.  I would just like to join

6    everybody else and thank you too.  You guys really

7    stepped up to the -- to be jurors in this case and my

8    client and my co-counsel appreciate that.

9              So it's pretty clear, very clear at this point

10   that Defendant McGrath and Defendant Barnaby both lied

11   to you about matters -- large matters, small matters,

12   many different matters here in court.

13             Mr. McGrath clearly lied when he testified

14   that it was normal practice to conduct a frisk in a tiny

15   little vestibule between an exit door and the door into

16   the facility.  He was adamant, no, there's nothing wrong

17   with that, there's no security concerns, not a problem.

18             We finally heard from Lieutenant Conto today

19   who testified very credibly that, no, that's not

20   something that would be something that would be

21   practiced at the facility and he said that indeed there

22   would in fact be major security concerns with inmates

23   passing by the back of the officer out of his range of

24   sight by his conducting a pat frisk of another inmate.

25   Of course that makes sense.  It's total common sense but

1    Lieutenant Conto confirmed it for us today as a
2    supervisor in that very facility.
3           Mr. McGrath also lied about when he first
4    started dating Maura Mayer.  Of course he doesn't want
5    you to believe that he had a motive for assaulting
6    Mr. Tranchina, so he wants you to -- he wants you to
7    believe that he wasn't, that he -- they were just
8    friends, and they were just starting to get to know each
9    other, but there was no real connection between them,
10   there was no real relationship that would make him
11   jealous or that would make him defensive of her or
12   protective of her at that time but we know that's a lie
13   and we know that Miss Mayer lied about it too.
14          She came in, she testified today, she cried,
15   but you heard that after -- a few months after the
16   incident, she gave sworn testimony to an investigator.
17   She was under oath, just like she was here, and she
18   testified that she had begun dating Mr. McGrath in
19   December of 2015.  New Year's Eve to be precise.
20          She said she tried to -- to pass it off as,
21   oh, you know, I got confused, I don't remember the date.
22   New Year's Eve is -- is a memorable event.  So if you
23   start to date somebody on New Year's Eve, you can be
24   pretty sure that that's accurate but of course now
25   there's an incentive, there's a motive to deny that and

1    to pretend that there wasn't a relationship at that

2    time.

3            And Mr. McGrath also lied to you when he told

4    you that it was -- you were not required to sign the

5    logbook in the annex school.  He said, oh, you sign the

6    logbook in the main school but not the annex school.  Of

7    course it didn't really make sense, didn't make any

8    sense but, once again, Lieutenant Conto came in today,

9    very matter of factually said, no, you -- you -- it's

10   standard practice that you -- given a frisk assignment

11   to -- assignment unit, it would be entered in the

12   logbook.  So he lied and he -- he -- the reason he lied

13   is because he doesn't want you to believe that there was

14   anything improper about what he was doing that day.

15           The mystery of the chart, the -- the chart

16   entry or -- I can't remember what Lieutenant Conto

17   referred to it as today but the -- basically the chart

18   that he testified about that he had written down

19   McGrath's name and somebody else had written in the

20   assignment.  The assignment of a frisk in the annex

21   school.  That hasn't been resolved but Sergeant Conto

22   said he didn't write it and he was unable to determine

23   what sergeant wrote it, and we know that OSI

24   investigated that very matter and if they had resolved

25   it in Mr. McGrath's favor, you can be sure we would have

1    heard about it here in this courtroom but you did not.

2              And Mr. McGrath is -- sorry.  And another

3    thing that Mr. McGrath lied to you about was being able

4    to identify an inmate from his cube number.  Both

5    Miss Mayer and Mr. McGrath both testified that she --

6    when she told him about the note, she told -- also told

7    him about the cube number of the inmate that -- that

8    passed the note to her, and from what Lieutenant Conto

9    told us today and Miss Mayer actually confirmed it, was

10   that you can absolutely identify an inmate from their

11   cube number.  Lieutenant Conto told you there's a list

12   in each dorm of the inmates -- list of the cubes and the

13   name of the inmate beside it.

14             We knew -- we know from Sergeant McGrath that

15   he visited the F-2 dorm so it would be an easy matter

16   for him to find out the name of the inmate and that's

17   even if you believe, to begin with, that she didn't just

18   tell him the name.  She admitted at one point to telling

19   him the cube number but she also said that it's --

20   that corrections officers often refer to the inmates by

21   their cube number, which is a clear identifier.  So he

22   lied about that too.

23             And officer or Mr. McGrath is not the only one

24   that lied.  Sergeant Barnaby did too.  He told some of

25   the same.  He also lied about the frisk in the

1    vestibule.  He's a sergeant, he's a supervisor, and he

2    told you that there's nothing wrong with that, like

3    there's no security concerns.  It's up to the discretion

4    of the officer, nothing surprising or weird about it.

5    Lieutenant Conto you heard, no, that's not correct.  It

6    is a security concern.

7              Of course both McGrath and Barnaby want you to

8    believe that this was just a routine assignment rather

9    than a ruse to beat down an inmate that -- that he had a

10   grudge against, that McGrath had a grudge against.

11             Barnaby also lied about the annex logbook in

12   the same way.  He also said that no, you don't sign into

13   that logbook for a frisk assignment.  A lie.  Lieutenant

14   Conto told us.  Sergeant Barnaby also lied about the

15   officers -- for being officers who enter the vestibule

16   before him right after the incident.

17             He said that when he got there, there were

18   other officers in there.  We heard from Officer Hurteau

19   today who said that when he responded, he responded

20   right away and took him -- I think -- I don't remember

21   exactly what he said but maybe 45 seconds and when he

22   got there, there was nobody in there except for Sergeant

23   Barnaby who had already gone inside the school.

24             And the number one reason that we all know

25   that both of them are lying is the injuries.  We saw the

1    photos of the injuries.  The injuries to Mr. Tranchina

2    are significant.  They are not the kind of injuries that

3    you get from being bear hugged, twisted around, maybe

4    hitting -- even if hitting a radiator and hitting the

5    ground.

6           These are multiple injuries all over his face,

7    head, and body, including a broken rib, swollen

8    abrasions to both sides of his face.  You saw the photos

9    and the defendants' account of how that -- those

10   injuries were inflicted is preposterous.  I'm not even

11   going to insult your intelligence by arguing how those

12   injuries could not have been caused by rolling around in

13   rock salt on the floor.  It's too absurd.

14          It's clear that Mr. Tranchina was beaten and

15   of course they can't admit it, so they come up with a

16   ridiculous story to justify it, and it's not just

17   McGrath that's lying about how the injuries occurred,

18   Barnaby is, too.

19          Barnaby is the sergeant who responded.  He's

20   responsible for this area, so it's his responsibility to

21   find out what happened and to deal with it

22   appropriately.  So he arrives on the scene and he sees

23   an inmate who's badly beaten, but they, you know -- the

24   photos show he's badly beaten inmate, and he sees an

25   officer with the skin removed from his knuckles.

TRANCHINA v McGRATH, et al. - 17-cv-1256

466

1              Ladies and gentlemen, come on.  It's not

2    difficult to figure out what happened here.  Now,

3    Barnaby says he didn't see the injuries in the vestibule

4    but he went to the infirmary with Mr. Tranchina.  He was

5    there while the medical examination was taking place.

6    He received the report from Nurse Mulverhill documenting

7    the many injuries that Mr. Tranchina had sustained but

8    yet he didn't go back and change his assessment, he

9    didn't go back to McGrath and say, hey, there's some --

10   I got some issues with this, this isn't very credible.

11   He didn't do that.  He just took McGrath's account and

12   passed it up the chain of command.

13              Now, eventually the truth was discovered and

14   McGrath was fired.  You heard that.  So why would -- why

15   would Barnaby, why would he put himself, his career at

16   risk to lie for McGrath?  There's only one plausible

17   explanation, and that's that he committed an act of

18   violence too, just like Mr. Tranchina told you that he

19   did.

20              Mr. Tranchina told you that when Barnaby

21   entered the vestibule, he, first of all, felt relief but

22   then Barnaby kicked him in the side of the face.  By

23   doing that, Barnaby put himself in the same boat as

24   McGrath, and they had to be a team to cover it up, and

25   that's exactly what they did and that's exactly why

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

```
 1   Barnaby took McGrath's ridiculous explanation of what
 2   happened and passed it up the chain of command.
 3           And you also -- you heard that not alone did
 4   Barnaby file that report, his to-from memo basically
 5   just parroting McGrath's account, he also testified
 6   at -- he also allowed a false misbehavior report to be
 7   filed, false use-of-force report and then he went to an
 8   infraction hearing and testified on behalf of the
 9   officer.
10           Now, one of the defense counsel mentioned that
11   we didn't prove where the knife came from.  How the --
12   how could a lawyer for a former inmate prove how
13   a Plexiglas shank was -- could be found by a corrections
14   officer in a correctional facility?  Obviously would not
15   be too difficult.  We heard testimony that weapons --
16   makeshift weapons are recovered all the time, they are
17   placed in the evidence drawer.  So if McGrath had wanted
18   to plant one, it's -- it's pretty obvious that that
19   would not be too difficult for him to do.
20           We heard from Barnaby that he initially had
21   stated that McGrath had told him in the vestibule that
22   the weapon that he had found was a ice pick-type weapon.
23   Well, obviously McGrath wasn't able to find the ice pick
24   that he thought he knew was somewhere, so he had to find
25   another weapon instead, and of course when Barnaby sees
```

1    the new weapon, he doesn't question as to, hey, I

2    thought you said it was an ice pick.  Never said that.

3            Now, you heard from Mr. Tranchina and he told

4    you about what he went through that day, and he told you

5    that when he was brought to the SHU, and when he was

6    interviewed by or when he was examined by the nurse, at

7    that time he was -- he was terrified.  He was afraid to

8    say anything about what had happened, for good reason.

9    Because not alone has he just been pummeled very

10   seriously, to the point where he credibly said that he

11   was about to pass out, never said he lost consciousness.

12   He said he felt like and he feared that he was going to

13   lose consciousness.

14           So, is it any wonder that he wouldn't -- when

15   he's brought to the SHU that -- where Sergeant Barnaby,

16   who kicked him in the head, is still present, still

17   there right up on the -- after the time that he's

18   examined, is it any wonder that he told the nurse that

19   he didn't have anything to say.  But you heard because

20   of his injury, because he -- he -- the word suspected

21   fractures of his face and his ribs, turns out his face

22   was not fractured, x-rays revealed that, his rib was

23   fractured but he had to be transported to a different

24   facility to get the medical care that he needed.

25           And once he got to that other medical

1    facility, Franklin, he wrote a note immediately

2    explaining what happened to him, and I believe that note

3    is in evidence and you can read it, and you'll see it's

4    very consistent with what Mr. Tranchina told you here in

5    court.

6              And it's significant that Mr. Tranchina, when

7    he's investigating -- the next day when he's interviewed

8    by the OSI investigators and he finds out that he's --

9    there's an allegation that he possessed a weapon, the

10   first thing he said is take my DNA, compare it with my

11   DNA, it won't be on there, it was planted.  It's --

12   lying about it, it was never on me and of course the

13   DNA -- you heard from the DNA expert today, his DNA was

14   not found on the knife.

15             And you also heard another -- getting back to

16   the lies, you also -- you heard that Mr. McGrath, his

17   explanation for, you know, why there's no DNA on the

18   knife is he claims that -- that Mr. Tranchina was

19   wearing long johns and the knife was somehow between

20   long johns and his pants and sock or somehow that the

21   knife was not touching his skin, but you will see from

22   the reports that are in evidence he wasn't saying that

23   in the beginning.  He said he recovered this knife in

24   Mr. Tranchina's sock, which of course his DNA would be

25   on the item if it had been in his sock.

1          So the judge will instruct you that if you --

2    if you as jurors find that a witness has testified

3    falsely about a material issue and fact, you are

4    entitled to disregard that witness's entire testimony,

5    and I submit that that's exactly what you should do for

6    both of these defendants.

7          They both came in here in federal court, swore

8    to tell the truth before Judge D'Agostino, and they both

9    lied to you about a very serious matter, about an

10   assault on a defenseless inmate and a coverup.

11         These defendants brutally beat Mr. Tranchina

12   on January 28th, 2016.  I'm going to ask you to hold

13   them accountable.

14         The judge told you at the beginning of the

15   case even though Mr. Tranchina was an inmate and had

16   been convicted of crimes at the time of this incident,

17   that doesn't mean he gives up his Constitutional rights,

18   and this -- the Constitutional right to be free from

19   cruel and inhuman punishment is obviously a very

20   important right that nobody should ever have to give up

21   no matter what their convictions and these defendants

22   brutally violated that right of Mr. Tranchina.

23         Both of them assaulted him and Defendant

24   Barnaby also failed to intervene to stop McGrath, who he

25   was the supervisor of, to stop him from continuing the

1    beating.

2           Now, one of the defense counsels commented on

3    some inconsistencies in Mr. Tranchina's testimony about

4    where exactly he was positioned in the vestibule when

5    the beating took place and how long it took, how many

6    blows he sustained.  Think about it.  Let's think about

7    the beating that Mr. Tranchina described and was

8    corroborated by the photos that you all have seen.

9           Would you really expect somebody who's just

10   had their legs pulled from them, fall on the floor and

11   then is being beaten while he doesn't know why, he

12   doesn't know why at that point.  Later on he kind of

13   figures it out but he's getting brutally beaten inside

14   this tiny enclosed area where nobody can see.

15          You really think that he's going to be

16   counting the blows or estimating the amount of time that

17   passed?  Or that he's, you know -- he's paying attention

18   to where exactly his body is aligned with one or two

19   identifiable items in the room?  Of course not.  Of

20   course not.

21          He told you what he was concerned about was he

22   didn't want to lose consciousness because he was afraid

23   what would happen, and he just wanted to stay awake, and

24   it's somewhat ironic that the defendants are trying to

25   harp on Mr. Tranchina's disorientation, when any

1    disorientation he might have been experiencing was

2    exactly from the beating that these defendants were

3    dishing out.

4            So, I'm going to ask you to award damage to

5    Mr. Tranchina for what he suffered, and I'm going to

6    just ask you to -- to bear with me, run through the

7    events that he experienced because, really, the damages

8    should start the moment that he was put up against the

9    wall, that Officer McGrath tells him to get up against

10   the wall for the pat frisk because there was no reason

11   for that pat frisk.

12           It was a ruse.  It was clearly because he

13   wanted to beat him up and then when he is undergoing

14   this -- this pat frisk, the officer pulls his legs from

15   under him and makes him come cascading to the floor and

16   then starts beating him.

17           Just try and put yourself into Mr. Tranchina's

18   position.  How terrifying must that be?  It's bad enough

19   being an inmate having your liberty taken from you but

20   to be in a situation where you're utterly helpless,

21   being beaten by an officer who has authority and power

22   over you and that that beating continued.

23           Now, whether or not Mr. Tranchina's estimate

24   of how many blows there were is accurate, is beside the

25   point.  It felt like countless blows to him and then

1    finally, when the door opens and feels his first moment

2    of relief that maybe this is going to end, Sergeant

3    Barnaby walks in and gives him another kick in the head.

4    Can you imagine how that felt?

5              If he's in this bleak situation, one little

6    moment of hope and then it gets snuffed out by another

7    violent attack.  Then he's falsely charged with

8    possessing a knife.  He has to go through an infraction

9    hearing, a trumped-up infraction hearing which he's

10   found guilty and he gets 210 days in solitary

11   confinement and after that, gets transferred to a

12   maximum security prison where he was terrified because

13   he absolutely did not belong there.

14             Ladies and gentlemen, these defendants

15   gratuitously inflicted pain and suffering on

16   Mr. Tranchina.  Make no mistake.  The trauma, the

17   emotional trauma for something like this doesn't end

18   when the incident is over.  Doesn't end when he gets

19   released from solitary confinement.  It doesn't end when

20   the charges, the guilty verdict and infraction hearing

21   is overturned and the officer who brought the false

22   claim against you is fired.

23             No.  The injury continues.  It's a very

24   traumatic thing that will be with him for a long time if

25   not his whole lime.  So for -- as to the amount of

1     damages that I would suggest, obviously, you know, it's

2     hard to come up with what the appropriate number is, and

3     you guys go in to the jury room and you will discuss

4     what you think is appropriate, and I submit that each of

5     you will, you know, probably come up with a different

6     suggestion but, you know, you will figure it out among

7     yourselves but what I would suggest as an amount that

8     would be an appropriate award for a compensatory damages

9     for this case would be as to Defendant McGrath I would

10    ask -- I would suggest the figure of 300,000 in

11    compensatory damages, and as to Defendant Barnaby,

12    $150,000.

13          And I will also ask you to consider punitive

14    damages and just for punitive damages, which, you know,

15    as we discussed in jury selection, punitive damages --

16    compensatory damages are to compensate for the pain and

17    the suffering that he experienced.  Punitive damages

18    focuses on the defendants on what their conduct was.

19          And really, what could be more egregious than

20    creating a ruse whereby a person is brought into an

21    enclosed space, is subjected to a pretextual frisk and

22    then brutally, brutally beaten.  Like what excuse can

23    there be for that?  What mitigating circumstances can

24    there be for Officer McGrath?  There's no excuse.  He

25    may have been, you know, upset with Mr. Tranchina for

1    hitting on his girlfriend.  You know.  There's -- that's

2    not -- that's somewhat understandable but to act on it

3    like this?  To take it upon yourself to brutally beat a

4    person who hasn't done anything violent, who hasn't

5    harmed anybody is absolutely outrageous.

6            Same thing with Sergeant Barnaby.  Like, what

7    he did, he was the supervisor.  He was the person who is

8    supposed to be the authority figure, the adult in the

9    room, the person who should stop this kind of conduct

10   from happening, and he was the first person on the

11   scene, the first person to enter the vestibule, and he

12   could have put a stop to it, to what McGrath was doing

13   but, instead, he decided that it was an opportunity for

14   himself, for him to inflict his own measure of violence,

15   and he kicked Mr. Tranchina in the head.

16           I submit that that's egregious conduct that is

17   deserving of punishment.  Both of them deserve to be

18   severely punished.  I'm not going to suggest a number

19   for punitive damages at this time but we may have an

20   opportunity to ask for that later.  Okay.  Thank you,

21   ladies and gentlemen.

22           THE COURT:  Thank you, Mr. Roche.

23           Members of the jury, I'm now going to instruct

24   you on the law.  I want to let you know that I will be

25   sending eight copies of what I am saying right now into

1    the jury deliberation room for you so that each one of

2    you will have a copy of my words.  I am required,

3    however, to orally go through the charge with you.

4           Now that you have heard all the evidence and

5    the arguments of counsel, I must instruct you on the law

6    applicable to this case.  You must base your decision on

7    this charge and not on the instructions that I gave you

8    at the beginning of the case.

9           Your duty as jurors is to determine the facts

10    of this case on the basis of the admitted evidence.

11    Once you have determined the facts, you must apply the

12    law as I am now instructing you to those facts.  You

13    must consider and apply all of these instructions.  You

14    may not elect to apply some and omit others.  It is the

15    application of these instructions in their entirety that

16    states the law.

17           You should not concern yourselves with the

18    wisdom of any rule of law.  You are bound to accept and

19    apply the law as I give it to you, whether or not you

20    agree with it.

21           In deciding the facts of this case, you must

22    not be swayed by feelings of bias, prejudice or sympathy

23    toward either the plaintiff or the defendants.  You are

24    not to consider what the parties' or the public's

25    reactions to your verdict may be, whether or not it will

1    please or displease anyone, be popular or unpopular.

2    Indeed, any consideration outside the case as it has

3    been presented to you in this courtroom.

4              You should consider only the evidence, both

5    the testimony and the exhibits and apply the law as I

6    now give it to you.  The proper administration of

7    justice requires that you carefully and impartially

8    consider all the evidence in the case, follow the law as

9    the Court states it, and render a decision based upon

10   the application of the law to the facts as you find them

11   to be.

12             Nothing I say in these instructions is to be

13   taken as an indication that I have any opinion about the

14   facts of the case.  It is not my function to determine

15   the facts.  It is yours.

16             In addition, you must not infer from anything

17   I have said during this trial or anything that I have

18   done that I hold any views for or against either the

19   plaintiff or the defendant.  In any event, any opinion

20   that I might have is totally irrelevant to the decisions

21   that you will make.

22             Our courts operate under an adversary system

23   in which we hope that the truth will emerge through the

24   competing presentation of opposing parties.  It is the

25   responsibility of the attorneys to press as hard as they

1    can for their respective positions.  It is their role to
2    call your attention to those facts which are most
3    helpful to their side of the case.
4            In fulfilling that role, they have not only
5    the right but also the obligation to make objections to
6    the introduction of evidence that they believe is
7    improper.  The application of the rules of evidence is
8    not always clear and the lawyers will often disagree.
9    It's been my job as judge to resolve those disputes.
10           It is important for you to realize, however,
11   that my rulings on evidentiary matters have nothing to
12   do with the ultimate merits of the case and are not to
13   be considered as points scored for one side or the
14   other.
15           Also, one cannot help but become involved with
16   the personalities and the styles of the attorneys, but
17   it is important for you as jurors to recognize that this
18   is not a contest between attorneys.
19           You are to decide this case solely on the
20   basis of the evidence and remember that the attorneys'
21   statements and their characterizations of the evidence
22   are not evidence.
23           As I've said, insofar as you find their
24   opening statements and their closing statements helpful,
25   take advantage of them, but it is your memory and your

TRANCHINA v McGRATH, et al. - 17-cv-1256

479

1    evaluation of the evidence that counts.

2              Questions asked by attorneys are also not

3    evidence.  Only the witnesses' answers are evidence.  In

4    addition, as I've said, you must not infer from anything

5    I've said during this trial or anything that I did that

6    I hold any view for or against either the plaintiff or

7    the defendants.  As I said, any opinion that I might

8    have is totally irrelevant to your decision.

9              It is your duty to determine the facts based

10   on the evidence that has been admitted.  The term

11   "evidence" includes the sworn testimony of witnesses,

12   exhibits that the Court has received and any

13   stipulations.

14             You may not consider any responses which I

15   ordered stricken from the record.  Now, I realize that

16   you can't remove those answers from your memories, but I

17   instruct you as a matter of law that you may not rely on

18   them during your deliberations.  As I have indicated

19   before, I instruct you that you are not to consider a

20   question asked by the attorneys as evidence.

21             Although you should consider only the admitted

22   evidence, you may draw inferences from the testimony and

23   exhibits which are justified in light of your common

24   experience.

25             As I have explained in my preliminary

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

TRANCHINA v McGRATH, et al. - 17-cv-1256

480

1    instructions, the law recognizes two types of evidence:
2    direct and circumstantial.
3            Direct evidence is the testimony of one who
4    asserts personal knowledge, such as an eyewitness.
5    Circumstantial evidence or indirect evidence is proof of
6    a chain of events which points to the existence or
7    nonexistence of certain facts.  Again, the use of logic.
8            The law does not distinguish between the
9    weight to be given to direct or circumstantial evidence,
10   nor is a greater degree of certainty required of
11   circumstantial evidence than of direct evidence.  You
12   may rely on both types of evidence in reaching your
13   decision.
14           To say that a party has the burden of proof on
15   a particular issue means that considering all of the
16   evidence in the case, the party's claim on that issue
17   must be established by what we call a fair preponderance
18   of the evidence.  The credible evidence means the
19   testimony and exhibits that you find worthy of belief.
20           A preponderance means the greater part of the
21   evidence.  It does not mean the greater number
22   of witnesses or the greater length of time taken by
23   either side.  The phrase preponderance of the evidence
24   refers to the quality of the evidence, its weight and
25   its effect it has on your minds.  In order for a party

1    to prevail on an issue on which it has the burden of

2    proof, the evidence that supports its claim on that

3    issue must appeal to you as more nearly representing

4    what happened than that opposed to it.

5              If it does not, or if it weighs so evenly that

6    you are unable to say that there is a preponderance on

7    either side, you must decide the question against the

8    party that has the burden of proof and in favor of the

9    opposing party.

10             You have now had the opportunity to observe

11   all of the witnesses.  Now it's your job to decide how

12   believable each witness was.  You are the sole judges of

13   the credibility of each witness and the importance of

14   his or her testimony.

15             Now, in evaluating a witness's testimony, you

16   should use all of the tests for truthfulness that you

17   would use in determining matters of importance to you in

18   your everyday lives.  You should consider any bias or

19   hostility that the witness may have shown for or against

20   either party, as well as the interest that witness has

21   in the outcome of the case.

22             You should also consider the specific

23   attributes of the witness.  For example, whether the

24   witness has been convicted of a felony, that is a crime

25   for which a person may serve a prison sentence for more

1     than one year.

2            You should consider the opportunity the

3     witness had to see, hear, and know the things about

4     which the witness testified; the accuracy of the

5     witness's memory, candor or lack of candor; the

6     reasonableness and the probability of the witness's

7     testimony; the testimony's consistency or lack thereof

8     and its corroboration or lack of corroboration with

9     other credible testimony.

10           Inconsistencies or discrepancies in the

11    testimony of a witness or between the testimony of

12    different witnesses may or may not cause you to

13    discredit such testimony.  Two or more persons

14    witnessing an incident or a transaction may see it or

15    hear it different.  An innocent misrecollection.  Like

16    failure of recollection is not an uncommon experience.

17           In weighing the effect of a discrepancy,

18    always consider whether it pertains to a matter of

19    importance or an unimportant detail and whether the

20    discrepancy results from innocent error or intentional

21    falsehood.

22           If you were to find that any witness willfully

23    testified falsely as to any material fact, that is, to

24    an important matter, the law permits you to disregard

25    completely the entire testimony of that witness upon the

1   principle that one who testifies falsely about one

2   material fact is likely to testify falsely about other

3   important matters.  You are not required, however, to

4   consider such a witness as totally unworthy of belief.

5   You may accept as much of that witness's testimony as

6   you deem true and disregard what you feel is false.

7          By the processes which I have described, you,

8   as the sole judges of the facts, decide which of the

9   witnesses you will believe, what portion of the

10  testimony you accept, and what weight you will give to

11  that testimony.

12         In other words, what you must try to do in

13  deciding credibility is to size up a witness in light of

14  the witness's demeanor, the explanations given, and all

15  of the other evidence in the case.  Remember, you should

16  also always use your good common sense, your good

17  judgment and your own life experience.  Also remember

18  that the existence or nonexistence of a fact is not

19  determined by the number of witnesses called.  Your

20  concern always has to be with the quality, not the

21  quantity, of the evidence.

22         In evaluating the credibility of witnesses,

23  you should take into account any evidence that the

24  witness who testified may benefit in some way from the

25  outcome of this case.  Such an interest in the outcome

1    creates a motive to testify falsely and may sway the

2    witness to testify in a way that advances his or her own

3    interests.

4         Therefore, if you find that any witness whose

5    testimony you are considering may have an interest in

6    the outcome of the trial, then you should bear that

7    factor in mind when evaluating the credibility of his or

8    her testimony and accept it with great care.

9         This is not to suggest that every witness who

10   has an interest in the outcome of the case will testify

11   falsely.  It's for you to decide to what extent, if at

12   all, the witness's interest has affected or colored his

13   or her testimony.

14         Now, a witness may be discredited or impeached

15   by contradictory evidence or by evidence that at some

16   other time the witness had said or done something or has

17   failed to say or do something that is inconsistent with

18   the witness's present testimony.  If the witness is not

19   a party to this action, such prior inconsistent,

20   out-of-court statements may be considered for the sole

21   purpose of judging the witness's questionability.

22   However, it may not be considered as evidence of proof

23   of the truth of the statement.

24         On the other hand, where the witness is a

25   party to the case and by such statement or other conduct

485

```
 1    admits some fact or facts against the witness's
 2    interest, then such statement or other conduct, if
 3    knowingly made or done, may be considered as evidence of
 4    the truth of the fact or facts so admitted by such
 5    party, as well as for the purpose of judging the
 6    credibility of the party as a witness.
 7            If you believe any witness has been impeached
 8    and thus discredited, you may give the testimony of that
 9    witness such credibility, if any, you think it deserves.
10    If a witness has shown to have testified falsely about
11    any material matter, as I said previously, you have the
12    right to distrust such a witness's other testimony and
13    you may reject all the testimony of that witness or give
14    it such credibility as you think it deserves.
15            You have heard evidence that the plaintiff has
16    been convicted of crimes.  You may consider that
17    evidence only in deciding whether the testimony provided
18    by that person is truthful in whole, in part, or not at
19    all.  Such a conviction does not necessarily destroy the
20    witness's credibility but it is one of the circumstances
21    you may take into account in determining the weight to
22    give his testimony.  You may not consider this evidence
23    for any other purpose.
24            You must give separate consideration to each
25    claim and each party in this case.  Although there are
```

1  two defendants, it does not follow that if one is

2  liable, the other is also liable.

3       In considering a claim against a defendant,

4  you must not consider evidence admitted only against

5  another defendant.

6       The law does not require any party to call all

7  witnesses or all persons who may have been present at

8  any time or place involved in the case or who may appear

9  to have some knowledge of the matters in issue at the

10  trial, nor does the law require any party to produce and

11  submit all papers and all things mentioned in the case.

12       You have heard testimony from corrections

13  officers.  The fact that a witness is employed as a

14  corrections officer does not mean that his testimony is

15  deserving of any more or less consideration or should be

16  given any greater or lesser weight than that of any

17  other witness from whom you have heard testimony.

18       At the same time, it's quite legitimate for

19  counsel to attempt to attack the credibility of

20  correction officers' witnesses.  It's your decision,

21  after reviewing all of the evidence, to accept the

22  testimony of correction officers' witnesses or to reject

23  it, or to give it whatever weight you believe it

24  deserves just as you would any other witness from whom

25  you heard testimony.

1           A stipulation is an agreement between the

2   parties that a certain fact is true.  You must regard

3   such agreed upon facts as true.

4           I'm now going to talk to you about what we

5   call the substantive claims in this case.

6           Plaintiff has brought his claim pursuant to

7   42 United States Code, Section 1983, which provides that

8   every person who, under color of any statute, ordinance,

9   regulation, custom or usage of any state, subjects or

10  causes to be subjected any citizen of the United States

11  or other person within the jurisdiction thereof to the

12  deprivation of any rights, privileges or immunities

13  secured by the Constitution and laws, shall be liable to

14  the party injured.  I will now refer to this statute

15  simply as Section 1983.

16          Section 1983 does not create any substantive

17  right in and of itself but, rather, it serves as a means

18  by which individuals can seek redress in this court for

19  alleged violation of their substantive rights under the

20  constitution.

21          One element of any claim under Section 1983 is

22  that the acts of the defendant be done under color of

23  state law.  In other words, the acts complained of must

24  have occurred while the defendant was acting or

25  purporting to act in the performance of his or her

                    Lisa L. Tennyson, CSR, RMR, FCRR
                   UNITED STATES DISTRICT COURT - NDNY

488

1    official duties.

2              It is important to remember, however, that the

3    State of New York is not a defendant in this case.  The

4    defendants in this case are Justin McGrath and Matthew

5    Barnaby who were employees of the State of New York

6    Department of Corrections and Community Supervision at

7    Bare Hill Correctional Facility during the time in

8    question.

9              Further, the plaintiff must establish by a

10   preponderance of the credible evidence that the

11   defendants' conduct deprived him of a right secured by

12   the Constitution or federal law.

13             Here, plaintiff claims the defendants used

14   excessive force against him and failed to protect him,

15   in violation of the Eighth Amendment of the

16   United States Constitution.

17             Third:  The plaintiff must establish that any

18   injuries he may have sustained were proximately caused

19   by the defendants' alleged unconstitutional conduct.

20             I will now discuss the actual deprivations

21   that plaintiff alleges defendants caused.

22             First, excessive force.  In this case, you

23   heard testimony that at all times relevant, plaintiff

24   was an inmate incarcerated at Bare Hill Correctional

25   Facility.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

489

```
1              When a state takes a person into its custody
2    and holds him there against his well, the Constitution
3    imposes upon him a corresponding duty to assume some
4    responsibility for the safety and general well-being of
5    that person.
6              As you have heard plaintiff alleges that the
7    defendants McGrath and Barnaby used excessive and
8    unnecessary force against him in a an incident that
9    occurred while the plaintiff was incarcerated.  The use
10   of excessive force may, under some circumstances,
11   constitute cruel and unusual punishment, in violation of
12   the Eighth Amendment.
13             To prove his claim of excessive force, the
14   plaintiff must prove each of the following elements by a
15   preponderance of the credible evidence:
16             First, that the defendant you are considering
17   acted under color of state law; second, that the
18   defendant you are considering acted maliciously and
19   sadistically; and third, that plaintiff suffered an
20   injury as a result of that particular defendant's
21   conduct.
22             The parties agree in this case that the
23   defendants were acting under color of state law, that
24   they were working in their capacity as New York State
25   employees at the time of the incident.  Therefore, this
```

1    element has been satisfied.

2           Second element:  In the context of an

3    excessive force claim, the key inquiry is whether the

4    defendant applied force in a good faith effort to

5    maintain or restore discipline or whether the defendant

6    acted maliciously and sadistically for the very purpose

7    of causing harm.

8           An act is maliciously done if it is done to

9    cause pain or injury to another without justification.

10   An act is done sadistically if it is done to obtain

11   gratification by the infliction of physical or mental

12   pain to another.

13          Your evaluation of this element involves an

14   evaluation of the force used, that is, was the force

15   reasonable in light of the circumstances of the case.

16   In deciding this, you should examine the facts, such as

17   the extent of the plaintiff's injuries, the need for the

18   application of force, the relationship between that need

19   and the amount of force used, the threat reasonably

20   perceived by the defendant you are considering, and any

21   effort by the defendant you are considering to temper

22   the severity of a forceful response.  For example, to

23   use only that force necessary to meet the threat posed.

24          Again, in the context of a prison, it's

25   necessary to realize that not every push or shove

1    violates a prisoner's constitutional rights.  It's

2    important to remember that a corrections officer is

3    permitted by law to use such physical force as may have

4    been reasonably necessary to enforce compliance with

5    proper instructions and to protect other prisoners,

6    themselves and other correction staff from physical

7    harm.

8            If in evaluating these factors leads you to

9    believe that the defendant you are considering acted

10   maliciously and sadistically for the very purpose of

11   causing harm, then plaintiff has established this

12   element as to that defendant.

13           If, however, you find that the defendant you

14   are considering acted in good faith in order to maintain

15   and restore discipline, then the plaintiff has failed to

16   meet this element as to the defendant you are

17   considering.

18           The third element is injury caused by the

19   defendant.  If you find that the defendant you are

20   considering used force in a malicious and sadistic

21   manner, then you must consider whether such conduct was

22   the proximate cause of an injury to the plaintiff.  In

23   an excessive force claim, this element may be

24   established even if the victim does not suffer serious

25   or significant injury so long as he has suffered some

1    injury.

2            A proximate cause is an act or omission that,

3    in a natural course, produces injury and without this

4    act or omission, the injury would not have occurred.

5    Stated another way, before plaintiff can recover damages

6    for any injury, he must first show by a preponderance of

7    the evidence that such injury would not have come about

8    were it not for the conduct of the defendant you are

9    considering.

10           In addition to the excessive force claim I

11   just described to you, plaintiff also alleges that

12   Defendant Barnaby failed to protect him from excessive

13   force inflicted upon him by Defendant McGrath.  It is

14   important to note that you are only to reach the merits

15   of this claim if you find that Defendant McGrath used

16   excessive force against the plaintiff.

17           Under the Eighth Amendment, a corrections

18   officer may not, with deliberate indifference, fail to

19   intervene to protect the constitutional rights of a

20   prisoner from infringement by another corrections

21   officer in his presence.

22           To prove his failure-to-protect claim,

23   plaintiff must prove each of the following elements

24   beyond a reasonable doubt as to the failure to intervene

25   against Defendant Barnaby.  First, the parties agree

TRANCHINA v McGRATH, et al. - 17-cv-1256

493

1    that the defendants were acting under color of state law

2    and that they were working in their capacity as New York

3    State employees at the time of this incident.

4    Therefore, the first element has been established.

5              Second, plaintiff must prove by a

6    preponderance of the evidence that the defendant used

7    excessive force against him during the incident alleged.

8    In other words, before considering plaintiff's

9    failure-to-protect claim, you must have found that

10   Defendant McGrath used excessive force against the

11   plaintiff.

12             Third, the defendant was deliberately

13   indifferent with excessive force being used against

14   plaintiff by another corrections officer.  To satisfy

15   this claim, plaintiff must prove by a preponderance of

16   the evidence that Defendant Barnaby was deliberately

17   indifferent to the excessive use of force being used

18   against plaintiff by Defendant McGrath.

19             Deliberate indifference is established only if

20   that defendant had actual knowledge that another

21   defendant was using excessive force against the

22   plaintiff and disregarded that risk by intentionally

23   refusing or failing to take reasonable measures to stop

24   the use of excessive force.  Mere inattention or

25   inadvertence does not constitute deliberate

1    indifference.

2            Fourth, that the defendant had a realistic

3    opportunity to intervene and prevent harm.  In addition

4    to proving that the defendant was deliberately

5    indifferent to plaintiff's safety, plaintiff must also

6    prove that the defendant had a realistic opportunity to

7    intervene and prevent harm from occurring.  Therefore,

8    you must find by a preponderance of the evidence that

9    Defendant Barnaby had sufficient time to intervene and

10   that had he intervened, he would have been capable of

11   preventing harm to plaintiff caused by the use of

12   excessive force.

13           Fifth, if you find that Defendant Barnaby

14   failed to protect plaintiff from the use of excessive

15   force, you may only find him responsible for the damages

16   that he would been able to prevent.  As I stated

17   earlier, a proximate cause is an act or omission that in

18   a natural course produces injury and without this act or

19   omission, the injury would not have occurred.  Stated

20   another way, before plaintiff can recover damages for

21   any injuries, he must first show by a preponderance of

22   the evidence that such injury would not have come about

23   were it not for the conduct of the Defendant Barnaby.

24           I'm now going to charge you on the law of

25   damages.  If plaintiff has proven by a preponderance of

1    the credible evidence that a defendant is liable on any

2    of his claims, then you must determine the amount of

3    damage to which plaintiff is entitled for this claim.

4    However, you should not infer that the plaintiff is

5    entitled to recover damages simply because I'm

6    instructing you on the elements of damages.

7            It is exclusively your function to decide the

8    issues of liability as I've outlined, and I'm

9    instructing you on damages only so that have guidance

10   should you decide the plaintiff is entitled to recover.

11           Compensatory damages.  The purpose of the law

12   of damages is to award, as far as possible, just and

13   fair compensation for the loss, if any, resulting from a

14   defendant's violation of plaintiff's rights.  If you

15   find that a defendant is liable on one or more of the

16   plaintiff's claims as I've explained them to you, then

17   you must award plaintiff sufficient damages to

18   compensate him for any injuries proximately caused by

19   that defendant's conduct.

20           An injury or damage is proximately caused by

21   an act or failure to act whenever it appears from the

22   evidence in the case that the act or omission was a

23   substantial contributing factor in causing the injury or

24   damage.  These are known as compensatory damages.

25           Compensatory damages seek to make the

1    plaintiff whole.  That is, compensate him for any damage
2    he may have suffered.  A prevailing plaintiff is
3    entitled to compensatory damages for the physical
4    injury, pain and suffering, mental anguish, shock and
5    discomfort that he has suffered because of the
6    defendant's conduct.  You are to use your sound
7    discretion in fixing an award of damages, drawing
8    reasonable inferences where you deem appropriate from
9    the facts and circumstances in the case.
10          Now I'm going to talk to you about nominal
11   damages.  If you find that the plaintiff has failed to
12   prove that he is entitled to compensatory damages, you
13   must nevertheless award him nominal damages in the
14   amount of one dollar if you find that the defendant you
15   are considering violated his Eighth Amendment rights.
16   You may not award the plaintiff both nominal and
17   compensatory damages if you find that the defendant you
18   are considering violated his rights.  In other words, if
19   you find that the defendant you are considering violated
20   the plaintiff's rights and the plaintiff was measurably
21   injured, you may award him compensatory damages.
22          On the other hand, if you find that the
23   defendant you are considering violated plaintiff's
24   rights but that the plaintiff was not measurably
25   injured, you must award him nominal damages.  If you

1   find that plaintiff's constitutional rights were

2   violated and award nominal damages, you may also

3   consider whether the plaintiff is entitled to an award

4   of punitive damages.

5            You may consider the issue of punitive damages

6   whether or not you award plaintiff any compensatory

7   damages on his Constitutional claims.

8            Punitive damages are awarded in the discretion

9   of a jury to punish a defendant for extreme or

10  outrageous conduct or to deter or prevent a defendant

11  and others like him from committing similar acts in the

12  future.

13           I must emphasize, however, that at this stage

14  of the proceeding, you are only to consider whether or

15  not the plaintiff is entitled to such an award of

16  punitive damages against one or more of the defendants.

17           If you determine that plaintiff is entitled to

18  such an award, you will be asked to determine what

19  amount such an award should be at a separate hearing

20  concerning the issue.  Therefore, you are not to

21  consider the amount of punitive damages if any you

22  believe the plaintiff is entitled to.

23           You may conclude that plaintiff is entitled to

24  punitive damages if you find that one or more of the

25  defendants' acts or omissions were done maliciously or

1    wantonly.  An act is maliciously done if it is prompted
2    by ill will or spite toward the injured person.
3          An act is wanton if it is reckless or in
4    callous disregard of or different to the rights of the
5    injured person.
6          In order to justify an award of punitive
7    damages, plaintiff has the burden of proving by a
8    preponderance of the evidence that the defendant you are
9    considering acted maliciously or wantonly with regard to
10   his rights.
11         Please remember that, again, at this stage of
12   the proceeding, you are only to consider whether or not
13   the plaintiff is entitled to such an award of punitive
14   damages.  If you determine that the plaintiff is so
15   entitled, a separate hearing will be held at which you
16   will hear evidence relevant to the proper amount of such
17   damages.
18         While many of the same considerations apply to
19   a determination of the amount of punitive damages, the
20   Court will have specific instructions for you regarding
21   this determination should it become necessary.
22         I'm now going to have the jury verdict
23   sheet -- would you display it?  That's great.
24         I have prepared a jury verdict form to help
25   you get through your deliberations.  You will see the

1    name of our court, the name of the case.  To the right

2    are my initials and the initials of our magistrate judge

3    and the file number of the case.  It's very important

4    that once you have reached a verdict, the foreperson

5    signs this verdict form and return that to the

6    courtroom.  So even though all of you will have a copy

7    of this, only one verdict form gets returned, signed by

8    the foreperson.

9              If you look at question 1-A, above that it

10   says, please carefully follow the bold type instructions

11   accompanying each question, and that's really important

12   because after each question, we have very explicit

13   instructions for you to help you.

14             Question 1-A:  Did the plaintiff prove by a

15   fair preponderance of the credible evidence that on

16   January 28th, 2016, any of the defendants used excessive

17   force against him, in violation of the Eighth Amendment

18   of the United States Constitution, and you would

19   consider each defendant separately.  You will answer yes

20   or no for Defendant Justin McGrath or yes or no for

21   Defendant Matthew Barnaby and carefully follow those

22   boldface instructions which indicate if you answered no

23   with respect to all defendants in question 1-A, your

24   deliberations are complete and then the foreperson

25   should sign the form and give it to the security

TRANCHINA v McGRATH, et al. - 17-cv-1256

1    officer.

2           If you answered yes with respect to any of the

3    defendants in question 1-A, proceed to question 1-B as

4    to any such defendants.  So if you turn the page, you

5    see question 1-B.  Did plaintiff prove by a fair

6    preponderance of the credible evidence that the use of

7    excessive force on January 28th, 2016, by any defendants

8    proximately caused an injury to the plaintiff, you will

9    answer that yes or no.  Follow the boldface

10   instructions.

11          If you answered yes, you go to question 1-C,

12   and that question asks:  What sum of money do you find

13   plaintiff has proven by a fair preponderance of the

14   evidence would fairly compensate him for any injuries he

15   has suffered that were caused by the defendant you are

16   considering, and then you will fill in that amount.

17          Now, as I've said to you in the charge, if you

18   find that the plaintiff was injured and you have found

19   that one or more defendant violated his constitutional

20   rights, you will award compensatory damages if you find

21   he was measurably injured.  If you find that there was

22   constitutional violation but there are no measurable

23   injuries, then you must award him nominal damages in the

24   amount of one dollar.

25          So it's not both and it's entirely up to you

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    in terms of whether you will award damages, what

2    defendants if any you will award damages against, and

3    whether or not it's nominal or compensatory.  It's all

4    up to you and nothing that I'm reading on this verdict

5    form should suggest what you should do.

6            If you look at question 1-D, if you get to

7    that question and, again, that's entirely up to you,

8    actually, I've already gone over 1-D, which is

9    compensatory damages.

10           If you have found that -- let me restate that.

11   If you get to the question of punitive damages which is

12   1-E, you will fill that out but, again, it will be

13   entirely up to you as to whether or not the plaintiff

14   met his burden for the award of punitive damages.

15   That's question 1-E.

16           Question 2-A is the claim against Officer

17   Barnaby.  Did plaintiff prove by a fair preponderance of

18   the credible evidence that the following defendant

19   violated his Eighth Amendment rights by failing to

20   protect him from the use of excessive force, you will

21   answer that yes or no, and then the questionnaire

22   follows what I just went through with the other officer

23   on the excessive force claim.  So you decide what

24   questions to answer.

25           If you carefully follow the boldface

```
 1    instructions, it's a road map for you, which is why we
 2    give it to you.  It's to assist you in your
 3    deliberations and, remember, if you do get to the
 4    punitive damages question, you're only deciding a yes or
 5    no on that.  You're not filling in any amount and,
 6    again, it's entirely up to you as to how many questions
 7    you will answer on this verdict sheet and what your
 8    answers will be.
 9            And just to emphasize again, only one verdict
10    sheet signed by the foreperson should come back, that
11    will be given to my courtroom deputy, and that's how we
12    will announce the verdict.
13            I have now outlined the rules of law
14    applicable to this case and the processes by which you
15    should weigh the evidence and determine the facts.  In
16    just a few minutes, you will retire to the jury room for
17    your deliberations.  Your first order of business in
18    that jury room will be to elect a foreperson.  The
19    foreperson's responsibility is to ensure that
20    deliberations proceed in an orderly manner.  This does
21    not mean that the foreperson's vote is entitled to any
22    greater weight than the vote of any other juror.
23            When you are in the jury room, listen to each
24    other and discuss the evidence and the issues.  It's
25    your duty, each of you as jurors, to consult with one
```

TRANCHINA v McGRATH, et al. - 17-cv-1256

503

1     another.  You must deliberate with a view to reaching an

2     agreement but only if you can do so without violating

3     your individual judgment and conscience.

4             Your job as jurors is to reach a fair

5     conclusion from the law and the evidence.  The parties

6     and the Court are relying on you to give full and

7     conscientious consideration to the issue and the

8     evidence before you.

9             In order to return a verdict, it is necessary

10    that each juror agree.  Your verdict must be unanimous.

11    If in the course of your deliberations your

12    recollections on any part of the testimony should fail

13    or if you find yourself in doubt concerning these

14    instructions, it's your privilege to return to the

15    courtroom to have the testimony read back or to have my

16    instructions further explained.

17            I caution you, however, that the readback of

18    testimony may take some time and effort.  You should

19    therefore make a conscientious effort to resolve any

20    questions as to the testimony through your collective

21    recollections.  Should you desire to communicate with

22    the Court during your deliberations, please have your

23    foreperson put a message or a question in writing.  The

24    foreperson should sign the note and pass it to the court

25    security officer who will bring it to my attention.  I

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    will then respond, either in writing or orally, by

2    having all of you return to the courtroom.

3            During your deliberations, do not hesitate to

4    re-examine your views and change your mind.  Do not,

5    however, surrender your honest convictions because of

6    the opinion of a fellow juror or for the purpose of

7    returning a verdict.  Remember, you are not the

8    partizans, you are the judges, the judges of the facts.

9    Your duty is to seek the truth from the evidence

10   presented to you while holding the parties to their

11   burden of proof.

12           Once you have reached a unanimous verdict,

13   your foreperson should fill in the verdict form, date

14   and sign it, and inform the court security officer that

15   you have reached a verdict.

16           After the Court has received your verdict, you

17   may be asked some additional questions.  Are there any

18   issues from the plaintiff's perspective in terms of the

19   oral presentation of the charge?

20           MR. ROCHE:  No, your Honor.

21           THE COURT:  How about from Defendant McGrath?

22           MR. BLENK:  No, your Honor.

23           THE COURT:  From Defendant Barnaby?

24           MR. ABEL:  No, your Honor.

25           THE COURT:  Members of the jury, it's 10 of 5

1    and I know that you have been here since quite early

2    this morning.

3              So this is my plan.  I'm going to ask you to

4    be back here tomorrow morning at 9:00 A.M.  This evening

5    you should not be discussing this case with anyone.

6    Don't exchange phone numbers for the purpose of

7    discussing the case.  You have to deliberate all

8    together all the time.  So I think that due to the

9    lateness of the day, the best thing, as I said, to have

10   you report at 9:00 A.M.

11             We will have all of the evidence in the

12   courtroom for you.  You can't deliberate until everybody

13   is together.  If someone leaves the room to use a

14   restroom or to have a cigarette -- I don't know if any

15   of you are smokers -- the deliberations have to stop

16   until everybody is together.

17             Your first job tomorrow morning will be to

18   select a foreperson.  Okay?  After you select a

19   foreperson, you can begin your deliberations.  I want

20   you to know that tomorrow is a bit of a different day in

21   that when you go into the jury room, your mobile devices

22   will be collected.  You cannot have them in the jury

23   room with you while you are deliberating.

24             Also, please make sure you pack a lunch and

25   snacks because while you are deliberating, you will not

1    be going outside to get lunch.  Now, ordinarily we order

2    lunch for jurors but because of COVID restrictions, we

3    are not able to do that.  So, pack your lunch, pack your

4    beverages, pack your snacks.

5            I am going to have our alternate juror come

6    back tomorrow; however, Britney is going to bring you

7    into a separate room.  You will not be deliberating with

8    the eight.  However, I am going to have you remain just

9    in the event that something were to happen to one of our

10   eight jurors.  Okay?

11           So, before I excuse you, Britney, did you want

12   to say something?

13           (Pause in proceeding)

14           THE COURT:  Before I send the jury home for

15   the evening, is there anything that the plaintiff needs

16   to put on the record?

17           MR. ROCHE:  No, your Honor.

18           THE COURT:  Anything Defendant McGrath needs

19   to put on the record?

20           MR. BLENK:  No, your Honor.

21           THE COURT:  Defendant Barnaby?

22           MR. ABEL:  No, your Honor.

23           THE COURT:  Britney, do you want to swear in

24   our court officer please.

25           COURT CLERK:  Please state your name for the

 1   record.

 2               COURT OFFICER:  Joseph F. Graziane.

 3               (Court officer sworn)

 4               THE COURT:  Remember, folks, no discussion of

 5   this case amongst yourselves, no discussion with anyone

 6   else, don't do any research about this case.  Tomorrow

 7   morning when you are all together you will begin your

 8   discussions on the case and not before.

 9               Have a good night.  We will see you tomorrow

10   morning at 9 A.M.

11               (Jurors excused)

12               THE COURT:  Britney is just making sure that

13   the jurors are taken care of right now but she will be

14   in in a minute.  I want to make sure that she has your

15   mobile phone numbers.  Now, I'm not saying that you have

16   to be physically present in the courthouse at 9:00 A.M.,

17   but you need to be at least ten minutes away for us so

18   that if we need you, we can get you.

19               I always ask attorneys to give their mobile

20   numbers and they do, but then sometimes when we call,

21   you don't answer them.  If you get a call, you need to

22   answer.  It's not unusual at all for us to get early

23   questions or early requests for readback.  So just make

24   sure that you can get over here in about ten minutes.

25               And I will say that -- and I want this to be

1    on the record -- that all counsel, really, you all knew

2    this case forward and backward and it resulted in a

3    great economy of time and resources.  Although not all

4    of the evidence was stipulated to, it ended up that much

5    of it was and, in my view, you did your clients a great

6    service because if there's anything that will drive a

7    jury up a wall, it's hours of fighting about evidence

8    and so you did a service, and I certainly am grateful to

9    counsel for the way that the case was put in.  It was

10   put in very well.

11            I think that looking at what both sides did,

12   the witnesses that were necessary were called, the ones

13   that weren't were not called, but the bottom line is

14   that it was a well-tried case and I say this now because

15   after a verdict comes in, no one really hears this

16   because someone will leave here quite content and others

17   will leave less content and off the record for a moment.

18            (Discussion held off the record)

19            (Case adjourned until August 21, 2020)

20

21            * * * * * * * * * *

22

23

24

25


                    Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

```
 1                    (Proceeding held on August 21, 2020)
 2                    (Held out of presence of jury.)
 3              THE COURT:  The record should reflect that I
 4     am in open court with counsel and the clients; the jury
 5     is not present.
 6              At 12:35 I received a note from our foreperson
 7     as follows:  In regards to question to 1-C, should we be
 8     considering plaintiff's time in solitary to be included
 9     as injury he has suffered that was proximately caused by
10     defendants' alleged use of excessive force?  Also,
11     clarification on the term surrounding the date of
12     1/28/16.
13              Let me deal with the latter portion of that
14     question.  If you look at question 1-C of the verdict
15     sheet, it states:  What sum of money, in any, do you
16     find that plaintiff has proven by a fair ponderance of
17     the evidence would fairly compensate him for any injury
18     he has suffered that was proximately caused by
19     defendants' alleged use of excessive force surrounding
20     the January 28th, 2016, incident.
21              I'm going to tell the members of the jury that
22     the word "surrounding" simply means on or about.
23              Is there any objection to that from the
24     plaintiff?
25              MR. ROCHE:  No, your Honor.
```

1          THE COURT:  Any objection from Defendant
2   McGrath?

3          MR. MIRANDA:  No, your Honor.

4          THE COURT:  Any objection from Defendant
5   Barnaby?

6          MR. ABEL:  No, your Honor.

7          THE COURT:  On the first question, what is the
8   plaintiff's position?

9          MR. ROCHE:  Your Honor, I would submit that
10  the solitary confinement should be part of the damages
11  calculation.  It followed directly from the incident and
12  filing the false misbehavior report following the
13  incident.  So it's damages that flows directly from the
14  violation of his rights, and so it should be considered
15  by the jury as damages.

16         THE COURT:  What is the position of
17  Defendant McGrath?

18         MR. MIRANDA:  Your Honor, we would submit that
19  it should not be included.  In plaintiff's amended
20  complaint they had a Fourteenth Amendment claim that
21  related to, I think, certain deprivations of due process
22  that I think more appropriate cover some issue relating
23  to SHU time.  I think that question was -- pertains more
24  to the bodily harm that the plaintiff alleged -- alleges
25  that he suffered.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1          THE COURT:  And Defendant Barnaby, what's your

2     position?

3          MR. ABEL:  We would have the same position as

4     that that was just advanced by Attorney Miranda.

5          THE COURT:  I'm doing a little research but

6     here's the thing.  The due process claim was dismissed,

7     and I don't really want to try this case twice and the

8     thing is that when you look at the claims that remain,

9     excessive force and failure to intervene and you look at

10    the misbehavior report, at first review to me, they

11    don't seem to be related, and if there was a due process

12    claim, I could see very easily why I could answer that

13    question in the affirmative but I'm not certain I can.

14         I'm going to take 10 or 15 minutes to do a

15    little research.  If any of you come up with any case

16    law while I'm looking, feel free to give it to me but

17    I'm inclined to -- I mean, there are a couple of things

18    that I can do.  Instead of just saying no, I could say

19    that you could -- you must award damages proximately

20    caused by the claims and these are the claims:

21    excessive force and failure to intervene, and trust

22    the good sense of the jury because I think that they are

23    thinking the same thing that I just heard in this

24    courtroom.  How can the fact that, you know, he was put

25    in a SHU relate to excessive force, especially if they

TRANCHINA v McGRATH, et al. - 17-cv-1256

512

1   have looked at the misbehavior report, which I have

2   looked at.

3           So let me just do a little research.  I will

4   let you know precisely what I'm going to say before I

5   say it, and obviously if you have an exception to it,

6   you can put it on the record.

7           I'd like to be as correct as I can on this

8   because it's important, and I want to see if I can find

9   any case law.  Again, if you find any case law on it,

10  just let Britney know and I will take a look at it.

11  Thank you.

12          MR. ROCHE:  Thank you, your Honor.

13          (Pause in proceeding)

14          THE COURT:  Record should reflect that we are

15  in open court, outside the presence of the jury.

16          With respect to the jurors' questions

17  regarding whether they can consider the time that

18  plaintiff spent in SHU as an item of damages, I've given

19  all counsel a copy of a case entitled *Greenburger versus*

20  *Roundtree*, 2020 WL 4746460.

21          In reviewing that case, it seems clear to me

22  that that case is quite similar to the case that I'm

23  trying and the difference between that case and this

24  case is that there was a pending claim for a violation

25  of due process, and particularly there's language in

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

513

1    that case, on page 3, as follows:  As to Greenburger's

2    due process claim based on the time he spent in solitary

3    confinement, Judge Kay found that the viability of this

4    claim hinges on whether Greenburger's allegations

5    established that he possessed a protected liberty

6    interest.

7            The only issues in this case are excessive

8    force and failure to intervene.  The Second Circuit has

9    held that damages recoverable for loss of liberty for

10   the period spent in wrongful confinement are separable

11   from damages recoverable for such injuries as physical

12   harm, embarrassment, and emotional suffering from

13   *Kerman versus City of New York*, **374 F.3d 93**, that's

14   Second Circuit 2004.  Initially in the amended complaint

15   there was claim number two under the Fourteenth

16   Amendment; however, and I'm marking as Court Exhibit

17   number one --

18           COURT CLERK:  Judge, that would be number two.

19   I'm sorry.

20           THE COURT:  Court Exhibit number 2, a letter

21   dated March 23rd, 2020, from plaintiff's counsel

22   indicating that there's no opposition to dismissing that

23   second claim and the claim was dismissed.

24           In light of my review of the cases, Second

25   Circuit precedent, the second amended -- pardon me --

1    the amended complaint and the letter that I marked as

2    Court Exhibit 2, I am going to instruct the jurors as

3    follows:

4              In this case, there are two claims remaining,

5    excessive force as to the Defendants McGrath and

6    Barnaby, and failure to intervene as to Defendant

7    Barnaby.  As I previously instructed you, the prevailing

8    plaintiff is entitled to compensatory damages for the

9    physical injury, pain and suffering, mental anguish,

10   shock and discomfort that he has suffered because of the

11   defendants' conduct.

12             Because there is no claim specific to the

13   plaintiff's time spent in the special housing unit, you

14   should not consider that time when determining an

15   amount, if any, of compensatory damages that plaintiff

16   is entitled to.  Rather, an award of compensatory

17   damages must be determined only when considering the

18   physical injury, pain and suffering, mental anguish,

19   shock and discomfort that plaintiff suffered as a result

20   of the alleged use of excessive force.

21             Does counsel for the plaintiff want to respond

22   in any way?

23             MR. ROCHE:  Yes, your Honor.  I have read the

24   case that you provided, the *Roundtree* case, and I would

25   submit that it doesn't address a question of -- the

```
1   question of causal connection between an Eighth
2   Amendment violation and the damages from time in
3   solitary confinement.  It said that -- it just addresses
4   the fact that it was -- that such damages would be
5   allowed under Fourteenth Amendment claim but didn't say
6   that it could not be considered on an Eighth Amendment
7   claim.
8            So I would submit that just in the context of
9   the facts of this case, where a corrections officer
10  assaults an inmate and in the course of the same
11  incident alleges that the inmate had assaulted the
12  officer and had planted a weapon on him.  It's entirely
13  foreseeable for the corrections officer and that this
14  inmate would suffer consequences such as time, you know,
15  a lot of time in SHU.  It's actually an inevitability
16  for such a circumstance and the corrections officer
17  should totally -- should totally know that.
18           So it is foreseeable and because of that,
19  should be considered proximate cause of the incident
20  that's alleged in this case.
21           THE COURT:  I understand your argument but
22  excessive force in this case is not what landed the
23  plaintiff in the special housing unit, and I do think it
24  goes to a due process liberty claim.  So I note your
25  exception.
```

Case 9:17-cv-01256-MAD-ML   Document 167   Filed 03/22/21   Page 248 of 259
TRANCHINA v McGRATH, et al. - 17-cv-1256
516

1          Is there anything that the defense for McGrath

2    wants to put on the record about that?

3          MR. MIRANDA:  Your Honor, we would just agree

4    that the case presented as Court Exhibit 2 factually is

5    analogous to the current situation, that there is no

6    pending Fourteenth Amendment claim, and that law in the

7    Second Circuit is such that time spent in SHU should not

8    be considered for damages, if any, that the jury may

9    award.

10          THE COURT:  All right.  Defendant Barnaby?

11          MR. ABEL:  No.  Once again, we will join with

12    the same points made just the now by Attorney Miranda.

13          THE COURT:  All right.  And I will also tell

14    the jurors that that word "surrounding" in question 1-C

15    simply means on or about.

16          MR. ROCHE:  Your Honor, if I may, I would just

17    ask that an instruction be given to the jury that even

18    though you are instructing them that they can't consider

19    the SHU time in the compensatory damages, that it is

20    something that could be considered for punitive damages.

21          THE COURT:  The time in SHU?

22          MR. ROCHE:  Yes.

23          THE COURT:  I don't think it flows that it

24    can.

25          MR. ROCHE:  It goes to the conduct of the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    officers.  It's entirely foreseeable for them.  They

2    know that if -- if they assault an inmate and claim that

3    the inmate had, in fact, assaulted them, they know that

4    the person -- the inmate is going to do time in SHU.  So

5    I would submit that's entirely appropriate that they

6    should be subject to punishment for that because it's

7    all inextricably interlinked and it -- it's -- they

8    know -- they're intentionally causing not just the

9    physical and emotional injuries to the inmate, but also

10   the confinement to SHU for an extensive period of time.

11          THE COURT:  I think that would render me an

12   inconsistent verdict.  So I'm going to note your

13   exception but I am not going to charge that they can

14   consider SHU for punitive damages.

15          Just for clarification, I didn't mark the case

16   as a Court exhibit.  I marked a letter dated March 23rd,

17   2020, as Court Exhibit 2.  Let's get the jury, please.

18          (Jurors enter courtroom, 1:38 P.M.)

19          THE COURT:  The record should reflect that we

20   are in open court.  The jury is present and accounted

21   for, all counsel and litigants are also present.

22          I received a note from our foreperson at

23   approximately 12:35 P.M., which has been marked as Court

24   Exhibit 1, it's states as follows:

25          In regards to question 1-C, should we

                 Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

1    considering plaintiff's time in solitary to be included

2    as injury he has suffered that was proximately caused by

3    defendants' alleged use of excessive force.  Also,

4    clarification on term "surrounding" the date of 1/28/16.

5            Let me begin with the latter portion of that

6    question.  Question 1-C says:  What sum of money, if

7    any, do you find that plaintiff has proven by a fair

8    preponderance of the evidence would fairly compensate

9    him for any injury he has suffered that was proximately

10   caused by defendant or defendants' alleged use of

11   excessive force surrounding the January 28th, 2016,

12   incident?

13           By the word "surrounding," the Court meant on

14   or about.  That's all.  On or about January 28th.

15           With respect to the remainder of the question,

16   in this case, there are two claims remaining:  excessive

17   force as to Defendants McGrath and Barnaby, and failure

18   to intervene as to Defendant Barnaby.

19           As I previously instructed you, a prevailing

20   plaintiff is entitled to compensatory damages for the

21   physical injury, pain and suffering, mental anguish,

22   shock and discomfort that he has suffered because of the

23   defendants' conduct.  Because there is no claims

24   specific to the plaintiff's time spent in the special

25   housing unit, you should not consider that when

TRANCHINA v McGRATH, et al. - 17-cv-1256

519

1    determining the amount, if any, of compensatory damages

2    that plaintiff is entitled to.

3              Rather, any award of compensatory damages must

4    be determined only by considering the physical injury,

5    pain and suffering, mental anguish, shock and discomfort

6    that plaintiff suffered as a result of the alleged use

7    of excessive force.

8              Would anyone like me to repeat that?  Okay.

9    Thank you, members of the jury.  You may return to the

10   jury room and continue your deliberations.

11             (Jurors excused, 1:42 P.M.)

12             (Return to courtroom, 2:25 P.M.)

13             THE COURT:  The record should reflect that we

14   are in open court, outside the presence of the jury, and

15   that I received a note from our foreperson at 2:00 P.M.

16   dated today's date, August 21st, it's been marked as

17   jury note number 2 and the note says:  We have reached a

18   verdict.

19             Britney, could we get the jury, please.

20             (Jurors enter courtroom)

21             THE COURT:  Record should reflect that I have

22   received a note from our jury foreperson at 2:00 P.M.

23   for today's date.  That note has been marketed as Jury

24   Note Number 2 and the note says:  We have reached a

25   verdict.  The jury is present and accounted for, all

TRANCHINA v McGRATH, et al. - 17-cv-1256

 1     counsel and parties are present.

 2             Before I have the verdict announced, I just

 3     want to say to the jurors and to our alternate juror who

 4     is here that I know how difficult it is to be a juror in

 5     everyday life.  I, myself, have been called for jury

 6     duty but to be a juror when we're operating under COVID

 7     precautions is really something else.

 8             Honestly, when we planned to try this case, I

 9     wasn't sure how many jurors would answer the call, and I

10     thought that many jurors would say, no, we're not

11     coming, you know, we have great concerns and, you know,

12     as a court we try to do everything that we could to keep

13     everyone safe.  Your service has been extraordinary, in

14     my view, and as I said on day one, without people like

15     you, we have no justice system.  You've seen it play out

16     now.  Two sides, actually tree sides, very different

17     views, very different positions and we put the case in

18     your hands.

19             Without you, no trial, no justice system, and

20     after I discharge you from your service, I'm just going

21     to ask you to stay in the jury room for five minutes so

22     I can come in and thank you personally, and I will do

23     that, but on behalf of everyone associated with the

24     Northern District of New York, I can't thank you enough

25     for serving.  Britney, would you get verdict sheet for

                   Lisa L. Tennyson, CSR, RMR, FCRR
                   UNITED STATES DISTRICT COURT - NDNY

1   me, please.

2                (Pause in proceeding)

3                THE COURT:  Britney, would you please take the

4   verdict.

5                COURT CLERK:  Yes, Judge.  Would the

6   foreperson of the jury please stand.

7                As I read each question, please indicate the

8   jury's answer to the question.  In the case of

9   Joseph Tranchina versus CO Justin McGrath, Bare Hill

10  Correctional Facility, formerly known as Jeremy McGrath,

11  and Sergeant Matthew Barnaby, Bare Hill Correctional

12  Facility, also known as John Barnaby, case number

13  17-cv-1256.

14               Question 1-A:  Did plaintiff prove by a fair

15  preponderance of the credible evidence that on

16  January 28th, 2016, any of the defendants used excessive

17  force against him, in violation of the Eighth Amendment

18  of the United States Constitution?  As to Defendant

19  McGrath, how do you find?

20               JUROR:  Yes.

21               COURT CLERK:  Was this answer unanimous?

22               JUROR:  Yes.

23               COURT CLERK:  As to Defendant Matthew Barnaby,

24  how do you find?

25               JUROR:  No.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

```
 1              COURT CLERK:  Was this answer unanimous?
 2              JUROR:  Yes.
 3              COURT CLERK:  Question 1-B, did plaintiff
 4    prove by a fair preponderance of the credible evidence
 5    that the use of excessive force on January 28th, 2016,
 6    by any defendants proximately caused an injury to the
 7    plaintiff?  As to Defendant Jeremy McGrath, how do you
 8    find?
 9              JUROR:  Yes.
10              COURT CLERK:  Was this answer unanimous?
11              JUROR:  Yes.
12              COURT CLERK:  As to defendant -- question 1-C,
13    what sum of money, if any, do you find that plaintiff
14    has proven by a fair preponderance of the evidence would
15    fairly compensate him for any injury he has suffered
16    that was proximately caused by defendants' alleged use
17    of excessive force surrounding the January 28th, 2016,
18    incident?  As to Defendant Jeremy McGrath, how do you
19    find?
20              JUROR:  $190,000.
21              COURT CLERK:  Was this answer unanimous?
22              JUROR:  Yes.
23              THE COURT:  Go on to the excessive force
24    claim.
25              COURT CLERK:  Okay.
```

1              THE COURT:  And failure to intervene.

2              COURT CLERK:  1-E, did plaintiff establish by

3      a fair preponderance of the evidence that the defendant

4      for whom you answered yes to both questions 1-A and 1-B

5      was motivated by evil motive or intent or by reckless

6      indifference to plaintiff's constitutional rights such

7      that punitive damages should be assessed against the

8      defendant?  As to Defendant McGrath, how do you find?

9              JUROR:  Yes.

10             COURT CLERK:  Was this answer unanimous?

11             JUROR:  Yes.

12             COURT CLERK:  Question 2-A, did plaintiff

13     prove by a fair preponderance of the credible evidence

14     that the following defendant violated his Eighth

15     Amendment rights by failing to protect him from the use

16     of excessive force on January 28th, 2016?  As to

17     Defendant Matthew Barnaby, how do you find?

18             JUROR:  No.

19             COURT CLERK:  Was this answer unanimous?

20             JUROR:  Yes.

21             COURT CLERK:  Thank you.

22             THE COURT:  Britney, would you get that

23     verdict sheet, please.

24             Members of the jury, before I thank you again,

25     let me ask, does either side request that the jury be

1    polled?

2              MR. ROCHE:  No, your Honor.

3              MR. BLENK:  No, your Honor.

4              MR. ABEL:  No, your Honor.

5              THE COURT:  All right.  Members of the jury, I

6    want to thank you again.  Your services on this portion

7    of the trial are concluded, and on the liability portion

8    of the case, you are discharged as jurors; however, at

9    some point in the future, at least a month away, there

10   is going to be a hearing on the amount of punitive

11   damages that should be awarded.  That's a separate

12   proceeding from this proceeding and my courtroom deputy

13   will get your contact information.  That's not something

14   that's going to happen right away, and we will give you

15   advanced notice of a hearing in order for you to assess

16   what you consider to be the appropriate amount of

17   punitive damages.

18             So if you would just kindly go to the jury

19   room just for a few minutes and I'll be right in to

20   thank you personally.

21             (Jurors excused)

22             THE COURT:  Be seated, please.  Pursuant to

23   Rule 50(b) of the Federal Rules of Civil Procedure, a

24   renewed motion for judgment as a matter of law must be

25   filed no later than 28 days after entry of judgment.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

1          Pursuant to Rule 59(b) of the Federal Rules of

2   Civil Procedure, a motion for a new trial must be served

3   no later than 28 days after entry of judgment.

4          Pursuant to Appellate Rule 4 of the Federal

5   Rules of Appellate Procedure, the notice of appeal must

6   be filed with the district clerk within 30 days after

7   the entry of judgment appealed from and post-judgment

8   interest will run from the date that judgment is

9   entered.

10          Counsel, my office will be in touch in terms

11   of scheduling a hearing on punitive damages.  It isn't

12   something that I'm going to do immediately.  We will

13   propose some dates.  We will ascertain if those dates

14   work for you, we will be in contact with the jury, and

15   we will proceed in that fashion.

16          [Juror 01-0070], thank you again so much for

17   your participation.  It's not uncommon that we will lose

18   a juror under ordinary circumstances but we were

19   fortunate enough not to lose a juror, and I thank you

20   for being willing to serve, especially as an alternate,

21   and you're certainly free to leave at any time that you

22   would like to.

23          Is there anything further from plaintiff's

24   counsel at this time?

25          MR. ROCHE:  No, your Honor.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

526

1           THE COURT:  Is there anything further from

2    Defendant McGrath?

3           MR. MIRANDA:  No, your Honor.

4           THE COURT:  Anything further from Defendant

5    Barnaby?

6           MR. ABEL:  No, your Honor.

7           THE COURT:  Okay.  Court stands adjourned.

8    Thank you.

9           (Proceeding concluded)

10              * * * * * * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

**C E R T I F I C A T I O N**


        I, Lisa L. Tennyson, RMR, CSR, CRR, Federal

Official Realtime Court Reporter, in and for the United

States District Court for the Northern District of New

York, do hereby certify that pursuant to Section 753,

Title 28, United States Code, that the foregoing is a

true and correct transcript of the stenographically

reported proceedings held in the above-entitled matter

and that the transcript page format is in conformance

with the regulations of the Judicial Conference of the

United States.


                    _____

                    Lisa L. Tennyson, RMR, RPR, FCRR


                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY